**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| RICHARD G. TATUM, individually and on behalf of a class of all other persons similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **AND ORDER** |
| | ) | |
| R.J. REYNOLDS TOBACCO COMPANY; R.J. REYNOLDS TOBACCO HOLDINGS, INC.; THE R.J.R. EMPLOYEE BENEFITS COMMITTEE OF THE R.J. REYNOLDS TOBACCO COMPANY CAPITAL INVESTMENT PLAN; THE R.J.R. PENSION INVESTMENT COMMITTEE OF THE R.J. REYNOLDS TOBACCO COMPANY CAPITAL INVESTMENT PLAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) | 1:02CV373 |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Plaintiff's Motion to Compel Production of

Documents (docket no. 107) filed October 22, 2007.  Defendants have responded

in opposition to the motion, and the matter was referred to the undersigned on

January 3, 2008.  In this posture, the matter is ripe for disposition.  For the reasons

set forth below, Plaintiff's motion to compel is granted in part and denied in part.

**Background**

This case arises out of an employee's challenge to the elimination of two stocks as options in the employer's 401(k) plan.[1]  RJR Nabisco Holdings Corp. ("RJR Nabisco"), parent company of the R.J. Reynolds tobacco companies ("RJR Tobacco") and the Nabisco food companies, spun off RJR Tobacco in 1999.  As an employee of RJR Tobacco, Plaintiff Richard G. Tatum ("Plaintiff") had participated in RJR Nabisco's original retirement plan and invested in two Nabisco stock funds that were among the original retirement plan's investment options.  As part of RJR Nabisco's separation of businesses, it was determined that the original retirement plan would be divided into two separate plans, one for RJR Tobacco employees and one for Nabisco employees.  In or about June 1999, the original plan was amended to create the R.J. Reynolds Tobacco Company Capital Investment Plan (the "Plan"), and participation in the Plan was limited to RJR Tobacco employees.  Plaintiff thus became a participant in the Plan.  The amended Plan included a section listing available investment options and freezing the Nabisco stock funds, prohibiting further contributions into those funds.

At about the time of the Plan amendment in mid-June 1999, RJR Tobacco informed Plan participants that the Nabisco funds would remain frozen and then would be eliminated approximately six months after the spin-off.  The Plan was

_____

[1]  This represents a summary of the background as it is relevant to the present discovery dispute.  For a more complete description of the factual allegations leading to the lawsuit, see *Tatum v. R.J. Reynolds Tobacco Co.*, 392 F.3d 636, 637–39 (4th Cir. 2004), and *Tatum v. R.J. Reynolds Tobacco Co.*, No. 1:02CV00373, 2007 WL 1612580, at *1–3 (M.D.N.C. May 31, 2007).

amended again in November 1999, to be effective February 1, 2000, eliminating the Nabisco stock funds from the list of investment options. On or about January 31, 2000, the Plan sold all shares of the Nabisco stocks at a substantial loss, despite the fact that the share prices were at an all-time low. Following the sale, the Nabisco stocks' value rebounded sharply.

Nearly a year after the sale, on January 10, 2001, Plaintiff met with RJR Tobacco Manager of Benefits Compliance Jennie Beasley to complain about the sale of the funds, and said that he had retained a lawyer and was considering a class action lawsuit. (Aff. of Jennie B. Beasley ¶ 2, Ex. A.) Beasley told Plaintiff to submit a claim for benefits. (*Id.*) Plaintiff's subsequent letter to the RJR Employee Benefits Committee, dated March 22, 2001, asserted the Plan fiduciaries "did not act '*prudently and in the interest of Plan participants and beneficiaries*' as prescribed by ERISA law in this divestiture." (Further Aff. of McDara P. Folan, III ("Folan Aff."), Ex. A (emphasis in original).) In a second letter, dated May 1, 2001, Plaintiff made a formal claim for benefits and stated that if his claim was denied, he requested, *inter alia*, the names of the members of the RJR Employee Benefits Committee, copies of Committee meeting minutes where the stock divestiture was discussed, and opinions of counsel related to the divestiture. (Folan Aff., Ex. B.) After Plaintiff's benefits claim was denied and the appeals process exhausted, Plaintiff filed suit on May 13, 2002, alleging that Defendants breached their fiduciary duties under the Employee Retirement Income Security Act (ERISA) of 1974, 29 U.S.C. § 1104(a)(1),

3

by failing to reconsider and investigate the decision to eliminate the Nabisco stock funds from the Plan.

On February 14, 2006, Plaintiff served his first set of interrogatories and document requests. On March 28, 2006, Defendants served their Privilege Log listing eighteen documents or portions of documents for which Defendants asserted the protections of attorney-client privilege and/or the work product doctrine. Defendants subsequently produced or offered to produce some of the Privilege Log documents with the agreement that disclosure did not constitute a waiver of any applicable privilege, but Documents 4, 6, and 12–18 remained in dispute. On October 22, 2007, Plaintiff filed his Motion to Compel, seeking production of the remaining disputed documents on the Privilege Log. On that same date, before Plaintiff's motion was filed, Defendants served an amended Privilege Log which included the original Documents 4, 6, and 12–18, plus thirteen additional documents, numbered 19–31. Defendants refer to all twenty-two of the amended Privilege Log documents in their brief in opposition to the motion to compel (docket no. 113), as does Plaintiff in his reply brief (docket no. 127).[2] Neither party, however, directly addresses Documents 20, 21, and 22 in their briefs. Therefore the court will limit its

---

[2] Although Plaintiff has certified that the parties met and conferred pursuant to Local Rule 37.1(a) with regard to Documents 4, 6, and 12–18 prior to Plaintiff filing his Motion to Compel, it is unclear whether the parties have met and conferred as of yet with regard to the thirteen additional documents on Defendants' amended Privilege Log. Nonetheless, because the parties have not been able to reach an accord with regard to Documents 4, 6, and 12–18, and because the additional documents implicate the same issues, the court will address the additional documents in the interests of judicial economy.

4

discussion to the nineteen documents listed on Defendants' amended Privilege Log, dated October 22, 2007, which are directly addressed by the parties: Documents 4, 6, 12–19, and 23–31.

Defendants invoke the attorney-client privilege and the work product doctrine as protections for the nineteen documents at issue on the amended Privilege Log. Defendants claim that sixteen of the documents at issue are, in whole or in part, privileged communications between Defendants and its attorneys, that fourteen of those sixteen are independently protected by the work product doctrine, and that three more documents on the Privilege Log are protected solely by the work product doctrine. Plaintiff challenges Defendants' withholding of the documents, arguing that the attorney-client privilege is subject to an exception in this context rendering the communications unprivileged as against Plaintiff, and that none of the disputed documents constitute work product. On January 16, 2008, Defendants provided the court with copies of the disputed documents, including unredacted as well as redacted versions where applicable, for this court's *in camera* review.

## Discussion

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that:

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons have knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in this action. Relevant information need not be

admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

The rules of discovery are to be accorded broad and liberal construction. *See Herbert v. Lando*, 441 U.S. 153, 177 (1979); *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Under Rule 37, "[a] party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling disclosure or discovery." FED. R. CIV. P. 37(a). Whether to grant or deny a motion to compel is generally left within the district court's broad discretion. *See, e.g.*, *Lone Star Steakhouse & Saloon Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995) (denial of motions to compel reviewed on appeal for abuse of discretion). In cases such as this, however, where attorney-client privilege is raised in objection to a discovery request, the Fourth Circuit has stated that "[w]e review the district court's decision that certain documents are subject to privilege *de novo*, since it involves a mixed question of law and fact." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999); *see also Sandberg v. Va. Bankshares, Inc.*, 979 F.2d 332, 349–50 (4th Cir. 1992) (reviewing *de novo* the district court's denial of motion to compel based on attorney-client privilege).[3]

---

[3] The Fourth Circuit vacated the *Sandberg* decision at the unopposed request of one of the parties. *See Sandberg v. Va. Bankshares, Inc.*, Nos. 91-1873(L), CA-88-299-A, 91-1874, CA-88-1020-A, 1993 WL 524680 (4th Cir. Apr. 7, 1993). Vacated opinions may be cited for precedential effect when they have been validated by the court of appeals. *See Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 459 (4th Cir. 1988). The Fourth Circuit has cited *Sandberg* numerous times. *See Davis Vision, Inc. v. Md. Optometric Ass'n*, 187 Fed. App'x 299, 302 (4th Cir. 2006); *Can. Life Assurance Co. v. Estate of Lebowitz*, 185 F.3d 231, 239 (4th Cir. 1999); *In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 353 (4th Cir. 1994); *United*

6

## A.  **Attorney-Client Privilege**

The attorney-client privilege is the oldest of the recognized privileges for confidential communications, and is intended to encourage "full and frank communication between attorneys and their clients" who may find themselves in actual or potential legal disputes.  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  Where the privilege applies, attorney-client confidential communications are afforded "absolute and complete protection from disclosure."  *In re Allen*, 106 F.3d 582, 600 (4th Cir. 1997); *see also Trammel v. United States*, 445 U.S. 40, 50 (1980); *In re Grand Jury Subpoena*, 204 F.3d 516, 519–20 (4th Cir. 2000).  This protection applies to communications between a corporate party and its in-house counsel as well as to communications with a privately retained attorney.  *See Upjohn*, 449 U.S. at 389–90.  The privilege also applies not only to documents authored by an attorney, but also to information and queries submitted to the attorney by the client to enable the attorney to give sound and informed advice.  *Id.* at 390; *Allen*, 106 F.3d at 601.

The privilege is not, however, an absolute one.  Because "the attorney-client privilege interferes with the truthseeking mission of the legal process, . . . [it] is not favored by federal courts" and is to be strictly construed.  *United States v. Aramony*, 88 F.3d 1369, 1389 (4th Cir. 1996) (internal citations and quotation marks omitted).

---

*States v. Mitchell*, No. 94-5331, 1994 WL 717605, at *2 (4th Cir. Dec. 29, 1994) (unpublished); *Horne v. Owens-Corning Fiberglas Corp.*, 4 F.3d 276, 280 (4th Cir. 1993). This court therefore treats *Sandberg* as authority for this decision.

A party asserting the attorney-client privilege must demonstrate its applicability to the communications at issue. *Allen*, 106 F.3d at 600.

In this case, Defendants assert that attorney-client privilege protects all or redacted portions of sixteen of the documents at issue. Plaintiff does not challenge the existence of the attorney-client relationship or that the communications at issue are of a type that would generally come within the scope of the attorney-client privilege. Rather, Plaintiff argues that these documents are subject to a fiduciary exception to the privilege and therefore Plaintiff is entitled to obtain the documents. As an initial matter, before considering the particular documents at issue, the court has determined that in this context there is good reason to recognize the existence of a fiduciary exception.

### *The Fiduciary Exception and Its Limitations*

A fiduciary exception to the attorney-client privilege has become "well established in federal jurisprudence" of some circuits. *Geissal v. Moore Med. Corp.*, 192 F.R.D. 620, 624 (E.D. Mo. 2000); *see, e.g.*, *United States v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999); *In re Long Island Lighting Co.*, 129 F.3d 268, 271–72 (2d Cir. 1997); *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992); *Fausek v. White*, 965 F.2d 126, 132–33 (6th Cir. 1992); *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103–04 (5th Cir. 1970); *Wash.-Balt. Newspaper Guild, Local 35 v. Wash. Star Co.*, 543 F. Supp. 906, 909 (D.D.C. 1982). The fiduciary exception is rooted in English trust law, and has been applied in numerous contexts. *Mett*, 178 F.3d at

8

1063.  In the context of ERISA, courts have found that an ERISA plan fiduciary generally may not assert the attorney-client privilege against plan participants with regard to matters of plan administration.  *See, e.g.*, *Mett*, 178 F.3d at 1063; *Long Island Lighting*, 129 F.3d at 271–72; *Geissal*, 192 F.R.D. at 624; *Wash. Star*, 543 F. Supp. at 909.

There are two rationales behind the fiduciary exception in the ERISA context. Some courts have held that a fiduciary that administers an ERISA plan for the benefit of the beneficiaries must disclose to plan beneficiaries all information regarding plan administration.  *See, e.g.*, *Mett*, 178 F.3d at 1063; *Long Island Lighting*, 129 F.3d at 271–72.  Other courts have focused on the ERISA fiduciary's role as representative of the beneficiaries, and have held that the beneficiaries, not the fiduciary, are the real clients of the attorney who provides the fiduciary with legal advice for the administration of the plan.  *See, e.g.*, *Mett*, 178 F.3d at 1063; *Wildbur*, 974 F.2d at 645.

Under either theory, courts have limited the fiduciary exception, recognizing that "not all acts of the plan administrator which relate to the plan involve the administration of the plan."  *Geissal*, 192 F.R.D. at 624 (internal quotation marks omitted).  The plan administrator may assert attorney-client privilege as to communications between the administrator and its attorneys on non-fiduciary matters, such as when the communications relate to plan sponsor or "settlor" functions of adopting, amending, or terminating an ERISA plan, and not to fiduciary

9

functions of managing or administering the plan.  *See, e.g.*, *Wachtel v. Health Net, Inc.*, 482 F.3d 225, 233 (3[d] Cir. 2007); *Long Island Lighting*, 129 F.3d at 271*; Hudson v. Gen. Dynamics Corp.*, 73 F. Supp. 2d 201, 202 (D. Conn. 1999).  Courts have also found that when a plan fiduciary retains counsel and seeks legal advice for his or her own protection against plan beneficiaries, the "legal fiction of 'trustee as representative of the beneficiaries' is dispelled, notwithstanding the fact that the legal advice may relate to the trustee's administration of the trust."  *Mett*, 178 F.3d at 1065.  In these situations, the fiduciary's interests diverge from that of the beneficiaries so as to render the fiduciary exception inapplicable and protect the plan administrator's interest in the attorney-client privilege.  *See id.* at 1063; *Geissal*, 192 F.R.D. at 624–25.

Although two of our sister district courts have recognized a fiduciary exception to the attorney-client privilege in the ERISA context, *see Vaughan v. Celanese Ams. Corp.*, No. 3:06CV104-W, 2006 WL 3592538 (W.D.N.C. Dec. 11, 2006); *Coffman v. Metro. Life Ins. Co.*, 204 F.R.D. 296 (S.D. W. Va. 2001), as Defendants point out, neither the Fourth Circuit nor this court has previously recognized a fiduciary exception in this context.  Nonetheless, in *Sandberg v. Virginia Bankshares, Inc.*, 979 F.2d 332 (4th Cir. 1992), the Fourth Circuit recognized an exception to the attorney-client privilege in the context of a shareholder action, and this court finds its reasoning to be instructive.

10

In *Sandberg*, minority shareholders of First American Bank (Bank) brought an action to enjoin the proposed merger of the Bank with its majority shareholder, Virginia Bankshares (Bankshares). 979 F.2d at 348. The district court denied the plaintiffs' motion to compel responses to deposition questions and production of documents related to a meeting, held after the suit was filed between representatives of the Bank and Bankshares and the litigation counsel for each, which was purportedly held for the purpose of reviewing litigation strategies for the lawsuit and to review the proposed merger prior to the shareholders' meeting. *Id.* at 348–49. The district court found the communications protected by the attorney-client privilege. *Id.* On appeal, the Fourth Circuit assumed that the discussions at the meeting were sufficient to invoke attorney-client privilege, and applied the exception articulated by the Fifth Circuit in *Garner v. Wolfinbarger*, 430 F.2d at 1103–04, to hold that the Bank could not assert the privilege against its shareholders in that case. *Sandberg*, 919 F.2d at 350–54 (adopting *Garner* holding and rationale, and applying the *Garner* factors to find the shareholders showed good cause why they should have access to the communications at issue).

The rationale for the *Garner* exception as adopted in *Sandberg* is that because the officers and directors of a corporation owe fiduciary duties to the shareholders, they must exercise the attorney-client privilege "in a manner consistent with their fiduciary duty." *Sandberg*, 919 F.2d at 351. A conflict arises when the officers or directors seek to withhold information sought by shareholders, because:

11

> [T]he shareholders are the persons for whose benefit the officers and directors are acting. In such a circumstance, we must balance the corporate management's need to manage, and concomitant ability to seek legal counsel, against the interests of the shareholders for whom they are ultimately acting.

*Id.* Minority shareholder status does not automatically entitle shareholders to obtain corporate information, nor prevent the corporation from communicating confidentially with its attorneys, but where the shareholders allege that the officers or directors have acted adversely to the shareholders' interests, then the shareholders may show "good cause" to prevent the officers from asserting attorney-client privilege against them. *Id.*

Thus the Fourth Circuit adopted and applied the *Garner* exception to the attorney-client privilege as a means of balancing the very competing policy interests identified by the parties in the present dispute: the fiduciary's need for confidential communications with its attorneys, and the interests of the beneficiaries of the fiduciary relationship. The *Garner* analysis finds its roots in the common law of trust relationships, but it does not create a blanket exception to the attorney-client privilege in the shareholder context; instead, it examines a number of factors to determine whether there is good cause to prevent a fiduciary from asserting attorney-client privilege against the beneficiaries of the fiduciary relationship.[4] In

---

[4] The *Garner* court identified nine nonexclusive factors, none of which is singly determinative or required: "the number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the

12

*Sandberg*, the Fourth Circuit applied the *Garner* analysis and determined that "the attorney/client privilege should not be used to shield the communications at the . . . meeting from discovery by the very persons for whom the meeting participants were acting as fiduciaries." *Id.* at 354. Moreover, the court did not restrict application of the *Garner* analysis to the fiduciary relationship in the shareholder context. *See Fortson v. Winstead, McGuire, Sechrest & Minick*, 961 F.2d 469, 475–76 n.5 (4th Cir. 1992) (advocating *Garner* analysis in the context of the fiduciary relationship between general partners and limited partners).

The Fourth Circuit's application of the *Garner* analysis appears to be suited to the ERISA context as well, where the ERISA plan fiduciary is acting in its fiduciary role. Some courts applying *Garner* to the ERISA context have rejected the requirement that the beneficiary of the fiduciary relationship must show good cause to prevent exercise of the attorney-client privilege, noting that unlike the shareholder context, the ERISA plan administrator as a trustee is obligated to serve directly the interests of the plan beneficiaries and therefore has no legitimate need to shield communications from the beneficiaries. *See, e.g., Wash. Star*, 543 F. Supp. at 909

---

shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons." *Garner*, 430 F.2d at 1104. In *Sandberg*, the Fourth Circuit examined all nine factors as well as additional considerations particular to the circumstances which favored finding good cause to abrogate the attorney-client privilege. 979 F.2d at 351–54.

13

n.5. Nevertheless, courts have limited the fiduciary exception as discussed *supra*, by permitting assertion of attorney-client privilege where the communications between the plan administrator and its attorneys relate to non-fiduciary matters such as plan settlor functions or legal advice for the plan administrator's personal protection against plan beneficiaries. Thus, even in the absence of the *Garner* good cause analysis, courts examine "the context and content" of the disputed communications to determine whether there is reason to apply the fiduciary exception and abrogate the attorney-client privilege in the circumstances. *Mett*, 178 F.3d at 1064.

In light of the Fourth Circuit's adoption of the *Garner* good cause analysis permitting the abrogation of the attorney-client privilege in a fiduciary relationship where the circumstances warrant such, as well as the weight of case law recognizing the application of a fiduciary exception to the ERISA context, this court considers it appropriate to recognize the existence of a fiduciary exception where an ERISA plan administrator asserts attorney-client privilege to withhold from plan beneficiaries communications related to matters on which a fiduciary duty is owed to the beneficiaries. The application of the exception to any particular communication is a matter of context and content, and includes consideration of whether the communication is related to fiduciary functions of managing or administering the plan, or to settlor functions of adopting or amending the plan, or to legal advice to

14

protect the plan administrator from personal liability where the administrator's interests are adversarial to those of the plan beneficiaries.

With these principles in mind, the court turns to the sixteen disputed documents on Defendants' amended Privilege Log for which Defendants have asserted attorney-client privilege either in whole or in part: Documents 4, 6, 12, 13, 16–19, 23, and 25–31.[5] Upon conducting an *in camera* review of the documents and considering the affidavits and exhibits submitted by the parties, the court is satisfied that these sixteen documents reflect legal advice and communication between client and counsel, and are of a type that would generally come within the scope of the attorney-client privilege. Plaintiff argues that these documents are subject to the fiduciary exception if they relate to matters of plan administration, and that the Privilege Log descriptions are insufficient to determine whether the documents are related to non-fiduciary matters and therefore privileged.

*Documents Claimed to Contain Legal Advice Relating to Plan Settlor Functions*

Defendants assert that five of the disputed documents—Documents 4, 6, 12, 16, and 19—contain communications seeking or reflecting legal advice relating to plan settlor functions rather than fiduciary functions. A decision about whether and how to amend the plan is a settlor function. *See Varity Corp. v. Howe*, 516 U.S. 489,

---

[5]  As noted, notwithstanding Defendants' assertion of attorney-client privilege as well as work product protection for Documents 20, 21, and 22 on the amended Privilege Log, because neither party has directed arguments to these particular documents, the court will not address these three documents in this Order.

504, 530 (1996).  Fiduciary functions include matters of plan management and administration, such as discretionary decisions regarding investment or liquidation of plan assets, *see Tatum*, 392 F.3d at 640, communications to plan beneficiaries, *see Varity*, 516 U.S. at 504, and plan benefits claim and review, *see Geissal*, 192 F.R.D. at 624–25.  Plaintiff asserts that these documents contain legal advice regarding the decision to freeze and sell the stock funds, or regarding communications to beneficiaries, or regarding Plaintiff's administrative claim and review process.  Defendants argue that all or redacted portions of these five documents relate to plan amendments and, as such, are privileged.

Document 4, dated March 19, 1999, is a memorandum from outside counsel to RJR Nabisco's in-house counsel.  Upon review, the court finds that the document reflects legal advice regarding adoption of Plan amendments and the new Plan document, and not, as Plaintiff contends, legal advice regarding the discretionary decision to sell the stock funds.

Document 12 consists of handwritten notes created in or about May 2001, but reflecting the events surrounding the spin-off and amendment of the Plan.  Three lines have been redacted on RJR 001315, and the court finds that although the notes were created while Plaintiff's administrative claim and review process was ongoing, the context and content of the redacted material indicate that it relates to advice of counsel regarding when to amend the Plan relative to the Nabisco funds,

16

and not to the discretionary decision regarding when to sell the stock holdings or to Plaintiff's administrative claim.

Document 16 consists of handwritten notes created in May 2001, summarizing an interview of two RJR Nabisco attorneys about decisions made in 1999 regarding the Plan amendment relative to the Nabisco funds.  Again, although the notes were created during the time period of Plaintiff's Plan claim and review, the court is satisfied that the legal advice reflected in this document does not relate to the discretionary decision to sell the stock holdings or to the Plan claim and review process.

Document 19, dated April 19, 1999, is correspondence from outside counsel regarding legal services related to the spin-off and Plan amendment, and contains no advice regarding the decision to sell the stock holdings.

As such, Plaintiff's motion is **DENIED** as to Documents 4, 12, 16, and 19.  The court finds that Documents 4, 12, 16, and 19 contain legal advice related to plan settlor functions rather than fiduciary functions.  Because these documents do not relate to matters on which the plan administrator owed a fiduciary duty to the beneficiaries, they remain subject to attorney-client privilege, and Plaintiff has not shown good cause to abrogate the privilege.

Document 6, dated May 17, 1999, is a draft communication to participants about the Plan amendment and contains three redactions: one on RJR 001308, and two on RJR 001309.  Defendants claim the redactions reflect legal advice about the

17

permissibility of one of the proposed actions stated in the draft and relate to amendment of the Plan. Plaintiff asserts that these are communications related to conveying future Plan changes to the Plan participants and beneficiaries, and thus fall within the scope of plan administration. Upon review, the court finds that the first two redactions reflect legal advice regarding amendment of the Plan and its permissibility, and do not relate to the communication of the amendment to the beneficiaries. Therefore, the first two redactions contain legal advice relating to plan settlor functions and are privileged. The third redaction, however, does not relate to the Plan amendment or the permissibility of a proposed action. The redaction at the bottom of RJR 001309 can only be described as advice regarding how to communicate Plan changes to the Plan participants and beneficiaries. As such, the redacted material relates to the fiduciary function of communicating a plan change to beneficiaries, *see Varity*, 516 U.S. at 504, and this redaction is subject to the fiduciary exception to the attorney-client privilege.

Therefore, Plaintiff's motion is **DENIED** with respect to the first two redactions on Document 6, and **GRANTED** with respect to the third redaction at the bottom of RJR 001309. *See Fischel v. Equitable Life Assurance*, 191 F.R.D. 606, 610 (N.D. Cal. 2000) (compelling production of documents involving word smithing of language communicating changes for the benefit of beneficiaries, as opposed to rendering legal advice regarding the advisability of the changes).

In addition, although Defendants do not discuss it in their brief, Defendants' Privilege Log indicates that Document 23 also reflects, *inter alia*, "legal advice about settlor decisions to eliminate Nabisco stock funds." (Defs.' Mem. Opp'n Pl.'s Mot. Compel, Ex. A.) Document 23 consists of handwritten notes created in May 2001, and includes a summary of a telephone conference with outside counsel regarding legal advice related to elimination of the Nabisco funds. The notes were created during the time period of Plaintiff's Plan claim and review process, but the materials do not relate to the Plan claim. Neither the content nor the context is sufficiently clear, however, for the court to determine that the legal advice reflected in this document relates to the settlor function of amending the Plan as opposed to the discretionary decision to sell the Nabisco stock holdings. All the same, the court need not make this determination. Even if the material relates to a fiduciary function and is therefore subject to the fiduciary exception, Defendants assert that it is still protected by the work product doctrine, discussed *infra*. *See, e.g.*, *Koenig v. Int'l Sys. & Controls Corp. Sec. Litig.* (*In re Int'l Sys. & Controls Corp. Sec. Litig.*), 693 F.2d 1235, 1239–40 (5th Cir. 1982); *Helt v. Metro. Dist. Comm'n*, 113 F.R.D. 7, 11–12 (D. Conn. 1986).

### *Documents Claimed to Contain Legal Advice Relating to Protecting the Plan Fiduciaries from Personal Liability in Plaintiff's Legal Claim*

Defendants assert that ten of the disputed documents—Documents 13, 17, 18, and 25–31—contain communications with legal counsel seeking, reflecting, or facilitating the provision of protective legal advice for the plan fiduciaries' benefit to

avoid potential liability as against Plaintiff, and as such, remain privileged pursuant to the liability limitation to the fiduciary exception. When a fiduciary seeks legal advice "for its own personal defense in contemplation of adversarial proceedings against its beneficiaries," the advice falls outside the fiduciary exception and remains protected by the attorney-client privilege. *Wachtel*, 482 F.3d at 233. This liability limitation to the fiduciary exception recognizes that when the interests of the ERISA plan fiduciary and the plan beneficiaries have diverged sufficiently such that the fiduciary seeking legal advice is no longer acting directly in the interests of the beneficiaries but in its own interests to defend itself against the plan beneficiaries, then the attorney-client privilege remains intact. *See id.* at 234; *Mett*, 178 F.3d at 1064; *Geissal*, 192 F.R.D. at 624; *cf. Sandberg*, 979 F.2d at 353 (noting, in response to defendants' argument that the meeting communications at issue should remain privileged because they related to legal advice sought to defend in the shareholder lawsuit, that "[i]f the sole purpose of the . . . meeting were consultation regarding legal strategies in the [shareholder lawsuit], then this argument might persuade us"). The beneficiaries are not the "real clients" obtaining legal advice, and disclosure of the legal advice is no longer an obligation. *Wachtel*, 482 F.3d at 234.

Whether any particular communication falls within this liability limitation requires close examination of the circumstances and whether the legal advice to the plan fiduciary can be considered in anticipation of litigation, as opposed to advice obtained as part of the fiduciary's ordinary administration of the plan. The mere

20

"prospect of post-decisional litigation against the plan by a disappointed beneficiary can exist whenever the plan denies a claim," and is not sufficient to render all pre-decisional legal advice privileged as against the beneficiary. *Geissal*, 192 F.R.D. at 625. Rather, only once there is a divergence of interests and a threat of litigation is it warranted for the fiduciary to obtain confidential legal advice and assert attorney-client privilege on the matter against the beneficiary. *See Mett*, 178 F.3d at 1063–64; *Wildbur*, 974 F.2d at 645; *Geissal*, 192 F.R.D. at 624–27.

Plaintiff argues that communications between a fiduciary and legal counsel during the administrative claim process about how to handle the claim fall within the fiduciary exception, because "fiduciaries continue to act as such through the administrative claim process." (Reply Supp. Pl.'s Mot. Compel 6.) Although Plaintiff appears to argue for a broad application of the fiduciary exception to any communications occurring during the administrative process, *see Lewis v. UNUM Corp. Severance Plan*, 203 F.R.D. 615, 620 (D. Kan. 2001), this court finds that position to be overly broad and inconsistent with the rationale behind the exception. The fiduciary exception is grounded in the identity of interests between the fiduciary and beneficiary, and the fact that the beneficiary is the "real client" of legal advice concerning plan administration. *See Mett*, 178 F.3d at 1063; *Wash. Star*, 543 F. Supp. at 909. That grounding vanishes where the fiduciary is faced with a threat of litigation and seeks legal advice for its own protection against plan beneficiaries,

21

regardless of whether that threat of litigation occurs before, during, or after the administrative claim process.

Plaintiff cites *Geissal* and cases influenced by *Geissal* for a general pre-decisional/post-decisional approach to determining whether communications are subject to the fiduciary exception. *See Asuncion v. Metro. Life Ins. Co.*, 493 F. Supp. 2d 716, 720–22 (S.D.N.Y. 2007); *Smith v. Jefferson Pilot Fin. Ins. Co.*, 245 F.R.D. 45, 48–49 (D. Mass. 2007); *Coffman*, 204 F.R.D. at 299–300; *Lewis*, 203 F.R.D. at 619–20. This is a misreading of the *Geissal* analysis. The *Geissal* court undertook a fact-specific inquiry, examining the context and content of the disputed communications, and found that aside from an ever-present prospect of post-decisional litigation, the record showed no specific threat of litigation and no divergence of interests prior to the plan administrator's decision to deny benefits, rendering pre-decisional legal advice subject to the fiduciary exception. 192 F.R.D. at 625–26. After the decision, however, the beneficiary retained counsel and threatened litigation, indicating a divergence of interests and rendering the post-decisional legal advice privileged. *Id.* Although *Geissal* referred to the legal advice as pre-decisional and post-decisional, the clear focus of its analysis was the context of the communications: when the threat of litigation and divergence of interests occurred. *Id.*; *see also Mett*, 178 F.3d at 1064–66. Courts have considered whether the communication is pre-decisional or post-decisional "because after the challenged benefits determination occurs, there should be little need for administrators to

22

consult counsel regarding a specific benefits determination." *Smith*, 245 F.R.D. at 48 (quotation and citation omitted).

Nevertheless, the pre-decisional/post-decisional distinction is not an analytical shortcut. The time period in which the communications occurred may be informative, but it is not dispositive. The key issue remains whether the communication related to plan administration or generalized concern for liability, as opposed to concern for the fiduciaries' liability as a result of a specific threat of litigation. S*ee, e.g.*, *Black v. Bowes*, No. 05 Civ. 108(GEL), 2006 WL 3771097, at *2–4 (S.D.N.Y. Dec. 21, 2006) (holding, where withheld communications post-dated plaintiff's commencement of litigation over denial of short-term benefits but pre-dated final determination of plaintiff's claim for long-term benefits, "[i]f the communications related solely to the pending determination of the long-term disability benefits application, without reference to the pending litigation over the short-term benefits application, they were not privileged. If, however, the communications pertained to the pending litigation, they were privileged."). Regardless of when the communication occurred relative to the processing of the administrative claim, this court finds it appropriate to examine both the context and content of each communication to determine whether it is subject to the fiduciary exception. A "communication-by-communication analysis, while perhaps untidy, is crucial if the attorney-client privilege and the fiduciary exception are to coexist." *Mett*, 178 F.3d at 1065.

23

The record before the court shows that during their meeting on January 10, 2001, Plaintiff told Beasley he had "retained a lawyer" and was "considering a class action lawsuit" because of the handling of the stock sale. (Aff. of Jennie B. Beasley ¶ 2, Ex. A.) Plaintiff also told Beasley "he would probably have his lawyer submit a demand letter." (*Id.*) Beasley informed members of the Employee Benefits Committee ("EBC"), and the Pension Investment Committee ("PIC") of Plaintiff's threatened lawsuit at that time. (*Id.*) Plaintiff's letter to the EBC, dated March 21, 2001, asserted that the Plan fiduciaries had breached their fiduciary duties under ERISA. (Folan Aff., Ex. A.) Plaintiff's formal claim letter, dated May 1, 2001, requested the names of the members of the EBC, copies of Committee meeting minutes where the stock divestiture was discussed, any documented opinions of counsel related to the stock divestiture, and reference to any law that may have required the divestiture. (*Id.*, Ex. B.)

Considering Plaintiff's communications from January to May 2001 as a whole, it is reasonable that Defendants would have perceived Plaintiff to be making a specific threat of litigation even before beginning Plaintiff's administrative claim and review process. The circumstances do not reflect the generalized prospect of post-decisional litigation that may occur anytime a claim is denied; rather, Plaintiff made specific statements indicating his intention to file suit, and his administrative claim for benefits, submitted "at the Plan fiduciaries' instigation" (Reply Supp. Pl.'s Mot. Compel 9), merely delayed the filing of his lawsuit. In this context, there is sufficient

24

evidence of a divergence of interests even before Plaintiff filed his administrative claim, giving Defendants reason to seek legal advice to protect themselves from liability related to Plaintiff's legal claim against them, notwithstanding the concurrent processing of Plaintiff's administrative claim for benefits. Defendants' act of engaging outside counsel from Kilpatrick Stockton in May 2001, specifically and solely to provide legal advice and services with respect to Plaintiff's anticipated lawsuit (Folan Aff. ¶ 6–7; Aff. of David R. Levin ("Levin Aff.") ¶ 3), reflects the divergence of interests and is a reasonable response to the Plan fiduciaries' concern for their personal liability arising out of Plaintiff's threat of litigation.

All of the ten documents for which Defendants assert attorney-client privilege under the liability limitation to the fiduciary exception—Documents 13, 17, 18, and 25–31—were created in or after May 2001, after the divergence of interests and retention of outside counsel for legal advice related to protecting the Plan administrators' interests against Plaintiff's threat of litigation. Plaintiff points out that the Privilege Log entries for many of these documents merely describe them as seeking or reflecting legal advice for Plaintiff's "claim," which Plaintiff interprets as his administrative claim rather than his legal claim. Nonetheless, the court's *in camera* review confirms that the content of the disputed documents is clearly defensive in nature, related to Plaintiff's legal claim and imminent lawsuit and to the Plan fiduciaries' concern for their own liability.

25

Document 13, dated May 14, 2001, consists of handwritten notes summarizing a conference call with outside counsel seeking and reflecting legal advice to respond to Plaintiff's legal claim and impending litigation. While the notes make reference to Plaintiff's administrative claim, the content clearly reflects Defendants' concern for avoiding liability in the face of Plaintiff's impending lawsuit, and reflects legal advice related to that litigation.

Document 25, dated May 24, 2001, is email correspondence and an attached memorandum from outside counsel. The correspondence reflects legal research and advice from counsel relating to Plaintiff's legal claim. Although there are minor references to Plaintiff's administrative claim, those references are made in the context of the anticipated litigation and relate to protecting the Plan administrators from personal liability, rather than reflecting legal advice relevant to the actual processing of Plaintiff's administrative claim.

Document 26, dated May 31, 2001, consists of handwritten notes reflecting communications with outside counsel regarding the legal advice in Document 25, and counsel's request for information related to Plaintiff's legal claim. Again, although Plaintiff's administrative claim is mentioned, the content of the notes clearly relates to Plaintiff's legal claim and counsel's advice related to the imminent litigation.

Document 17, dated June 8, 2001, is correspondence to outside counsel. The correspondence reflects counsel's requests for information related to Plaintiff's legal

26

claim, and the client's response providing information and documentation. Plaintiff's administrative claim is referenced, but this correspondence does not relate to the processing of the claim. It reflects information provided to counsel to facilitate legal advice related to avoiding liability in Plaintiff's impending lawsuit.

Document 18, dated June 19–20, 2001, consists of handwritten notes containing information gathered and provided to outside counsel to facilitate provision of legal advice related to Plaintiff's legal claim. This document contains no reference to Plaintiff's administrative claim and review process.

Therefore, Plaintiff's motion is **DENIED** as to Documents 13, 17, 18, 25, and 26. The court finds that Documents 13, 17, 18, 25, and 26 relate to communications with outside counsel seeking or reflecting legal advice sought to protect the Plan administrators in Plaintiff's imminent lawsuit. These five documents do not contain legal advice relating to the conduct of the Plan claim and review process or any other fiduciary function; rather, the legal advice relates to defense of Plaintiff's legal claim. The divergence of the Plan administrators' interests from Plaintiff's and the specific threat of litigation warrant the Plan fiduciaries obtaining confidential legal advice related to the litigation and asserting attorney-client privilege on the matter as against Plaintiff.

Documents 27–31 present, as Defendants call it, a closer question. These five documents, dated from July to September 2001, contain legal opinions and advice of outside counsel regarding the response to Plaintiff's administrative claim

27

and appeal.  Although there is clearly a concern evident in the documents for the Plan administrators' liability in Plaintiff's imminent lawsuit, these documents are nevertheless directly related to communicating with the beneficiary regarding the results of the administrative claim and review process.  Legal advice related to the ordinary administration of the plan, such as preparing a response to a beneficiary's claim, is not privileged as against the beneficiaries.  Yet in this case, the legal advice was rendered by outside litigation counsel in anticipation of Plaintiff's impending litigation.  Therefore, even after *in camera* review, the determination of attorney-client privilege is less clear as to these five documents, and would require further analysis.  The court need not undertake this analysis, however, because Defendants have also asserted work product protections for these five documents, and the court finds this argument persuasive.

## B.    <u>Work Product Doctrine</u>

The purpose of the work-product doctrine differs from that of the attorney-client privilege.   The attorney-client privilege promotes the attorney-client relationship, and, indirectly, the functioning of our legal system, by protecting the confidentiality of communications between clients and their attorneys.  In contrast, the work-product doctrine promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation.  Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used

28

against their clients. *Hickman*, 329 U.S. at 510–11. *Hickman* and its progeny, codified in FED. R. CIV. P. 26(b)(3),[6] establish that material which is prepared "in anticipation of litigation" is protected from discovery. *Id.* at 508–10. The Fourth Circuit has held that an attorney's work is protected when it was created "because of" the real likelihood of litigation, and not merely with the general possibility of litigation in mind. *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992). Once the court determines that the material is prepared in anticipation of litigation, opinion work product is "absolutely immune" from production, whereas fact work product may be discovered upon a showing of "substantial need." *Id.* at 983–84.

Although Plaintiff argues that some courts also apply the fiduciary exception to the work product doctrine, the Fourth Circuit, in adopting the fiduciary exception as articulated in *Garner*, specifically noted that "[t]he *Garner* exception . . . does not

---

[6] Rule 26(b)(3) provides:

> **Trial Preparation: Materials.** Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering the discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

29

apply to the work product doctrine." *Sandberg*, 979 F.2d at 355 n.22 (citing *Int'l Sys.*, 693 F.2d at 1239). This is so because the fiduciary exception is based on the "mutuality of interests" between the fiduciary and the beneficiaries, but once there is a real anticipation of litigation, the "mutuality is destroyed." *Int'l Sys.*, 693 F.2d at 1239. "It is not reasonable to indulge in the fiction that counsel, hired by management, is also constructively hired by the same party counsel is expected to defend against." *Id.*

Defendants assert that seventeen of the documents under consideration are protected by the work product doctrine: Documents 12–19 and 23–31. The court has already determined Documents 12, 13, 16–19, 25, and 26 are protected by the attorney-client privilege; there is no need to revisit those documents. With respect to the remaining documents—Documents 14, 15, 23, 24, and 27–31—each of these documents was created between May and September 2001. As the foregoing discussion makes clear, during this time Defendants were facing a specific threat of litigation. The record before the court shows that Plaintiff made statements to Defendants in January, March, and May 2001, which consistently conveyed that he intended to file a class action lawsuit for breach of fiduciary duty. In May 2001, Defendants retained outside counsel for legal advice to defend against Plaintiff's imminent lawsuit. Thus the record is sufficient to establish that the documents at issue were created during a time period when Defendants faced the threat of

30

litigation. An existing threat of litigation, however, is not sufficient to establish that the documents at issue were created in anticipation of litigation.

Documents 14, 15, and 24, dated May 22–24, 2001, are email correspondence regarding records requests by an RJR employee to a third-party administrator of the Plan and the third-party's response. Upon *in camera* review, the court finds that Documents 14 and 15 make no reference to Plaintiff's administrative claim for benefits. Document 24 refers to Plaintiff's administrative claim, but the reference is related to Plaintiff's impending legal claim. All three documents reflect efforts to gather information at outside counsel's request to facilitate provision of legal advice to defend against Plaintiff's imminent lawsuit. (Levin Aff. ¶ 7; Aff. of Kathy A. Cissna ¶ 4.) The record is sufficient to establish that these documents contain information gathered at the request of counsel in anticipation of litigation, and were created "because of" the genuine prospect of litigation. *Nat'l Union*, 967 F.2d at 984. Moreover, the court finds the information to be opinion work product as it is a reflection of counsel's mental impressions and legal theories concerning the litigation, and thus is not discoverable.

Document 23 consists of handwritten notes created in May 2001, summarizing a conference call regarding legal advice related to elimination of the Nabisco funds, and also summarizing information requests by outside counsel related to Plaintiff's legal claim. These notes contain no reference to Plaintiff's administrative claim and review process. The conference call and notes were made at the request of outside

31

counsel to facilitate provision of legal advice related to defending against Plaintiff's impending legal claim, and reflect counsel's mental impressions and legal theories. (Levin Aff. ¶ 7.)  The court finds the notes to be opinion work product created in anticipation of litigation, and as such, the notes are not discoverable.

Document 28, created on or about August 7, 2001, consists of handwritten notes concerning Plaintiff's August 7, 2001, letter appealing his denial of benefits, but reflecting legal advice of outside counsel related to Plaintiff's legal claim.  These notes may relate to the administrative response to Plaintiff's appeal, but the notes reflect legal advice of outside counsel related to Plaintiff's impending lawsuit and counsel's theories and efforts to minimize or eliminate Defendants' liability.  (Levin Aff. ¶¶ 7–8.)  As such, the notes are opinion work product created in anticipation of the present litigation, and are not discoverable.

Document 29, dated August 8, 2001, is email correspondence from outside counsel related to Plaintiff's August 7, 2001, letter appealing his denial of benefits. Upon review, the court finds that although the content relates to Plaintiff's administrative claim, it was clearly made in anticipation of Plaintiff's impending lawsuit and reflects mental impressions of counsel related to that litigation. Therefore the material is opinion work product and is not discoverable.

Documents 27, 30, and 31, dated in July and September 2001, contain a memorandum to outside counsel and annotated draft correspondence from outside counsel regarding the written response to Plaintiff's administrative claim and appeal.

32

In other circumstances, correspondence with beneficiaries regarding Plan claims might be created "in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes," *Nat'l Union*, 967 F.2d at 984, but the court's review of the content of these particular documents as well as the record supports a finding that these documents were prepared with regard to defending the Plan fiduciaries against Plaintiff's claim of breach of fiduciary duty, and contain legal advice related to Plaintiff's legal claim and impending lawsuit. (Levin Aff. ¶ 8.) As such, the court is satisfied that these documents were created in anticipation of litigation, and they contain counsel's opinion work product.

Therefore, Plaintiff's motion is **DENIED** as to Documents 14, 15, 23, 24, and 27–31. The court finds that despite their creation during the Plan claim and review process, Documents 14, 15, 23, 24, and 27–31 contain legal advice and opinions of outside litigation counsel related to defending the Plan fiduciaries in Plaintiff's impending lawsuit. Thus the documents were prepared "*because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Nat'l Union*, 967 F.2d at 984. The content and context indicate that these documents were prepared in anticipation of the present litigation, and contain opinion work product. As such, the documents are "absolutely immune" from production. *Id.*

**Conclusion**

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Compel Production

33

of Documents (docket no. 107) is **GRANTED IN PART** and **DENIED IN PART**, as set forth more fully above.  That is, Plaintiff's motion to compel is **GRANTED** with respect to the third redaction on Document 6 at the bottom of RJR 001309. Plaintiff's motion is **DENIED** with respect to the first two redactions on Document 6, and with respect to Documents 4, 12–19, and 23–31.  Defendants are hereby **ORDERED** to produce a version of Document 6 containing only the first two redactions no later than the close of business Monday, February 25, 2008.

Finally, although the court has not addressed Documents 20, 21, and 22 in this Order, in light of the foregoing analysis and discussion, the parties now have sufficient guidance to reach an accord between themselves with respect to these additional documents without the court's involvement.

**IT IS SO ORDERED**.

_____
Wallace W. Dixon
United States Magistrate Judge

February 15, 2008

34