1            THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

3   RICHARD G. TATUM, individually   Civil action
    and on behalf of a class of      No.  1:02CV373
4   all other persons similarly
    situated,
5          Plaintiffs,

6   vs.                              Greensboro, North Carolina
                                     February 2, 2010
7   R.J. REYNOLDS TOBACCO COMPANY,
    et al,

8

           Defendants.
9   _____/

10                    VOLUME XV

11       TRANSCRIPT OF BENCH TRIAL PROCEEDINGS

12     BEFORE THE HONORABLE N. CARLTON TILLEY, JR.

13             UNITED STATES DISTRICT JUDGE

14  APPEARANCES:

15  For the Plaintiffs:    JEFFREY LEWIS, ESQUIRE
                           CATHA WORTHMAN, ESQUIRE
16                         Lewis Feinberg Lee Renaker & Jackson
                           1330 Broadway, suite 1800
17                         Oakland, California 94612

18                         ROBERT M. ELLIOT, ESQUIRE
                           HELEN L. PARSONAGE, ESQUIRE
19                         Elliot Pishko Morgan, P.A.
                           426 Old Salem Road
20                         Winston-Salem, North Carolina 27101

21                         KELLY M. DERMODY, ESQUIRE
                           DANIEL HUTCHINSON, ESQUIRE
22                         Lieff Cabraser Heimann Bernst
                           275 Embarcadero Center West
23                         275 Battery Street, 30th Floor
                           San Francisco, California 94111-3339

24

25       Proceedings reported by stenotype reporter.
    Transcript produced by computer-aided transcription.

```
 1   For the Defendants:      DANIEL R. TAYLOR, JR., ESQUIRE
                              CHAD D. HANSEN, ESQUIRE
 2                            TONYA R. DEEM, ESQUIRE
                              ADAM H. CHARNES, ESQUIRE
 3                            JAMES J. HEFFERAN, JR., ESQUIRE
                              Kilpatrick Stockton, LLP
 4                            1001 West Fourth Street
                              Winston-Salem, North Carolina 27101
 5

 6   Court Reporter:          J. Calhoun, RPR
                              Room 101, U.S. Courthouse Building
 7                            324 West Market Street
                              Greensboro, North Carolina 27401
 8                            (336) 332-6033

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# INDEX

|                              | DIRECT | CROSS | REDIRECT | RECROSS |
| ---------------------------- | ------ | ----- | -------- | ------- |
| WITNESSES FOR THE DEFENSE:   |        |       |          |         |
| John Montgomery              | 8      |       |          |         |

1        THEREUPON, the following proceedings were had:)

2        THE COURT:  It is good to be on the other side of

3   a closed door coming into a courtroom and hear the attorneys

4   laughing.  It's a good sign.

5        Mr. Charnes, are you ready?

6        MR. CHARNES:  We are ready to call John

7   Montgomery.

8        MR. LEWIS:  Before we start, may I raise an issue?

9   We have just received, several minutes ago, a stack of brand

10  new exhibits that we've never seen before.  These are not

11  documents that were attached to Mr. Montgomery's report or

12  supplemental report.  They may be new opinions.  I mean,

13  they are detailed charts and tables, so I guess to the

14  extent anything other than illustrative, fairly

15  illustrative, we don't know that, past opinions in his

16  report we would object to them being used.  I'm not quite

17  sure how to take it up procedurally.  Obviously we've not

18  had time to analyze this.

19        THE COURT:  Why don't we take a recess and you can

20  look at them.  If the Defense wishes to present those during

21  Mr. Montgomery's testimony, then you may explain to the

22  Plaintiff what they are, and then with everybody having some

23  information about them, we'll come back and talk about

24  whether they would be appropriate or not.

25        MR. LEWIS:  We did get a very brief explaining,

1  but didn't have time before Your Honor came to the bench, so

2  I think it would probably be helpful.

3  　　　　THE COURT:  You let us know when you are ready or

4  have reached an impasse that needs the Court's presence.

5  　　　　MR. LEWIS:  Thank you, Your Honor.

6  　　　　(Recess taken.)

7  　　　　THE COURT:  Where are we?

8  　　　　MR. LEWIS:  Your Honor, we are satisfied that as

9  far as the new exhibits, with one exception, they are

10 extracted from or somehow relate to things in the witness's

11 reports.  We're going to have -- this is a summary, a set of

12 opinions as we saw with Mr. Raborn, one of which we don't

13 believe is contained in the report, so we have a

14 disagreement about that.

15 　　　　I don't know when the best time to take that up

16 is.  I'll leave that to Your Honor's discretion.

17 　　　　THE COURT:  Do you want to go ahead and do that

18 now?

19 　　　　MR. LEWIS:  And specifically, we're looking at

20 opinion one on Defendant's Exhibit 239, and although

21 Mr. Montgomery in his reports, to be fair about it, does

22 say -- have certain portions of his reports where he says

23 there was no reason to expect what he calls extraordinary

24 returns from NGH and NA, but no where in his reports is

25 there any comparison of what can be achieved from the

1    Diversified Investment Fund.  Those words don't appear

2    anywhere in the report.

3              Mr. Charnes has pointed me to one paragraph in

4    Doctor Montgomery's supplemental report, which is Paragraph

5    4, and it is Defense Exhibit 64.

6              THE COURT:  What page?

7              MR. LEWIS:  Page 2 of the report.

8              THE COURT:  That's Paragraph 4?

9              MR. LEWIS:  That's correct, Your Honor.

10             THE COURT:  Let me take a moment to read this

11   then.

12             Do you wish to be heard at more length, Mr. Lewis?

13             MR. LEWIS:  I think the words speak for

14   themselves, Your Honor.  So pending hearing from opposing

15   counsel --

16             MR. CHARNES:  I think Mr. Lewis is quibbling with

17   the language here.  That sentence in Page 2 and Paragraph 4

18   indicates that was the whole point of his original report,

19   and much of the supplemental report -- there was no reason

20   to expect, as it says there, the Nabisco Stock delivered

21   extraordinary returns.

22             Extraordinary returns, Doctor Montgomery will

23   testify by definition means, a return greater than you could

24   achieve from a diversified portfolio of stocks.  So it's

25   using different language, but the concept is exactly the

same, but I think it's clear from the context of Doctor

Montgomery's report and testimony, that it's talking about

exactly the same thing.

Extraordinary returns is -- Doctor Montgomery's

use of the term extraordinary return is the same, I think,

as Professor Lys has used the phrase abnormal returns, that

means a return greater than you could get in the stock

market as a whole, or diversified set of stocks that

achieve -- that diversify away the company's specific risk.

So I think the concept that he's expressing in his

reports and as are summarized in that sentence on Page 2, is

exactly what he is crystallizing in opinion one. I think it

is the same point, as will be clear during his testimony.

THE COURT: Opinion one or opinion three?

MR. CHARNES: Opinion one is the one I think

Mr. Lewis is objecting to.

THE COURT: I understood it was opinion three.

MR. LEWIS: No. Opinion one, Your Honor.

THE COURT: And that may be saying the same thing

in different words. Why don't we allow him to testify. You

may cross-examine him, and if at the conclusion of the

testimony it appears that it is an opinion which has not

reasonably been stated in his report or supplemental report,

then let's address where we go from there.

MR. LEWIS: Thank you, Your Honor.

1    THE COURT:  Sure.

2    MR. CHARNES:  Your Honor, for at least the initial

3    sections of the initial part of Doctor Montgomery's

4    testimony, we'll be using defense binders two and four.

5    THE COURT:  Okay.

6    **(JOHN D. MONTGOMERY, DEFENSE WITNESS, WAS**

7    **SWORN.)**

8    **DIRECT EXAMINATION**

9    BY MR. CHARNES:

10   Q.   Good morning, Doctor Montgomery.

11   A.   Good morning.

12   Q.   Would you please state your name for the record.

13   A.   John Dennison Montgomery.

14   Q.   Doctor Montgomery, do you have a Ph.D in economics?

15   A.   Yes, I do.  From Princeton University.

16   Q.   And what year did you receive that Ph.D.?

17   A.   1990.

18   Q.   Would you please describe for the Court the remainder

19   of your educational background.

20   A.   Yes.  Starting from the beginning, I have a bachelor of

21   arts from Yale University.  My major was economics.  I have

22   a masters of science from the London School of Economics,

23   that was 1985.  I should say also my BA was in 1982.  Then I

24   have my Ph.D. from Princeton.

25   Q.   And, Doctor Montgomery, who is your present employer?

1   A.   I'm presently employed by NERA, N-E-R-A Economic

2   Consulting.

3   Q.   Is NERA an acronym?

4   A.   It is.  It used to be -- the name of the firm used to

5   be National Economic Research Associates.  So in some sense,

6   NERA is an acronym for that.

7   Q.   What is NERA Economic Consulting?

8   A.   NERA is a firm of economists, mathematicians,

9   accountants and other professionals providing analytical

10   services in consulting and other areas for governments,

11   regulators, businesses, corporations, parties in litigation.

12   Q.   And approximately how many professionals does NERA

13   Economic Consulting employ?

14   A.   Worldwide, it's about 500.

15   Q.   And what is your current position at NERA?

16   A.   I'm a senior vice president.

17   Q.   How long have you held that position?

18   A.   A couple weeks now.  I was promoted recently.

19   Q.   Congratulations.

20   A.   Thank you.

21   Q.   What are your job responsibilities as senior vice

22   president?

23   A.   My responsibility is to direct projects in --

24   consulting projects and expert testimony projects in finance

25   and securities areas.

Q.    And what was your position before you were promoted to senior vice president?

A.    I was a vice president.

Q.    And when did you begin as vice president?

A.    In 2006.

Q.    And before 2006 when you were a vice president, what was your position?

A.    Title was called senior consultant.  In all of these positions my duties have essentially been the same over time.

Q.    And what year did you become a senior consultant with NERA?

A.    When I joined the firm in 2002.

Q.    In the position as senior consultant, vice president and senior vice president, do you supervise other employees of NERA?

A.    Yes, I do.  Ranging from three or four, up to eight, possibly depending on the nature of the project that I'm involved in.

Q.    And during your entire employment with NERA, have you provided consulting advice on securities and finance matters?

A.    Yes.  That's been the bulk of my focus.

Q.    During your employment with NERA, have you worked on matters involving ERISA and ERISA plans?

A.    Yes, I have.  I've worked on approximately -- somewhere

between 15 and 20 projects related to ERISA issues during my

employment at NERA.

Q.    And at NERA do you provide any nonlitigation consulting

services?

A.    I provide some.  I've been involved in some advising of

companies involved in transactions.

Q.    And in your personal work at NERA, have you represented

any governmental entities?

A.    I have served as a consultant to governmental entities.

I've been a consultant to the U.S. Attorneys Office for the

and Southern District of New York in a criminal insider

trading case.  I've also been a consultant to the Ontario

Security Commission in Canada, also on an insider trading

case.

Q.    Prior to joining NERA in 2002, by whom were you

employed?

A.    Immediately before my employment at NERA, I was vice

president and senior economist at Morgan Stanley in New

York, which is investment bank.

Q.    What years were you employed by Morgan Stanley?

A.    1998 through 2001.

Q.    What were your job responsibilities at Morgan Stanley?

A.    My responsibilities were to cover global economic

developments and developments in global financial markets,

1    and to develop currency, equity and bond markets and to

2    write those views about the economics and finance, to

3    provide that information to the firm's clients.

4    Q.   Who were Morgan Stanley's clients that received your

5    opinion?

6    A.   It was a big distribution system, so I don't think I

7    know all of them.  They were institutional investors, hedge

8    funds, investment advisors, consultants.

9    Q.   With whom were you employed prior to joining Morgan

10   Stanley in 1998?

11   A.   Immediately prior to that, I was an economist in the

12   capital markets and financial studies division of the

13   International Monetary Fund in Washington, DC.

14   Q.   What years were you employed there?

15   A.   Overall, 1993 to 1998.  I did spend one year on a leave

16   of absence from the IMF, as a senior staff economist on the

17   President's Council of Economic Advisors.

18   Q.   Before we get to that, can you just please describe for

19   the record what the International Monetary Fund is.

20   A.   The International Monetary Fund is an international

21   organization that the United States and most other countries

22   are members of.  It was organized by a treaty immediately

23   following World War II, and its primary functions are to

24   provide surveillance of member countries' economic and

25   financial policies, to identify potential risks, and to

provide lending to countries having balance of payments and
financial difficulties.

Q.   What were your responsibilities as an economist at the
International Monetary Fund?

A.   I was part of a group that monitored, evaluated and
wrote on financial systems and financial issues in countries
that were considered important to the international
financial and economic system.

Q.   You mentioned that you were -- during the period -- at
some point between 1993 and 1998 you were also employed by
the President's Council as an economic advisor?

A.   Yes.  I was a senior staff economist in charge of
international issues from mid 1996 to mid 1997.  I provided
briefings to the president, and I worked a wide range of
policy issues as a representative for the Council of
Economic Advisors on interagency policy issues and finance
and trade issues.  I was one of about ten senior staff
economists on the council.

Q.   Can you please describe for the record what the
President's Council for Economic Advisors is?

A.   It is a council.  It is a small group within the
executive office of the President, charged with providing
economic advice to the President in his or her policy making
role.

Q.   Doctor Montgomery, how were you employed before

1  beginning work with the International Monetary Fund in 1993?

2  A.    I was an economist at the Board of Governors of the

3  Federal Reserve System in Washington from 1989 when I left

4  graduate school, to 1993.

5  Q.    And what is the Board of Governors of the Federal

6  Reserve?

7  A.    It is the central governing organization, and

8  analytical organization for the Federal Reserve system,

9  which is a system of 12 banks which make up Federal Reserve

10 banks, which make up the nation's central bank.

11 Q.    What were your responsibilities as an economist with

12 the Federal Reserve?

13 A.    I was in charge of working on a variety of financial

14 issues, primarily international financial issues and banking

15 issues.  I also provided economic analysis for a foreign

16 country, France, part of that time.

17 Q.    Now, did you testify that your position at the Federal

18 Reserve was the first job you held after receiving your

19 Ph.D?

20 A.    Yes, I did.

21 Q.    And before you received your Ph.D., did you have any

22 full time employment?

23 A.    I did.  For most of the time between college and

24 getting my Ph.D.  I was a securities analyst at the

25 brokerage firm of J. Bush and Company in New York City.

1  Q.   And during what years were you employed by J. Bush and

2  Company?

3  A.   1982 to 1984.

4  Q.   What were your responsibilities as a securities analyst

5  at J. Bush and Company?

6  A.   I analyzed the finances and business trends for

7  companies in a variety of industries.   I prepared reports.

8  I forecasted earnings, and I discussed the companies that

9  are covered with our institutional plans.

10 Q.    What was included in the reports that you drafted as

11 an employee of J. Bush and Company?

12 A.   They included, as best I can recall, discussion of the

13 prospects of the company, the nature of the business, the

14 trends in different parts of the company's business, and the

15 finances of the companies.   They included projections for

16 earnings.

17 Q.   And what kind of companies did you research and write

18 reports about when you were employed with J. Bush and

19 Company?

20 A.   Most of them were relatively small companies.   They

21 were in a range of industries.   They include banks,

22 companies in the defense industries.   I think there was a

23 toy company.   There were others.   Pharmaceutical companies.

24 Q.   Doctor Montgomery, I would like you to turn to

25 Defendant's Exhibit 238.   What is Defendant's Exhibit 238?

A.    This is a copy of my curriculum vitae that was attached

to my initial expert report in this case.

Q.    If you would please review the first page of DX 238, I

would like to ask you whether this page accurately

summarizes your educational and work experience about which

you just testified.

A.    It does, with the exception that it doesn't reflect my

current title at NERA.

Q.    Which is senior vice president?

A.    That's correct.

Q.    If you would please review pages two and three of

Defendant's Exhibit 238, and I would like to ask you if

these pages accurately reflect the publications that you

have authored and coauthored.

A.    Yes, they do.  The one exception is, that since I

drafted this list of publications, I had an additional

publication published on NERA's website as a working paper.

That publication discussed the financial policies by the US

Government and Federal Reserve, related to the recent

financial crisis.

Q.    And are the publications listed on pages two and three

in the areas of finance and securities?

A.    Yes.  They all are.  Well, let me -- that is true with

one partial exception, and that is the chapter of the

economic -- on page three which deals with financial issues

1  and other economic issues, but everything else has to do

2  with finance and securities.

3  Q.   Could you please turn to page three of your CV.  Does

4  this page accurately reflect your professional affiliations?

5  A.   Yes, it does.

6  Q.   You are a member of the American Economic Association?

7  A.   Yes.  I am a member of the American Economic

8  Association.

9  Q.   What is the American Economic Association?

10  A.   The AEA is an organization of professional economists,

11  mostly academic economists.  It is the preeminent

12  association of academic economists in the United States.

13  Q.   You are also a member of the American Finance

14  Association?

15  A.   That is a similar organization to the American Economic

16  Association for professionals in financial academics as well

17  as practicing financial specialists.

18  Q.   Doctor Montgomery, have you testified as an expert

19  witness in other cases?

20  A.   Yes, I have.

21  Q.   If you please turn to page two of your CV.  Does page

22  two accurately list your expert testimony?

23  A.   Yes, it does.

24  Q.   Doctor Montgomery, have you been paid directly by the

25  Defendant for your work in this case?

1  A.    No.   I work for NERA.   NERA bills RJR.

2  Q.    So you're --

3  A.    So I'm not paid directly, no.

4  Q.    So NERA has been compensated for the work of you and

5  others at the firm in this case?

6  A.    That's correct.

7  Q.    What is your hourly rate?

8  A.    My hourly rate for working this case is 465 an hour.

9  Q.    And what is the range of hourly rates of the other NERA

10 personnel who have assisted you in this case?

11 A.    It ranges from about $95 an hour for clerical staff, up

12 to about 450-dollar an hour for some other senior staff.

13 There is one exception.   I believe there is one hour of

14 billed time by somebody whose billing rate was about $600 an

15 hour.

16 Q.    Has all of the work that NERA billed in this case been

17 related to your expert testimony?

18 A.    No.   NERA has provided -- I have provided a variety of

19 consulting and a variety of other issues related to this

20 case, and I believe others at NERA have also.

21 Q.    What is the total amount that NERA has billed to date

22 with respect to your work and NERA's work in this case?

23 A.    Including bills that haven't yet been sent, it's a

24 little over two million dollars for all the work that NERA

25 has done.

Q.    Doctor Montgomery, do you have -- of the approximately
$2 million, do you have an estimate for the amount that was
related directly to the preparation of your opinions in this
case?
A.    Focusing just on the work that was done around -- can't
quite break it up by how much was done related to my
opinions, but if I could go back and look at how much was
done during the period in which I and my staff prepared my
two expert reports and reviewed the expert reports from the
other side, and there is a little bit of other work in that
time, but all and all, the bills for that period were just
about exactly a million dollars.  About 450,000 of that
related to programmers time, mostly involved in damages
calculations, and I think a little bit more than $200,000 of
it related to my time.
Q.    Do you know, Doctor Montgomery, for your personal time
that you've billed in this case, how much have you -- strike
that.
      How much has NERA billed for your personal time in this
case, from start to finish; if you know?
A.    It's around $500,000.
Q.    Is the compensation that either you or NERA is
receiving in any way dependent on the outcome of this case?
A.    No, it's not.
Q.    Doctor Montgomery, have you been retained by the

1 Defendants to offer an opinion in this case?

2 A.   Yes, I have.

3 Q.   Have you formed one or more opinions with regard to

4 this case?

5 A.   Yes, I have.

6           MR. CHARNES:  Your Honor, we would tender Doctor

7 Montgomery as an expert in the evaluation of securities,

8 finance, economics, investing, the stock market, portfolio

9 diversification, market efficiency and the computation of

10 damages.  I can repeat that.

11           THE COURT:  Is that all?

12           MR. LEWIS:  Could I have that read back, Your

13 Honor?  I didn't get them all.

14           THE COURT:  Okay, Mr. Charnes.

15           MR. CHARNES:  Valuation of securities, finance,

16 economics, investing, the stock market, portfolio

17 diversification, market efficiency, and the computation of

18 damages.

19           MR. LEWIS:  May we have a moment?

20           THE COURT:  Sure.

21           MR. LEWIS:  We certainly don't quarrel with Doctor

22 Montgomery's expertise in most of those areas; finance,

23 economics, et cetera.  There are three of them which I would

24 like the opportunity to voir dire on.

25           THE COURT:  You may proceed.

1        MR. LEWIS:  Okay.

2                **VOIR DIRE EXAMINATION**

3    BY MR. LEWIS:

4    Q.   Doctor Montgomery, good morning.  As you know from your

5    deposition, I'm Jeff Lewis, one of the attorneys for the

6    Plaintiff.

7    A.   Yes.

8    Q.   Have you ever measured investment diversification for a

9    client, other than in litigation?

10   A.   Not that I can recall, no.

11   Q.   Have you ever published an article on investment

12   diversification?

13   A.   Not specifically on that subject, no.

14   Q.   Have you ever taught a class on investment

15   diversification, or a course?

16   A.   Well, I've taught at the assistant level at a

17   university as part of my graduate studies on finance, and

18   investment diversification is part of the general curriculum

19   of finance.

20   Q.   Have you ever spoken at a public program or association

21   program with regard to investment diversification?

22   A.   Not narrowly and specifically on that subject.  I have

23   spoken on general portfolio issues related to ERISA.

24   Q.   Have you ever written any articles on the efficient

25   market hypothesis?

1  A.    No, I have not.

2  Q.    Have you ever testified as an expert with regard to the

3  efficient market hypothesis, other than in this case?

4  A.    Other than in this case -- I would have to go back and

5  look at my testimony record.  May I do that?

6  Q.    Certainly.

7  A.    I'm forgetting the exhibit number.

8  Q.    If you are referring to your CV, it is Defendant's

9  Exhibit 238.

10  A.    Let me -- I just want to make sure.  I don't know the

11  answer to that question.  No.  I have not.  I have not

12  testified on that subject, although it's, I think, been a

13  presumption behind some of the other work that I've done.

14  Q.    Have you ever authored any publication on the

15  investment of assets?

16  A.    Well, a lot of the work I did at Morgan Stanley as well

17  as with J. Bush, involved providing advice of various sorts

18  on the investments of assets.  The work I did at the

19  International Monetary Fund involved reviews of various

20  issues having to do with financial markets and an important

21  part of that has to do with investment, with the investment

22  of assets.

23       My Ph.D dissertation had to do with the international

24  capital, which also involved money flowing from the sources

25  of those, and savings to uses of the savings, that is

1  investments, so I think I have written on the investment of

2  assets and those types of things.

3  Q.   Did you testify at your deposition that other than your

4  work at Morgan Stanley -- did you testify at your deposition

5  that you did not offer any document on investment of assets

6  specifically?

7  A.   I don't recall.  I don't remember if I did.

8              THE COURT:  You don't remember if you testified?

9              THE WITNESS:  I don't remember if I testified,

10 yes.

11 BY MR. LEWIS:

12 Q.   Doctor Montgomery, do you recall having your deposition

13 taken in this case?

14 A.   Yes, I do.

15 Q.   I've handed you the original transcript of your

16 deposition.  Does that look like -- in fact, have you had an

17 opportunity to review the transcript of your deposition

18 since it was taken?

19 A.   Yes, I have.

20 Q.   And is this a copy of that transcript?

21 A.   Yes.  Just flipping through, it appears to be.

22 Q.   Can I direct your attention, please, to Page 138, and

23 direct your attention to Line 15, and I'm going to read the

24 question, and I would ask you to read the answer, please,

25 and we're just going to read from there, on the line that

says, discussion off the record, all the way to 139, Line 9.

     "Question:  And have you authored or coauthored any publications on investment of assets?"

A.   I'm sorry, you want me to read the answer?

Q.   Please.

A.   "Answer:  I think it depends on how you look at what I've -- what I've written.  Much of the work that I've done at Morgan Stanley involves providing advice on the allocation of investments, and I'm not -- I don't believe I've done any other work that's related to that issue."

Q.   Actually, we'll stop there in that deposition testimony.

     You've mentioned allocation of assets.  Did that include -- did you publish any articles on investment -- on individual securities investment decisions?

     Let me rephrase that.  Have you ever published any article on the issue of decision-making as to individual securities?

A.   Not that I can recall, with the exception of the analyst reports that I wrote at J. Bush and Company.

Q.   That was 1982 through 1984?

A.   Correct.

Q.   Leaving aside your graduate school teaching duties, have you ever taught any course on investments and securities?

1    A.    No.   I don't believe I have.

2    Q.    Do you claim to be an expert on what individual

3    investors specifically do?

4    A.    I claim to be an expert on the lessons to be taken from

5    the study of financial economics for what individual

6    investors do.   I don't claim to be an expert on other

7    aspects of what individual investors do.

8    Q.    Do you claim to be an expert on the practices of

9    knowledgeable experienced investors?

10    A.    I think I would give the same answer.   I believe I'm an

11    expert on what the study of financial economics has learned

12    about the practices of investors, but more broadly, I don't

13    claim to be an expert.

14    Q.    Other than with regard to your work at J. Bush and

15    Company from 1982 to 1984, did you ever advise a client with

16    regard to buying and selling an individual stock?

17    A.    No, I don't believe I have.

18    Q.    Do you claim to be an expert on the analysis of

19    securities?

20    A.    I believe that a large part of that is related to my

21    expertise in financial economics, so again, I believe that

22    my expertise in financial economics extends to a large

23    portion of the analysis of securities.   I believe I would

24    say in part, but not in general.

25    Q.    Is it fair to say that you have never published any

1  research that bears on the analysis of an individual

2  security?

3  A.    Again, with the exception of the analysis that I did on

4  individual securities in my first job, that's correct.

5  Q.    Those were -- the publications were internal to your

6  clients, is that correct?  Those publications that you did

7  at J. Bush and Company, were they publications you authored

8  at the J. Bush and Company disseminated to anybody other

9  than internally and clients?

10  A.    I don't know for sure.  Not that I know of, no.  They

11  were not made available to the general public.  We never

12  sold on the newsstand or anything like that.

13  Q.    These articles were not submitted to journals?

14  A.    No.

15  Q.    They were not peer reviewed?

16  A.    No, they were not.

17  Q.    Have you ever published any articles that address the

18  topic of analyst reports?

19  A.    No, I have not.

20  Q.    And for purposes of this case, have you ever done any

21  empirical research into analyst reports or recommendations?

22  A.    No, I have not.

23  Q.    Before your assignment in this case, did you ever at

24  any time engage in a review of published literature

25  regarding the usefulness of analyst reports and

1  recommendations?

2  A.    Could you repeat that?

3  Q.    Before your engagement in this case, did you ever make

4  any systematic study of the literature regarding analyst

5  recommendations?

6  A.    Well, first of all, I don't think there is that much

7  literature like that.  But, no, I did not make a systematic

8  study.

9                  MR. LEWIS:  One moment, Your Honor.

10                 THE COURT:  Surely.

11 BY MR. LEWIS:

12 Q.    Doctor Montgomery, in your -- in an exhibit to your

13 report in this case, did you list certain articles that you

14 had reviewed in the course of preparing that report?

15 A.    Yes, I did.  I think there is probably a list in both

16 my supplemental and my original report.

17 Q.    In the list attached to your original report, did you

18 include some articles related to analyst reports and

19 recommendations?

20 A.    I believe I did.

21 Q.    Had you ever read any of those articles prior to

22 becoming involved in this case?

23 A.    I don't know.

24 Q.    Would you like to look at the list?

25 A.    If you want.

1          THE COURT:  Yes, please.

2          MR. LEWIS:  Your Honor, can we direct -- I'll get

3    Plaintiff's Exhibit 397.

4    BY MR. LEWIS:

5    Q.   Let me direct your attention to Plaintiff's Exhibit

6    397, specifically to Exhibit 2, which is on -- the pages are

7    not Bates stamped, Your Honor, so we can't direct you to it.

8    There are about 35 pages to the report, and then there is an

9    Exhibit 1, which has four -- three pages and --

10   A.   It is a bit less than half-way.

11   Q.   I want to direct your attention, when you get there, to

12   Page 4 of 7 and Page 5 of 7, and ask for you to review the

13   academic articles that appear on Page 4.

14        Does that refresh your memory as to whether -- strike

15   that.

16        Would you agree that that article number 89, it's on

17   Page 5 -- 95, 96, are all related to the analyst

18   recommendations and reports?

19   A.   Yes, they are.

20   Q.   Having reviewed this list, does that refresh your

21   memory as to whether or not prior to your engagement in this

22   case, you had ever reviewed any of those articles?

23   A.   No.  I am actually not sure whether I looked at these

24   before.  I mean, I generally keep up on the literature on

25   financial economics.  I look at journals when they come out.

1    It's hard for me to recall.  I mean, I see many articles.

2    It's hard for me to recall.

3    Q.    But as you sit here today, you can't tell us, can you,

4    that you ever read -- that you had ever read any of those

5    articles before your engagement in this case?

6    A.    No, I can't tell you I have.

7    Q.    Do you have any experience administering a 401(K) plan?

8    A.    No, I don't.

9    Q.    Have you ever provided consulting services with regard

10   to the operation or administration of a 401(K) plan?

11   A.    Not with regard to the operation or administration, no.

12   Q.    Before issuing your report in this case, or reports in

13   this case, had you ever addressed in any way the issue of

14   how 401(K) plan participants make or do not make investment

15   decisions?

16   A.    I believe I have dealt with that issue in other

17   litigation projects that I've worked on.

18             MR. LEWIS:  If I could have one moment, Your

19   Honor.

20             THE COURT:  You may.

21             MR. LEWIS:  Your Honor, I have no further

22   questions, and if Your Honor would like to hear argument

23   about what the witness is not an expert in.

24             THE COURT:  I'm going to give Mr. Charnes an

25   opportunity to follow up on your questions.

1  BY MR. CHARNES:

2  Q.    Thank you, Your Honor.  Doctor Montgomery, in your

3  academic training, your Ph.D., did you receive course work

4  regarding investment diversification?

5  A.    I received extensive course work in financial

6  economics, which includes as a very basic of that, the

7  theory of investment diversification.

8  Q.    During that academic training, did you also receive

9  course work on efficient market hypothesis?

10  A.    Again, that's part of the basic theory of finances

11  taught at the Ph.D. level.

12  Q.    Is the same thing true with investments and securities?

13  A.    It's part of the same theory, yes.

14  Q.    Is it fair to say that in order to receive a Ph.D. in

15  finance and economics, you have to show a level of

16  proficiency in those areas, that is investment

17  diversification, efficient market hypothesis and investments

18  and evaluation of securities?

19  A.    Yes.

20  Q.    In the course of -- strike that.

21      Are you familiar with the literature published in the

22  fields of finance?

23  A.    Yes, I am.

24  Q.    Did you just testify that you keep current with that

25  literature on a regular basis as part of your being an

1  economist?

2  A.    Yes, I do.

3  Q.    Apart from this case, or work in this case, you keep

4  current with that?

5  A.    Yes.

6  Q.    And you engage in discussions at NERA and outside of

7  NERA with other economists about matters related to finance

8  and the like?

9  A.    Yes, I am.

10 Q.    Have you reviewed this literature as indicated in your

11 original report in connection with the formation of your

12 opinions in this case?

13 A.    I'm sorry, I reviewed what literature?

14 Q.    Academic literature related to -- I'll take them one by

15 one.

16     Have you reviewed the academic literature related to

17 analyst reports in forming your opinions in this case?

18 A.    Yes.

19         MR. LEWIS:   Could I object to the form of the

20 question, ambiguous.

21         THE COURT:   Don't lead him.   He's your witness.

22 Ask him in a certain field what he has done in preparation

23 for giving expert witness reports.

24 BY MR. CHARNES:

25 Q.    Okay.   Doctor Montgomery, in arriving at your opinions

1  relating to analyst reports, can you please describe to the

2  Court what you did in the course of your review in arriving

3  at your opinion.

4  A.    I did several things.  I reviewed the economic

5  literature on analyst ratings, analyst reports and analyst

6  forecasts, and their relationship to stock returns and other

7  matters.  I reviewed data on analyst reports.  I analyzed

8  the relationship, if any, between analyst ratings and stock

9  returns using statistical and econometric techniques, and I

10 reviewed a variety of other sources and information as well,

11 such as news articles, SEC filings, in forming my opinions.

12 Those are the main things that come to mind.

13 Q.    In the course of arriving at your opinions related to

14 the efficiency of the market related to the market

15 hypothesis, could you please describe the activities you --

16 A.    I relied on my general training as a financial

17 economist.  I reviewed economic literature on efficient

18 market hypothesis and on deviations or anomalies from the

19 efficient market hypothesis.  I performed some of my own

20 statistical analysis for this project also.

21 Q.    In arriving at your opinions in this case as they

22 relate to diversification, can you please explain what, if

23 anything, you did by way of research and analysis.

24 A.    Again, I relied on my training as a professional

25 financial economist, and the study of diversification is an

integral part of that.  I also performed numerical and

statistical analysis of the degree of diversification in the

plan, and the contribution of the two stock funds at issue;

the NA Stock Fund and the NGH Stock Fund, and the level of

risk, diversification being a means to reduce risk.

MR. CHARNES:  That's all I have at this point,

Your Honor.

MR. LEWIS:  Just one, Your Honor.

BY MR. LEWIS:

Q.   Can I direct you back to Plaintiff's Exhibit 239 --

excuse me, 397, Doctor Montgomery, which, again, was your

report.

A.   Yes.  I'm there.

Q.   Did you just testify that you reviewed, in the course

of arriving at your opinions on the efficient market, you

reviewed the literature regarding anomalies with respect to

the efficient market hypothesis?  Did you testify to that,

sir?

A.   I'm generally familiar with that literature.  I'm

not -- I didn't rely on them in any way specifically to form

these opinions.

Q.   Did you just testify in answer to Mr. Charnes'

question, that you had reviewed the literature on anomalies

in the course of preparing your opinions in this case?

A.   Yes.  I believe that is true, yes.

1   Q.   Let me direct your attention to Pages 4 and 5, on

2   Exhibit 2 to your report, which is Plaintiff's Exhibit 397,

3   and ask you to point out to me what article, if any, relates

4   to the anomalies that have been found with regard to the

5   efficient market hypothesis.

6   A.   I believe the answer to the question related both --

7   the question related both to -- maybe I misunderstood the

8   question.  But both my initial report and also to the

9   follow-up report that I did that was reported in my

10   supplemental report, I may not have looked at them in any

11   detail for this initial report.  Certainly based on this

12   list, I didn't.

13       You know, if I can just add to that.  In generally

14   reviewing the financial economic literature as part of my

15   professional work, I am familiar with the state of that

16   literature and obviously, you know, bring that general

17   familiarity to any work that I do.  I don't obviously list

18   the hundreds of articles that I review in the course of my

19   work on these exhibits.

20   Q.   Let me direct your attention to Defendant's Exhibit 64,

21   which I guess --

22          THE COURT:  Binder two.

23          THE WITNESS:  I'm sorry, could you repeat the

24   exhibit number?

25

BY MR. LEWIS:

Q.    Exhibit 64.  And I direct your attention to the first page of that exhibit, which is titled Exhibit 1 on the top right-hand corner.  I'm sorry, the first page of the report. The report has 31 pages, and then it is followed by Exhibit 1.  Is this a list of additional materials you reviewed in preparation of your supplemental report in this case?

A.    Yes, it is.

Q.    Is there anywhere on that list, where there is a piece of literature that listed -- that addresses any anomalies with regard to the efficient market --

A.    None of these things I think specifically.  Actually, I -- there is probably a discussion of anomalies in the Andrei Shleifer book.

        THE COURT:  Which one is that?

        THE WITNESS:  That's number 14, Inefficient Markets, An Introduction to Behavioral Finance, but I don't know that with certainty as I sit here.

BY MR. LEWIS:

Q.    At your deposition did you testify that you were unfamiliar with the accrual anomaly?

A.    I don't know what I testified.  I'm not unfamiliar now.

Q.    At the time you had your deposition taken, you had already prepared both of your reports; is that correct?

A.    That's correct.

Q.   Did you testify at your deposition, that you were
unfamiliar with the accrual anomaly?

A.   I don't remember.

Q.   Let me point you to Page 4 of your deposition, please.
I'm going to read the question again and ask you to read the
answer, starting at Line 3, continuing through Line 18.

      "Question:  What is an accrual anomaly?  Are you
familiar with that term?"

A.   "I'm familiar with the term.  It is in, I believe, one
of your expert's reports, and I believe it refers to a
pattern of stock returns related to the -- the amount of
accrued earnings and overall earnings reported by a
company."

Q.   "Are you familiar with any literature, other than what
Mr. Lys may have referenced in his expert report with
respect to accrual anomalies?"

A.   "Nothing that I can specifically think of, no."

Q.   "Is accrual anomaly as reported in the literature
consistent or inconsistent with semistrong EMH?"

A.   "I don't have an opinion about that."

Q.   Is it also fair to say that at the time of your
deposition, which was after you prepared your report in this
case, that you had little familiarity with post-earnings
announcement drift?

A.   I don't know how you define "little."  I understood the

1   issue, I believe, in general terms.

2   Q.   Let me direct your attention to your deposition at Page

3   190.

4            THE COURT:   That was post-earnings what?

5            MR. LEWIS:   Announcement drift.

6   BY MR. LEWIS:

7   Q.   I'm going to ask you to start reading on Line 25 and

8   all the way over to 192 and Line 18.

9   A.   Are you going to read the question?

10  Q.   Before we do that, let me ask one other question.   Were

11  you sitting in the courtroom during this trial when

12  Professor Lys testified about post-earnings announcement

13  drift?

14  A.   Yes, I was.

15  Q.   And were you sitting in the courtroom when Professor

16  McEnally testified about post-earnings drift or earnings

17  surprise as he claimed?

18  A.   I was not here for Professor McEnally's testimony.

19  Q.   Now we'll start reading at Page 190, Line 25.

20       "Question:   What is post-earnings announcement drift?"

21  A.   "Answer:   My understanding of that is, that it's an

22  empirical anomaly, and anomaly, if you will, that relates to

23  a finding that a company's -- that stocks of companies that

24  have positive earnings surprises tend to appreciate even

25  after the earnings surprise is announced."

Q.    "How long has that phenomena been the subject of the
published information?"
A.    "I'm not sure."
Q.    "Is fair to say it goes back as far as the 1960's?"
A.    "I don't know."
Q.    "Have you read any articles or studies on that topic?"
A.    "I've looked at some.  I don't recall if I've read them
in -- in -- completely."
Q.    "So does this mean -- is the -- is the implication of
post-earnings announcement drift that investors don't --
strike that.

      "Is the implication of post-earnings announcement drift
that investors -- strike that -- that investors underreact
to news about a company?"
A.    "I think the -- the -- the empirical literature
documents what it documents, which is just what I said.
It's the tendency of stocks to continue to appreciate,
whether that is a function of investors underreacting to the
news or failing to appreciate the fact that additional
positive news follows that additional positive earnings
announcement.  I think is -- I'm not sure.  I believe that
it's -- I believe it's still probably a subject of
controversy" -- let me start again.  "I believe that is
still probably a subject of controversy, but I don't
actually know."

1  Q.   "Does the published literature establish post-earnings

2  announcement drift exist for all stocks?"

3  A.   "I don't know.

4  Q.   "Including large -- does the published literature

5  establish that although the drift may be less for large

6  stocks than small, it still exists?"

7  A.   "I don't know."

8  Q.   "By large, I mean large cap.  Did you understand the

9  question?"

10  A.   "Yes.  But I still don't -- I still don't know the

11  answer."

12           MR. LEWIS:  Thank you.

13           I have no further questions, Your Honor.

14           THE COURT:  Mr. Charnes, do you?

15           MR. CHARNES:  Yes.

16  BY MR. CHARNES:

17  Q.   Do you still have your deposition transcript, Doctor

18  Montgomery?

19  A.   Yes, I do.

20  Q.   I would like to continue reading after where Mr. Lewis

21  stopped on Page 192.  Are you there?

22  A.   Yes, I am.

23  Q.   Again, I'll read the question, if you could read the

24  answer, starting on Line 19.

25        "Is post-earnings announcement drift consistent or

1    inconsistent with semistrong efficient market hypothesis?"
2    A.    "I think it depends on a debate as to the reasons for
3    that, for the drift."
4    Q.    "Well, it's not consistent for semistrong efficient
5    market hypothesis, is it?"
6         There was an objection, and then --
7    A.    My answer:  "It depends on if this is a drift that
8    investors could and did anticipate ahead of time."
9    Q.    "Explain what you mean by that."
10   A.    "The semistrong or any form of market efficiency
11   involves whether there are predictable stock returns above
12   the compensation for risk.  What I believe this literature
13   that you're referring to documents is the tendency of stock
14   returns in past -- in a database of past returns.  What I
15   don't think it addresses specifically is whether investors,
16   knowing that such"  -- the transcript says attendance, I
17   believe it is supposed to be such a tendency -- "that such a
18   drift might occur failed to take advantage of it and buy the
19   stock.  And the question, I guess, comes down to whether
20   it's reasonable to assert that investors know about this
21   drift ahead of time and failed to act, and if that -- if you
22   can assert -- if you can establish that, then you can
23   establish that it's a departure from semistrong efficiency.
24   I don't know enough about the literature on that particular
25   issue to know if anybody has brought any evidence to bear on

1  that question."

2  Q.   Doctor Montgomery, you have reviewed the expert reports

3  that Plaintiff has submitted in this case, have you not?

4  A.   Yes, I have.

5  Q.   And did you or did you not -- strike that.

6       Were you present in the courtroom for Professor Lys and

7  Doctor Biller's testimony in this case?

8  A.   Yes, I was.

9  Q.   At any point either in their testimony or in their

10 expert reports, had they suggested that the accrual anomaly

11 has any application to the facts in this case?

12         MR. LEWIS:  Objection, Your Honor.

13         THE COURT:  I will allow him to answer that for

14 the purpose of showing what he thinks he heard, not for the

15 purpose of what actually the testimony was.

16         THE WITNESS:  Maybe you could repeat the question.

17 BY MR. CHARNES:

18 Q.   In either their expert reports or their testimony, have

19 you -- any of the Plaintiff's experts argued that accrual

20 anomaly applies in any way to the facts in this case?

21 A.   No, not that I'm aware of.

22 Q.   Have any of the Plaintiff's experts, in either their

23 testimony here in court or reports, argued that

24 post-earnings announcement drift has any application to the

25 facts of this case?

A.   No, they have not, to the best of my knowledge.

MR. CHARNES:  Nothing further.

MR. LEWIS:  Nothing further, Your Honor, other than argument.

THE COURT:  And, Doctor Montgomery, perhaps you should step outside in the hall as we discuss this.

(The witness left the courtroom.)

MR. LEWIS:  Your Honor, focusing on two specific areas that I questioned him about, let's take the last one first, which is efficient market hypothesis.  Much of his opinions -- the heart of many of his opinions in the report rest on review that the semistrong efficient market hypothesis is a valid concept, extremely so in his case.  I think he's testified that he's really done -- other than what he got generally when he went to school, he really doesn't have any particular expertise in the efficient market hypotheses.  He hasn't published on it, he hasn't written on it, he hasn't taught on it.

Both Professor McEnally and Professor Lys testified it was one thing they did agree about, that two of the major departures on the efficient market hypotheses in the literature were accrual anomaly and post-earnings announcement drift.

The witness, at the time of his deposition, that late, really had never heard of the accrual anomaly, and had

1    little familiarity.  I think Mr. Charnes, the excerpt

2    Mr. Charnes had him read, at the end of it, as well as the

3    excerpt I read, little familiarity with the post-earnings

4    announcement drift, which is the major one document in the

5    literature.

6          He testified that he -- if you look at the

7    exhibits to his reports, he evidently did not review any of

8    the literature on any of these anomalies in the course of

9    preparing his report.

10         The issue isn't whether Professor Lys or Doctor

11   Biller said that that, either of those concepts has specific

12   analysis, specific applicability to the facts of this case,

13   the issue is, Doctor Montgomery rests his opinions on the

14   efficiency of the markets, the semistrong form of market

15   efficiency and, therefore, for him to be unfamiliar with the

16   two major deviations to it documented in the academic

17   literature, shows he's not truly an expert on that.

18         I don't see how somebody could be expert on it, if

19   they haven't read the major literature with regard to its

20   failings.  That's on efficient markets.

21         THE COURT:  I'm going to allow him to testify on

22   that, subject to your cross-examination, which you may

23   choose to stand on what you have already asked, or you may

24   ask further questions, as that goes to the weight of the

25   value of his opinion.

1          MR. LEWIS:  Again, I think with regard to the

2    other subjects as well that I questioned him about;

3    diversification primarily, what individual experienced

4    investors do in terms of securities and securities

5    selection, I don't think -- again, he has general knowledge

6    of finance and economics, I don't dispute he's an expert in

7    that, kind of macro economic issues, but I don't think he's

8    shown expertise in the particular areas of diversification;

9    securities analysis, buying and selling of individual

10   securities or diversification -- or I'll leave it at those

11   two.  Again, I assume Your Honor's ruling would be similar

12   on those.

13         THE COURT:  Yes.  I think he has sufficient

14   training and experience to state an opinion in that field.

15   The extent to which that opinion should be valued, I think

16   is subject to examination you've already made and any

17   further examination that you undertake.

18         MR. LEWIS:  Thank you, Your Honor.  Would this be

19   a good time to take a midmorning recess?

20         MR. CHARNES:  I think so, Your Honor.

21         THE COURT:  Let's do that.

22         Doctor Montgomery, we're going to take a

23   midmorning recess, so you may come down off the stand and

24   we'll be back in about 15 or 20 minutes.

25         (Recess taken from 11:20 a.m. to 11:45 a.m.)

BY MR. CHARNES:

Q.   Welcome back, Doctor Montgomery.

A.   Thank you.

Q.   Will you please turn to Defendant's Exhibit 60.  Do you have that in front of you?

A.   I do.  Okay.

Q.   What is Defendant's Exhibit 60?

A.   This is a copy of my initial expert report for this case, dated April 18, 2008.

Q.   And if you please turn to Exhibit 61 and identify that for the record, DX 61.

A.   Sixty-one?  Exhibit 61 is a list of corrections, primary typographical or numerical to the initial expert report.

Q.   And read together, do Defendant's Exhibits 60 and 61 accurately contain expert opinions you have formed in this case?

A.   Yes, they do.

Q.   With respect to the damages opinions in Defendant's Exhibits 60 and 61, have they been subsequently updated after you wrote those documents?

A.   Yes, they have.  They've been updated in two ways.  I can provide detail on them when you want.  For recent, more recent financial returns and also for an updated list of release signers.

1 Q. If you now turn to Defendant's Exhibit 64. If you

2 could identify that for the record.

3 A. This is a copy of my supplemental report in this

4 matter, dated July 15th, 2008.

5 Q. And if you could please identify Defendant's Exhibit

6 65.

7 A. Defendant's Exhibit 65 is a list of corrections to the

8 supplemental report.

9 Q. And what sort of corrections did DX 65 make to DX 64?

10 A. They are primarily typographical or minor numerical

11 changes.

12 Q. And again with the exception of the damages numbers,

13 which I understand you testified have been updated, do

14 Defendant's Exhibits 64 and 65, read together, accurately

15 contain the expert opinions you formed in this case?

16 A. Yes, they do.

17 Q. If you would please turn to DX 67. Are you there,

18 Doctor Montgomery?

19 A. I am there.

20 Q. What is Defendant's Exhibit 67?

21 A. This is a supplement -- I guess it's actually an update

22 to certain exhibits in the expert report and supplemental

23 expert report. The update, as it says in the first

24 paragraph, the updates reflect information about additional

25 plan participants who have signed releases, and they also

1  reflect data on recent returns on Plan investments and on

2  market financial returns.

3  Q.   You may have just said this, but what is the date of

4  these updates?

5  A.   I think I forgot to say.  It's June 5th, 2009.

6  Q.   And after this -- after Defendant's Exhibit 67, did you

7  further update your exhibits to your reports related to

8  damages?

9  A.   Yes, I have.  The most recent updates reflect financial

10  returns and Plan returns through September 30th, 2009 that

11  is the end of the third quarter of 2009, and also release

12  signers up until November 30th, 2009.

13  Q.   And if you would please review Defendant's Exhibits 244

14  through 251 and then 282, and we can go back with those

15  numbers, and confirm that those exhibits reflect your

16  updated damages information.

17  A.   I'm going to need to turn to a different binder.

18          MR. CHARNES:  It should be in binder four, Your

19  Honor.

20          THE WITNESS:  Okay.  Sorry.  I believe you said

21  starting with Defendant's Exhibit 244?

22  BY MR. CHARNES:

23  Q.   244 to 251, and then 282.

24  A.   Okay.  244, 245, 246, 247, 248, 249, 250 and 259 are

25  all --I'm sorry, I misspoke.  250 and 251, are all exhibits

1  providing the updated -- the most updated estimate of

2  damages in various scenarios for this case.

3      Just remind me of the last exhibit, please.

4  Q.   282.   DX 282.

5  A.   Yes.   This is the update of the returns that are --

6  feed into the damages calculations that were in the other

7  exhibits.

8  Q.   282 is an update of those?

9  A.   Of the financial returns, yes.

10  Q.   Doctor Montgomery, if you please turn to Defendant's

11  Exhibit 239.   It should be in that same binder.   Do you have

12  239, Doctor Montgomery?

13  A.   I have it.   Does the Court have it?

14          THE COURT:   I think I do.

15          THE WITNESS:   Okay.   Good.

16  BY MR. CHARNES:

17  Q.   What is Defendant's Exhibit 239?

18  A.   239 is a summary of my three main opinions related to

19  liability matters in this case.

20  Q.   Who created these summaries?

21  A.   I created the summaries.   The lawyers helped me, the

22  law firm helped me prepare the actual exhibit.

23  Q.   The words on Exhibit 239 are your's?

24  A.   Yes, they are.

25  Q.   Would using Defendant's 239 today assist your

1  testimony?

2  A.   Yes, it would.

3  Q.   If you would please turn to your first opinion listed

4  on DX 239, would you please explain to the Court what your

5  opinion is.

6          MR. LEWIS:  Your Honor, can we have a standing

7  objection on this one, pursuant to the colloquy we had

8  earlier this morning?

9          THE COURT:  Of course.

10 BY MR. CHARNES:

11 Q.   What is your first opinion, Doctor Montgomery?

12 A.   My first opinion is, there was no reason in 1999 or

13 2000 to expect returns from NGH or NA that were in excess of

14 what could be achieved from two alternative ways to put the

15 same concept.  One is the way it's written in this exhibit

16 now, to -- in excess of what could be achieved from

17 diversified investment funds.

18     The other way to put that, which is the way I expressed

19 it in my report, there is no reason to expect extraordinary

20 returns, and by extraordinary -- and sometimes you hear this

21 called abnormal returns, Professor Lys used in his

22 testimony, and those are returns beyond the return that the

23 market will provide based on -- basically the returns beyond

24 what the market provides to a diversified investment,

25 basically beyond the returns in the market, adjusted for

1  whatever the overall market risk is of a particular

2  investment, in this case, NGH or NA.

3  Q.    And what is the basis of that opinion?

4  A.    I think there are three primary bases for this opinion.

5  The first is, I think, essentially, basically for want of a

6  better word, a common sense approach, and that is, the

7  market consists of thousands, if not millions of investors

8  each seeking to find some informational edge to exploit --

9  to get the highest possible return they can for the lowest

10  amount of risk, and if there were public information out

11  there in the market that would have led people to expect

12  that either of these stocks would have a better return, a

13  greater return than the market as a whole or other stocks

14  which are represented by the market average, participants

15  who didn't -- I'm sorry, investors who didn't own either of

16  these stocks would be rushing to buy them.  That process

17  would be bidding up the price.

18       Conversely, investors who already held them, would

19  be -- and may have had plans for whatever reason to sell

20  them, would have said, well, wait I minute, I expect

21  extraordinary returns, I'm not going to sell these stocks

22  now.

23        Both of those things together would create a demand

24  for the stocks and they would, quite quickly, and in a

25  matter of hours, if not quicker, would bid up the price of

1  those stocks, and whatever that public information would

2  quickly be reflected in the stock price, such that there

3  would no longer be any predictable extraordinary returns to

4  be had by investing in the stock, and I think that's --

5  essentially it is common sense, when you think about how the

6  market works and what all the investors in the market are

7  doing as well as all the media covering the market.

8      The second opinion relates to something called the

9  efficient market hypothesis.

10  Q.   You mean the second basis?

11  A.   Excuse me, the second basis, yes.  The second basis for

12  my first opinion is essentially, the efficient market

13  hypothesis.

14      Now, the efficient market hypothesis, which is a

15  theoretical statement that they are essentially the same

16  thing, there are no -- there is no ability to achieve

17  returns, extraordinary returns for any particular financial

18  investment greater than one could achieve from any other

19  investment.  Basically there are no exordinary returns

20  available in the market.  There are three versions of that.

21  There is the weak form, which has to do with no reason to

22  expect extraordinary returns based on the past performance

23  of the stocks, their stock prices or returns.  The

24  semistrong, which says that there is no ability to achieve

25  extraordinary returns based on public -- any publicly

1  available information, and those are the two that are really

2  relevant to my opinion here.  There is also something called

3  strong form, which says there is no -- when there is no

4  ability to achieve extraordinary returns, even relying on

5  insider information, and that's probably not in anybody's

6  estimation correct.

7      The efficient market hypothesis, if it is true for NGH

8  or NA, would also imply that there are no extraordinary

9  returns to be had based on public information.  The

10  efficient market hypothesis, I should say is basically an

11  academic, "formulation" of the common sense view that I

12  already gave you as my first basis.

13      I performed a series of tests of the efficiency of the

14  markets for NGH and NA.  These tests are all tests that have

15  been considered by courts in securities class action

16  litigation, where the establishment of the efficiency of the

17  market is an important part of the establishment that

18  investors could rely on whatever public information is at

19  issue in those cases.

20      I have an exhibit in my expert report that goes through

21  the tests, the details of these tests; several exhibits,

22  rather, for NGH and NA, and in almost all cases, the results

23  strongly support the conclusion that the market for both NGH

24  and NA was efficient during 1999 and early 2000.

25  Q.   If you would please turn to Defendant's Exhibit 240.

1  What is Defendant's Exhibit 240?

2  A.    This is a summary of the tests that I ran on the

3  efficiency of the markets for NGH and NA.

4  Q.    I was just going to ask if Defendant's Exhibit 240 is a

5  summary of the information provided in six and seven in your

6  initial expert report, DX 60.

7  A.    Just have to make sure that I have the exhibit numbers

8  right.

9  Q.    Take your time.

10  A.    Yes, it is.

11  Q.    Does Defendant's Exhibit 240 accurately represent the

12  findings in your expert report?

13  A.    Yes, it does.

14  Q.    Would using DX 240 assist your testimony today?

15  A.    Yes, it would.

16  Q.    Would you, please, using Defendant's Exhibit 240 as you

17  need to, if you would please describe for the Court what

18  your findings were with respect to market efficiency.

19  A.    Okay.  It would probably be helpful as I do this to

20  also -- I'm going to refer to some of my exhibits in my

21  expert report, just because they provide more detail, but

22  the summary is again on Exhibit 240.

23      The Exhibit 240 reports the results of six tests.  The

24  first four of these tests, were tests that were outlined in

25  the Cammer decision, that is, I believe -- my understanding

was the original decision that dealt with the test for
efficient markets. The last two were other tests that have
been in other decisions. The first test looks at the
average weekly trading volume for the stocks, and the idea
behind this is that the more stock that is being traded on a
weekly basis over any period of time, the more investors are
active in the market, making buying and selling decisions,
so any information that's available in the public domain,
those buyers and sellers will be looking at that information
in making their decisions about buying or selling the stock
and, therefore, the prices will more accurately and more
quickly, I shouldn't say accurately, but they would more
quickly reflect any public information.

The average weekly trading volume for NGH was about
2.1 percent of the shares outstanding, and the average
weekly trading volume for NA, was 3.24 percent, and both of
these are above the 2 percent level cited by the Cammer
criteria as providing evidence in favor of an efficient
market, and they do both to me, appear to indicate that
there was a substantial amount of trading volume in the
stocks.

The second test also in Cammer is, the number of
securities analysts covering the stock, and in order to do
this, I derived from the IBES database analysts who were
providing earnings statements and earnings forecasts for the

1    stock.  I found that there were 11 analysts covering NGH and

2    19 analysts covering NA.  These are all sell-side analysts

3    working for brokerage firms and banks that have been

4    discussed in other testimony.

5        Both of those -- in both cases, there is a substantial

6    amount of analysts, and I believe supports the conclusion of

7    the efficiency for both of these stocks.

8        There are many people who are -- as part of their

9    professional activities -- are acquiring, interpreting and

10   processing public information, and this is part of the

11   process by which the public information gets reflected in

12   the stock prices.

13       The third condition, also a Cammer decision is, the

14   eligibility of the companies to file an S3 registration

15   statement with the SEC, and that's a more abbreviated

16   registration statement that is permitted for more

17   established companies.  Both companies were eligible to file

18   such statement, and that, in my mind with the Cammer

19   decision, also supports efficiency.

20       The fourth test is the price response to unexpected

21   news, and this, I think, is the most directly relevant test

22   to efficient market, because it looks directly at whether

23   publicly -- new public information, that is new news, gets

24   reflected in the stock price, whether new news tends to move

25   the stock price to a different level either up or down,

whereas -- and if it moves the stock, the stock moves more
on days where there is news being released, then it does on
other days.  In order to do this -- and the details of this
is reported in separate tables in my expert report.

In Exhibits 9 and 10 of Defendant's Exhibit 60, I
identified three fairly standard sources of news that might
be relevant to investors.  They are earnings announcements,
dividend announcements, and acquisition announcements.  I
tested to see whether the abnormal returns of NGH and NA on
days when there was this sort of announcement had a tendency
to be larger than the abnormal returns were on days when
there wasn't any information, and I indeed found that there
were more days proportionately that were with large returns
when there was also news being released, then there were on
days when there wasn't being released.  So that suggests
that news has a tendency to move the stock, and move it more
than just regular buying and selling.  This, in turn,
supports the conclusion that the stocks both had a fast
response to unexpected news and in terms supports the idea
of the fact -- supports the conclusion that both of these
stocks traded in an efficient market.

Those four I've just discussed are the four conditions
that are mentioned in the Cammer decision, and my
understanding is, they've also been mentioned in a number of
other decisions.

         There are two other conditions that have been mentioned
in other cases that we've also looked at for this case.  One
is the overall market capitalization of the stock, and
actually, I should probably stop and define what market
capitalization is, because the idea comes up in a few areas
in my testimony and in my opinions.

         Market capitalization is the total value of the shares
of stock outstanding of a particular company.  If you look
at all of the shares, let's say that NGH distributed at the
time it may be a hundred million dollars, and that stock was
worth, say, $20 a share, then the market capitalization
would be a hundred million times $20 a share, or
$2 million -- $2 billion, rather.  So that's market
capitalization, overall values of shares in the market.

         Both of these stocks were basically large cap stocks.
NGH's market capitalization range from 2.7 billion to
5 billion during the period from June 15, '99 through
January 31st, 2000.  That is the large market capitalization
that favors a conclusion of efficiency.

         NA's market capitalization, if you only look at
20 percent of the stock that was traded in the market, was
1.5 to 2.3 billion, that's also a substantial market
capitalization and favors market efficiency.

         The final test that I ran, and the only one where the
results are mixed is, the size of the bid ask spread.  The

1    size of the bid ask spread is the difference between the

2    highest quote to buy the stock among the market makers and

3    the lowest stock quote to sell the stock among market

4    makers, and this spread was somewhat -- for NA and NGH, was

5    somewhat wider than the average or typical stock.

6        Having said that, both of these stocks traded on the

7    New York Stock Exchange, which is a very well-established

8    and generally efficient stock market, and I understand there

9    are actually some courts that have generally recognized the

10   New York Stock Exchange as being an efficient stock market.

11       So any way, that's a summary of the tests I ran of

12   market efficiency, and they support my conclusion that both

13   NGH and NA generally traded in efficient stock range.

14   Q.   Doctor Montgomery, based on your experience, are the

15   tests you just performed the ones that are used by

16   economists to analyze market efficiency and fraud on the

17   market, based on the fraud on market theory in security

18   fraud cases?

19   A.   Yes.  Well -- sorry, your question is, is it my

20   experience that these are the tests --

21   Q.   I apologize for the poor question.  Based on your

22   experience, the tests that you -- that you just testified

23   to, are those tests economists perform in order to determine

24   market efficiency for fraud on the market in securities

25   fraud cases?

1    A.    Yes, they are.

2    Q.    You said there are three bases for your opinion.  What

3    is the third basis for your opinion?

4    A.    The third basis is a set of three statistical or

5    econometric -- econometric is really the application of

6    statistics to economic data.  There are three econometric

7    tests of behavior of NA and NGH Stock prices and they also

8    support efficiency.

9    Q.    Are those three tests described in detail in your

10   expert report?

11   A.    Yes, they are.  All three tests support efficiency.

12   Q.    Could you point out where they are located in your

13   expert report, DX 60?

14   A.    Yes.  In DX 60 the results of the tests, I believe they

15   are discussed in the text of the report, of course, but the

16   exhibits summarizing the test is Exhibit Number 10.

17   Q.    Thank you.

18              THE COURT:  And the best way to get to Exhibit

19   Number 10?

20              THE WITNESS:  Depends on where you are.

21              THE COURT:  I got Exhibit 10, page one of one.

22              THE WITNESS:  Yes.  It's only one page.

23   BY MR. CHARNES:

24   Q.    Could you briefly summarize what those three tests are

25   in the results?

1    A.    Yes.    The first test is a test for something called

2    serial correlation.    Serial correlation is a test, and the

3    footnotes of this exhibit provides a lot of detail, but

4    serial correlation is a test that examines the extent to

5    which a stock's return on a particular day are useful in

6    predicting its return on the next day.

7         A positive serial correlation would imply that a

8    positive abnormal or excess return would be followed by

9    another positive abnormal or excess return.

10        Negative serial correlation would mean that a positive

11   return would be followed by a negative return, and if that

12   were true, it would suggest that the market is not efficient

13   in the weak form sense, and that past stock return is useful

14   for predicting a future stock return.

15        The tests for serial correlation for both NA and NGH,

16   basically fail to reject the hypothesis that there is no

17   serial correlation, and so the test supports the conclusion

18   that both NA and NGH were efficient with regard to this

19   test.

20        The second test is a test of the tendency of a stock to

21   overreact to news, and this is based on a selection of days

22   in which either NA or NGH had a large return, that is a

23   return that is statistically significant, the 5 percent

24   level which is a standard measure of statistical

25   significance, and it's a test of whether days with a

large -- that is statistically significant return, tend to
be followed in any of the next ten days by either additional
returns, additional positive returns, additional returns
either in the same direction or in the opposite direction,
so basically, our large returns generally followed by other
large returns, more than you would expect just by looking at
random, a random selection of days.  When you do this test,
the results also support null hypothesis that the markets
are efficient, there is no tendency of stocks to overreact
or underreact to news.

     Finally the third test is based on a paper by authors,
by the name of Lo and MacKinlay.  Lo and MacKinlay test the
variability or variance of stock returns over time.  If the
markets follow a form -- follow something called a random
walk, which is that every stock return is basically
unpredictable and either could either be randomly up or
randomly down on any day, and that's kind of a narrow --
somewhat restricted version of efficient market where there
is no ability to predict anything about stock returns from
day-to-day.  An implication of a random walk is, that the
variability of a stock's return is exactly proportional to
the length of time that the return is calculated over, so
that a two day return would have twice the variability of a
one day return.  A three day return would have three times
the variability of a one day return, and so forth.  And

1   that's the basic idea behind the Lo and MacKinlay test and

2   running this test on NGH and NA also supports a finding of

3   efficiency for NGH and NA.  That's a summary of the three

4   tests that I did.

5   Q.   And in your opinion, Doctor Montgomery, what are the

6   implications of your findings with respect to whether the

7   above market or abnormal returns could have been anticipated

8   into the year 2000 for NGH and NA?

9   A.   Well, all of these -- all of this analysis supports,

10   again, the conclusion that the markets for NA and NGH were

11   generally efficient, at least in 1999 and 2000, and in an

12   efficient market, there is no ability for investors to

13   predictably make extraordinary returns based on publicly

14   available information.

15   Q.   Will you please turn back to Defendant's Exhibit 239,

16   which is the summary of your opinions.

17   A.   Okay.

18   Q.   What is your second major opinion, Doctor?

19   A.   My second major opinion is, that the removal of the NGH

20   and NA from the Capital Investment Plan, did not raise, and

21   in fact lowered the risk level borne by the vast majority of

22   plan participants.

23   Q.   And what is the basis for that opinion?

24   A.   The basis for that opinion is, an analysis that I

25   carried out of the levels of risk of NGH and NA in the Plan,

1  their correlation with other investments, and specific

2  analysis of the levels of risk borne by each participant in

3  the CIP in 1999 and 2000, and the effects of eliminating NGH

4  and NA on the risk levels for each of those participants.

5  Q.   Before we turn to the specific analysis that you did,

6  as with your first opinion, do you have a common sense

7  explanation of this opinion for the Court?

8  A.   Well, I think the common sense opinion is, that single

9  stock funds like NA or NGH, are riskier than diversified

10  stock funds, like the total stock market fund, which was one

11  of the options in the Plan, and the reason is, that a

12  diversified investment funds aggregates investments in

13  numerous different stocks, and the particular risks of

14  investing in each of those stocks, tends to cancel each

15  other out, and that's the basic process of diversification,

16  if you only hold a little bit of this stock, a little bit of

17  that stock, et cetera, they won't all go up at the same time

18  and down at the same time, so your overall risk is

19  substantially less, and that's the basic principle of

20  diversification.

21  Q.   Did you just testify that in addition to that basic

22  principle of diversification, you also undertook analysis to

23  determine a level of risk in this Plan?

24  A.   Yes, I did.

25  Q.   Would you please turn to Defendant's Exhibit 241.   What

1  is Defendant's Exhibit 241?

2  A.    This is a summary of the analysis of plan risk that I

3  performed.

4  Q.    And is the information on Defendant's Exhibit 241,

5  summarized in your analysis in Exhibits 19 and 22 of your

6  report, DX 60?

7  A.    Yes.  It does summarize the analysis presented in those

8  exhibits and in the text of those reports.

9  Q.    Would DX 241 assist your testimony today?

10  A.    Yes, it would.

11  Q.    With reference to DX 241, would you please explain the

12  work that you performed to help you reach your second

13  opinion.

14  A.    Yes.  There really are four different stages of the

15  work.  The first involves the calculation of volatility.

16  Now, volatility is the variability of a particular

17  investment stock or mutual fund or portfolio of multiple

18  investments.  I analyzed this by calculating the historical

19  variability of daily returns of each of the investment

20  options within the CIP, including the NGH and NA Common

21  Stock Funds.  My findings for NGH and NA are in the two

22  columns at the right of the Exhibit 241.

23       For NGH, I found that it had the -- NGH had the second

24  highest volatility among Plan options.  The highest

25  volatility by the way was the RJR Tobacco Common Stock Fund.

I also found that NA had the third highest volatility
among the Plan options and, subsequently, all the
diversified investment funds within the Plan had lower
volatility than these single stock funds.

The second piece of analysis that I performed involved
an analysis of the correlation of the returns of NA and NGH
with other options within the Plan.  The importance of
correlation is a basic statistical concept, and it's the
tendency of two investments to have high returns at the same
time, or conversely low returns at the same time.  The
higher the correlation of the two investments have with each
other, the less benefit you get from diversification from
investing in those two investments together.  When you
diversify you want to try to choose investments that have
low correlation with each other.

So, I calculated the correlation of NGH and NA's Common
Stock Fund returns with each of the other investments in the
Plan.  I found that NGH's returns were highly correlated,
very highly correlated with the returns on RJ Reynolds
Tobacco Common Stock.  That's not surprising, because both
of these stocks had exposure to tobacco litigation, and it's
not surprising that their daily returns would be highly
correlated, reflecting changes in the perception of the risk
of tobacco litigation.

I found that NA had lower correlation with RJ Reynolds

Tobacco Stock, but it is also -- I found that NA was held by far fewer participants than NGH.  NGH was held by many participants because those participants had been investing in their company stock, that is RJR Nabisco, before the spin-off, and then after the spin-off, they simply retained the positions that resulted from the spin-off, without taking any addition to adjust those -- any action to adjust those positions, either positively or negatively.

NA had to be a more active decision by participants, and I found relatively few participants that undertook that active decision to hold NA Stock.

The third piece of the analysis I did was, I used data on Plan transactions and Plan balances and Plan values that I was provided in this case, to calculate the impact for each Plan participant's total account in the CIP to calculate the impact of removing hypothetically the investments in NGH and NA from their Plan accounts on June 14, 1999, and what the impact would be on their total level of volatility, that is risk in their Plan accounts, basically compared to the level of risk, including NGH and NA, whatever positions they actually had with the level of risk of hypothetically taking those NGH and NA investments out on June 15th.  My conclusion was, that the level of risk decreased for the vast majority of participants.  About 80 percent of the participants saw a risk of some degree in

1   the level of risk of NGH and NA were removed.

2      The final piece of the analysis I did was somewhat

3   similar to the previous one, but instead of looking at what

4   would have happened if hypothetically NGH and NA had been

5   removed on June 15th, I looked at what actually happened

6   after NGH and NA were ultimately removed from the Plan on

7   June 31st, 2000, and I analyzed the portfolios of every Plan

8   participant who held either NGH or NA or both, on

9   January 31st, 2000, and these would be the participants

10   whose investments in those stocks would have been

11   transferred into the interest income investments on

12   February 1st. In order to give them some time to make any

13   adjustments they might have wanted to make in their

14   investments after that transfer to interest income, I looked

15   at their investment portfolios as of the end of February,

16   one month later, February 29th, 2000, and I calculated the

17   level of volatility of each participant's portfolio. I

18   compared that level of volatility of risk with the level of

19   volatility of risk right before NGH or NA were removed on

20   January 31st, 2000, and I found, similar to my analysis for

21   June 15th, I found that removing -- the actual removal of

22   NGH and NA resulted in reduction of risk for the vast

23   majority of participants, in this case, about 75 percent of

24   participants saw a reduction of their level of risk.

25      Those are -- that's a summary of the four different

ways that I analyzed the impact of NGH and NA on the risk

borne by Plan participants.

Q.    To your knowledge, Doctor Montgomery, did any of

Plaintiff's experts perform a comparable risk analysis

related to the Nabisco Funds?

A.    No.  To my knowledge, they did not.  I believe

Plaintiff's experts made some statements about the effect

that if NGH and NA had been optimal from a risk standpoint

before June 14th, they would be at least as optimal after

June 14th, and that was based on, I think, as far as I know,

unsubstantiated views about the correlation of NA and NGH

with other investments, but there was no effort to actually

analyze the risk that I'm aware of by either of Plaintiff's

experts.

Q.    Doctor Montgomery, one may argue that the participants

who held NGH or NA Stock in their Plan accounts made the

choice to do so and, therefore, voluntarily assumed the

greater risk to which you've just testified.  Do you have an

opinion as to whether such an argument would be correct or

not?

          MR. LEWIS:  Your Honor, objection.

          THE COURT:  Doctor Montgomery, do you mind

stepping out in the hall.

          THE WITNESS:  Not at all.

          (The witness left the courtroom.)

          1          MR. LEWIS:  I don't think there is any -- he's not

          2     qualified as an expert in the psychology of 401(K) plan

          3     participants, as to why they make decisions they do, as to

          4     what they do.  He said he has no experience consulting with

          5     or helping administer 401(K) plans, unlike Mr. Altman, for

          6     example, so I think it's outside his area of expertise, Your

          7     Honor.  We're heading to an opinion as to what participants

          8     do or don't choose to do.

          9          MR. CHARNES:  Your Honor, I can try to rephrase.

         10     He actually analyzed the participant data and reached

         11     opinions on that data, as to behavior of the participants in

         12     the Plan.  He's not testifying, as he made clear, I think on

         13     voir dire, that he's not testifying about the investment,

         14     he's not qualified to talk about the investment behavior of

         15     any particular person, but based on his training and

         16     experience and on his analysis of a million plus pieces of

         17     data here, he will be testifying about his actual -- the

         18     results of his study about the participant data and what

         19     they show.

         20          As I said, I think I can try and rephrase the

         21     question, if Your Honor has a concern with the way it was --

         22          THE COURT:  I do have a concern about the way it

         23     was phrased.  I don't know -- how do you intend to rephrase

         24     it?

         25          MR. CHARNES:  Well, I think I can ask him if he's

studied the behavior of participants -- strike that.

I can ask him if he's studied the actions taken by participants in the Plan, based on the data he has, which is over the period of 1997 to, I believe, 2002. And if he has a conclusion as to whether participants -- as to what proportion of participants were making active -- based on the data that he analyzed, whether participants were actively managing their accounts or not.

THE COURT: Do you object to that?

MR. LEWIS: It depends on the ultimate form of the question as the conclusion, Your Honor. I don't have any objection -- I don't know that he's particularly qualified to do this statistical study, not having experience administering 401(K) plans, familiarity of the records, but if he just gives the numbers, that's fine, but I think I may still have an objection when we get to the punch line, when Mr. Charnes gets to the punch line.

THE COURT: Why don't we go there and see where we are.

BY MR. CHARNES:

Q. Doctor Montgomery, do you have in your possession data regarding participant -- strike that.

Did you have in your possession data regarding the activities of participants in their accounts?

A. Yes, I do.

1  Q.   And what was the period of time for which you had that

2  data?

3  A.   It was from the middle of 1997 through the end of 2002.

4  Q.   And did you do any work to analyze that data to

5  determine the activity of participant changes -- strike

6  that.

7       Did you do any work using that data to determine how

8  frequently participants in the Capital Investment Plan made

9  changes to their Plan account?

10 A.   Yes, I did.

11 Q.   What was the conclusions of that study?

12 A.   The analysis that I had staff under my direction

13 perform looked at transfers, voluntary transfers that

14 participants made from one investment fund to another, and

15 these would be transfers that participants might undertake

16 if they wanted to reallocate their investments based on

17 changing -- their changing perceptions of risk or their

18 changing views of investments, whatever.  And I think they

19 would be indicative of Plaintiff's -- I'm sorry,

20 participants taking an active role in managing their

21 portfolio.

22      At any rate, we looked at the number of participants

23 who had no voluntary transfers over the entire data set that

24 is from mid 1997 through the end of 2002, which I think is

25 five and a half years, if I'm calculating it correctly, and

1   I found that there were about 1,500 of the approximately

2   3,500 participants in the data set had no voluntary

3   transfers whatsoever.  I believe the exact number was 1,568,

4   but I may have that off a little bit.

5               THE COURT:  Are these total participants in the

6   CIP?

7               THE WITNESS:  No, Your Honor.  They are the -- it

8   is the data set that we were informed were all the

9   participants who had a position in either NA or NGH on June

10  15th, 1999.  So they are all the participants who are

11  potentially members of the class.

12  BY MR. CHARNES:

13  Q.   So approximately 45 percent?

14              MR. LEWIS:  Excuse me, move to strike everything

15  in the answer up to the point where he said, "We looked at

16  the number of people."  All of the beginning of it was

17  speculation and opinion on what people might or might not

18  have been thinking, in terms of risk, et cetera.

19              THE COURT:  Okay.  I will not consider that up to

20  this point.

21              MR. LEWIS:  Thank you.

22  BY MR. CHARNES:

23  Q.   Doctor Montgomery, is your testimony that approximately

24  45 percent of the participants who held NGH and or NA as of

25  the time of the spin-off, never made a voluntary transfer

1  during the time period you examined?

2  A.    If the math is right, about 1,500 is about 45 percent

3  of 3,500, sounds about right.

4            THE COURT:  You do the math before you agree.

5            MR. CHARNES:  Your Honor, I'll withdraw the

6  question.

7  BY MR. CHARNES:

8  Q.    Doctor Montgomery, did you also compare the holdings of

9  participants who were -- whose NGH and NA shares were sold

10  on January 31st, with their holdings as of June 14th, 1999?

11  A.    Yes, I did.

12  Q.    What were the conclusions of that analysis?

13  A.    Well, the comparison is slightly broader than your

14  question stated.  It was a comparison -- it was an

15  examination of their holdings of both NGH, which was the --

16  had been the former RJR Nabisco Stock, and also their

17  holdings of RJR Tobacco Stock, which was the stock they

18  would have received as a result of the spin-off, so

19  everybody who held RJR Nabisco Stock on June 14th, received

20  NGH and RJR Tobacco Stock, and I found that for many --

21  forgetting if it was most, but many, fairly certain it was

22  most participants who had positions in NGH as of January

23  31st, 2000, most of them had not done anything to change

24  either their RJR Tobacco or their NGH positions since the

25  spin-off, that is, they held exactly the same positions on

January 31st, that they had held on June 15th.

        THE COURT:  And I'm not sure how helpful that is.

Any, most.  I'm not sure how to process that information,

Mr. Charnes.

BY MR. CHARNES:

Q.   Doctor Montgomery, would it help you to refer to your

expert report to put a little bit more meat on the bones, so

to speak?

A.   Yes, it would.

Q.   If you refer, please, to DX 64, which is your

supplemental report -- and I'm sorry -- yes, DX 60, which is

your original report, on Page 22.

A.   Okay.  Shall I continue?

Q.   Yes.

A.   In Paragraph 73 of my initial expert report, Page 24,

bottom of Page 24, this is the paragraph that reports the

results that I've been trying to remember accurately, and

the third sentence I can just read.  "Furthermore, most

participants who were forced to liquidate NGH held exactly

the same RJR and NGH positions that they received in the

spin-off, without having either increased or decreased those

investments."  So the correct term is most.

Q.   Doctor Montgomery, are you aware of academic literature

which has concluded that 401(K) investors tend to be --

strike that.

1      Are you aware of academic literature contending to find
2  a significant amount of inertia in the behavior of 401(K)
3  participants?
4  A.    Yes, I am.
5  Q.    Based on the studies and research you have just
6  testified to, do you have an opinion as to whether the
7  participants in this Plan have exhibited any degree of
8  inertia?
9            MR. LEWIS:  Your Honor, objection.  Beyond the
10  scope of expertise.
11            THE COURT:  Doctor Montgomery, would you step back
12  out in the hall, please.
13            (The witness left the courtroom.)
14            THE COURT:  Mr. Lewis.
15            MR. LEWIS:  Same objection.  He is not qualified
16  as an expert in participant behavior in 401(K) plans,
17  inertia or anything else.  The fact that he just read some
18  academic literature, it doesn't change the fact that the
19  Court has not qualified him as an expert -- nor does it
20  establish him as an expert in that regard.  I could read the
21  article also, but it doesn't make any me an expert.
22            MR. CHARNES:  He just doesn't read articles, he
23  did several statistical studies regarding participants'
24  behavior, and I think it's well within the field of
25  economics and finance for him to testify about his opinions

regarding how they reflect on the -- consistent with the economics literature that shows participants' inertia.

Doctor Biller agreed there was economic literature that found participants to be extremely -- exhibit extreme inertia in 401(K) accounts and agreed in his experience he found that.

THE COURT:  Then you don't need Doctor Montgomery's opinion; is that right?

MR. CHARNES:  Well, I think the difference is, that Doctor Biller was explaining his experience and Doctor Montgomery would be testifying about what he found based on his statistical analysis.

THE COURT:  He's testifying about what he found on his statistical analysis of these participants?

MR. CHARNES:  Yes, sir.

THE COURT:  But he really is not an expert with regard to anything else, is he?

MR. CHARNES:  I think his opinion would be based on his -- he has an opinion about inertia exhibited by these participants.

THE COURT:  Why do you need to get his opinion about that as long as you have the number?

MR. CHARNES:  That's fine, Your Honor, I'll move only.

THE COURT:  When you get to a convenient stopping

```
 1   place, we'll take our luncheon recess.  You let us know when
 2   you get there.
 3               MR. CHARNES:  I think I just have one or two more
 4   questions, Your Honor.
 5               THE COURT:  Okay.
 6   BY MR. CHARNES:
 7   Q.   Doctor Montgomery, based on a risk analysis that you
 8   have -- that you performed and to which you just testified,
 9   do you have an opinion about the implications of your
10   findings for Plaintiff's claims for breach of fiduciary
11   duty?
12   A.   Yes, I do.
13   Q.   And what is that?
14   A.   My opinion is, that the decision to remove or not to
15   retain NGH and NA Stocks was to the benefit of participants.
16   There were no extraordinary returns to be expected from
17   either stock, so the participants were not giving up any
18   expected returns beyond which -- beyond those they could
19   have already attained from other investments in the Plan,
20   and generally the risk borne by participants declined when
21   NGH and NA were removed and, therefore, the decision to
22   remove the stocks didn't raise risk.  The combination of not
23   sacrificing any expected extraordinary returns and not
24   raising risks, in fact lowered risk, makes this a beneficial
25   decision for Plan participants, and also a prudent decision.
```

1  Q.   If you would please --

2          MR. LEWIS:  May I have a motion to strike on that

3  one?  May I take one second?  I'm being passed notes here.

4  If I could take one second on that, literally.

5          THE COURT:  You mean to confer?

6          MR. LEWIS:  To confer, yes.

7          THE COURT:  Surely.

8          MR. LEWIS:  I'll just cross-examine instead, Your

9  Honor.

10          MR. CHARNES:  Now is a convenient time, Your

11  Honor.

12          THE COURT:  Why don't we take our luncheon recess

13  at this time.  Doctor Montgomery, not that you intended to

14  carry on a conversation with folks on this side of the

15  courtroom, if you would suppress that desire until a later

16  time.

17          Let's take a luncheon recess.

18          (Luncheon recess taken from 12:45 p.m. to 2:00

19  p.m.)

20  BY MR. CHARNES:

21  Q.   Doctor Montegomery, if you would please turn to

22  Defendant's Exhibit 239.

23  A.   Okay.

24  Q.   What is your third major opinion?

25  A.   The third major opinion, as I mentioned before the

break, also is that because the removal of NGH and NA cannot reduce expected returns in the Plan, and it did not -- and because the removal of NGH and NA did not increase risk, removing NGH and NA was beneficial to Plan participants and was not imprudent.

Q.   And you testified to the basis for that right before the break for lunch; is that correct?

A.   That's correct.

MR. CHARNES:  Your Honor, in the next series of questions, we'll be referring primarily to Defendant's binders three, four and five.

Doctor Montgomery, if you want to refer to his expert report, that will be in two.  And also be looking at some point in Plaintiff's binder 11.  I can give you forewarning for that one when we get closer.

BY MR. CHARNES:

Q.   Doctor Montgomery, did Professor Lys and Doctor Biller both contend that the stock market is not perfectly efficient and, therefore, investors could have expected to receive returns on NGH and NA above those as the market as a whole?

THE COURT:  Sustained.

MR. LEWIS:  Objection.

BY MR. CHARNES:

Q.   Doctor Montgomery, do you have an opinion as to whether

1    the stock market is perfectly efficient?

2    A.    Well, I don't believe that it is perfectly efficient,

3    no.

4    Q.    Does that opinion impact or undermine your prior

5    testimony in any way?

6    A.    No.  I don't think that any of my conclusions depend on

7    perfect efficiency.  The market for NGH and NA Stocks were

8    generally efficient, and that is one of the bases for my

9    opinion.

10   Q.    Did you hear testimony in this case about certain

11   anomalies that have been reported in the academic literature

12   with respect to efficient market hypothesis?

13   A.    I did.

14   Q.    Do you have an opinion about how that impacts your

15   testimony, if at all?

16   A.    It does not effect my testimony.  The two major

17   anomalies that have been cited by, I believe by Professor

18   Lys, pertain to post-earnings announcement drift effect, and

19   something called the accruals and anomaly.  I maybe should

20   just briefly explain.  An anomaly in the literature is a

21   pattern of returns in an association of abnormal returns

22   with some other factor that appears to be anomalous, and

23   that it appears to be not in conformity to the market that

24   are generally expected to be efficient.

25        I think there is extensive literature on both of these

1    topics.  Neither of them seem to be at all relevant to

2    this -- the issues having to do with the removal of NA or

3    NGH.  There is no issue with post-earnings announcement

4    drift in this case.  There is also no assertion that I'm

5    aware of, that somehow relates to the level of accruals in

6    NGH or NA's financial statement, and those are the degrees

7    to which those two anomalies would be relevant, and there is

8    no relevance that I am aware of.

9    Q.    Doctor Montgomery, did Professor Lys cite a study that

10   he testified in his report -- he opined that stocks with

11   higher ratings outperform those with lower ratings?

12   A.    Yes.  He did state a study.  It was by Barber and three

13   coauthors.

14   Q.    In your opinion, does that study support the opinion he

15   gave in this case?

16   A.    No.  In my opinion, it does not support his opinion.

17   Q.    Could you explain that to the Court, please.

18   A.    Yes.  I think there are at least three, maybe four

19   reasons that it does not support his opinion.  The first is,

20   that the amount of -- well, let me back up.  The study is a

21   study of analyst ratings and stock returns associated with

22   strategies of investing that are based on investing in stock

23   with the highest analyst ratings, and actually selling

24   short, those stocks with the worst analyst ratings.  The

25   study overall, concludes that the strategy of investing in

the highest rated stocks would give investors following that
strategy, about a 4 percent return, 4 percent abnormal
return per year, and I do not believe that a 4 percent
return is anything to do with large returns that NA and NGH
achieved in 2000, and then are part of the claim in this
case.

The other important point to make about that case, even
if you accept that the 4 percent is relevant is, that that
case, that paper, rather, says up front, that the result
could not apply to the several hundred companies with the
largest market capitalizations, that they do not find any
discernible effect, any discernible relationship between
analyst ratings and abnormal returns for those top several
hundred companies.

Nabisco -- both Nabisco Stocks would be in the category
of the top several hundred companies in market
capitalization and, therefore, the study is not relevant for
either of the Nabisco Stocks.

The third point to make is, that the category of stocks
with the highest analyst ratings, actually is the category
with an average rating that were substantially better than
the rating that NA and NGH had during 1999 and early 2000.
So again, it is not relevant to this case.

The final point to make is, that that study analyzed
data through 1999, and it indeed found that subject to the

qualifications I've mentioned, that there is a positive

relationship between analyst ratings and subsequent stock

returns, and the follow-up study, the same authors looked at

data for 2000 and 2001, and in fact found the opposite

results; more highly rated stocks had a worse return in

2000, 2001, than low rated stocks.  So, that shows that this

is not a general phenomenon, that it's very sensitive to the

period in which you are looking and, you know, in reality,

the return -- positive returns that this case is focusing

on, are returns that happened in 2000.

So for those reasons, I do not believe that the study

is relevant to anybody's opinion in this case.

Q.  Doctor Montgomery, did Professor Lys testify that there

was a large body of academic literature documenting, in his

view, the utility of analyst reports in making investment

decisions?

MR. LEWIS:  Objection.

THE COURT:  Sustained.

BY MR. CHARNES:

Q.  Doctor Montgomery, did you hear testimony from

Professor Lys regarding a large body of academic literature

related to utility of analyst reports?

MR. LEWIS:  Objection.

THE COURT:  Sustained.

1  BY MR. CHARNES:

2  Q.   Doctor Montgomery, in your opinion, is there a large

3  body of academic literature that supports the conclusion

4  that analyst reports are useful in making investment

5  decisions?

6            MR. LEWIS:  Objection.

7            THE COURT:  Would you step out in the hall,

8  please.

9            (The witness left the courtroom.)

10           MR. LEWIS:  He has no expertise in academic

11  literature.  He couldn't even testify that he ever read a

12  single paper on this issue until he did work in this case on

13  the issue of analyst reports and recommendations, so I don't

14  know what his qualification is to talk about the large body

15  of academic literature, when he never looked at it before

16  this case.

17           MR. CHARNES:  Well, Your Honor, I don't think that

18  accurately reflects what his testimony is, but the fact of

19  the matter is, I can lay this foundation, he did review the

20  literature for this case and that, therefore, he is

21  qualified to comment on whether -- comment on the size of

22  the studies that exist as to the value or not of analyst

23  reports in making investment decisions.

24           Whether he read them before or after his

25  engagement in this matter is of little relevance to the

1   question, if he's read them now and can testify about them.

2              MR. LEWIS:  Well, he's done no systematic study of

3   this in the past.  I don't know that he's any more qualified

4   than anybody else to testify about what's in the literature.

5   I mean, it's his opinion as to the literature without a

6   background in that literature, without ever doing any

7   empirical studies of it himself.  I don't think he has the

8   background.

9              THE COURT:  You think there is some requirement

10  that he did empirical studies himself?

11             MR. LEWIS:  Not necessarily empirical studies

12  himself, but at least study the literature prior to the

13  case, at least have some sense of what is out there, what is

14  not out there, what the literature says overall.  If the

15  standard, I guess is any economist can come in and read

16  literature and give opinions, then I suppose he's qualified.

17             THE COURT:  Why couldn't he do that?

18             MR. LEWIS:  Because I think in order to get

19  context to what you are reading, you need to have some

20  background in it and some basic knowledge to apply.  It is

21  not just -- he's being asked for a conclusion about what the

22  whole body of literature concludes or doesn't conclude, and

23  now the context and background.  I don't think he's capable

24  of doing that.

25             THE COURT:  I'm going to allow you to

1  cross-examine him about that.  Now, if it's something that
2  was not in his reports, and it's not a timely opinion,
3  that's one thing.  I think he has established that he has
4  sufficient experience and expertise generally, to allow him
5  to review the literature and say what the literature does or
6  does not say in his opinion.
7          MR. LEWIS:  I did check his report -- to Your
8  Honor's other question, as to whether it was in the report,
9  the sweeping conclusion that is being asked.
10          MR. CHARNES:  I would simply note that Professor
11  Lys so testified about the body of academic literature,
12  there is nothing in his report.  He did not opine in his
13  report about the existence of a large body of literature one
14  way or the other.  He cited a couple of studies which Doctor
15  Montgomery cited in his report and on which he just
16  testified about.  There was no opinion in Professor Lys'
17  reports regarding a body of literature, even though he did
18  testify to that.
19          So, I think, you know, existence of the literature
20  or not is more or less a factual question.
21          THE COURT:  You're the one that raised the
22  question of a large body of literature in the framing of the
23  question.
24          MR. CHARNES:  That was in response to how
25  Professor Lys testified, and that testimony -- and that

testimony was not reflected -- the basis of that opinion was
not reflected in his prior report.

        THE COURT:  Did you object?  Did you object to his
prior report?

        MR. CHARNES:  We did not.

        MR. LEWIS:  In looking through his initial report,
Your Honor, we have not found it in there and we're looking
quickly through the supplemental report.

        THE COURT:  Okay.

        MR. LEWIS:  We're not finding it, Your Honor, in
the supplemental report.

        THE COURT:  Can you point that out, Mr. Charnes?

        MR. CHARNES:  I'm sorry.

        THE COURT:  Can you point out in his expert
witness reports where he discusses this?

        MR. CHARNES:  Well, I don't believe he discussed
it in those terms.  He did indicate that he reviewed the
literature.  This is not -- I don't think it --

        THE COURT:  Show us what you're talking about, and
perhaps I'm confusing this with something else, but did he
not testify in the deposition testimony that Mr. Lewis asked
him about that he was not familiar with that?

        MR. CHARNES:  No.  I don't think that is correct.

        THE COURT:  Perhaps I'm confusing that with
something else.

1          MR. CHARNES:  Let me read one, DX 60, which is his

2     initial report, on Page 14, section on analyst reports, he

3     wrote, I quote --

4               THE COURT:  Page what?

5               MR. CHARNES:  Page 14 of DX 60.

6               THE COURT:  Okay.

7               MR. CHARNES:  In Paragraph 34 at the top of the

8     page of he wrote, second sentence, "economic literature

9     indicates that any information from analyst opinions, like

10    any other public information, would have been rapidly

11    incorporated into market prices for NGH and NA."  And in

12    this report, and more so in the rebuttal report, he

13    specifically discusses references to the articles that in

14    the academic literature that Professor Lys relied on.

15         In his deposition, I do not believe it is correct

16    to say that he was unfamiliar with that literature on the

17    two anomalies.  During voir dire what Mr. Lewis went over

18    were his knowledge of economic literature on the two

19    so-called anomalies in the efficient market hypothesis.  I

20    do not recall him talking about literature regarding analyst

21    reports in general, and I think what he would testify to is,

22    that he reviewed the academic literature before arriving at

23    his opinions, and identified those articles that related to

24    analyst reports and, therefore, is familiar with the extent

25    of the academic literature on analyst reports.

1          THE COURT:  Why don't you lay that foundation.

2          MR. CHARNES:  Okay.  Yes, sir.

3          THE COURT:  And you may object.

4          MR. LEWIS:  Thank you, Your Honor.

5     BY MR. CHARNES:

6     Q.   Doctor Montgomery, during the course of developing your

7     opinion in this case, did you review academic literature

8     relating to the value of analyst reports in financial and

9     investment decisions?

10    A.   Yes, I did.

11    Q.   You did that --

12         THE COURT:  The question is, when.

13         THE WITNESS:  The question is when?

14         THE COURT:  That's my question.

15    BY MR. CHARNES:

16    Q.   That's the more important question.

17    A.   I reviewed -- well, I'm not sure I remember exactly.  I

18    know I reviewed the Barber paper cited by Professor Lys

19    before I wrote my first report.  I don't recall whether I

20    reviewed it then, relative to later.  It is just a little

21    bit difficult to recall the timing.

22    Q.   I guess the question is, Doctor Montgomery, did you

23    generally survey the economic literature in an attempt to

24    identify academic papers discussing the value of analyst

25    reports before finalizing your supplemental opinion in this

1  case?

2  A.    I made an effort to identify whether there were any

3  papers that would be relevant to the opinion.   I can't find

4  any.

5  Q.    Apart from the papers that Professor Lys cited, you did

6  not find any additional papers discussing analyst reports?

7  A.    There are certainly other articles involving analyst

8  reports, but I don't believe that any of them specifically

9  bear on the issue at hand.

10  Q.    By the issue at hand, what are you referring to?

11  A.    Well, you know, the -- I don't think I did an

12  exhaustive search for articles related to analyst reports

13  and the association of analyst reports and returns.   I

14  looked at the -- looked at some articles.   Obviously I

15  looked at the Barber article, and I looked at some others,

16  and none of them provided evidence that they would have been

17  useful in the issues in this case in terms of helping to

18  predict any extraordinary returns in NGH and NA.   It's a

19  little difficult for me to say how exhaustive the search

20  was.

21          THE COURT:   I sustain the objection with regard to

22  the body of literature generally.   You have elicited his

23  position with regard to the Barber article and what if any

24  significance it had with regard to the issues in this

25  matter.

1          MR. CHARNES:  Thank you, Your Honor.

2    BY MR. CHARNES:

3    Q.   Doctor Montgomery, did you perform any analysis of

4    stocks generally, for the period of 1999 and 2000, with

5    ratings similar to those -- analyst ratings similar to those

6    of NGH and NA to determine how they performed?

7    A.   Yes, I did.  I did an analysis of large CAP stocks,

8    those in the S&P 500 Index in 1999/2000, and looked at how

9    stocks were different -- at different levels of rating

10   performance during those two years.

11   Q.   What were your conclusions, based on the study that you

12   performed?

13   A.   My conclusion, and this is shown in the exhibits in my

14   report, my initial expert report was, that there was no

15   evidence -- evident association between returns and analyst

16   ratings between those stocks and those earnings.

17   Q.   Did you, with reference to DX 60, which is your

18   additional analyst report --

19   A.   Expert.

20   Q.   Could you please refer the Court to the results of that

21   study.

22   A.   The results of the study are shown in Exhibit 11 to my

23   initial report, Defendant's Exhibit 60, probably about three

24   quarters of the way through the entire exhibit.  Exhibit 11

25   is a four page exhibit.

Q. Is Exhibit 11 to your report discussed in the text of your report beginning at Paragraph 28 on Page 11 -- I'm sorry, Paragraph 32 on Page 13?

A. Yes, it is. In fact, Paragraph 32 is the primary discussion of the results.

Q. Could you, Doctor Montgomery, please read Paragraph 32 for the record.

A. Okay. "We performed our own analysis of the return of stocks with similar ratings to NGH and NA. Exhibit 11 shows the performance of stocks in the Standard and Poor's 500 Index in 1999 and 2000, comparing those with similar ratings to NGH and NA to other stocks. We separated the members of the S&P 500 Index into quintiles based on the strength of their analyst ratings as of the beginning of 1999 and 2000, and calculated their returns over the next 12 months. We defined the strength of analysts' ratings in terms of both the average ratings for a stock, as well as the percentage of ratings for a stock that were "buys." During 1999 and 2000, stocks with ratings similar to those for NGH and NA did not tend to exhibit extraordinary returns over the next 12 months. The median returns for stocks with their ratings range from negative -5.6 percent to 17.8 percent, compared with median returns for all stocks ranging from 1.2 percent to 11.9 percent. We also did not find any evidence that stocks with more favorable analyst ratings delivered better

1  investment returns than stocks with less favorable ratings."
2  Q.    Doctor Montgomery, in his expert report, did Professor
3  Lys conduct an econometric analysis addressing the value of
4  analyst reports?
5  A.    Yes.  He provided -- did an econometric study in his
6  supplemental report and then another one including a
7  correction in his initial.
8  Q.    Do you have an opinion with respect to the validity of
9  his analysis regarding the value of analyst reports?
10            MR. LEWIS:  Objection.  If I can explain.
11            THE COURT:  Would you step back out in the hall.
12            (The witness left the courtroom.)
13            THE COURT:  Which analysis are you referring to?
14            MR. CHARNES:  I'm referring to the analysis both
15  done in his supplemental report and in the addendum
16  correction, it is called, to that report.
17            MR. LEWIS:  That would be the analysis that
18  Professor Lys testified he was not relying on and giving his
19  opinions at trial in this case.  We have that whole going
20  back and forth, and for awhile, you let Mr. Taylor question
21  him about it, and I think eventually curtailed it, Your
22  Honor, and I believe that since Professor Lys is not basing
23  any of his opinions on that analysis, I don't see the
24  relevance of the question.
25            MR. CHARNES:  I think we can impeach Professor Lys

based on any work he did in the case.  He provided two

analyst reports -- excuse me, two expert reports that

provided this progression analysis in two different forms,

and I think it's fair game for Doctor Montgomery to testify

whether he thinks those results are fair and up to

scientific standards or not.  I think if they are not and

the Court is convinced by Doctor Montgomery that they are

not, I think that impacts Doctor Lys' credibility as a

witness and, therefore, is relevant.

THE COURT:  Even though he has disavowed them

himself?

MR. CHARNES:  I think disavow is not quite the

word.  He did not rely on them on the witness stand.  I

don't think he disavowed them.  I think the fact that he put

them forth in his expert report that were duly served on

opposing counsel in the case, and opposing party, makes them

fair game for use at trial, and one of the reasons

potentially why he's not relying on them, go to his

credibility and trustworthiness as an expert.

THE COURT:  I think at this point it is needless

to do that.  I think it's a waste of time, and I will

sustain the objection.

BY MR. CHARNES:

Q.   Doctor Montgomery, what if any research did you do to

identify analyst reports in addressing the NGH and NA Stocks

1  during the period of 1999 and early 2000?

2  A.   I did several different things.  First of all, I looked

3  at the database on IBES that contains, among other

4  information, the data on analyst ratings of stocks from

5  strong buy, strong sell, and I evaluated those ratings for

6  NA and NGH.  In particular, in response to the Plaintiff's

7  expert opinions on the subject, I also reviewed analyst

8  reports that I received from counsel, and I also obtained

9  any other reports that I could obtain from public databases,

10 and I read all of those reports.  Those are the primary ways

11 that I obtained information and analyst reports regarding

12 NGH and NA.

13 Q.   To the best of your knowledge, did you review all of

14 the analyst reports that were produced by the Plaintiff or

15 that were relied on by any of the Plaintiff's experts?

16 A.   Yes.  To the best of my knowledge, I did.

17 Q.   Based on your review of all the analyst reports that

18 you testified that you had in your possession, was there

19 any --

20          THE COURT:  And I hate to spend more time on this,

21 but I think you need to go through what they were.  I think

22 this -- I don't know as I sit here what he has reviewed.

23          MR. CHARNES:  You want him to identify the

24 particular analyst reports?

25          THE COURT:  Yes.

BY MR. CHARNES:

Q.    Doctor Montgomery, if you would please turn to
Defendant's Exhibit 60, which is your initial report in this
case.

A.    Yes.

Q.    In particular, I would like to refer you to Exhibit 2
to your report.

A.    Yes.  This is the exhibit of materials considered.

Q.    And in Exhibit 2 to your report, did you list by name
and date, each of the analyst reports that you reviewed as
part of this -- your work on this case?

A.    Well, this is a list of all of the reports that I had
reviewed, as complete as I felt I could make it.  I have
other reports that I have obtained and reviewed by the date
of this initial report.  I may have received others
presumably from counsel after that, but these were all the
ones that I had at this time.

Q.    Would you please turn to Defendant's Exhibit 64, your
supplemental report.  Are there any additional -- in Exhibit
1 to your supplemental report, DX 64, are there any
additional analyst reports that you obtained after your
initial report but prior to finalizing your supplemental
report?

A.    No.  There are none.  There are none listed here so,
therefore, there are none.

Q.   Was this analyst information that you obtained?

A.   I don't believe there was any additional information.
Now it says in this list that there was additional IBES
inspection.  I can't recall exactly which IBES information
we got for the supplemental report that we didn't already
have for the initial, and I'm just not sure about.

Q.   If I understand your testimony, you believe that the
analyst reports that you reviewed listed in the -- excuse
me, listed in Exhibit 2 to your initial report; is that
correct?

A.   Yes.

Q.   And based on your review of those reports that you
listed in that Exhibit 2 to your expert report, do you have
an opinion as to whether analysts were expecting or
forecasting the returns on NGH and NA that actually occurred
after January 31st, 2000?

A.   Yes.  I do have an opinion about that.

Q.   What is your opinion?

A.   My opinion is, that they were not forecasting the scope
of the returns that NGH and NA had in 2000.  After
January 31st, 2000, none of them were expecting the chain of
events starting with the bid by Carl Icahn that led to the
large rise in NGH and NA.

Q.   Are all of the analyst reports on NA and NGH predicting
appreciation of stock prices of those stocks?

A.   No.  I don't believe so.  Some, I think, had price
targets that implied some appreciation, others were more
pessimistic.

Q.   If you would please turn to DX 301.

A.   I forgot the number.

Q.   301.  If you would please turn to Page 24 of
Defendant's Exhibit 301, 24 and 25.  Are you there?

A.   I'm there.

Q.   And were you present in the courtroom when Professor
Lys testified about these two figures from his report?

A.   Yes, I was.

Q.   And, did Professor Lys use figure four and figure five
on Pages 24 and 25, to present his opinion that analysts
were increasingly more positive about the Nabisco Stocks as
time passed in 1999?

A.   That is my recollection, yes.

Q.   Doctor Montgomery, have you determined whether in
putting together figure four and figure five, whether
Professor Lys included all published analyst recommendations
or just those recommendations that had been issued within
the last month?

A.   Yes.  I have determined that these are all published
recommendations.  These are basically all recommendations
that would have been in the IBES database as of any
particular month, and that would include recommendations

```
 1    that had been issued months, many months before.
 2    Q.   And did Professor Lys testify that when he performed
 3    his regression analysis --
 4              THE COURT:  Sustained.  I'm not going to let one
 5    witness recall what another witness testified to.  That's
 6    for the finder of fact to recall.
 7              MR. CHARNES:  I'll rephrase the question.
 8    BY MR. CHARNES:
 9    Q.   Doctor Montgomery, did you review Professor Lys'
10    addendum -- strike that.
11         Doctor Montgomery, did you review the addendum
12    correction to Professor Lys' supplemental report which is
13    Defendant's Exhibit 303?
14    A.   Yes, I did.
15    Q.   In his addendum correction in the regression analysis
16    he performed therein, did Professor Lys remove from his
17    analysis reports that were older -- analyst recommendations
18    that were older than one month?
19              MR. LEWIS:  Objection, Your Honor.  We're getting
20    back into this correction regression analysis, which was not
21    the basis of Professor Lys' testimony.
22              THE COURT:  Doctor Montgomery, would you --
23              (The witness left the courtroom.)
24              MR. LEWIS:  Perhaps there is some connection I'm
25    missing, but it seems like we're getting back to the
```

regression analysis which Professor Lys is not relying on.
If there is something I'm missing, I will certainly listen,
and perhaps withdraw the objection.

MR. CHARNES: I'm not seeking to go back to the
regression analysis, but I think Professor Lys did things
that are inconsistent. In putting together figure four and
figure five, upon which he testified in this courtroom, he
included all, as Doctor Montgomery just testified, he
included all previous analyst reports that were still in
existence as of a particular day. When Professor Lys did
his regression analysis, however, he excluded, and I believe
he testified about this on cross-examination, he excluded
what were referred to as stale reports, that is reports that
were older than one month, and he testified that he did this
to increase the accuracy of his regression analysis.

What Doctor Montgomery will testify that he
revised, Professor Lys' figure four and figure five to
remove the reports that Professor Lys in his addendum and
corrections concluded were stale and he will testify about
what these tables look like if you remove the so-called
stale reports, and give his opinion about what that shows
about the trend in the analyst reports if you remove the
stale reports. That's where we're going with this.

MR. LEWIS: And although I think we're comparing
apples and orange when you are talking about what one might

do to do a regression analysis for statistical significance
and doing what Professor Lys did in four and five, I can
cross-examine him about that, so I will withdrawal the
objection at this time.

BY MR. CHARNES:

Q.    Doctor Montgomery, referring you back to -- I'm sorry,
let me strike that.

      In his addendum and correction, did Professor Lys, in
the regression analysis of figure one, remove analyst
recommendations from his analysis that were older than one
month?

A.    Yes, he did.  And in Paragraph 2, part B of this
addendum, he makes that statement.

Q.    Would you read that for the record.

A.    "For each month, I used only recommendations that were
released in that month by individual analysts."  Then there
is a long passage in parentheses.  "(The analysis in the
supplemental report was based on IBES consensus
recommendations and, as such, was based on the average
recommendations and the changes thereof as reported by IBES.
Because of the way in which IBES aggregates its data, the
average analyst recommendation reported by IBES includes
carryover recommendations from previous months.)"

Q.    Thank you.  Now, with respect to figures four and five
in his initial report, did you determine whether Professor

1  Lys similarly excluded -- strike that.

2      Did you determine whether Professor Lys similarly used

3  recommendations that were released in that month?

4  A.   No.  He did not do that.  He used all recommendations.

5  Q.   Did you revise Professor Lys' figures for four and five

6  in order to restrict the data in that chart to analyst

7  recommendations issued in that month?

8  A.   Yes, I did.  I took the restricted data from the data

9  set that Professor Lys used in these regressions, and

10  reconstructed a version of the charts with one difference

11  that I can explain, based on non-stale recommendations that

12  is the recommendations that actually are dated.

13  Q.   Would you like to explain the difference?

14  A.   The difference is, the charts that I prepared, there

15  only are at most two, maybe three recommendations, if I can

16  recall correctly, without looking at the chart, only two or

17  maybe three recommendations released in a particular month,

18  so it didn't really make sense to go at the scale like

19  Professor Lys.  Professor Lys' exhibits goes from zero to a

20  hundred percent, so instead, I have the scale just one, two,

21  three, whatever the number the analyst ratings there are.

22  Q.   If you please turn to Defendant's Exhibit 298.

23              THE COURT:  That's number what?

24              MR. CHARNES:  Twenty-nine.

25

1    BY MR. CHARNES:

2    Q.    Doctor Montgomery, what is Defendant's Exhibit 298?

3    A.    This 298 is a reconstruction of the tables as four and

4    five, if I recall correctly, from Professor Lys' original

5    exhibit, but using the current recommendations, that is the

6    recommendations released that month, in line with the

7    approach Professor Lys used in his addendum, and what this

8    shows is, for each month, if you want to look at the first

9    page, the first page is for NGH, it starts -- actually, it

10   starts before Professor Lys' exhibit did.  It starts in

11   January '99, so it would actually be starting with RJR

12   Nabisco, and then in June '99, RJR Nabisco becomes NGH.

13        It shows the fresh recommendations, that is the

14   recommendations that are actually released in the month

15   showing the graph, and it shows whether they're buy, which

16   is the blue; hold, which would be red; or sell, there are no

17   sell, but they would be yellow.  And it shows the number of

18   recommendations.  If a particular analyst had more than one

19   recommendation in a month, it would show the latest one in

20   that month and that happens once or twice.

21   Q.    And with respect to the first page, which as I

22   understand it relates to NGH, what if any conclusions or

23   opinions do you have with respect to trend analyst

24   recommendations with respect to NGH?

25   A.    My opinion would be that if you take the approach of

1   only using the fresh recommendations, there is no clear

2   trend in analyst recommendations.  Arguably, if you look at

3   September to October in 1999, there may be a negative trend

4   because you're going from one buy in September to a buy and

5   hold in October 1999.

6   Q.   If you please turn to the second page of DX 298.  What

7   is this page?

8   A.   This is the same exercise, but for NA instead of NGH.

9   It shows the number for each month of the number of fresh

10  recommendations issued for NA in each month, and by the way,

11  when there is nothing for a particular month, that means

12  there were no fresh recommendations.  Perhaps just to go

13  back to the previous chart, there were no fresh

14  recommendations for NGH after October 1999.

15       Any way, back to the second page, it shows the same

16  information for NA.

17  Q.   And what if any opinions do you have with respect to

18  NA, based on the second page of this exhibit?

19  A.   Well, I don't think that one -- there isn't any clear

20  trend in recommendations, if you look at this chart.

21  Q.   Doctor Montgomery, did you perform any analysis to

22  determine whether spin-offs, including spin-offs that are

23  positively touted by company management analysts, invariably

24  increase shareholder value in subsequent periods of time?

25  A.   Well, that follows from the presumption and the

demonstration of the fact that the -- that records for

stocks like NGH and NA at least are efficient.

I also did have my staff research other spin-offs, and

look for examples of spin-offs that although good things

were generally expected from the companies involved in the

spin-offs, the stocks of those spin-offs in fact didn't turn

out well, and we did find a number of examples where

although the spin-offs were touted, the stocks did not

perform well.

Q.   Would you please turn to Defendant's Exhibit 280, which

is in notebook four.  Do you have that document, Doctor

Montgomery?

A.   I do.

Q.   What is Defendant's Exhibit 280?

A.   This is a summary of some of the information from the

analysis of spin-offs that I reported in my initial expert

report.

It shows the stock return detail for three spin-offs

that occurred before the spin-off by RJR Nabisco of RJ

Reynolds Tobacco, and they are -- these three spin-offs are

the spin-off by Kimberly Clark of a company that is

difficult to pronounce, Schwitser Maunduih and the spin-off

of Fortune Brands by the Gallagher Group and the spin-off by

Campbell Soup company of Vlassic Foods International.

The table shows some of the press coverage of the

1    spin-offs to show that positive things were expected from

2    the spin-off and the spin-off was expected to be positive

3    for the companies involved, and then it shows the stock

4    returns relative to the market for the 12 months following

5    the spin-off, for the period up through June 14, '99, when

6    the RJR Nabisco spin-off occurred, and through -- and also

7    the returns through January 31st, 2000, when the NGH and NA

8    were removed from the CIP.

9    Q.   Doctor Montgomery, is the information contained in

10   Defendants Exhibit 280, also contained in Exhibit 12 to DX

11   61, which is the corrections to your initial report?

12   A.   Yes, it is.

13   Q.   Would using Defendant's Exhibit 280 assist your

14   testimony today?

15   A.   Yes, it would.

16   Q.   Will you please turn to the first page of 280.   What

17   does your research show with respect to the spin-off

18   reflected on that page?

19   A.   This first page is about the spin-off by Kimberly Clark

20   of Schwitzer.  Schwitzer was a company -- Kimberly Clark, of

21   course, is a large paper goods manufacturer and marketer.

22   Schwitzer was a subsidiary of Kimberly Clark, whose main

23   business was cigarette paper, and there were, of course,

24   concerns about tobacco liabilities.  The quote that I have

25   in this, which are all from Wall Street Journal articles,

talk about the desire of Kimberly Clark to have the market

view it as a maker of consumer and healthcare products and

not as a supplier to the tobacco industry.

So, you know, it also talks about the -- the third

quote talks about the fact that investors might view this

positively, that they could have their cake and eat it, too,

is how the quote reads.

At any rate, the spin-off occurred in 1995. In the 12

months following the spin-off, there were some positive

returns. Kimberly Clark had a 3 percent return relative to

the market. Schwitser had a 19 percent. There was actually

positive returns; however, if you look at it from the

standpoint of sitting on June 14th, 1999 when the spin-off

of RJR Tobacco occurred, at that point, Kimberly Clark had

had a 12 percent negative return relative to the market, so

the stock had underperformed the market, and Schwitser had a

negative 65 percent return relative to the market, so it had

dramatically underperformed the market, and the same basic

conclusion results if you look at the returns through

January 31st, 2000.

Q. If you please turn to the second page of DX 280, and

explain to the Court what your research showed with respect

to this spin-off.

A. This spin-off is the spin-off by Fortune Brands. Well,

the company was actually called American Brands until it

undertook the spin-off.  The spin-off by American Brands of

a company called the Gallagher Group, and the Gallagher

Group was the UK tobacco operation of American Brands.

American Brands had previously disposed of its U.S.

cigarette operations, and the Wall Street Journal quotes in

this article -- talks about the American Brands desire to

disassociate itself more fully in the public eye and

investors' eye from the tobacco business.  So this is

another tobacco related spin-off.  Actually, you can see in

the third quote, that American Brands Stock reacted on the

day of the spin-off by raising 8.1 percent on the news of

the spin-off, so as you would expect with an efficient

market, there was an immediate reaction to it.

In the 12 months after the spin-off, however, the

group -- the stock of Fortune Brands, which is what American

Brands had been renamed, underperformed the market by

11 percent, and the Gallagher Group also underperformed the

market by 6 percent, and the underperformance of Fortune

Brands continued through June 14, 1999, and more

dramatically through January 31st, 2000.  Gallagher Group

performed a little better to June 14, 1999, but also had

dramatically underperformed by January 31st, 2000.

Q.   If you please turn to the third page of this exhibit

and please testify about what your research showed regarding

the Campbell Soup/Vlassic spin-off.

A.   Yes.   The Campbell Soup Company spun off a number of

diverse number of food businesses into a company called

Vlassic, named after the pickle part of the business.   And,

the quote that I have here talks about how analysts were

encouraged by some of the details of the spin-off.

     There is an upgrade by the Goldman Sacks analyst, the

Bear Sterns analyst talks about how the new Campbell's has

become the Cadillac of the food business and should command

a higher multiple, that is a higher price relative to its

earnings.   That notwithstanding, if you look at the returns

for these companies, Campbell's Soup in the 12 months

following the announcement of the spin-off, underperformed

the market by 5 percent.   Vlassic Foods in the 12 months

following the spin-off, underperformed the market by

57 percent, and that both companies also substantially

underperformed the market in the period up to June 14th,

1999, and the period up to January 31st, 2000.

Q.   Doctor Montgomery, during Mr. Altman's testimony, did

you hear reference to form 11K with respect to the Vlassic

Foods 401(K) plan after the spin-off?

A.   Yes, I did.

Q.   Did Vlassic Foods keep frozen Campbell's Stock in the

plan afterwards?

A.   That's what I recall the testimony being, yes.

Q.   And based on this page, Page 3 of this exhibit, was

1    that a good -- did that achieve good results or poor results

2    for the participants in that plan?

3              MR. LEWIS:  Objection.

4              THE COURT:  And your --

5              MR. LEWIS:  Objection is ambiguous.

6              THE COURT:  Overruled.

7              MR. LEWIS:  Because of the time, Your Honor.

8              THE COURT:  You may answer.

9              THE WITNESS:  Well, the returns on this chart for

10   Campbell's Soup are all negative relative to the market and

11   so, therefore, you know, obviously the participants who

12   invested in Campbell's Soup would have been off investing in

13   a diversified stock fund.

14   Q.   Now, Doctor Montgomery, you did not perform a

15   statistically valid sample of all spin-offs prior to

16   June 14, 1999, is that correct?

17   A.   That's correct.

18   Q.   What was the reason for your looking at these

19   spin-offs?

20   A.   The reason was to provide examples that contradicted

21   the -- you know, assertions that I felt that the Plaintiff

22   was making in the case and I believe also the Plaintiff's

23   experts that --

24              THE COURT:  Sustained in the way that is being

25   expressed.

1          THE WITNESS:  Okay.  May I try again?

2          THE COURT:  You may.

3          THE WITNESS:  I wanted to provide examples that

4   contradicted the notion that spin-offs invariably are

5   beneficial for stock, for stock prices and stock returns.

6   BY MR. CHARNES:

7   Q.   If you please turn to Defendant's Exhibit 242.  What is

8   this document, Doctor Montgomery?

9   A.   This is another summary of information that is taken

10  from my initial expert report, and this relates to the three

11  spin-offs we've just been talking about, and one additional

12  spin-off, and that's the spin-off by General Motors

13  Corporation, Adelphi Corporation, and the exhibit shows the

14  analyst ratings one month after the announcement or the

15  actual spin-off, and the analyst ratings for the eight

16  stocks involved in these spin-offs and also the returns over

17  the same periods that previous exhibit showed.

18  Q.   And does Defendant's Exhibit 242 include information

19  that's also contained in Exhibit 13 to your initial report,

20  which is DX 60?

21  A.   I'll just verify the number, but I believe that's

22  correct.  Yes, that's correct, Exhibit 13.

23  Q.   Would use of Defendant's Exhibit 242, assist your

24  testimony today?

25  A.   Yes, it would.

Q.   What if any opinion do you have -- have you arrived at
based on Defendant's Exhibit 242?

A.   Well, my opinion is, that these are four examples of
companies where there is a mix of buy ratings and hold
ratings by analysts, and almost no sell ratings.  I believe
there are 6 percent of the ratings for Campbell's Soup
Company, that's presumably one rating was a sell or
underperform, but the rest of the ratings for all of these
eight companies were either hold or buy, and despite those
evidently positive ratings, the returns were generally
disappointing.

Q.   Doctor Montgomery, in his expert report, did Professor
Lys list two articles in support of his opinion that
spin-offs generally result in increases in firm values?

A.   Yes, he did.

Q.   Did you review those two articles?

A.   Yes, I did.

Q.   Do you have an opinion as to whether those articles
support Professor Lys' opinion?

A.   Yes, I do have an opinion.  I don't believe they
support the opinion that there should have been -- that
investors should have expected some future positive return
to the stock, as the stocks would, in some delayed fashion
somehow reflected the benefits of the spin-off.  Both of
those articles look at the behavior of stocks around the

1  time of the spin-off, not at some future time after the

2  spin-off.

3  Q.  Did the two articles that Professor Lys cited contain

4  information about a period of time during which there is a

5  positive -- strike that.

6      Did the two articles on which Professor Lys cited,

7  report a period of time during which there is a price

8  reaction to announced spin-offs?

9  A.  Yes, they did.  Both -- well, they looked at somewhat

10 different reactions.  One of the articles looked at really a

11 typical -- typical in the financial economics literature,

12 looked at a window of a price reaction of, I think about

13 three days around the announcement of the spin-off, which is

14 the time you -- as much time as you would expect would be

15 needed for the market to reflect the new information that is

16 embodied in the announcement of the spin-off.

17     The other article looked at the movement in the stock

18 in the year prior to the actual spin-off, which might have

19 been the time the market first became aware that the

20 spin-off was going to happen, and the stock in the year of

21 the spin-off.

22 Q.  Doctor Montgomery, did you do any analysis to determine

23 whether the Nabisco Stocks were likely to rise in price in

24 the year 2000, simply because they declined significantly in

25 the year 1999?

A.    I did do some analysis to on that, that subject, yes.

Q.    What is your opinion?

A.    Well, my opinion is, that it follows from the -- all the reasons I cited earlier about no reason to expect extraordinary returns based on public information. Moreover, I performed some additional statistical analysis in my expert report to demonstrate, to test that fact and also to demonstrate that it is true.

Q.    What's true, Doctor?

A.    It is true that there is no tendency of stocks that have fallen by a significant amount, by the amount that NGH and NA fell in 1999, to rise at all after that decline, much less to actually recover the amount of the decline that they had fallen by or as even to rise as much as NA or NGH rose.

Q.    Can you please describe what work or analysis you conducted.

A.    It might help to refer to my expert report.

Q.    Sure.

A.    Which is -- exhibit?

Q.    Your expert report is Exhibit 60.

A.    My expert report is Exhibit 60.

Q.    If you want to also refer to Defendant's Exhibit 243, which is the demonstrative exhibit, I think Ms. Winchester might have that.

A.    I don't have it here.

1    THE COURT:  What was the exhibit in 60?

2    THE WITNESS:  Exhibit 14, Your Honor, which is a

3  two page exhibit.

4  BY MR. CHARNES:

5  Q.  With reference to your either Defendant's Exhibit 43 or

6  your expert report or both, could you please describe the

7  analysis that you conducted in your conclusions.

8  A.  Yes.  The analysis took as a sample of stock, all of

9  the stocks that were members of the S&P 500 Index, which is

10  obviously 500 stocks at the time, over 1999 through 2004.

11  For each of those stocks, we looked at the stock price

12  returns over the course of each of those years, and we

13  identified each time a stock declined by either -- by two

14  different amounts, either by 60 percent or by 29 percent.

15      It might be easiest to look at the DX 243.  60 percent

16  is the -- was the drop in -- the amount that NGH Stock

17  dropped between June 14, 1999 and January 31st, 2000.  So,

18  the first exhibit looks at what happens when the -- all the

19  stocks in the S&P 500 had a drop of at least 60 percent.

20      Just might mention parenthetically, that RJR Nabisco

21  was a member of the S&P 500, and then after the spin-off,

22  NGH became a member of the S&P 500 Index.  The graph is a

23  bar graph showing the distribution of returns of all of the

24  stocks that had -- every time -- every episode stocks had of

25  a 60 percent price drop and what the returns were in the one

year, that is 250 trading days after that episode, the 60

percent drop.  There were -- as one of the green boxes

indicate, there were 326 total episodes of stock with a

60 percent drop.  The bar -- the left most bar indicates

that 170 of those episodes, which is more than half, the 170

of those episodes have a 60 percent drop, were followed by a

subsequent drop of some magnitude in the year following the

initial 60 percent drop.  So less than half of the companies

had actually a positive return after suffering the

60 percent drop.

     Then the next three bars to the right show groups of

stock that had positive returns of varying magnitudes.

Seventy stocks had positive returns from zero to 41 percent.

Thirty stocks had increases from 41 to 82 percent.

Thirty-six stocks had increases from 82 to 150 percent.  If

you put all of those together and look at that first green

box, 306 of 326 times, the stock did not have an increase of

at least 150 percent.

     Now, the significance of the 150 percent is, that's in

the increase that stock needs to fully recover from the

60 percent drop.  So, 306 of 326 times, the stock did not

fully recover from its drop.

     Then there are another 14 times where a stock had

between 150 and 247 percent increase.  The significance of

247 percent apart from being a big number is, that that's

the increase that NGH had from January 31st, 2000 to

December 11, 2000, so out of 326 total episodes of the

60 percent drop, 320 did not manage to have an increase as

high as the increase of NGH and only six had an increase

higher than NGH's.

If you want to turn to the next page. The next page

performs essentially the same analysis, but the only

difference is, that instead of identifying a 60 percent

drop, we identified every episode of a 29 percent or greater

drop, and a 29 percent drop is the size of the decline of NA

Stock price from June 14th, 1999 to January 31st of 2000.

So there -- and there are, as the green boxes show, there is

1,693 total episodes. Obviously it is a smaller drop, so

there are more episodes. Of that, of the 1,693, 719, that's

the bar to the left, 719 of those drops were not -- were

followed by a negative -- additional negative stock price

performance, so by an additional claim.

The only -- another 616 did not have an increase

as high as 41 percent. Forty-one percent is the amount of

increase you would have to have to get fully recovered from

the 29 percent drop, to get you back to even. So out of

1,693 episodes with a 29 percent drop, 1,335 were not

followed by full recovery. Another 248 had an increase of

41, 82 percent. 82 percent is the actual increase in NA

from January 31st, 2000 through December 11, 2000.

1    So, all in all, out of the 1,693 episodes at the

2  29 percent drop, like the drop for NA, 1,583 of those

3  episodes were followed by a return less than the return NA

4  actually had.

5  Q.   Doctor Montgomery, based on Defendant's Exhibit 243,

6  the two pages that you have described, what is your opinion

7  with respect to the stock, the likelihood of stock price

8  performance of NGH or NA following January 31st, 2000?

9  A.   Well, I think this demonstrates the larger point, that

10 there are -- just because the stock had a large negative

11 return, that's public information, and there is no reason,

12 based on that fact, that the stock had had a large return,

13 negative return to expect that its return would be anything

14 out of the ordinary in a subsequent period.  The mere fact

15 that the stock is dropping does not imply that it's going to

16 increase in the future.  A future drop is quite likely.

17 Q.   Doctor Montgomery, do you have an opinion with respect

18 to whether the stock price appreciation for NGH and NA that

19 began in March of 2000 was predictable before January 31st,

20 2000, based on factors in the marketplace?

21 A.   Yes, I do have an opinion on that.

22 Q.   What is that opinion?

23 A.   My opinion is, that it was not predictable.

24 Q.   I would like to start with a little background.  Did

25 you research performance of the NGH and NA Stock prices

1   during the period from June 14, 1999 to December 11, 2000?

2   A.   Yes, I did.

3   Q.   How did you obtain the data with respect to the two

4   stock prices during that period?

5   A.   My source for data on those two stock prices was Facts

6   Research Systems, which is a service that NERA subscribes to

7   and is a widely used service among investment professionals

8   for obtaining stock price and other financial information.

9   Q.   I would like to refer you to Defendant's Exhibit 267,

10   272, as well as 297. I think Ms. Winchester may have that

11   for you.

12       Doctor Montgomery, what information is contained in

13   Defendant's Exhibit 267, 272 and 297?

14           THE COURT: You're not making inquiry about --

15           MR. CHARNES: 267 through 297.

16           THE WITNESS: 267, 268, 269, are graphs of NGH's

17   stock price for two subject periods, and then for two

18   subperiods, and then for the entire period from June 14,

19   1999 through December 11, 2000.

20       270 is a graph of NA Stock price for June 14th

21   through December 11th, then there are two subperiods

22   following that, and then 297 is another subperiod for NGH's

23   Stock price.

24   BY MR. CHARNES:

25   Q.   Do all of the exhibits you just mentioned, is the

1  information you mentioned also contained in the graphs,

2  price graphs in your expert report?

3  A.   Yes.   That's correct.

4  Q.   And will Defendant's Exhibits 267 through 272 and DX

5  297 assist your testimony today?

6  A.   Yes, they will.

7  Q.   Please turn to DX 288.   What does Defendant's 268 show?

8  A.   This is a graph of NGH's Stock price from June 14, 1999

9  through January 31st, 2000.   It shows that NGH declined

10 fairly steadily through this entire period, with a

11 particularly sharp decline on October 20th, 1999, when the

12 Engle decision -- when the decision in the Engle case was

13 announced.

14 Q.   Would you please turn to Defendant's Exhibit 269.   What

15 does Defendant's 269 show?

16 A.   269 is a graph of NGH's Stock price from January 31st,

17 2000, the time in which NGH and NA were first removed from

18 the Plan, to December 11, 2000, when NGH was acquired by

19 RJR.   It shows that NGH's Stock price was relatively flat

20 through February 2000, then began to rise in March 2000 and

21 rose sharply after the announcement of Carl Icahn's bid on

22 March 30th, 2000, and then after some dips in stock, rose

23 substantially later in the spring of 2000.

24 Q.   And finally on NGH, Doctor Montgomery, if you would

25 turn to Defendant's Exhibit 227 and explain what that

1  exhibit shows.

2  A.    Okay.  This is a graph -- this is a graph that combines

3  the information on Exhibits 268 and 269.  It is a graph of

4  NGH from the entire period from June 14, 1999 through

5  December 11, 2000 and so, therefore, shows the decline of

6  NGH in 1999 and then the increase in NGH 2000.

7  Q.    Doctor Montgomery, did you hear testimony in this trial

8  regarding a October 8, 1999 meeting regarding the Capital

9  Investment Plan?

10  A.    Yes, I did.

11  Q.    Did you determine what the postspin performance of the

12  NGH Stock would have looked liked as of October 8th, 1999?

13  A.    Yes.  I did.  That information would be shown in

14  Exhibit 297 and that is a graph of the return in NGH's Stock

15  price from June 14, 1999 through October 8, 1999.  I would

16  like to add one small detail.  The June 14th price for NGH

17  is what is known as split adjusted.  The actual stock price

18  would have been a lot higher before the spin-off, but this

19  is adjusted and adjusted for the spin-off.  It's what the

20  price would be if you took the spin-out out on June 14th.

21  June 14th itself is something of a constructive, but this

22  graph shows the actual prices from June 14.  The spin-off

23  adjusted stock price date is also dated -- it's typically

24  used by investors.

25  Q.    Doctor Montgomery, if you please turn to Defendant's

1  Exhibit 271.

2         THE COURT:  When you reach a convenient stopping

3  place, you let us know.

4         MR. CHARNES:  Your Honor, I think we should do it

5  now.

6         THE COURT:  Okay.  Anything we should talk about

7  before we take our afternoon recess?

8         MR. LEWIS:  No, Your Honor.

9         MR. CHARNES:  No, Your Honor.

10         (Recess taken from 3:25 p.m. to 3:46 p.m.)

11  BY MR. CHARNES:

12  Q.  Doctor Montgomery, if you please turn to Defendant's

13  Exhibit 271.

14  A.  Okay.

15  Q.  And with respect to the NA Stock, what does DX 271

16  show?

17  A.  DX 271 shows NA's Stock price from June 14th, 1999

18  through January 31st, 2000.  And, it shows fairly steady

19  decline in the stock throughout this period, obviously with

20  some up's and down's.

21  Q.  If you please turn to DX 272.

22  A.  Okay.

23  Q.  And what does DX 272 show?

24  A.  It shows NA Stock price from January 31st, 2000 through

25  December 11th, 2000.  It shows that NA continued to trend

down from January 31st into March 2000, and then rose quite
sharply after the Icahn bid on March 30, 2000, and rose
throughout the spring of 2000, and then flatened out after
the acquisition of NA by Phillip Morris was announced in
June of 2000.

Q.   If you turn to DX 270 and explain what that exhibit
shows.

A.   This shows NA Stock price for the combined periods of
the previous two exhibits that we discussed, running from
June 14th, 1999 through December 11, 2000.

Q.   A few minutes before the break, did you testify that it
was your opinion, that the stock price appreciation of NGH
and NA, after March of 2000, was not the result of
predictable factors in the marketplace?

A.   Yes, I did testify.

Q.   And what analysis did you perform in reaching that
opinion?

A.   Well, it follows from the general opinion that there is
no reason to expect extraordinary returns based on public
information, moreover, I reviewed analyst reports for any
indication that these increases and chain of events that
started with Carl Icahn's bid and ended with the acquisition
of NA and NGH, was anticipated by analysts.  I also reviewed
news articles on Nabisco from June 14th, 1999 through March
of 2000 and after March of 2000 as well, and found no

1  indication that the chain of events that ensued in
2  March 2000 was anticipated.
3  Q.    Doctor Montgomery, I would like you to please return to
4  your expert report, which is DX 60, which is in notebook
5  two.
6          MR. CHARNES:  Your Honor, that's in notebook two,
7  and in particular, Exhibit 18.
8  BY MR. CHARNES:
9  Q.    Exhibit 18 to DX 60.
10 A.    I've got it.
11 Q.    What is Exhibit 18 to Defendant's Exhibit 60?
12 A.    Exhibit 18 to Defendant's Exhibit 60 is a graph of
13 three lines.  The dark blue line is Nabisco -- was NA's
14 Stock price from December 31st, 1998 through December 11,
15 2000.  The red line is an index, an equal weighted index of
16 other companies in the packaged food industry.  The name of
17 companies are listed in the footnote to the exhibit, and the
18 green line is the overall market, as shown by S&P 500 Index.
19 What this shows is, that the price that -- the drop of NA
20 Stock price throughout 1999 and early 2000, was similar to
21 the drop in prices of other companies in the package food
22 industry, and what this indicates is, that the decline in NA
23 over this period was largely due to the declining value of
24 food companies in the marketplace.
25 Q.    And what, if anything, does Exhibit 18 indicate to you

with respect to the performance of NA Stock after
January 31st, 2000?

A.   Well, it indicates -- first of all, it's the same
information that where in the exhibits of NA alone, and
that's that NA continued to decline until late March 2000.
Also, that decline was also in line with the continued
decline of the other food stocks, so it was continuing
disfavor in the market of the food stocks.

This, by the way, was during basically the tech boom,
the NASDAQ boom and investors were very interested in stocks
with high growth potential and food stocks were not seen as
having high growth potential.  Then on March 30, the Icahn
bid was announced, and NA had a sharp increase.  Other food
stocks also began to increase around the same time, as
several other mergers and acquisitions were initiated and
announced in the food industry, including the acquisition of
Best Foods by Unilever.

Q.   Would you please turn to Exhibit 16.  Using Exhibit 16
to DX 60, please explain to the Court your opinions
regarding the performance of NGH Stock during 1999.

A.   Okay.  This is a graph of the stock price of NGH from
June 14, 1999 through December 11, 2000.  It also shows the
stock price for RJ Reynolds Tobacco, which is the red line,
and it shows an index of other tobacco stocks, excluding RJ
Reynolds, and that's the light blue line, and the stocks in

that index are listed in the footnote, and it also has for

the previous graph, shows that the market, the S&P 500 Index

in green.

What this shows is, that the decline of NGH from

June 14, 1999 through early 2000, was in line with the

decline of other -- well, of stocks in the tobacco industry,

including RJ Reynolds, and also the stocks that are in the

tobacco index, and the reason for this was, as I understand

it, heightened concern over the risks for tobacco related

companies of tobacco litigation and the sharp decline in

late October was in reaction to the Florida Appeals Court

decision in the Engle case on October 20th.

Q.   Doctor Montgomery, with respect to the performance of

NGH beginning in March of 2000, what opinion do you have

based on Exhibit 16 to DX 60?

A.   Well, the increase in NGH starting in late March was

sharp, it was sudden.  Other tobacco stocks improved

somewhat during this period.  RJ Reynolds improved, had a

big increase.  As I, you know, have said, the reasons for

NGH's decline were related to, I think primarily concerns

about tobacco related liabilities, as well as a decline in

the underlying value of NA, which the other graph shows, and

then the increase starting in March 2000 was related to the

Icahn bid, and the fact that that unleashed the possibility

of corporate restructuring that had previously been

1  considered basically off the table until mid 2001.

2  Q.   Doctor Montgomery, did you testify earlier today, that

3  you researched and reviewed available analyst reports and

4  news articles regarding NGH and NA during the period of 1999

5  to early 2000?

6  A.   Could you repeat that question?

7  Q.   Yes.  Did you research and review analyst reports and

8  news articles regarding NGH and NA from the time of the

9  spin-off in June of 1999 through January 31st, 2000?

10  A.   Yes, I did.  And actually beyond January 1st, 2000 as

11  well.

12  Q.   In any of the materials that you read that were

13  published before January 31st, 2000, did you see any

14  indication whatsoever, that Carl Icahn might make an offer

15  for NGH in the year 2000?

16  A.   No.  There was no mention of that possibility, or as

17  best I can recall, of anybody else making an offer for

18  either NGH or NA.

19  Q.   If you please refer to Plaintiff's Exhibit 346, which I

20  will get for you.

21          MR. CHARNES:  I think it is in 12, Your Honor.

22  BY MR. CHARNES:

23  Q.   Doctor Montgomery, what is Plaintiff's Exhibit 346?

24  A.   This is a copy of an article in the Wall Street Journal

25  for Friday, November 26, 1999, which is, by the way, the day

after Thanksgiving, or was the day after Thanksgiving, and
it's a series of brief news items related to deals and deal
makers.  I guess the third item in here is a report of Carl
Icahn's -- the fact that Carl Icahn had taken -- well, I'm
sorry.  The fact that Carl Icahn had purchased 6 million
shares in Nabisco Group Holdings.  So this is a report of
the fact that Carl Icahn had acquired 6 million NGH shares.
Q.   Do you know in fact whether that news article
accurately reports Mr. Icahn's acquisition?
A.   I don't have any additional knowledge other than the
article on that subject.
Q.   And what, if anything, did you do to analyze the impact
of this newspaper article on the market for NGH Stock?
A.   Well, I reviewed the stock prices of NGH and NA and I
guess really for this article NGH would be more relevant.
The return on NGH Stock price for November 26th.  I found
that there was no change in the price on November 26th,
relative to the previous price, which would have been on
Wednesday, the day before Thanksgiving.  So there was no
price reaction to this news regarding NGH.  That's also true
when we look at adjusted for the market.
Q.   After November 26th, 1999, the date of that article,
was there any indication in any source, whether an analyst
report or an article in the media, mentioning the
possibility of an offer for NGH by Carl Icahn?

1  A.    No, there was not.

2  Q.    Doctor Montgomery, in your opinion, is there certain

3  information that is released public that is value relevant

4  to potential buyers of a security that is not value relevant

5  to potential sellers of the same security?

6  A.    There is no information.

7            MR. LEWIS:  Objection, Your Honor, new opinion.

8            THE COURT:  Doctor Montgomery, would you.

9            (The witness left the courtroom.)

10           MR. LEWIS:  It is possible I have forgotten

11  something in one of his reports, but this is not leaping to

12  mind as something I have heard any testimony about.

13           THE COURT:  Okay.

14           MR. CHARNES:  Your Honor, Doctor Biller testified

15  on cross-examination specifically with respect to a New York

16  Times article in March of 1999, that he believed the

17  information in that article was relevant, was value relevant

18  to potential buyers of RJR Nabisco Stock, but he did not

19  opine that it was not relevant to people like the Plan that

20  already held RJR Nabisco Stock, and testimony from Doctor

21  Montgomery would be in direct rebuttal to Doctor Biller's

22  testimony on the witness stands.

23           THE COURT:  Was this an opinion that he had stated

24  in either his original opinion or supplemental?

25           MR. CHARNES:  It was not an opinion in either of

his reports. It was simply rebuttal to something Doctor
Biller stated on the witness stand. More importantly,
Doctor Montgomery believes it is not economically valid.

THE COURT: Mr. Lewis.

MR. LEWIS: I have nothing further to add, Your
Honor.

THE COURT: What would allow that just as
rebuttal? I said what would allow that just as rebuttal?

MR. CHARNES: I think that Doctor Biller testified
to that on the stand, and I think it would be helpful
information for the Court, and as a matter of fairness for
Doctor Montgomery to -- that was an opinion that was not in
Doctor Biller's reports, came out on cross-examination, for
completeness for the Court, for Your Honor to hear Doctor
Montgomery's view about whether that is an economically
valid opinion or not.

To the extent that the Court might be considering
ultimately relying on Doctor Biller's opinion on that, I
guess our view is, that we would like the Court to hear, you
know, a contrary economic view. If the Court believes it is
irrelevant information, then obviously --

THE COURT: But that came out through your
examination?

MR. CHARNES: It came out through my examination
of Doctor Biller, correct.

1          THE COURT:  I'll sustain the objection.

2     BY MR. CHARNES:

3     Q.    Doctor Montgomery, I would like to turn your attention

4     to the subject of damages in this case.

5     A.    Okay.

6     Q.    Did you in fact calculate, assuming that the Court

7     finds liability on behalf of the Plaintiffs here against

8     Defendants, did you in fact calculate damages that the class

9     would be entitled to?

10    A.    Yes, I did.

11    Q.    And over what periods of time did you calculate the

12    damages?

13    A.    I calculated damages from June 14th, 1999 up through

14    December 11, 2000, and then I additionally calculated the

15    damages adding several different returns to those damages

16    and calculated damages through September 30th, 2009.

17    Q.    And what data did you use in order to make full sets of

18    calculations, that is calculations of losses up to

19    December 11, 2000, and then from December 11, 2000 through

20    the end of September 2009?

21    A.    The primary data that I used to do the calculation of

22    the losses up through December 11, 2000, was a data set that

23    was provided that contained three files of data from the

24    Plan's record keeper, that is a data set of all transactions

25    by the participants who held NGH or NA on June 15th, 1999.

1   Also, there was another data file that contained the

2   quarterly balances in each fund for each participant, and

3   that information was also broken up by each subaccount in

4   each participant's -- in each participant's account and

5   subaccounts or for different sources of money, such as after

6   tax and before tax contributions.

7        The final file was a daily file of unit values for each

8   investment option in the Plan, and these data originally

9   covered the period, as I mentioned earlier in my testimony,

10  from the middle of 1997 through the end of 2002.  The part

11  that was relevant for my calculations, was from June 1999

12  through December of 2000.

13  Q.   And, Doctor Montgomery, you mentioned that the third

14  included daily fund unit values.  Is it correct that it

15  included unit values rather than share prices because these

16  were unitized funds in the Plan?

17  A.   That's correct.  And that's with respect to the three

18  single stock funds; NGH, NA and RJ Reynolds Tobacco.

19             MR. CHARNES:  I would just like to note for the

20  record in evidence are two compact disks, DX 159 and DX 161.

21  These contain participant data that Doctor Montgomery just

22  testified to and have been relied on to calculate potential

23  damages.  The parties executed a stipulation dated

24  April 4th, 2008, that has been heard previously in this

25  trial, that is PX 295, and pursuant to that stipulation, the

1　data on these compact disks are true and accurate Plan

2　participant data, and the parties also stipulated that they

3　are business records under Rules of Evidence 803.6, and that

4　they meet the authentication requirement of Federal Rules of

5　Evidence 901.A.

6　　　　　We have not yet formally filed that with the

7　electronic ECF, but we will do so.  I just wanted to alert

8　the Court that is the data on which Doctor Montgomery is

9　going to be testifying.

10　　　　　THE COURT:  Okay.

11　BY MR. CHARNES:

12　Q.　Doctor Montgomery, I would first like to turn your

13　attention to the appreciation damages and that is the

14　damages that existed up through December 11, 2000.  What

15　methodology or methodologies did you use in order to

16　calculate those damages?

17　A.　These damages were calculated -- the basic approach is

18　to look at the difference in money that participants would

19　have had as of December 11, 2000, if they had retained their

20　NGH and NA investments up until that point.  The difference

21　between what they would have had and what they actually had,

22　and in order to calculate that difference, you need to

23　analyze which of the investments that they actually made

24　that would not have made had they retained their NGH and NA

25　holdings, so that calculation boils down to an analysis of

1    the difference between the proceeds of investing in NGH and

2    NA, and the proceeds of the alternative investment that they

3    would not have made had they retained their NGH and NA

4    holdings, and the investment that they would not have made

5    is one of the investments that they actually made.

6    Q.    And what methods did you use in order to calculate

7    damages along those lines?

8    A.    Well, there are two approaches to determining which

9    investments -- investment or investments each participant

10   would not have made had they retained their NGH and NA

11   investments.  The first approach is tracing, that is to

12   follow the money that the participants took out of NGH and

13   NA, either voluntarily before January 31st, or as part of

14   the liquidation on January 31st, and follow that into

15   whatever fund it was transferred into, and then continue to

16   follow that money, and if it was subsequently moved to any

17   other investment fund, and also, consider if the money was

18   in fact withdrawn from the Plan, that would be part of the

19   calculation as well.  But all of that is the tracing of the

20   methodology that follows where the money taken literally

21   went, if you will.

22        The other approach that I took is, I refer to the most

23   similar approach, and that takes the approach that instead

24   of looking at the Nabisco money, the money coming out of the

25   Nabisco Funds in isolation, it is more appropriate to keep

1    in mind that a participant is likely to be looking at his or

2    her entire portfolio within the Plan as a portfolio, and

3    would be interested in the mix of investments that he or she

4    has, and so if that participant isn't permitted to retain

5    his or her investment in NGH or NA, he or she would likely

6    invest that money in the investment that's the most similar

7    to NGH and NA, and that would be an effort to have an

8    investment portfolio as close to being the portfolio they

9    would have with NGH and NA, in lieu of having NGH and NA.

10   That approach is what I referred to as the most similar

11   analysis.  It takes as a premise that the Plaintiff's are

12   managing their investments as a portfolio.

13   Q.   What alternative investments in the Plan did you

14   determine were most similar to NGH and NA?

15   A.   I performed an analysis of all the different investment

16   options in the Plan, and looked at their degree of

17   similarity to NGH, NA on two dimensions.  One of those

18   dimensions was the degree of volatility of those

19   investments, remembering that volatility is the variability

20   of daily returns, and l ranked separate for NGH and NA, I

21   ranked the other investment options according to how similar

22   they were; how close the volatility was to NGH.

23        Some of the details of this in my original expert

24   report.  The other dimension I considered in assessing the

25   similarity was the area of correlation of the other

investment options with NGH or NA.  The more correlated an
investment option is with NGH or NA, the more similar it is.
I used these two methods because risk as well as return are,
in my opinion, the relevant considerations for making
investments, so looking at the different aspects of risk is
the appropriate way to measure the similarity of investments
with NGH or NA.

When I did this, I determined that the most similar
investment to NGH was in fact RJ Reynolds Tobacco.  It, like
RJ Reynolds Tobacco, NGH has high volatility.  In addition,
NGH and RJ Reynolds are highly correlated with each other,
so RJ Reynolds Tobacco is the most similar investment to
NGH.

The most similar investment to NA, I determined to be
the -- I'm actually forgetting.  I think it's the Total
Stock Fund.  It is one of the diversified stock funds.  I
can refresh my memory on that.

Q.   Yes.  Please turn to your report, if that will be
helpful.

A.   Exhibit 30 of my original report shows the details of
this analysis.  The most similar fund for NA was in fact the
Total Stock Market Fund, which was an index investment in
the entire U.S. Stock Market.

Q.   Doctor Montgomery, as between the tracing method and
the most similar investment method that you've just

described, do you have an opinion as to which you believe is
the most accurate method for computing damages in this case?
A.   My opinion is, that the most similar method is more
accurate, it takes into account what -- instead of looking
at simply tracing Nabisco money in isolation, it takes into
account the whole of what a participant looking at a
portfolio of investments would do, and comes up -- tries to
come up with what would be what that participant managing
the risk would likely to do if that participant didn't have
available NGH or NA.

MR. LEWIS:  Motion to strike, Your Honor.

THE COURT:  Would you.

THE WITNESS:  Step out?

THE COURT:  Please.

*(The witness left the courtroom.)*

MR. LEWIS:  It's him giving an opinion about what
participants would do, which I believe is outside the scope
of his expertise.  There are other problems we have with
this also, if we get to those.

MR. CHARNES:  Your Honor, it's based on his
background and expertise.  It's his opinion about how
investors behaved.  Again, he testified that he believes
based on his training and experience in economics, he has
the expertise to describe how investors overall behaved.  He
said he was not an expert in how person A or person B

behaves, but that economists are competent to testify about
how investors as a group behave in the stock market, that
would translate --

THE COURT:  Investors in a plan, in this Plan?

MR. CHARNES:  Overall based on his -- I think he
testified to that during voir dire, but I think that his
opinion is based on his expertise in how investors behave.

THE COURT:  I'm going to let you ask him those
questions, and tell you that you have a very high bar to go
over to get this in, but I'll let you ask him those -- how
he arrives at his decision of how those investors would
behave, especially when it's been his earlier testimony,
that a huge percentage of people in that Plan never moved
anything.

MR. CHARNES:  Your Honor, I think he already did
testify about his -- how he arrived at the -- what you call
the most similar and best method, and how he assumed -- how
he calculated where that money would go but for the removal
of the funds.  That is a --

THE COURT:  If that's the basis of it, the
objection is sustained.  If you have an additional basis for
it, I'll hear it.

MR. CHARNES:  Thank you.  I'll just move on, Your
Honor.

BY MR. CHARNES:

Q.    Doctor Montgomery, it's true, is it not, that the NGH

and NA Funds did not exist in the Plan after January 31st

are 2000?

A.    Yes, that is true.

Q.    How did you calculate what those two funds would have

earned if they had remained in the Plan after January 31st,

2000 up until December 11th, 2000?

A.    Well, in order to do that calculation, I considered

several different methods.  The one method that I considered

was statistical analysis of the relationship between daily

returns of the NA and NGH Stock Funds from this analysis

separately for both stock funds.

        The statistical analysis of the relationship of the

return of those stock funds, the daily returns on the

June 14th through December -- I'm sorry, through

January 31st, 2000 period, to the daily returns of the

underlying stocks of the NGH and NA Stock, and that

statistical analysis -- the statistical analysis I used was

the regression analysis, the relationship of daily returns.

I also considered looking at using the information on the

cash levels in both the NGH and NA Stock Funds, and as you

presumably know, each stock fund contains mostly the

underlying stock, but also contains some cash, some other

underlying short term investments.

One of the other ways to do it is, to look at the
percentage of cash, percentage of short term investment and
then project the returns, assuming that the stock had -- the
stock portion of the stock fund had the underlying stock
return, the cash had a zero percent return and the short
term investments maybe had a small interest return.  That's
the other possible way to project the NGH and NA returns
after January 31st.  So I did this, looked at these both
ways.

In order to assess which of those was better, I
performed the exercise for the one single stock fund that I
did have data from throughout this period, from June 14,
through December 11, 2000; that's the RJ Reynolds Common
Stock Fund.  I did the same exercise for the RJ Reynolds
Stock Fund in the data up through -- doing the regression up
through January 31st, 2000, and also doing the projection
based on the cash levels in that stock fund as of
December 31st, 1999.  I found that the regression approach
predicted much more closely the actual return in the RJ
Reynolds Common Stock Fund over the period from
January 31st, 2000 to December 11, 2000, and using the cash
levels on December 31st, 2000.  So, that is why I decided to
use the regression approach for projecting the NGH and NA
Common Stock Funds and fund returns from the hypothetical
Common Stock Fund returns from January 31st, 2000 through

1  December 11, 2000.

2  Q.    Doctor Montgomery, were you required to make -- in

3  addition to what you already testified to, were you required

4  to make other assumptions in your analysis using the tracing

5  method or most similar fund method of calculating damages?

6  A.    Yes, I was.

7  Q.    Would you please generally describe what those

8  assumptions were and why you think that they were valid.

9  A.    Okay.  The list of assumptions is -- it's all in the

10  expert report, and I think I might be -- if I could, I could

11  just use the expert report to refer to.  It is probably the

12  easiest way to answer this question.  And this is

13  Defendant's Exhibit, what is it --

14          THE COURT:   60.

15          MR. CHARNES:   It should be Defendant's Exhibit 60.

16          THE WITNESS:   Right.  The list of assumptions that

17  needed to be made for the tracing method are listed in

18  Exhibit 60 in Paragraph 81 on Page 27 of my report.  One of

19  the assumptions is, that money in a particular source

20  account such as the before tax employee contribution, stayed

21  in that account, and this -- we confirmed this assumption by

22  analyzing all of the Plan data that we received, and we

23  confirmed that money that was in one account never got

24  transferred to another account -- money -- it stays in the

25  particular source account that it starts in.

1    The other assumptions are listed that are all for

2  the basis of identifying where money that goes out of a

3  particular investment option, identifying when the money

4  that goes out is money that had begun its journey as NA or

5  NGH money.  Those are all here.  I'm not sure if I should go

6  through that detail.

7    There are also, I believe, some assumptions on the

8  most similar method.  Let's see if I can find --

9    THE COURT:  I don't know that you need to do that

10  for the most similar method.

11  BY MR. CHARNES:

12  Q.   Doctor Montgomery, without discussing the assumption in

13  particular, if you could just talk generally -- describe

14  generally for the Court how you tested -- whether you tested

15  the assumptions to assure that they were accurate and not

16  bias in your result one way or the other.

17  A.   Yes, I did.  Whenever there was an assumption that

18  there seemed to be more than one conceivable way to approach

19  it, I calculated damages both ways, and satisfied myself --

20  first of all, I chose the approach that I felt was the most

21  reasonable, but I also satisfied myself that where there was

22  a reasonable argument about the assumption, that the

23  alternative would not make any significant amount of

24  difference.  For example, in the tracing method, I made the

25  assumption last in, first out, which is the last money put

1  into an investment is the first money taken out.  I also

2  estimated damages on using the opposite assumption, which is

3  FIFO, which is first in, first out, which is the first money

4  into an investment is the first money that's taken out.  The

5  overall aggregate damages were something like one percent

6  higher using FIFO, so it's not a very significant

7  difference.

8  Q.    Doctor Montgomery, do you have an opinion as to whether

9  your damages methodology is preferable to the methodology

10  used by Mr. Altman in calculating the damages?

11  A.    Yes, I do.

12  Q.    What is that?

13  A.    I believe it is preferable.

14  Q.    Have you determined whether Mr. Altman's damages

15  calculations considered the actual returns received by

16  participants when they liquidated Nabisco Holdings?

17  A.    Yes.  I have determined that he did not do that.  He

18  assumed that all participants got the average return

19  realized by the entire Plan, not even just by the portion of

20  the Plan made up by the participants who had held NGH and

21  NA, whereas my analysis looked at the actual returns

22  realized by each participant separately.

23  Q.    Did any of the participants receive the returns that

24  Mr. Altman used in his damages calculation?

25  A.    I don't think I actually know that.  It would be highly

1 unlikely that any participant got the average Plan return,

2 no.

3 Q.   Do you have an opinion as to whether Mr. Altman's use

4 of the actual NGH and NA stock prices to estimate returns up

5 through December 11, 2000, was appropriate?

6 A.   Yes.  I do have an opinion.  In general, using the

7 actual NA and NGH Stock prices through December 11, 2000,

8 overestimates the returns that participants would have

9 received from investments in the NA and NGH Stock funds,

10 because according to my analysis, as well as general

11 experience, single stock funds that contain cash and incur

12 transaction costs, expenses and fees, typically underperform

13 the actual underlying stocks by some margin.

14 Q.   Do you have an opinion as to whether Mr. Altman is

15 correct that you overestimated the amount of cash held by

16 the NGH Stock Fund?

17 A.   I don't think there is any basis for Mr. Altman to say

18 that one way or another.  Mr. Altman, based that assertion

19 on cash levels on one single day, December 31st, 2000, and

20 the whole point of having a cash level was to provide a

21 buffer for transactions, and cash levels are not constant

22 and the December 31st cash level is not necessarily a good

23 predictor of cash level on any other day.

24 Q.   And you said December 31st, 2000?

25 A.   Yes.  I'm sorry, I did.  And that was a misspeak.  It

1  is December 31st, 1999.

2  Q.  Have you determined how Mr. Altman addresses money

3  withdrawn from the Plan by participants between June 14,

4  1999 and the end of September, 2009?

5  A.  The end of September 2009?

6  Q.  Yes.  From June 14, 1999, up to the end of his damages

7  calculations.

8  A.  Yes.  Mr. Altman assumes that no participant, no class

9  members withdrew any money from the Plan during this time.

10  His damages are based on the assumption that all money

11  stayed in the Plan.  What I did, on the other hand, through

12  December 11, 2000, was assume that where participants had

13  taken out some of the investment that they made instead of

14  NA or NGH, they would have also taken out money if they kept

15  their money in NGH or NA.

16  Q.  Do you believe that Mr. Altman's assumption that no

17  money was withdrawn from the Plan is a valid assumption?

18  A.  No.  I think It's clearly unrealistic.  There are all

19  sorts of reasons that people would remove money from the

20  Plan, and it makes no sense to me to believe that if they

21  had retained NGH or NA, they would not have made any

22  withdrawals.

23  Q.  Have you determined whether Mr. Altman correctly

24  considered the timing of sales of NGH and NA Stock by the

25  trustee.

1  A.   Well, Mr. Altman's analysis is based on the

2  transactions by the trustee, the sales by the trustee of NGH

3  and NA.  Those sales were not necessarily and generally not

4  done on the same date that participants transferred their

5  money out of NA and NGH, and this is obviously the case with

6  the participants who were forced out of the Plan, out of NGH

7  and NA on January 31st, 19 -- January 31st, 2000.  The

8  persons who were forced out on that day received the closing

9  value of the NA and NGH Stock Funds on that day, which was

10 based on the closing price of NA and NGH.  The sales by the

11 trustee were not until early February, so they were at

12 different prices.  Any gains or loses would have been

13 incurred by the Plan overall, and not by the individual

14 participants.

15 Q.   Going back to the withdrawal of money from the Plan, I

16 just have one further question, which is based on your

17 analysis of data, did participants actually in fact withdraw

18 money from the Plan during the periods in question?

19 A.   Yes, they did.  Well, my analysis confirmed that they

20 did up through December 11, 2000.  I didn't do any specific

21 analysis of the period after December 11, 2000.

22 Q.   Do you have an opinion as to whether Mr. Altman

23 correctly calculated the Plan's returns during the year --

24 calendar year 2008 and the first three quarters of 2009?

25 A.    I do have an opinion.  Mr. Altman greatly overstated

the Plan's returns in 2008.  He made a basic mistake with
calculating the weighted average of Plan returns for 2008.
He used the balances in each investment fund as of the end
of the year, rather than at the beginning of the year, and
if he used the weights as of the end of the year, you are
going to greatly underweight any investment that did poorly
during that year and overweight any investment that did
well.

As we all know, 2008 was a terrible year for stocks,
and so if you used end of period rates, you are going to
greatly underrate the return on stocks during -- the stock
funds during 2008 and, therefore, greatly understate the
overall negative return of the Plan.  So on that basis
alone, Mr. Altman greatly understated the loss that the Plan
incurred in 2008 due to poor stock market.

In addition, Mr. Altman used form 5500 data to
calculate his Plan returns for every year up through 2007,
and in his initial report, clearly showed a view that form
5500 data was the better way to calculate returns than using
investment returns.  Form 5500 data was available, at least
has been available recently for calendar year 2008, and it
is -- was initially provided in the form 11-K filing for
2008 in a note of that filing, and if you use that, the data
in the note to the 11K that's the form 5500 data, you get a
negative return for the Plan for 2008, that's fairly close

to the return you would get if you do a proper weighted
average based on beginning of the year balances.

At any rate, Professor Altman -- I'm sorry, Mr. Altman,
greatly overstated the Plan's return in 2008.

He made a similar mistake with weights in 2009, in that
he appears to have used the end of the third quarter weights
to calculate his average returns for 2009, whereas I believe
the more proper thing to do would be to use the beginning of
period weight for 2009, and if -- I did that and I get a
negative -- a positive return for 2009.  It is somewhat less
than the positive return Mr. Altman used for 2009.  So if
you add those together, the overall return that Mr. Altman
had for the Plan for 2008 or 2009 was substantially
overstated.

Q.   Did Mr. Altman's overstating of the returns in 2008 and
2009, have the effect of overstating damages or understating
damages?

A.   It had the effect of overstating damages when the Plan
return was used for the calculation.

Q.   Did Mr. Altman's damages methodology allow him to
calculate damages, if the Court decides ultimately to
exclude early sellers or participants who signed releases?

A.   No, it does not.  There is no information in
Mr. Altman's calculation about any damages for individual
participants and so you can't exclude portions of the class.

1   Q.   Doctor Montgomery, to go back briefly to your opinion

2   with respect to Mr. Altman's calculation of Plan returns in

3   2008 and 2009, is your reason for criticizing Mr. Altman's

4   calculation of Plan returns for the first three quarters of

5   2009, in other words, his using the end of quarter returns

6   instead of the beginning of the quarter returns the same

7   reason that you articulated for the calendar year 2008?

8   A.   Yes.   It's essentially the same.   Well, the mistake

9   Mr. Altman did is the same.   I think in addition, one can

10  calculate the 2008 return using the same methodology that

11  Mr. Altman had used in previous years, but you got a

12  relatively fairly similar return to the return you would use

13  if you corrected Mr. Altman's mistake for 2008, which is the

14  same mistake he made for 2009.

15  Q.   Do you have an opinion as to whether Mr. Altman was

16  correct in that the participant level data on which you

17  relied for your damages, were not accurate?

18  A.   I believe that opinion of Mr. Altman is incorrect.   My

19  staff reviewed that data closely.   They verified that the

20  data was consistent.   All of the balances agreed with all

21  the transactions, sort of the way you balance a checkbook,

22  you add up all the positive entries, you subtract the

23  negative entries and you get your balance and everything

24  works out, so my opinion is, that the data are reliable.

25  Q.   And do you have an opinion with respect to Mr. Altman's

1  criticism of your approach, that your methodology did not

2  reflect what actually happened in the Plan, beginning with

3  the liquidation of the Nabisco Fund?

4  A.   Yes.  I believe that that is based on a

5  misunderstanding of the Plan data by Mr. Altman.  He took --

6  that opinion, I think, was largely based on a table that was

7  in some working papers that NERA had produced in response to

8  a subpoena that combined data for the lead Plaintiff,

9  Mr. Tatum, and combined the data for all of the different

10 source of accounts into one overall account, and I also

11 believe that Mr. Altman's commentary about that data doesn't

12 really make sense if you read it closely, but if you do, if

13 you look carefully at the data, subaccount by subaccount,

14 you can see that the approach I took makes sense, and I

15 believe is the correct approach.

16 Q.   Doctor Montgomery, do you have an opinion about whether

17 Mr. Altman is correct in his own opinion that you

18 understated Mr. Tatum's personal damages by about $10,000?

19 A.   I believe that is incorrect.  I believe that the review

20 of the numbers that we have calculated, and I believe they

21 are correct -- again, this is based on a combination,

22 combining data from different subaccounts, which I believe

23 is an inappropriate thing to do for tracing.

24 Q.   I would like you to turn to PX 296, which Mr. Altman's

25 report.

1          MR. CHARNES:   That's in plaintiff's binder 11,

2     Your Honor.

3     BY MR. CHARNES:

4     Q.    Doctor Montgomery, I would like you to read for the

5     record the paragraph at the top of -- excuse me, if you

6     refer to Page 5 of Mr. Altman's report.   For the record,

7     this is his rebuttal report, Your Honor, Plaintiff's Exhibit

8     296.

9          Are you there, Doctor Montgomery?

10    A.    Yes.

11    Q.    Would you please read the paragraph at the top of Page

12    5.

13    A.    "Mr. Montgomery's methodology does not reflect what

14    actually happened.   His calculation assumed investments made

15    in RJR Stock on February 2nd remained in RJR Stock until a

16    later sale or transaction, but it does not consider other

17    transactions occurring on February 2nd.   By examining

18    document Montgomery 2212, Exhibit A, one can see that

19    Mr. Tatum did not invest $7,912 in the RJR Stock Fund on

20    February 2nd, 2000.   According to the data on that same day,

21    $6,407 was transferred from the RJR Stock Fund into the

22    Vanguard Funds.   The actual investment in Vanguard Funds on

23    that date totaled $28,877 times two funds or $57,754.   See

24    Exhibit A.   And the amount remaining in the RJR Stock Fund

25    was $7,912, less $6,407, or $1,505.   Since Mr. Tatum held

much less RJR Stock than Mr. Montgomery assumed, the ending

value of his actual investment was lower, and Mr. Tatum's

damages was 131,444, not 121,204.  See Exhibit B.  The

corrected damages amount is $10,240 greater than

Mr. Montgomery's model calculated.

    "Defendant's methodology assumed that there were no

other transactions occurring on the same day Mr. Tatum

purchased RJR shares, which produced results that are

inaccurate and understate damages.  This example calls into

question the reliability of Mr. Montgomery's calculations,

even assuming his methodology is generally credible.  See

above."

Q.  Now, with reference to Exhibit 18 to your report,

actually the corrections to your report, which is DX 65,

Exhibit 18 to DX 65, would you please explain whether you

have an opinion as to whether Mr. Altman's criticism was

correct or not.

A.  Yes.  This exhibit shows the details for the four

subaccounts in Mr. Tatum's Plan account, and it shows the

activity in each of those four subaccounts.  I believe it is

inappropriate to combine those subaccounts, and so that I

believe my methodology using these four subaccounts is the

proper approach.

    Just as an example of why subaccounts are important,

the second subaccount is the basic after tax money.  It is

1    important, I think obviously, to segregate the money that
2    exists in the Plan in an after tax basis, and you would not
3    want to combine that and comingle that with before tax
4    money, and so that's one of the purposes of these
5    subaccounts is, to keep before tax and after tax money
6    separate.
7        I can walk you through these if that would be
8    appropriate.
9    Q.   Yes.  If you could briefly do so, that would be
10   helpful.
11           THE COURT:  Would you like to give me a chance to
12   get this?
13           MR. CHARNES:  DX 65.
14           THE COURT:  I've got it.  But I missed about a
15   page of his testimony while I was looking for it.
16           THE WITNESS:  My apologies.
17           THE COURT:  Doctor Montgomery, if you could go
18   back and explain again, using -- the part about the
19   subfolder.
20   BY MR. CHARNES:
21   Q.   Explain why it is important -- whether it is important
22   to keep the different subaccounts separate in the damages
23   calculation.
24   A.   Yes.  The reason is, that for tax purposes, and
25   potentially other purposes, money that is identified as one

particular source, needs to be kept distinct from other

sources in a 401(K) plan.  If you look at the first page of

my corrected Exhibit 18, you will see that two of the

subaccounts -- these are headings all the way over on the

left-hand side of the page, two of the subaccounts are the

basic pretax and basic after tax.  After tax contributions

are contributions in which participants have already paid

income taxes, which before tax contributions are

contributions in which they have not yet paid taxes, and it

is obviously important to keep those two sources separate

from each other in the Plan accounts, and then there are two

other subaccounts which are shown on the next page that the

ESOP match and the company cash match, and all four of these

accounts are separated in the Plan account data that we

received.

Q.    With reference to corrected Exhibit 18 in DX 65, can

you use this exhibit to explain why Mr. Altman's criticisms

of your damages methodology are not correct in your view?

A.    Yeah.  Just referring first to what Mr. Altman stated

in his rebuttal report, he appears to be claiming that only

$1,505 of the money taken out of the NGH Fund by Mr. Tatum

ended up in the RJ Reynolds Common Stock Fund, and so let me

explain why I come up with a different number, and this

requires that you walk-through all four subaccounts.

THE COURT:  Let me get back there again.

1          THE WITNESS:  It is again Exhibit 18, corrected
2    Exhibit 18.
3          THE COURT:  You hold right where you are.
4          THE WITNESS:  DX 65.
5          THE COURT:  You are on Page 1 or Page 2 of that?
6          THE WITNESS:  I'm on Page 1, Your Honor.  I'm just
7    going to walk-through this sort of line-by-line.
8          Let's start with the first subaccount, which is
9    the basic pretax.  The second line of numbers there shows
10   the balance that Mr. Tatum had in this subaccount, the basic
11   pretax account on January 31st, 2000, and you can see that
12   in the NGH Common Stock column, he had a balance of $12,863.
13   Now, that balance of 12,863, got forced out of NGH the next
14   day on February 1st, and all of the money that was forced
15   out of NGH and NA, got transferred into the Interest Income
16   Fund, so the first line -- the next line shows the negative
17   entry in the NGH account equal to the balance on
18   January 31st, and then there is a positive entry the next
19   line down, where it says 2/1/2000 fund transfer, and in
20   there, there is a positive $12,863 entry for the Interest
21   Income Account.
22         So as of February 1st, that NGH money that was in
23   the subaccount ended up in the Interest Income Fund.  The
24   next day, February 2nd, you see a negative entry for $12,868
25   under Interest Income Fund, and the reason it's not exactly

the same as the day before is, that there were actually two

days of interest. There is interest from January 31st to

February 2nd on that money, so it's going to be a little bit

more, and you can -- so any way, the money was transferred

out of the Interest Income Fund, and the next line shows

where the money was transferred into; February 2nd, 2000,

fund transfer in. You've got 870 going into the RJRT Common

Stock Fund, 5,999 into each of the Vanguard Total

International Fund, and the Vanguard Total Stock Fund. So,

based on this account, the subaccount, the NGH money went a

little bit into the RJRT Fund and mostly into the two

Vanguard funds, so that's one subaccount.

Now the next subaccount, one has to look at --

basically perform the same exercise. If you go back to the

basic after tax, which is the bottom part of the first page

of Exhibit 18, and read across on the January 31st, 2000

line, you can see that in this subaccount the basic after

tax account, this was $19,819 worth of investment in NGH

Fund, January 31st, 2000. That money got transferred out

the next day, forced out, and transferred into the Interest

Income Fund, and you can see a positive entry of $19,819 in

the Interest Income Fund. The next day, that money got

transferred out of the Interest Income Fund or, again,

reflecting two days worth of interest, and that $19,826 got

spread into the same three funds as the previous subaccount;

the RJRT Common Stock Fund, the Vanguard Total International

Fund and the Vanguard Total Stock Fund; however, the amount

going into the RJRT Fund was greater, was $3,278.

Onto the next page. The next page shows the ESOP

match subaccount, and if you look at the data for the

balance in the ESOP match in January 31st of 2000 and read

across to NGH Common Stock line, there is actually a box

around this line, there is no balance.

In this subaccount, Mr. Tatum had no investment in

the NGH account, so we would not need to look at this

account to trace Mr. Tatum's NGH money and see where it

went. You can see -- by the way, if you look at the RJRT

Common Stock Fund under this subaccount that there was

actually a transfer out in the ESOP fund of $6,407. It was

a transfer out of the RJRT Fund, but the important thing is,

that that transfer out was not money that can be traced to

the NGH Common Stock Fund, because this subaccount had no

investment in the NGH Common Stock Fund, and this is the

mistake Mr. Altman makes is, he's mixing these sources up,

when they actually are distinct.

Then the final subaccount is the company match

fund. This is the bottom of the second page. In the

company match fund, Mr. Tatum had a balance on January 31st,

2000 of $26,554 in the NGH Common Stock Fund. That money

got forced out into the Interest Income Fund, and so you

1    have a transfer in of that same $26,554 on February 1st,

2    2000, into the Interest Income Fund, and the next day, that

3    money, plus interest, was transferred out of the Interest

4    Income Fund, and gets distributed into the RJRT Common Stock

5    Fund, $3,763, as well as the two Vanguard Funds, 11,200 in

6    each of them.

7            If you combine the information from all three

8    subaccounts which have NGH money, and you can see the total

9    amount of NGH money that ended up in the RJRT Fund, and

10   that's $870 for the basic pretax on the first page, plus

11   3,278 for the basic after tax, which to keep a running total

12   is about $4,100, and then you have another $3,763 in the

13   company cash match, which gets you up above $8,000 that can

14   be traced from the NGH Common Stock Fund into the RJRT Fund,

15   so you have on the order of $8,000 or so.

16           I can see -- according to Mr. Altman, I see

17   $7,912, so maybe my math in my head wasn't exactly right,

18   but it's approximately correct.  So it is not true that as

19   Mr. Altman claims, that only $1,500 worth of NGH Funds could

20   be traced into RJRT.  It is in fact a much larger number.

21   BY MR. CHARNES:

22   Q.    Doctor Montgomery, I would like to shift gears a little

23   bit and return to your basic data calculations and move away

24   from Mr. Altman.

25           Did you make any -- after conducting your two

1  approaches; most similar and tracing method, did you make

2  any adjustments to your damages analysis based on the

3  certain legal defenses asserted by Defendant?

4  A.   Yes, I did.

5  Q.   What were those?

6  A.   Well, there were two adjustments related to excluding

7  portions of the class from damages.  The first of those

8  adjustments excluded from the damages calculations

9  participants who signed a release after liquidating their

10 entire NGH and NA investment within the Plan.

11     The second exclusion was to exclude individual

12 participants who liquidated their entire NGH and NA holdings

13 within the Plan, before those holdings were forcibly

14 liquidated on January 31st, 2000.  I considered damages

15 excluding either alternatively, each of those two groups and

16 then excluding both groups combined.

17          MR. LEWIS:  Can we have a standing objection to

18 the testimony about both of those exclusions, given the

19 legal issues?

20          THE COURT:  Certainly you may.

21 BY MR. CHARNES:

22 Q.   Obviously, Doctor Montgomery, you aren't taking any

23 position whether the legal exclusions are correct or not?

24 A.   That's correct, I'm not taking any position.

25 Q.   Would you please turn to Defendant's Exhibit 266.

1    THE COURT:  Does that conclude the Plaintiff's
2  volume 11?
3    MR. CHARNES:  I believe so, Your Honor.
4  BY MR. CHARNES:
5  Q.    Let me know when you're there, Doctor Montgomery.
6  A.    I'm there.
7  Q.    What is Defendant's 266?
8  A.    This is a list of early liquidators in the class, and
9  this was based on our analysis of the participant data that
10  we received.
11  Q.    So you created Defendant's Exhibit 266?
12  A.    Yes.  My staff did.
13  Q.    How did you create it?
14  A.    We analyzed each participant's transactions within the
15  Plan and identified those participants that had completely
16  liquidated their holdings of NGH and NA before January 31st,
17  2000.
18  Q.    And what does Defendant's Exhibit 266 show?
19  A.    It is the name of each of these participants and it
20  shows that there are 894 participants in the class that
21  liquidated early.
22  Q.    And does this exhibit also contain a redaction for the
23  social security numbers of the participants?
24  A.    Yes, it does.
25  Q.    If you please turn to Defendant's Exhibit 71A, which is

1  in binder two.  I apologize, Your Honor.

2  A.   Okay.

3

4  Q.   What is this document?

5  A.   This document is a list of class members who signed a

6  release, according to the list of release signers that we

7  were provided, who signed a release after liquidating their

8  entire holdings in NGH and NA.

9  Q.   How did NERA create Defendant's Exhibit 71A?

10  A.   We received from counsel, and I understand counsel

11  received these lists from the Defendant, we received lists

12  of individuals who had signed releases, along with the dates

13  that they signed the releases, and then these -- we received

14  several supplements of these lists over time and we compared

15  the name and social security numbers on those lists to the

16  Plan records that we received, and we identified the

17  individuals on the lists of release signers that we received

18  that were also members of the class, and this is the

19  basis -- well -- and then we also identified for those

20  members those individuals who signed the release after fully

21  liquidating their NGH and NA Holdings.  That's the way the

22  list was constructed.

23  Q.   Did you testify earlier, that this list of participants

24  who signed releases was current through November 30, 2009?

25  A.    Yes, I did.  It is current through November 30, 2009.

1  Q.   Are the list of early sellers and list of releasors

2  mutually exclusive?

3  A.   No, they are not.

4  Q.   So participant class members could be on both lists?

5  A.   That's correct.  There is some overlap.

6  Q.   If you please turn back to Defendant's Exhibit 244,

7  which is in notebook four.  What is this document?

8  A.   This document is an exhibit that summarizes my estimate

9  of alleged damages under the tracing method based on the

10 full appreciation of NGH and NA following January 31st, 2000

11 through December 11, 2000.

12 Q.   These are damages as of December 11, 2000?

13 A.   That is correct.

14 Q.   And does Defendant's Exhibit 244 accurately represent

15 your calculations applying that method?

16 A.   Yes, it does.

17 Q.   Would you please explain to the Court the result of

18 your calculations using the tracing method.

19 A.   The exhibit shows four options, option one through

20 option four, and these options relate to which of the two

21 previous groups; early liquidators or releasors is excluded

22 from the damages calculation.  The first option excludes

23 neither group, that is to say it includes all class members

24 in the damages.  There are 3,287 class members with positive

25 damages.  I should say, there are another roughly 300 class

members who have negative damages, and they are excluded

from this calculation.  The 3,287 class members had total

aggregate damages of approximately $27.7 million as of

December 11, 2000.

The next option is option two, and that shows damages

removing releasors, the number of individuals who signed a

release after fully liquidating their NA and NGH Holdings

and having -- have to have positive damages was 1,088, and

if these individuals are excluded, the overall damages is

just a little under $18.0 million.

Option three excludes -- includes release signers, but

excludes all early sellers, all early liquidators of NGH or

NA, and if the 653 individuals with positive damages and who

are early liquidators are excluded, damages are

approximately $20.3 million.

Finally, option four excludes both groups, both

releasors and early sellers.  This results in the exclusion

of 1,510 class members, and if these individuals are

excluded from damages, damages are approximately

$13.5 million.

Q.   Doctor Montgomery, can you please explain for the Court

how a class member could have negative damages.

A.   A class member would have negative damages, if the

class member basically was better off having -- it would

have been better off -- was better off in the alternative

investments, than the class members would have been had they
retained NGH or NA until December 11, 2000.

An example of how this might come to pass is, a class
member might have liquidated his -- say he had a position in
NGH and he might have liquidated that position early, early
on, say in July of 1999, and perhaps invested in the Total
Stock Market Fund, and so gained the benefit of the
appreciation of the overall stock market in 1999, while NGH
was actually declining in value, and then had the luck or
whatever, to switch out his stocks in early 2000 and either
invest in the Interest Income Fund, or more likely, this
happened in some instances, invest in RJR Tobacco at that
point, and then gain the benefit of RJR Tobacco appreciation
in 2000.

So this is an example of somebody who would have
negative damages under the tracing methodology.

Q.    If you please turn to Defendant's Exhibit 245.

A.    You said 245?

Q.    Yes, sir.  What is DX 245?

        MR. LEWIS:  Objection, Your Honor.

        MR. CHARNES:  I'm not sure I understand the basis
of the objection.

        THE COURT:  I had sustained the objection to his
being able to state an opinion with regard to what investors
likely would have done.

1          MR. CHARNES:  I interpreted your -- maybe

2   incorrectly -- your standing objection to his comparison as

3   to which of the two methods he thought was more appropriate.

4          THE COURT:  No.  I sustained it as to this method.

5          MR. CHARNES:  Okay, Your Honor.

6          THE COURT:  That's why I was going to give you the

7   opportunity to follow up on questions, if you had additional

8   questions to support that method.

9          MR. CHARNES:  I apologize.  I didn't understand

10  that.  If we could maybe confer for a minute.

11         THE COURT:  You may.  Sure.  You want a five

12  minute recess?

13         MR. CHARNES:  Sure.  Thank you, Your Honor.

14         (Recess taken from 5:10 p.m. to 5:15 p.m.)

15         MR. CHARNES:  If it is okay with the Court, I

16  would like to ask a few more questions of Doctor Montgomery

17  related to the most similar method.

18         THE COURT:  All right, sir.

19  BY MR. CHARNES:

20  Q.   Could you please again describe for the Court how you

21  determined what funds available in the Capital Investment

22  Plan after January 31st, 2000 were most similar to the NGH

23  and NA Funds.

24  A.   Well, in short, I analyzed each fund's returns, the

25  risk characteristics of each fund's returns and risk

1   characteristic, looked at the volatility of each fund in
2   comparison to NGH and NA and the correlation of each fund
3   with NGH and NA.
4           THE COURT:  In doing that, did you then assume
5   that each investor would find the most similar fund to the
6   Nabisco Stock Fund that investor was in and put the money in
7   that most similar fund?
8           THE WITNESS:  I'm not sure if I assumed it
9   necessarily.  The calculation of damages were compared with
10  a comparison of what the investor would have received.
11          THE COURT:  If they had invested --
12          THE WITNESS:  If they had invested in NGH or NA,
13  that's the hypothetical.
14          THE COURT:  What is the basis --
15          THE WITNESS:  With the investment that they
16  actually made, that was closest to NA and NGH in terms of
17  the risk characteristics.  So that's the calculation as
18  comparison of NGH and NA returns with the investment that
19  participants actually made closest, similar to NA or NGH in
20  terms of risk.
21          THE COURT:  Okay.  Go ahead.  I obviously don't
22  understand.
23  BY MR. CHARNES:
24  Q.   Doctor Montgomery, in applying the most similar
25  investment methodology, did you make any assumptions at all

1  about what participants actually would have invested in but

2  for the removal of the NGH or NA Funds?

3  A.   I think, as I stated, it's -- the calculation compares

4  the actual returns in NA and NGH to the returns of all the

5  funds that the participant actually invested in, to ones

6  that are the most similar based on the risk characteristics

7  to NGH or NA, and it's either NGH or NA, depending on what

8  that participant had been investing in, in which stock is

9  the basis for the damages calculation.

10          THE COURT:  And you did that for each participant?

11          THE WITNESS:  That's correct.

12          THE COURT:  So walk me through a typical

13  participant.

14          THE WITNESS:  All right.  So a typical participant

15  would have had -- the most typical participant is a

16  participant who had NGH Stock until January 31st, 2000, and

17  then may have -- and also, after that stock was liquidated

18  on February 1st, had investments in say, RJ Reynolds

19  Tobacco, in the Total Stock Market Fund, and so the Interest

20  Income Fund -- I'm just making up what I think is probably a

21  fairly typical example, but it's only a hypothetical

22  example.  And the damages calculation would be a comparison

23  of the hypothetical returns that investor would have

24  received, had that investor been able to keep -- stay

25  invested in NGH up until December 11, 2000, in this

instance, because that investor had RJR Tobacco Stock and
assuming they had enough RJR Tobacco Stock with the returns
in RJR Tobacco. If that investor didn't have RJR Tobacco
Stock, it would involve a comparison of NGH returns with the
next most similar investment, which in this case would be
the total sock.

THE COURT: You're assuming that the investor put
all of his or her money in the most similar fund?

THE WITNESS: No. I'm not assuming that. I'm the
investor -- and I'm doing this analysis based on what the
actual -- what the investor actually had. This investor
actually had investments in RJR Tobacco, the Total Stock
Market Fund and the interest income. Those are actual
investments.

THE COURT: How about money that was in the
Interest Income Fund, what would you do with that?

THE WITNESS: That would not enter into this
particular damages calculation, unless the individual didn't
have an investment that was more similar than the Interest
Income Fund.

THE COURT: So if the money from the Nabisco
Stocks was put into the Interest Income Fund --

THE WITNESS: Well, that's a -- that's the -- what
you just described there is tracing approach. If the money
is put in -- if that money, if money somehow carries a tag

that allows you to identify -- the money didn't really carry

a tag that allows you to identify where it goes, although we

can trace money through the accounts using the methodology I

described, but money is essentially a portfolio, and so the

comparison is not based on trying to see where the NGH money

actually went, that's the tracing methodology. But this

approach doesn't attempt to see where the money actually

went, but rather compares the NGH return with the actual

investment that the participant had that was the most

similar.

THE COURT: And what is the basis for doing that?

THE WITNESS: The basis is, that there is no -- I

think that the tracing methodology, or any tracing

methodology, assumes that the only thing that would have

changed in a participant's portfolio is the investment that

can actually be traced to the NGH money, and that nothing

else in the participant's portfolio would have changed.

Finance theory says that people manage portfolios as

portfolios, and the most similar method is one way to take

into account risk characteristics that are part of how one

manages a portfolio.

THE COURT: Is that consistent with what you

testified to earlier with regard to the participants who had

their money or investments in the Nabisco Funds from June

the 14th until January the 31st of 2000?

1           THE WITNESS:  I'm not sure I understand the

2    question.  I'm sorry.

3           THE COURT:  Did you not testify earlier today with

4    regard to the number of participants who did not move their

5    money at all --

6           THE WITNESS:  I see.

7           THE COURT:  -- from June the 15th of '99 until

8    January the 31st of 2000?

9           THE WITNESS:  No.  I think it is -- it is -- those

10   participants appeared to be rather passive in their

11   investments, and I think that my argument there was

12   essentially that -- a liability argument.

13          THE COURT:  What would you do with those investors

14   with regard to the most similar?

15          THE WITNESS:  Well, this is a -- these investors

16   would be treated the same as other investors.

17          THE COURT:  Which is how?

18          THE WITNESS:  Which is assuming --

19          THE COURT:  Their money is put from the Nabisco

20   Stocks into the Interest Income Fund, now what do you do

21   with that?

22          THE WITNESS:  It depends on what else they have.

23          THE COURT:  If they happen to have some money in

24   one of the funds that you would consider the most similar,

25   then you would go to the most similar fund?

1          THE WITNESS:  That's correct, because if one takes

2    the view of liability in this case, that participants were,

3    you know, actively managing their portfolios and making

4    choices and were deprived the choices of NA or NGH, it would

5    make sense to me that they would try to do the best they

6    could with the choices they had, which would be invest in

7    the things most similar.

8          THE COURT:  Okay.  Sustained.  That's not coming

9    in.

10          MR. CHARNES:  Thank you.

11          THE COURT:  That's not coming in.  Now if you

12   would like to stop here for the day, in view of that and

13   pick back up tomorrow, we can do that, since we've only got

14   five more minutes.

15          MR. CHARNES:  That will be fine, Your Honor.

16          THE COURT:  Let's adjourn until 9:30 in the

17   morning, unless we have something else we need to talk

18   about.

19          MR. CHARNES:  I'm advised we do, Your Honor.

20          THE COURT:  Then, Doctor Montgomery, you can be

21   excused.

22          MR. CHARNES:  I'm advised I misspoke earlier when

23   I was referring to the compact disk with participant data.

24   I called them DX 159 and 161.  Those are PX numbers.  It

25   is -- I should refer to PX 159 and PX 161, and the correct

DX numbers are 205A and 205B.

THE COURT: Okay. Hold where you are, if you would. You had identified them as DX 159 and 161 and they should be what?

MR. CHARNES: PX 159 and 161 or DX 205A and 205B.

THE COURT: 205A, 205B?

MR. CHARNES: Yes. I apologize for the misstatement.

THE COURT: Thank you. Anything else we should take up?

MR. LEWIS: No, Your Honor.

THE COURT: See you all at 9:30 in the morning.

(Court adjourned at 5:27 p.m.)

1              C E R T I F I C A T E

2

3           I, J. CALHOUN, RPR, United States District Court

4    Reporter for the Middle District of North Carolina, DO HEREBY

5    CERTIFY

6

7           That the foregoing is a true and correct transcript of

8    the proceedings had in the within-entitled action; that  I

9    reported the same to typewriting through the use of

10   Computer-Aided Transcription.

11          THIS TRANSCRIPT CERTIFICATION IS VOID, IF THE

12   SIGNATURE IS NOT ORIGINALLY SIGNED BY THE COURT

13   REPORTER WHO REPORTED THIS MATTER.

14

15

16

17

18

19   Date:    5-12-10              J. Calhoun, RPR
                                   United States Court Reporter
20                                 324 W. Market Street
                                   Greensboro, NC  27401
21

22

23

24

25