IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RICHARD G. TATUM, individually and on behalf of a class of all other persons similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | 1:02CV00373 |
| v. | ) ) | |
| R.J. REYNOLDS TOBACCO COMPANY, et al. | ) ) ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

A bench trial was held in this case from January 13, 2010 to February 9, 2010, regarding Plaintiff Richard Tatum's claim that Defendants R.J. Reynolds Tobacco Company and R.J. Reynolds Tobacco Holdings, Inc. (collectively "RJR") breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") by allegedly mismanaging the R.J. Reynolds Capital Investment Plan ("the Tobacco Plan," or "the Plan"), a defined contribution retirement plan governed by ERISA. Tatum brought this case as a class action, representing a class of employees and retirees of RJR who owned Nabisco stock when it was removed from the Plan as an investment option shortly after the RJR Nabisco food and tobacco companies separated in June 1999. The issue now before the Court is whether Plaintiff should be allowed to amend his complaint to conform to evidence presented at trial. [Dock. # 365.] Consequently the parties have also requested a ruling on the subject of the proposed amended complaint: whether Defendants followed the proper amendment

procedures in the Plan documents when they issued an amendment to the Plan removing former company stock funds, and, if not, whether that amendment is invalid. As discussed in further detail below, Plaintiff's Motion to Amend [Dock. # 365] is GRANTED and the Plan amendment is determined to be invalid.

I.

Prior to1999, R.J. Reynolds Tobacco Company ("RJR Tobacco") and Nabisco Holdings Corp. ("Nabisco Foods") were operating subsidiaries of RJR Nabisco, Inc. ("RJR Nabisco").[1] RJR Tobacco engaged in the selling and manufacture of tobacco products. Nabisco Foods engaged in the sale and manufacture of food products. RJR Nabisco owned 100% of RJR Tobacco and 80.5% of Nabisco Foods. The remaining 19.5% of Nabisco Foods was public stock and traded on the New York Stock Exchange. RJR Nabisco was owned by RJR Nabisco Holdings Corp. ("RJR Nabisco Holdings"), a corporation also publicly traded on the New York Stock Exchange.

In the spring of 1999, RJR Nabisco decided to separate the food and tobacco companies, and did so through a series of transactions which resulted in spinning off the tobacco company as a separate company. PX 158, DX13 (RJR 1588). R.J. Reynolds Tobacco Holdings, Inc. (RJRTH) (containing RJR Tobacco as a wholly owned subsidiary) and Nabisco Group Holdings (NGH) emerged as the tobacco and food

---

[1] Some of the facts relevant here may be repeated and discussed more fully in the Court's forthcoming findings on Plaintiff's breach of fiduciary duty claims.

companies, respectively.[2]

In connection with the spinoff, the retirement plan formerly available to both Nabisco Foods and RJR Tobacco employees ("Original Plan") was amended to form a new plan, the R.J. Reynolds Capital Investment Plan ("Tobacco Plan"), for employees of the new tobacco company. The Tobacco Plan initially held all of the same investment options as the Original Plan, including NGH stock and Nabisco Foods stock (collectively the "Nabisco Stock Funds"). In the course of the spinoff discussions, however, it was determined that the Nabisco Stock Funds should not be an investment option in the Tobacco Plan, as NGH and RJRTH would become separate, unrelated companies at the time of the Spinoff. Therefore, the Nabisco Stock Funds would be "frozen" at the time of the Spinoff (meaning no future contributions could be allocated to the two Nabisco funds and no money invested in other funds could be transferred to those funds after that date) with the intent that they would be removed altogether from the Tobacco Plan at a later date.

Effective June 14, 1999, the Original Plan was amended (the "June Amendment") to create the Tobacco Plan. The June Amendment also provided in Section 4.03 that the Nabisco Stock Funds would be frozen:

> <u>Separate Funds</u>. The Trustee shall maintain the following separate Investment Funds within the Trust Fund: the Interest Income Fund, the Nabisco Common Stock Fund, the Nabisco Group Holdings Common

---

[2] To spinoff the tobacco business, 1) RJR Nabisco's shares of Nabisco Foods would be conveyed upstream to RJR Nabisco Holdings, renamed Nabisco Group Holdings and 2) RJR Nabisco, now holding shares of only RJR Tobacco, would be renamed R.J. Reynolds Tobacco Holdings, Inc. (RJRTH).

Stock Fund, the RJR Common Stock Fund, the Total Stock Market Fund, the Total International Fund, the Conservative Growth Fund, the Moderate Growth Fund and the Growth Fund. All Investment Funds under the Plan are active Funds; <u>provided, however, the Nabisco Common Stock Fund and the Nabisco Group Holdings Common Stock Fund are frozen and, as of the Effective Date, Participants are prohibited from investing contributions or reallocating amounts held under the Plan to such Funds.</u> In addition, the Trustees shall maintain any other Investment Funds as are designated by the RJR Pension Investment Committee.

PX 1, DX 21 (emphasis added). Members of the Employee Benefits Committee for the Original Plan ("Original EBC") issued and signed a resolution in the form of a Consent in Lieu of Meeting on June 7, 1999 (the "June Consent"), authorizing the June Amendment in Section 6. The June Consent stated a desire to cease all *future* investing in the Nabisco Stock Funds, and authorized the Original EBC to take action to effectuate the amendment:

> 6. AMENDMENT AND RESTATEMENT OF THE RJR NABISCO, INC. CAPITAL INVESTMENT PLAN
> * * *
> WHEREAS, due to the spin-off of R.J. Reynolds Tobacco Company the [EBC] desires to amend and restate the RJR Nabisco, Inc. Capital Investment Plan to <u>a) cease all future investing in the new Nabisco Group Holdings Common Stock Fund and in the Nabisco Common Stock Fund on and after the date of the spin-off</u>,....
>
> NOW, THEREFORE, BE IT
> * * *
> RESOLVED, that the R.J. Reynolds Tobacco Company Capital Investment Plan as amended and restated is hereby adopted effective as of June 14, 1999 as attached hereto as Exhibit E, and further
> RESOLVED, that the proper Members of the [EBC] and their designees are hereby authorized and directed to take all actions necessary or desirable to carry out the intent of the foregoing resolution.

PX 17, DX 20 (emphasis added). Thus, at the date of its inception, the Tobacco Plan

contained frozen Nabisco Stock Funds.

The decision to freeze and the intention to ultimately divest the Nabisco Stock Funds was communicated to Plan participants in several notices in 1999 and 2000. Initially, no date was determined for eliminating the Nabisco Stock Funds as investment options from the Plan. In April, 1999, the first quarter statement to participants of the Original Plan included a letter notifying them of the anticipated spinoff, as well as the intention to freeze and "eventually" eliminate the Nabisco Stock Funds. PX 10. In June 1999, another letter was sent informing participants of the intention to freeze and then eliminate the Nabisco Funds "approximately six months after the date of the Spinoff." PX 11, DX 19.

In October and December 1999, letters went to participants of the Tobacco Plan notifying them that the frozen Nabisco Stock Funds would be eliminated from the Plan on January 31, 2000. PX 12, DX 35 (October); PX 14, DX 47 (December). The January 31, 2000 effective date of divestiture of the Nabisco Stock Funds was determined on October 14,1999, at a meeting of human resources managers and the Plan's recordkeeper, PWC Kwasha. PX 30, DX 39; Beasley Trial Tr. Vol. VII at 78 (Jan. 20, 2010) (Dock. # 380). The attendees at the October 14, 1999 meeting discussed the timing of the Nabisco Stock Funds liquidation with respect to Y2K, a concern which resulted in planning the liquidation for January 31, 2000. The October meeting was not an EBC meeting. PX 30, DX 39; Beasley Trial Tr. Vol. VII at 78 (Jan. 20, 2010) (Dock. # 380). There were few, if any, EBC members present

at the October meeting and no EBC meeting followed the October meeting. No action of the EBC was taken - in the form of a vote or written instrument - adopting the January 31, 2000 divestiture date prior to November 1999.

The October and December 1999 letters also informed participants erroneously that the funds were being eliminated "[b]ecause regulations do not allow the Plan to offer ongoing investment in individual stocks other than the Company." In December of 1999, a new Summary Plan Description was also sent to all plan participants with a paragraph regarding the anticipated divestment of the Nabisco Stock Funds:

> Frozen Stock Funds. Funds relating to the common stock of Nabisco Group Holdings Corp. and Nabisco Holdings Corp. which were maintained under the Plan prior to June 14, 1999 (the Spinoff Date) were "frozen" as of the Spinoff Date. After the Spinoff Date, no contributions of any kind could be made to these funds. It is anticipated that these frozen funds will be eliminated early in 2000 and the balances invested in other Plan funds.

PX 155, DX 42. In January of 2000, a newsletter distributed to employees, the "RJRT Weekly," included the statement that "[a]s of January 31, 2000, any amounts in your Capital Investment Plan (CIP) account still invested in the 'frozen' stock funds (the NGH Common Stock Fund or the Nabisco Common Stock Fund) will be transferred automatically to the Interest Income Fund." DX 48.

The power to amend the Tobacco Plan was granted to a newly-appointed Employee Benefits Committee ("Tobacco EBC" or "EBC"). The Tobacco Plan designated the Tobacco EBC and the Pension Investment Committee ("PIC") as fiduciaries. Shortly after the Tobacco Plan was created, the members of the Tobacco

EBC and PIC were designated by the Board of Directors of R.J. Reynolds in Plan documents dated July 2, 1999. PX4, DX 27. Four Tobacco EBC members were designated by the Board of Directors of RJR in Board Resolutions dated July 2, 1999. Those members included Bob Gordon (Executive Vice President of Human Resources, RJRTH and R.J. Reynolds), Ann Johnston (Vice President of Human Resources for RJR Tobacco), Ken Lapejko (Executive Vice President and Chief Financial officer of RJRTH and R.J. Reynolds Tobacco), and McDara Folan (Senior Vice President, Deputy General Counsel, Secretary of RJRTH). The members of the PIC included all four members of the EBC as well as two additional members: Charles Blixt (General Counsel for R.J. Reynolds Tobacco) and Lynn Lane (Senior Vice President and Treasurer, RJRTH and R.J. Reynolds Tobacco). PX 4, DX 27.

Sections 10.04 and 11.01 of the Tobacco Plan gave the Tobacco EBC authority to amend the Plan by written instrument on behalf of RJR Tobacco. In Section 11.01 of the Plan, entitled "Amendments," the Company "reserve[d] the right at any time and from time to time by *action* of the EBC *in writing*, both retroactively and prospectively, to modify or amend, in whole or in part, any or all of the provisions of the Plan." PX 1, DX 21, §11.01 (emphasis added). Section 10.04 of the Plan also states that "the [EBC] may amend the Plan, subject to the provisions of §11.01." PX 1, DX 21, §10.04 (emphasis added). Section 10.01(e) of the Plan explained how the EBC could take "action":

> A majority of the members of the [EBC] shall constitute a quorum for the
> transaction of business. All resolutions or other action taken by the EBC

7

shall be by the vote of a majority of the members of the Committee <u>present at any meeting</u>, or without a meeting by an <u>instrument in writing signed by a majority of the members of the Committee.</u>

PX 1, DX 21, §10.01(e) (emphasis added).

In November of 1999, McDara Folan, acting as secretary of the EBC, executed a document purporting to be an amendment (the "November Amendment") to the Tobacco Plan which removed the frozen Nabisco Stock Funds from the list of investment options in Section 4.03 effective February 1, 2000. At the time Folan executed the November Amendment, no "action", as defined in the Plan, had been taken regarding elimination of the Nabisco Stock Funds. No formal EBC meeting had been held to discuss or vote upon the elimination of the Nabisco Stock Funds from the Plan,[3] and no Consent in Lieu of Meeting or any other type of document authorizing removal of the Nabisco Stock Funds effective February 1, 2000 had been signed by the members of the EBC. Nonetheless, the November Amendment purportedly removed from Section 4.03 of the Plan any reference to the frozen Nabisco Stock Funds, and dictated that "all Investment Funds under the Plan are active funds":

Effective February 1, 2000, Section 4.03 of the Plan is amended to read as follows:

---

[3]At the time of the proposed amendment, only one EBC meeting had been held since the Tobacco Plan's inception. That meeting, held July 29,1999, did not include any discussion regarding amending the Plan to eliminate the Nabisco Stock Funds from the Plan using an effective date of February 1, 2000, and there was no vote to amend the Plan at that meeting. PX 16 (Index of Minutes), PX 26, DX 30 (Minutes); Beasley Trial Tr. Vol. VII at 134 (Jan. 20, 2010) (Dock. # 380); Folan Trial Tr. Vol. X at 154-156, 210-212 (Jan. 25, 2010) (Dock. # 383); Johnston Trial Tr. Vol. X at 62 (Jan. 25, 2010) (Dock. #383). As noted above, the decision to divest the Tobacco Plan of the Nabisco Stock Funds effective February 1,2000 was made at the October 14, 1999 meeting of human resources executives and PWC Kwasha.

4.03:   Separate Funds.   The Trustee shall maintain the following separate Investment Funds within the Trust Fund: the Interest Income Fund, the RJR Common Stock Fund, the Total Stock Market Fund, the Total International Fund, the Conservative Growth Fund, the Moderate Growth Fund and the Growth Fund.  All Investment Funds under the Plan are active Funds.   In addition, the Trustee shall maintain any other Investment Funds as are designated by the RJR Pension Investment Committee.

The Nabisco Stock Funds were eliminated from the Tobacco Plan on January 31, 2000, in accordance with the November Amendment.  As the market price of the Nabisco Stock Funds had continuously declined in value from June 1999 to January 2000, the liquidation of the Nabisco Stock Funds came at a substantial loss to participants.

In February of 2000, a bidding war ensued over the NGH and Nabisco Foods stocks. Blixt Trial Tr., Vol. X at 18-22 (Jan. 25, 2010) (Dock. #383). As a result of the competing bids, the stock price for both stocks increased dramatically, and NGH and Nabisco Foods were ultimately purchased by R.J. Reynolds and Phillip Morris, respectively, on December 11, 2000.

The EBC approved several amendments adding new investment options to the Tobacco Plan after the Nabisco Stock Funds were liquidated.  On September 27, 2000, the members of the EBC (still Gordon, Johnston, Folan, and Lapejko) signed a Consent in Lieu of Meeting [DX 324] authorizing, among other things, Amendment No.4 [DX 265] (entered into Sept. 27, 2000) and Amendment No. 5 [DX 325] (entered into Dec. 8, 2000) to the Plan.  Amendment No. 4 added three new "core"

investment options to the Plan. Amendment No. 5 added a new "non-core" investment option, a participant self-directed brokerage account fund, to the Plan. Amendment No. 4 was entered into on September 27, 2000, and signed by Folan, as Secretary of the EBC. Amendment No. 5 was entered into December 8, 2000 and signed by Folan, as Secretary of the EBC.

On February 26, 2002, the members of the EBC (Johnston, Folan and Lapejko)[4] signed a Consent in Lieu of Meeting authorizing, among other things, an amendment and restatement of the RJR Capital Investment Plan as of December 31, 2000. DX 326. The restated Plan included, in addition to the Investment Funds listed in Section 4.04(a), a Brokerage Account Investment Fund alternative through which plan participants could establish an individual brokerage account. PX 156.

In May of 2001, Mr. Tatum submitted a claim with the EBC for an increase in his account based upon what would have been a change in the account value as a result of the purchase of NGH and Nabisco Holdings. PX 48. That claim was denied by the Plan's "Benefits Administration Committee" in July 2001.[5] Tatum appealed the denial on August 7, 2001, and his appeal was denied by the EBC on September 27, 2001. PX 56.

---

[4] Gordon retired effective January 1, 2002 and thus terminated his service as member and chair of the EBC.

[5] Section 13.01 of the Tobacco Plan stated that an initial determination of claim for benefits to be made by Benefits Administration Committee.

The lengthy procedural history of this case will not be revisited for purposes of this Memorandum Opinion. Only the dispositive motions necessary to give context to the issues here will be discussed.

Mr. Tatum instituted this action in May 2002 pursuant to ERISA's fiduciary duty requirements, seeking to recover losses to the Tobacco Plan resulting from the January 31, 2000 sale of the Nabisco stocks.[6] See 29 U.S.C. § 1132(a)(2) (civil action allowed for breach of fiduciary duty); 29 U.S.C. § 1109 (fiduciary liable for breach of duty); 29 U.S.C. § 1104(a)(1) (prudent man standard of care). Tatum initially named RJR and the Plan fiduciaries (the EBC and PIC) as defendants (collectively, "Defendants"). On December 10, 2003, Tatum's complaint was dismissed for failure to allege any fiduciary action on the part of the defendants that resulted in losses to the Plan. [Doc. ## 21, 22.] The dismissal was based on a determination that the November Amendment mandated the removal of the Nabisco Stock Funds and thus, RJR's actions in liquidating the Nabisco Stock Funds were acts of the settlor, were not discretionary, and thus no fiduciary duty attached. On December 14, 2004, the United States Court of Appeals for the Fourth Circuit reversed the dismissal and remanded for further proceedings, finding that the November Amendment did not require removal of the Nabisco funds from the Plan after January 31, 2000:

---

[6] Mr. Tatum's initial Complaint was filed on May 13, 2002 (Dock. # 1) and his First Amended Complaint was filed on May 23, 2002 (Dock. # 3).

A plain reading of the [June and November 1999] amendments reveals several points that are dispositive: (1) the trustee was required to maintain the Nabisco funds as frozen funds from June 14, 1999, through January 31, 2000; (2) as of February 1, 2000, the Nabisco funds were unfrozen, were not listed as investment options, and were no longer required to be maintained as investment funds under the Plan; and (3) other investment funds, in addition to those listed, could be designated by the investment committee on or after February 1, 2000. All of this means that the amendments did not strip the Plan fiduciaries of discretion to re-designate the Nabisco funds as investment options effective February 1, 2000.

Tatum v. R.J. Reynolds Tobacco Co., 392 F.3d 636, 640 (4th Cir. 2004).

On January 20, 2005, Defendants filed another motion to dismiss [Dock. # 31], which resulted in additional limited discovery [Dock. #43], and Tatum was granted leave to amend the First Amended Complaint to add new facts. [Dock. #74.] In April 2007, RJR brought a third motion to dismiss. [Dock. #78]. RJR's motion to dismiss was granted as to the Committee Defendants but Tatum was allowed to proceed against RJR. [Dock. #90.]

In September 2008, this case was certified as a class action. [Dock. # 209] The parties' cross motions for summary judgment were denied in December 2009, and a bench trial on Tatum's breach of fiduciary duty claim was held from January 13, 2010 to February 9, 2010.

III.

Rule 15(b)(1) of the Federal Rules of Civil Procedure allows a party to amend the pleadings to conform to evidence presented at trial unless the objecting party can show prejudice. Fed. R. Civ. P. 15(b)(1). Tatum seeks to amend his complaint to add

an allegation that the November Amendment was not adopted in accordance with the Tobacco Plan's procedure for amending plan documents and is therefore invalid. If the November Amendment is invalid, Plaintiff claims, another basis exists for his argument that the Nabisco Stock Funds should have remained frozen funds in the Plan.

During the trial of this action, evidence was presented by both parties relating to whether the EBC had validly adopted "Amendment No. 1 to the Plan" dated November 18, 1999, which purported to remove the Nabisco Stock Funds from the required investment options listed in the Plan effective February 1, 2000. See Gordon, Trial Tr. Vol. IV at 184:17 - 186:1 (Jan. 14, 2010) (Dock. # 377); Folan, Trial Tr. Vol. X at 210:5-212:10 (Jan. 25, 2010) (Dock. # 383). The Court reopened trial on December 2, 2010, for the purpose of addressing RJR's concern that it would be prejudiced if Tatum were permitted to amend his complaint. RJR presented additional exhibits and testimony to support its contention that the November Amendment was valid and/or ratified by the EBC.

Recognizing that Tatum's allegations might trigger claims under other sections of ERISA, the parties also entered into a stipulation on December 2, 2010 which stated that Tatum would not pursue any claims under 28 U.S.C. § 404 (a)(1)(D) and "is not seeking to impose any higher standard of prudence, or any presumptions based on [ERISA §] 404(a)(1)(D) [allowing a cause of action for failure to follow plan documents]." The same stipulation also states that "all evidence presented by the

parties' experts at trial regarding the prudence of redesignating or maintaining the Nabisco Stock Funds as active funds is the same as would be offered and applies to the same extent on the issue of whether a hypothetical prudent fiduciary could or would have retained those funds as frozen funds or sold them." The parties also stipulated that "the considerations of a fiduciary are the same with regard to the Nabisco Stock Funds regardless of whether the funds would be frozen or active." At that time, following the additional testimony in December 2010, the parties represented to the Court that all documents and testimony related to the validity of the November Amendment were in evidence.

RJR maintained its objection to allowing an amendment on several grounds, including prejudice. In light of the parties' representation to the Court in their stipulation entered December 2, 2010, no additional discovery is required, and that which was required was entered into the trial record with the Court's permission on December 2, 2010. Thus, any claim of prejudice has been remedied by giving the parties a full opportunity to supplement the record.

In addition to claiming prejudice, however, RJR objects to Tatum's proposed amendment on two additional grounds. First, RJR maintains Tatum should not be permitted to amend at such a late date based on principles of judicial estoppel. "Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation." John S. Clark Co. v. Teneco, Faggert & Frieden, P.C., 65 F.3d 26, 28 (4th Cir. 1995). Judicial estoppel, however, is a specific form

of relief which must be applied "with caution," Id. at 28, and "in the narrowest of circumstances." Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996). The Fourth Circuit has identified specific elements which must be met before judicial estoppel is to be applied. Id. First, the party to be estopped must be seeking to advance a position (of fact, rather than law or legal theory) that is inconsistent with a stance taken in prior litigation. Second, the position sought must have been accepted by the court. Finally, the party to be estopped must have intentionally misled the court to gain unfair advantage. Id. The last requirement has been called the "bad faith requirement" and the "determinative factor" by the Fourth Circuit. Zinkand v. Brown, 478 F.3d 634, 638 (4th Cir. 2007).

Applying the facts of this case to the elements outlined by the Fourth Circuit, it is determined that judicial estoppel is inappropriate under these circumstances. First, it is a strain to suggest that Tatum ever took a "position" that the November Amendment was valid, thus making it difficult to say that his recent claim that the amendment is invalid is a "contrary" position. Rather, all of the parties appear to have assumed the November Amendment was valid throughout the course of this litigation up to the time of trial. There is also no indication Mr. Tatum ever used the validity of the November Amendment to his advantage or that he misled this Court or the Fourth Circuit in any previous proceedings to gain unfair advantage. RJR argues that Tatum's Fourth Circuit arguments on appeal of his motion to dismiss - arguments which focused exclusively on the meaning of the language in the November Amendment -

assumed the amendment's validity and thus its validity was used to Plaintiff's advantage. This strained reading of judicial estoppel does not show bad faith and will not be adopted.

In addition to the above reasons, judicial estoppel will not be used under these specific circumstances, where RJR at all times had access to the very documents and witnesses which brought forth the facts placing the November Amendment's validity in question. Under such circumstances, it is difficult to accept RJR's claim of disadvantage.

RJR also argues that amending the complaint would be futile because Tatum cannot prevail on a theory that the November Amendment is invalid. As the remainder of this Memorandum Opinion sets forth, Plaintiff's claim is not futile and Plaintiff's amendment to conform to the evidence will be permitted to add the following allegation in Paragraph 30A:

> 30A. In the alternative to Paragraph 30, on or about November 18, 1999, the Plan was purportedly amended to provide the following investment options for its participants, effective February 1, 2000: the Interest Income Fund, the RJR Common Stock Fund, the Total Stock Market Fund, the Moderate Growth Fund, the Growth Fund, and any other investment funds designated by the RJR Pension Investment Committee. Under this purported amendment, the Pension Investment Committee retained discretion to designate other stock funds as investment options in the Plan. The November 18, 1999 purported amendment was ineffective and invalid, because it was not adopted pursuant to the amendment procedures set forth in the Plan. Nothing in the Plan prohibited the Plan and its fiduciaries from maintaining the NGH and NA common stock funds as investment options in the Plan.

Evidence regarding the November Amendment's validity was introduced at and after

trial through additional testimony, documents, and a stipulation by the parties. Therefore, the issue of validity is also ripe for determination.

IV.

ERISA Section 402(b)(3) provides that "[e]very employee benefit plan shall … provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 42 U.S.C. § 1102(b)(3). The procedure may be simple or complex, but "whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 85, 115 S.Ct. 1223, 1231 (1995). Consequently, following the procedure provided is required, and failing to do so may be grounds for invalidating the amendment. Id. at 84, 115 S. Ct. at 1231; Overby v. Nat'l Assoc. of Letter Carriers, 595 F.3d 1290, 1296 (D.C. Cir. 2010) (collecting cases and saying "[t]he clear implication of the Supreme Court's language [in Schoonejongen] is that there must be amendment procedures in a plan, and those amendment procedures must be followed for the valid adoption of an amendment").

The Tobacco Plan's specific amendment procedure is found in Section 11.01 of the Plan, entitled "Amendments." There, "the Company reserves the right at any time and from time to time by _action_ of the EBC in writing, both retroactively and prospectively, to modify or amend, in whole or in part, any or all of the provisions of the Plan." PX 1, DX 21 § 11.01 (emphasis added). Section 10.04 of the Plan also states that "the [EBC] may amend the Plan, subject to the provisions of § 11.01." Id. § 10.04

(emphasis added). Section 10.01(e) of the Plan explains how the EBC may take "action":

> A majority of the members of the [EBC] shall constitute a quorum for the transaction of business. All resolutions or other <u>action</u> taken by the EBC shall be by the vote of a majority of the members of the Committee <u>present at any meeting</u>, or without a meeting by an <u>instrument in writing signed by a majority of the members of the Committee</u>.

<u>Id</u>. §10.01 (emphasis added). Based on the wording of these provisions, to effect an amendment to the Plan, the EBC would be required to "act" – through a vote of a majority of members present at an EBC meeting or written instrument signed by a majority of the members of the Committee - and amend the Plan in writing.

RJR has presented no evidence that the Plan procedure, as outline above, was followed by the members of the EBC with respect to the November Amendment. RJR does not seem to dispute the lack of any evidence that the EBC conducted a vote at the one meeting held between June and November 1999 or the lack of a consent signed by the EBC members, as required by the Plan documents. Instead, RJR focuses on the consent signed by the Original EBC in June 1999 ("June Consent"), adopting the Tobacco Plan and providing authority to freeze the Nabisco funds.

The June Consent is silent regarding any plan to remove the Nabisco Stock Funds from the Tobacco Plan. Section 6 of the June Consent, where the Original EBC stated its desire to "cease all <u>future</u> investing in the new Nabisco Group Holdings Common Stock Fund on and after the spinoff," contained three "Resolved" clauses, the last two of which RJR cites as further authority for the November Amendment.

PX 17, DX 20 (emphasis added). They read:

> RESOLVED, that the R.J. Reynolds Tobacco Company Capital Investment Plan as amended and restated is hereby adopted effective as of June 14, 1999, as attached hereto as Exhibit E, and further
>
> RESOLVED, that the proper Members of the Committee and their designees are hereby authorized and directed to take all actions necessary or desirable to carry out the intent of the foregoing resolution.

"Exhibit E" referenced in the first "Resolved" clause is the entire amended R.J. Reynolds Tobacco Company CIP, which went into effect June 14, 1999. Paragraph 4.03 of Exhibit E referenced the Nabisco Funds:

> 4.03 <u>Separate Funds</u>. The Trustee shall maintain the following separate Investment Funds within the Trust Fund: the Interest Income Fund, the Nabisco Common Stock Fund, the Nabisco Group Holdings Common Stock Fund, the RJR Common Stock Fund, the Total Stock Market Fund, the Total International Fund, the Conservative Growth Fund, the Moderate Growth Fund, and the Growth Fund. All Investment Funds under the plan are active Funds; <u>provided, however, the Nabisco Common Stock Fund and the Nabisco Group Holdings Common Fund are frozen, and, as of the Effective Date, Participants are prohibited from investing contributions or reallocating amounts held under the Plan to such Funds.</u> In addition, the Trustee shall maintain any other Investment Funds as are designated by the RJR Pension Investment Committee.

PX 1, DX 21 (emphasis added). The June Consent unambiguously states an intent to cease <u>future</u> investing in the Nabisco Stock Funds. It does not discuss the fate of the Nabisco Stock Funds that were in the Plan at the time; rather, it references and effectuates "Exhibit E," which freezes the Nabisco funds, thus comporting with the "whereas" clause stating the intent to cease "future investing." The final "Resolved" clause empowers the EBC members to take action to effectuate the new Tobacco

Plan, which is referenced in the "foregoing resolution."[7] Even if the final "Resolved" clause had been intended to authorize the EBC members to take action to effect any part or all of Section 6, as RJR has argued, no part of Section 6 suggests permanent removal of the Nabisco Stocks from the Plan.

With no proper authority from the EBC through a vote or written consent, as required by the Tobacco Plan, the November Amendment was invalidly adopted. The remaining discussion relates to RJR's contention that it should be considered valid under alternative legal theories.

V.

The November Amendment was not subsequently ratified, as RJR contends. The Plan clearly specified that the Plan could be amended "by action of the EBC in writing." Thus, RJR was bound to that level of specificity. Schoonejongen, 514 U.S. at 85, 115 S.Ct. at 1231 ("ERISA … follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level."); see also, e.g. Overby, 595 F.3d at 1293 (adopting district court's finding that "'a proposed amendment not done in accordance with a plan's amendment procedure is ineffective and does not amend a plan'"). While Schoonejongen allows for the possibility of ratification in the fact-specific context of the broadest of Plan amendment procedures (there, the only

---

[7] Even assuming the June Consent is ambiguous, Defendants have not presented any credible testimony supporting their theory, and the interpretations offered at trial by Folan and Gordan remain inadmissible opinion testimony.

direction is that "the Company" may amend the plan), it makes clear that more specific amendment procedures must be followed as such. Consistent with this view, using ratification in this context would render the specific requirements in 11.01 meaningless. If one could determine from implied acts what the EBC intended but did not do, there would be no point in the Plan's formalities at all.

The use of ratification in this context also conflicts with the longstanding view in this Circuit that plans may not be informally amended and that amendments must be in writing.[8] Coleman v. Nationwide Life Ins. Co., 969 F.2d 54 (4th Cir. 1992) ("Based upon [ERISA], any modification to a plan must be implemented in conformity with the formal amendment procedures and must be in writing."); see also Pizlo v. Bethlehem Steel Corp., 884 F.2d 116, 120 (4th Cir. 1989) (stating that informal and unauthorized amendments are "as a matter of law … impermissible"). This conflict may only be resolved by placing the principles of Schoonejongen in the proper context, where no specific plan procedure exists. That is simply not the situation here.

Even if it were appropriate to consider ratification in this context, RJR has not presented sufficient evidence of ratification. The notices sent to participants which included the date of divestiture - i.e. the letters in October 1999 and December 1999

---

[8] RJR also relied heavily on the Fifth Circuit's use of ratification in Halliburton Co. Benefits Comm. v. Graves, 463 F.3d 360 (5th Cir. 2006). In Halliburton, however, the Fifth Circuit found (via other provisions in the plan documents) that the corporation had retained some authority over amending the plan and had used that authority, thus making analysis under corporate law (and the corporate principle of ratification), more like the circumstances in Schoonejongen and thus more appropriate in Halliburton than in this case.

and the January 2000 Newsletter - simply did not indicate that the EBC had presumably already amended the Plan documents to permanently eliminate the Nabisco Stock Funds from the Plan effective January 31, 2000. Moreover, the October and December 1999 letters to participants contained inaccurate information[9] regarding the reason for the divestiture and did not inform participants that the November Amendment contained language arguably permitting the Plan fiduciaries to re-designate funds on or after February 1, 2000.[10] The Summary Plan Description sent to participants in December of 1999 merely stated that it was "anticipated that the[] Frozen [Nabisco Stock] Funds will be eliminated early in 2000 and the balances vested in other Plan funds." PX 155, DX 42. It did not reference an amendment to the Plan or the effective date of amendment. <u>Accord</u> <u>Frommert v. Conkright</u>, 433 F.3d 254, 263 (2d Cir. 2006, *rev'd on other grounds* 130 S.Ct. 1640 (2010) ("Because we conclude that an ERISA 'amendment' to a plan occurs only when the plan's employees are informed of a change in the text of the plan, the defendant's argument that an amendment may be made by plan administrators changing the operation of the

---

[9]As noted in Section I, <u>supra</u>, the October and December letters informed participants erroneously that the funds were being eliminated "[b]ecause regulations do not allow the Plan to offer ongoing investment in individual stocks other than the Company." PX 12, DX 35 (October); PX 14, DX 47 (December). RJR's representatives have admitted there is no regulation or statute forbidding a plan from offering ongoing investment in stocks other than the stock of the company offering the plan.

[10] In <u>Tatum v. R.J. Reynolds Tobacco Co.</u>, 392 F.3d 636 (4th Cir. 2004), the Fourth Circuit determined that the final line of 4.03 gave discretion to the fiduciaries (i.e. the "investment committee") of the Plan to re-designate  the Nabisco Stock Funds as an investment option even if they had been removed from the list of funds in the same paragraph. Defendants argued at trial that the final line of the November Amendment was a scrivenor's error.

plan has no merit.").

The amendments and accompanying consents issued by the EBC in September of 2000 and February of 2002 were executed long after the Nabisco Stock Funds had been removed from the Plan, and only served to add new investment options to the Tobacco Plan. They do not provide any evidence of the EBC's intentions with respect to the Nabisco Stock Funds other than to no longer have them listed as required funds included in the Plan.

Attempting to apply ratification in this context highlights the problems encountered when a specific amendment procedure already exists in a plan. RJR contends that the notices to participants, coupled with the September 2000 and February 2002 consents and amendments, show the EBC ratified the November Amendment through subsequent acts. There was no way for those notices and subsequent amendments to notify participants that the Plan had been amended, however, because the Plan procedure had not been followed. Unlike in Schoonenjongen, where the plan procedure was broad and included any and all ways in which a corporation could act, the EBC could act in only those ways outlined in the Plan. No participant could reasonably be expected to look beyond the specific plan procedure to find an amendment where one had not been effectively made.

Applying a theory of implied ratification to this set of facts is also troubling in light of the fact that the November Amendment's effect was to authorize the removal of the Nabisco Stock Funds from the Tobacco Plan at a significant loss to the Plan

participants.  Plaintiff cited <u>Depenbrock v. Cigna Corp</u>., 389 F.3d 78 (3d Cir. 2004) and related cases which do not recognize ratification as an option where to do so would adversely affect vested or accrued benefits.  Though the circumstances here may not involve the types of intervening rights anticipated under the <u>Depenbrock</u> line of cases, they do, at the very least, involve the irrevocable action of a stock sale at a potential significant loss to the Plan participants. <u>See, e.g.</u>, <u>Albedyll v. Wisconsin Porcelain Co. Revised Retirement Plan, et al.</u>, 947 F.2d 246, 255 (7th Cir. 1991) (finding invalidation of amendment appropriate when the plan "contain[ed] an explicit amendment procedure, the participants were [substantively] harmed by its violation and ERISA and trust law provide a remedy").  This type of harm is also sufficient for the Court to abstain from extending ratification to this set of circumstances.

## VI.

RJR further argues that a showing of fraud, bad faith or detrimental reliance is required before an amendment may be invalidated.  The D.C. Circuit recently addressed the argument now advanced by RJR in <u>Overby v. Nat'l Assoc. of Letter Carriers</u>, 595 F.3d 1290, 1296 (D.C. Cir. 2010).  In addition to the long list of cases cited from numerous circuits, including the Fourth Circuit, where bad faith and fraud were not required findings in order to invalidate a plan amendment, the <u>Overby</u> Court articulated the sentiments of this Court in stating:

> The [United States] Supreme Court's guidance on the necessity of amendment procedures [in <u>Schoonejongen</u>] drives us toward a conclusion that the procedures should not be ignored. Likewise, the near unanimous conclusions of our fellow circuits weighs heavily against the

24

novel construction sought by appellants.  Appellants give us no reason why we should treat the written procedures of the Plan so lightly, nor can we think of any.  An amendment procedure is there to be followed. It is there to give fair notice to the beneficiary under the Plan.  We have already upheld the District Court's finding that it was not followed in this case. In short, we adopt the near unanimous view of the other circuits that a failure to follow the amendment procedure of a plan invalidates an amendment without regard to a showing of bad faith.

Overby, at 1296.

Thus, the November Amendment was invalid as adopted, leaving in place the June 1999 version of the Tobacco Plan, which required that the Nabisco Stock Funds remain in the Plan in a frozen state.  As the language of the November Amendment did not mandate permanent removal of the Nabisco Stock Funds, and the parties have agreed that no heightened presumption should apply, Plaintiff's claims simply remain that RJR breached the duty of prudence by removing the Nabisco Stock Funds from the Tobacco Plan.  This standard will apply as the Court continues to review the trial evidence.

This the 1st day of June, 2011.


    /s/ N. Carlton Tilley, Jr.

Senior United States District Judge