# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RICHARD G. TATUM, individually
and on behalf of a class of all other
persons similarly situated,

        Plaintiff,

        v.

R.J. REYNOLDS TOBACCO
COMPANY, et al.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

1:02CV00373

FILED
FEB 2 5 2013
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N. C.
By JCS

## MEMORANDUM OPINION

This case involves the unwinding of what has been described as "one of the biggest mergers and most fought-over leveraged buyouts of the 1980's, a battle that became a symbol of the decade's excesses"–the 1986 merger of R.J. Reynolds Tobacco and Nabisco. Ironically, the merger was "intended to enhance the tobacco company's increasingly negative image."[1] Fourteen years later, R.J. Reynolds and Nabisco separated because of the negative impact of tobacco litigation on Nabisco's stock prices. The subject of this litigation is the retirement plan created for R.J. Reynolds Tobacco as a result of the spin-off of R.J. Reynolds from Nabisco.

Plaintiff Richard Tatum was an employee of R.J. Reynolds Tobacco ("RJR Tobacco"), before and after the spin-off. A bench trial was held in this case from

---

[1] The above information came from RJR's Exhibit 273 (Constance L. Hayes, *End of an Empire: The Overview; RJR Nabisco Splits Tobacco Ventures and Food Business*, N.Y. Times, March 10, 1999, at A1).

January 13, 2010 to February 9, 2010 on Mr. Tatum's claim that Defendants R.J. Reynolds Tobacco Company and R.J. Reynolds Tobacco Holdings, Inc. (collectively, "RJR") breached their fiduciary duties in managing the RJR Tobacco Capital Investment Plan ("the Plan") in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq.

Mr. Tatum brought this case on behalf of himself and a class of over 3,500 employees and retirees of RJR who had invested in the Plan and whose investments were moved out of Nabisco stocks shortly after the RJR Nabisco food and tobacco companies separated in June 1999. This Memorandum Opinion states the Court's findings of fact and conclusions of law after receiving the evidence at trial and considering the arguments of counsel. For the reasons outlined below, it is determined that fiduciary duties of procedural prudence were breached when those in charge of the investment decision decided to remove and sell Nabisco stock from the Plan without undertaking a proper investigation into the prudence of doing so; however, it is further determined that the decision to remove the stock, under the circumstances of this case, is one which a reasonable and prudent fiduciary could have made after performing such an investigation.

## I. FINDINGS OF FACT

### A. The Parties and the Class

Mr. Tatum brought this certified class action in May 2002, on behalf of all participants in the R.J. Reynolds Tobacco Company Capital Investment Plan ("Tobacco Plan") whose individual accounts held Nabisco stocks (shares of Nabisco Group

2

Holdings ("NGH") common stock and/or Nabisco ("NA") common stock) at any time from June 14, 1999 through January 31, 2000. Dock. # 209, at 5.

The Class is represented by Mr. Tatum, who was employed at R.J. Reynolds Tobacco Company from July 1977 until he retired on August 1, 2007. Immediately prior to his retirement, Mr. Tatum served in the position of Lead Systems Analyst. 1/13/10 Tr. at 7:22-24, 8:9-23 (Tatum) (Dock. # 372). At all times pertinent to this action, Mr. Tatum has been a participant in the Plan. During the class period, portions of the Plan accounts of Mr. Tatum and the other class members were allocated to the Nabisco stock funds ("Nabisco Funds").[2]

The defendants in this case are R.J. Reynolds Tobacco Company ("RJRT" or "RJR Tobacco") and R.J. Reynolds Tobacco Holdings, Inc. ("RJRTH"). As further explained *infra*, RJRTH (now Reynolds American) is the successor in interest to pre-spinoff RJR Nabisco, Inc. R.J. Reynolds Tobacco Company (RJRT) is a wholly owned subsidiary of Reynolds American, Inc. (formerly RJRTH at the time of the spin-off). DX-173 at RJR11642.

## B. The Spin-off

In early March 1999, RJR Nabisco, Inc. decided to separate the company's food business, Nabisco (NA), and tobacco business, R.J. Reynolds Tobacco Company (RJRT), through a spin-off of the tobacco business to shareholders of the holding company, RJR Nabisco Holdings.

At the time, RJR Nabisco Holdings owned 100 percent of RJR Nabisco, Inc.

---

[2] Since trial, Defendant RJR has moved for a second and third time to decertify the class on the grounds that Tatum held only NGH funds and not NA funds.

3

("RJR Nabisco"). RJR Nabisco had two operating subsidiaries. RJR Nabisco owned 100 percent of R.J. Reynolds Tobacco Company (RJRT), the second-largest tobacco company in the United States. RJRT's stock was not publicly traded. RJR Nabisco also owned 80.5 percent of Nabisco (NA), one of the nation's top snack food and bakery products companies. The remaining 19.5% of NA was owned by public stockholders and traded on the New York Stock exchange.

To accomplish the spin-off, the RJR Nabisco Holdings Board of Directors did the following: (1) the shares of Nabisco (NA) held by RJR Nabisco were conveyed up to the holding company, RJR Nabisco Holdings, which would be renamed Nabisco Group Holdings (NGH); and (2) RJR Nabisco, now holding shares only of RJR Tobacco, would be renamed RJR Tobacco Holdings (RJRTH), and its shares would be distributed by dividend to the shareholders of the entity formerly known as RJR Nabisco Holdings and to be known as NGH. 1/14/10 Tr. at 80:21-81:10 (Gordon) (Dock. #377); DX-208. The RJR Nabisco Holdings shareholders would receive one share of RJRTH for every three shares of RJR Nabisco Holdings. DX-24, DX-13 at RJR001598.

As a result of the spin-off, where an RJR Nabisco Holdings shareholder previously owned one share of RJR Nabisco Holdings–which included both the food and tobacco businesses–the shareholder, following the spin-off, would own two stocks–stock of a food business (NGH) and a second stock of the tobacco business (RJRTH). DX-9 at RJR000257; DX-13 at RJR001599. Ownership of NA stock was not affected.

4

### 1. Rationale Behind the Spin-off

The May 19, 1999 public information statement filed with the U.S. Securities and Exchange Commission ("SEC") by RJR Tobacco Holdings, described the "primary purposes of the distribution":

- each of the food and tobacco businesses will be better able to respond to the opportunities and challenges in its industry and thereby achieve its full potential under separate ownership;
- management of each business will be able to focus solely on that business;
- RJR will be able to align management's incentives more closely with stockholder's interests;
- the companies will achieve substantial costs savings; and
- investors and financial markets will be better able to understand and evaluate the food business and the tobacco business.

DX-13 at RJR001588; 1/21/10 Tr. at 190:16 - 191:19 (Angowitz) (Dock. # 381) .

The May 19, 1999 public information statement further explained that, in deciding to move forward with the spin-off, management considered that:

-[T]he food and tobacco businesses are large, complex businesses with different challenges, strategies and means of doing business and that, under a separate ownership structure, each business will be better able to respond to the opportunities and challenges in its industry and thereby achieve its full potential.

. . .

-[T]he separation will result in two distinct publicly traded equity securities that will enable financial markets to better understand and evaluate the food and tobacco businesses.

DX-13 at RJR001599; 1/21/10 Tr. at 191:20-192:10 (Angowitz).

While neither party has suggested that the public statements regarding the reason for the spin-off were not accurate, employees from RJR and Nabisco testified at trial that it was widely believed the shareholder value of Nabisco would be enhanced after the split because the value of Nabisco's stocks was being unnecessarily depressed

5

by investors' fears regarding ongoing litigation against tobacco companies. See 1/20/10 Tr. at 173:1-174:6 (Schindler) (Dock. # 380); 1/13 10 Tr. at 187:4-10 (Suozzi (Video)) (Dock. # 372); 1/22/10 Tr. at 27:10-15 (Angowitz) (Dock. # 382); 1/25/10 Tr. at 37:20-38:4 (Johnston) (Dock. # 383). The discount on the Nabisco stocks as a result of the tobacco litigation was known as the "tobacco taint." See, e.g., 1/14/10 Tr. at 22: 19-23, 132: 11-13 (Gordon) (Dock. # 372); 1/22/10 Tr. at 170: 18-21 (Angowitz) (Dock. # 382).

### 2. Tax Consequences of the Spin-off

The spin-off transaction was structured to comply with a section of the tax code that allowed for a tax-free spin-off transaction (with no tax consequences to RJR Nabisco or RJR Nabisco Holdings/NGH shareholders resulting from the spin-off of the shares of the domestic tobacco company to the shareholders of RJR Nabisco) provided the spin-off was not part of a larger sales transaction. Tax code regulations allowed a presumption that there was no larger transaction if two years had passed from the time of the spin-off until a further event or sale occurred. 1/21/10 Tr. at 185:21-186:18 (Angowitz) (Dock. # 381); 26 U.S.C. §355(e); 26 C.F.R. §1.355-7 (2010). If NGH initiated any corporate restructuring or a sale within two years, the spin-off transaction could lose its tax-free status. Members of senior management at RJR Nabisco Holdings were aware of the tax consequences of the spin-off and had discussions about those consequences. 1/21/10 Tr. at 186:19-187:3 (Angowitz) (Dock. # 381).

6

## C. The Tobacco Plan[3]

As a result of the spin-off, the RJR Nabisco Plan was divided into two separate plans, one for NA and one for RJRT. RJRT retained the old pre-spin RJR Nabisco Plan, while a new plan was created for employees of NA. 1/19/10 Tr. at 132:6-14 (Cissna) (Dock. #379). The spin-off created two different stocks–NGH and RJRTH–from the former RJR Nabisco Holdings stock. As a result of the spin-off, Plan participants who had invested in the RJR Nabisco Holdings Fund (which was an investment option in the pre-spin RJR Nabisco Plan) after the spin-off held units of the new NGH and RJRTH Funds in their accounts. 1/19/10 Tr. at 151:10-17 (Cissna) (Dock. # 379).

The Tobacco Plan came into existence on June 14, 1999, at the time of the spin-off. The Tobacco Plan was sponsored by RJRT and was a 401(k) retirement plan for employees of the post-split RJRT. The stated purpose of the Tobacco Plan was to provide for participants' long-term retirement savings. See PX-2 at RJR879 (purpose of the plan is to "help [participants] meet [their] long-term savings goals"); id. at RJR909 (Nabisco company funds "seek to maximize long-term total return through capital

---

[3] Before the spin-off, employees of RJRT, RJR Nabisco Holdings, and NA were allowed to participate in the RJR Nabisco Capital Investment Plan ("the RJR Nabisco Holdings Plan"), a 401(k) retirement plan for employees of RJR Nabisco. PX-79. RJR Nabisco was the plan sponsor of the pre-spin RJR Nabisco Holdings Plan. DX-1; 1/14/10 Tr. at 62:10-12 (Gordon) (Dock. # 377). Employees of both the food and tobacco businesses participated in the RJR Nabisco Holdings Plan, which included several investment options, including investment in company stock. PX-79 at RJR643-45. For employees of R.J. Reynolds Tobacco Company, following the split, the R.J. Reynolds Tobacco Company Capital Investment Plan ("the Plan") succeeded the RJR Nabisco Holdings Plan. PX-1 at RJR729-30.

7

appreciation and divided income"); PX-155 at RJR30 (purpose of plan is to "help [participants] meet [their] long-term savings goals").

## 1. Designation of Funds and Trustee

Section 4.03 and Section 4.04 of the Plan listed each investment fund offered to Tobacco Plan participants. At the time it was created, the Tobacco Plan's investment options included the Nabisco Funds which remained in the Plan as frozen funds, meaning no new investing was allowed in those funds. In addition to the frozen Nabisco Funds, the Tobacco Plan included the Interest Income Fund, which was primarily invested in guaranteed investment contracts (GICs), synthetic GICs, and a fixed-income Government Bond Index Fund. The Interest Income Fund was the most conservative fund in the Plan and was the fund into which assets resulting from the liquidation of the NA and NGH stocks were placed.

The assets of the Plan were held by Wachovia Bank, as Trustee. Wachovia made distributions to participants and bought and sold shares in the various funds offered under the Plan based on instructions from the record-keeper. 1/20/10 Tr. at 103:19-104:3 (Beasley) (Dock. # 380). Those shares were then divided into units and allocated to participants' individual accounts.

## 2. Named Fiduciaries and Plan Administrator

The Plan designated the Employee Benefits Committee as responsible for the general administration of the Plan and for carrying out the provisions of the Plan. PX-1, §10.01(a).

The named fiduciaries of the Tobacco Plan were the Employee Benefits

8

Committee ("EBC") (consisting of "not less than three persons appointed from time to time by the Compensation Committee"), the Pension Investment Committee ("PIC") (consisting of "members . . . appointed by the Compensation Committee of the Board of Directors to serve at the pleasure of the Compensation Committee"), and "any Administrative Committee." PX-1, §§10.05(a), 10.01(a), 10.03(a). In addition, "[a]ny fiduciary appointed as a named fiduciary by the Board of Directors by resolution or appointed by an appropriate instrument executed by an officer of the Company thereunto authorized by resolution of the Board of Directors, shall also constitute a named fiduciary in respect of the duties delegated to him or it in such resolution or instrument." PX-1 §10.05(b).

In addition to the powers designated in the Plan documents, two resolutions were adopted by the Board of Directors on July 2, 1999, "redesignating" the powers of the Employee Benefits Committee and the Pension Investment Committee. PX-3. Among other powers, the Resolution designating the powers of the EBC authorized it to "act on behalf of the Company and its subsidiaries in administering the Company's retirement plans, savings plans, and other defined benefit plan, defined contribution plan or welfare benefits plan maintained for employees of the Company," as well as "act as the 'plan administrator' for all employee plans for purpose of compliance with all applicable laws and regulations; and . . . approve the text of plan documents and employee communications including summary plan descriptions and savings plan prospectuses." PX-3.

The Resolution also appointed the members of the EBC for the Tobacco Plan, who were all employed by RJ Reynolds Tobacco Company: McDara Folan, Senior Vice

9

President, Deputy General Counsel, and Secretary (from June 21, 1999 to 2000);

Robert Gordon, Executive Vice President of Human Resources for RJRTH and RJR

Tobacco; Ann Johnston, Vice President of Human Resources, and Kenneth Lapejko,

Executive Vice President and Chief Financial Officer of RJRTH and RJR Tobacco.

The Resolution designating the powers of the Pension Investment Committee in

part authorized it to:

> [A]pprove all matters with respect to the funding of savings and retirement
> plans, including, but not limited to, actuarial assumptions, annual pension
> fund contributions, asset transfers, investment guidelines, and the
> appointment and removal of investment managers, provided that the
> Committee may delegate any of the foregoing powers ot the Chief Financial
> Officer or the Treasurer; [and] . . . report annually to the Compensation
> Committee and the Board of Directors as to the funding status of principal
> employee benefit plans, including a report on the investment performance
> of funded retirement plans.

PX-4.

The Resolution also appointed the members of the PIC:  McDara Folan; Robert

Gordon; Ann Johnston; Kenneth Lapejko; Charles Blixt, Executive Vice President and

General Counsel, R.J. Reynolds Tobacco Holdings, Inc.; and Lynn Lane, Senior Vice

President and Treasurer, R.J. Reynolds Tobacco Holdings, Inc and R.J. Reynolds

Tobacco Company.

### D.  The Decisions Regarding the Tobacco Plan

#### 1. The March Working Group

Immediately after the public announcement of the spin-off in March 1999,

company employees–mostly from the human resources departments of RJR Nabisco

Holdings, NA, and RJRT–began a series of meetings at the RJR Nabisco Holdings

headquarters in New York to address the effect of the spin-off on a wide variety of issues, including the various benefit plans of RJR Nabisco Holdings and its subsidiaries.[4] 1/21/10 Tr. at 211:11-212:6 (Angowitz) (Dock. # 381). These "working groups" met at least three times between March and June 1999, and covered a range of topics. 1/19/10 Tr. at 105:16-22 (Cissna) (Dock. # 379); 1/21/10 Tr. at 212:7-17 (Angowitz) (Dock. # 381); 1/25/10 Tr. at 98:13-14 (Johnston) (Dock. # 383).

The working groups had no authority or responsibility under the then-existing Plan documents to implement any decision regarding the pre-spin RJR Nabisco Holdings Plan, nor were they later given authority to make or enforce decisions in the

---

[4] RJRT employees who were members of the working group included Kathy Cissna, Dawn Harris, Susan Newsome, and Ann Johnston. DX-7; DX-11, 1/19/10 Tr. at 8:1-14 (Cissna) (Dock. # 379); 1/25/10 Tr. at 38:20-39:2 (Johnston) (Dock. # 383).
NA employees who attended the working group meetings included Walt Forsyth, Head of Pension Administration at NA; Paula Bills, who was responsible for compensation and benefits at NA; Tony Guerra, who worked in finance with respect to benefit programs at NA; and Donna Mislevits. DX-7; DX-11; 1/19 Tr. at 109:20-110:4 (Cissna) (Dock. # 379); 1/14/10 Tr. at 7:24-8:4 (Gordon) (Dock. # 377).
RJR Nabisco Holdings employees who attended the working group meetings included Gerry Angowitz; Tom Sansone, Vice President of Compensation and Benefits for RJR Nabisco Holdings; Leon Lichter, Vice President and in-house counsel for RJR Nabisco Holdings; Ed Robertiello; Janet Quintal, an employee in the pension investment area of RJR Nabisco Holdings; Claudia Ciappoini, a paralegal responsible for benefits compliance; Andy Nebens, in-house counsel for RJR Nabisco Holdings; and Nancy Merola. DX-7; DX-11; 1/19/10 Tr. at 105:23-106:6 (Cissna) (Dock. # 379); 1/21/10 Tr. at 212:18-213:7 (Angowitz) (Dock. # 381); 1/25/10 Tr. at 44:9-11, 99:15-20 (Johnston) (Dock. # 383). Mr. Angowitz and Mr. Robertiello were members of the RJR Nabisco Holdings EBC. DX-20 at RJR000072; 1/19/10 Tr. at 108:4-8, 109:1719 (Cissna) (Dock. # 379); 1/21/10 Tr. at 184:4-11 (Angowitz) (Dock. # 381); 1/25/10 Tr. at 99:21-24 (Johnston) (Dock. # 383).
Several representatives from Kwasha, the Plan record-keeper, also participated in working group meetings. Kwasha representatives included Jesse Yallof, who was in charge of Kwasha's relationship with RJR Nabisco Holdings, as well as Wendy Eckstut, Jennifer Buchalter, and Barry Cosloy. DX-7, DX-11, 1/19 Tr. at 106:24-107:14 (Cissna) (Dock. # 379).

Tobacco Plan documents. 1/19/10 Tr. at 131:23-132:4 (Cissna) (Dock. # 379); 1/20/10

Tr. at 33:11-14 (Cissna) (Dock. # 380); 1/21/10 Tr. at 213:23-214:9 (Angowitz) (Dock. #

381); 1/25/10 Tr. at 45:5-15, 100:22-25 (Johnston) (Dock. # 383); 1/14/10 Tr. at 9:23-

97:4 (Gordon) (Dock. # 377); PX-92 at 14.

The first working group meeting took place on March 24, 1999 and lasted two

days. 1/25/10 Tr. at 98:13-16 (Johnston) (Dock. # 83). The focus at the meeting on

March 24 was "the implications of the corporate spin-off on the RJR Nabisco Capital

Investment Plan," while the second day was focused on defined benefit plans and post-

retirement health plans. 1/19/10 Tr. at 126:5-16, 131:18-22 (Cissna) (Dock. # 379);

1/25/10 Tr. at 39:12-17 (Johnston) (Dock. # 383); PX-99 at RJR14276-77.

Approximately thirty to sixty minutes were spent discussing the specific issue of

what to do with the Nabisco Funds that would carry over from the RJR Nabisco Plan

into the new Tobacco Plan once they were no longer employer funds. The participants

at the meeting discussed reasons to remove the funds and assumed that the new RJR

Tobacco did not want Nabisco stocks in its 401(k) plan due to the high risk of having a

single, non-employer stock fund in the Plan. 1/14/10 Tr. at 86:25-87:12, 170:9-171:3

(Gordon) (Dock. # 377); 1/19/10 Tr. at 10:20-11:3 (Cissna) (Dock. # 379). In discussing

what to do with the funds, they discussed their belief that such funds were only held in

other plans as frozen funds in times of transition, 1/25/10 Tr. at 49:20-51:19 (Johnston)

(Dock. # 383), as well as the belief that the Nabisco Funds would not fall within the

exemption to ERISA's diversification requirement carved out for employer, single stock

funds. 29 U.S.C. § 1104(a)(2); 1/19/10 Tr. at 137:16-25, 138:22-139:12 (Cissna) (Dock.

# 379); DX-82 at RJR014276. The group also believed that a single stock fund in the

12

plan would be an "added administrative complexity," and incur additional costs, but did not discuss specifically what the complexities were or the amount of costs of keeping the fund in the Plan, as balanced against any benefit to participants. 1/19/10 Tr. at 138:22-139:20 (Cissna) (Dock. # 379); DX-3 at RJR000924.

Everyone was in agreement that the Nabisco Funds should be frozen[5] at the time of the spin-off and eventually eliminated from the Plan, after giving participants notice and an opportunity to exit the fund at any time. How long the Nabisco Funds would be frozen was discussed. "There was a general discussion, and different ideas were thrown out, would three months be appropriate, would a year be appropriate, and everybody got very comfortable with six months." 1/19/10 Tr. at 140:19-141:4 (Cissna) (Dock. # 379). During this six month time frame, the Nabisco Funds would be frozen in the Tobacco Plan and not open to new investments. Id. at 141:5-10, 11-25. The group did not determine a specific date for liquidating the Nabisco stocks at that time.

The Working Group's decisions were taken back from the New York meeting by Ann Johnston, Vice President of HR for RJ Reynolds Tobacco Company, who reported them to Bob Gordon during the course of a two to three hour discussion the day she returned from the March 24-25 meeting. 1/25/10 Tr. at 103:6-15 (Johnston) (Dock. # 383). Ms. Johnston informed Mr. Gordon of the working group's decision that the Nabisco Funds should be frozen in the Tobacco Plan and eliminated in approximately

---

[5] When a fund is frozen, participants already invested in the fund cannot direct any additional money into the fund and participants not invested in the fund may not make any investments into the fund. However, participants may maintain their existing investments in the fund, withdraw money from the fund, or transfer money from the frozen fund into another fund. 1/26/10 Tr. at 9:12-18 (Folan) (Dock. # 384); 1/14/10 Tr. at 106:17-22 (Gordon) (Dock. # 377).

13

six months. 1/25/10 Tr. at 101:4-14 (Johnston) (Dock. # 383); 1/14/10 Tr. at 89:11-90:15 (Gordon) (Dock. # 377). Gordon agreed with the working group's recommendation to freeze and eliminate the funds and testified that all four members of the RJR Nabisco Holdings EBC agreed with the working group's recommendation. However, there is no other evidence that the EBC met, discussed, or voted on the issue of eliminating the Nabisco Funds or otherwise signed a required consent in lieu of a meeting authorizing an amendment that would do so. 1/14/10 Tr. at 95:20-96:19 (Gordon) (Dock. # 377); 1/25/10 Tr. at 103:16-20 (Johnston) (Dock. # 383).

Soon after the working group meeting, RJ Reynolds Company officials began taking immediate steps to implement the decision by disseminating communications to Plan participants and providing directions to the Plan record-keeper. 1/25/10 Tr. at 39:3-41:10, 56:14-58:3 (Johnston) (Dock. # 383); see also PX-10 at RJR257-259; PX-135; PX-99 at RJR14276-77; PX-49 at RJR246-47. Two letters were sent to participants before the spin-off and prior to the formation of the new Tobacco Plan. Participants were told as early as April 1999, in the letter accompanying their March 31, 1999 Plan account statement, that "Nabisco Group Holdings and the Nabisco Common Stock funds will be eventually eliminated from the R.J. Reynolds CIP plan." See 1/25/10 Tr. at 56:14-58:3 (Johnston) (Dock. # 383). On June 2, 1999, participants were notified that the Nabisco Funds would be eliminated within approximately six months after the spin-off. See id. at 58:9-60:9 (discussing PX-135 and saying language was "consistent with what the working group preference was"). Both letters were also written before the official amendment to the Plan by the EBC, which froze the Nabisco Funds but did not mention eliminating them from the Plan. See infra Section E.

14

### E. The June Amendment to the RJR Nabisco Holdings Plan

The spin-off was implemented on June 14, 1999. On the same day, the RJR Nabisco Capital Investment Plan was amended and renamed the R.J. Reynolds Tobacco Company Capital Investment Plan.

Section 4.03 of the Plan was amended to provide language stating the Nabisco Funds were frozen:

> The Trustee shall maintain the following separate investment Funds within the Trust Fund: the Interest Income Fund, the Nabisco Common Stock Fund, the Nabisco Group Holdings Common Stock Fund, the RJR Common Stock Fund, the Total Stock Market Fund, the Total International Fund, the Conservative Growth Fund, the Moderate Growth Fund and the Growth Fund. All Investment Funds under the Plan are active Funds; *provided, however, the Nabisco Common Stock Fund and the Nabisco Group Holdings Common Stock Fund are frozen and, as of the Effective Date, participants are prohibited from investing contributions or reallocating amounts held under the Plan to such Funds.* In addition, the Trustee shall maintain any other Investment Funds as are designated by the RJR Pension Investment Committee.

See PX-1 at RJR757 (§ 4.03) (emphasis added).

By its terms, the June amendment required that the Nabisco Common Stock Fund and the Nabisco Group Holdings Common Stock Fund held by the Plan be "frozen." There was no language in the amendment eliminating the Nabisco Funds or limiting the duration in which the Plan would hold the funds. See PX-1 at RJR757 (§ 4.03).[6]

---

[6] On June 7, 1999, the EBC had executed a Consent in Lieu of Meeting which authorized the June Amendment and stated its purpose:

> [D]ue to the spinoff of RJ Reynolds Tobacco Company the Committee desires to amend and restate the RJR Nabisco, Inc. Capital Investment Plan to a) cease all future investing in the new Nabisco Group Holdings Common Stock Fund and in the Nabisco Common Stock Fund on and

15

## F. New Committees and Orientation Meetings

The new EBC met on July 29, 1999 and adopted a consent resolution transferring sponsorship of the RJRT Plan from RJRT to RJRTH, effective as of June 14, 1999. DX-30 at RJR011878-79. The EBC also re-designated the members of the RJRT Benefits Administration Committee at that meeting and gave the BAC authority to "interpret plan provisions with respect to eligibility, service, vesting and determination of benefits" and to "review benefit claims made by participants or beneficiaries with regard to the defined benefit plans, the defined contribution plans, and . . . salary and benefit continuation plans." DX-30 at RJR011879-80. The Plan also provided in section 13.01 that the BAC made the "initial determination of a Participant's Surviving Spouse's or Beneficiary's eligibility for, and the amount of, a benefit." PX-1, RJR000791.

The RJRT PIC also met on July 29, 1999. DX-29. At this meeting, PIC members reviewed a list of the functions of the PIC that had been prepared by the PIC's outside investment consulting company, Summit Fiduciary Services,[7] which

---

> after the date of the spin-off, b) change the sponsorship of the Plan, Employee Benefits Committee, Pension Investment Committee, Board and Agent for Service of Process to R.J. Reynolds Tobacco Company and c) delete all Nabisco related subsidiaries and RJR Nabisco Inc. from Schedule B, Participating Companies.

DX-20 at RJR000069. The Consent did not mention eliminating the frozen funds or limiting their duration.

[7] After the spin-off, Ed Robertiello left RJR Nabisco Holdings and established an investment consulting company called Summit Fiduciary Services ("Summit"). Summit became the PIC's outside investment advisor and Mr. Robertiello became the PIC's secretary. 1/25/10 Tr. at 114:20-25 (Johnston) (Dock. # 383); 1/19/10 Tr. at 165:4-7, 196:20-23 (Cissna) (Dock. # 379); 1/27/10 Tr. at 24:9-17, 25:17-23 (Lapiejko) (Dock. # 385); 1/26/10 Tr. at 13:3-8 (Folan) (Dock. # 384); 1/27:10 Tr. at 75:25-76:5 (Lane Dep.) (Dock. # 385). Summit served as outside investment advisor to the PIC from August 1,

16

included:

>    1. Implement a Funding/Contribution Policy for each Pension Plan.
>    . . . .
>    6. Approve the Asset Class Investment Guidelines for each Investment Option within the Capital Investment Plan (CIP).
>    7. <u>Approve the selection and elimination of each Investment option within the CIP.</u>
>    8. Monitor the performance of each Investment Option within CIP.

<u>Id.</u> at RJR000110 (emphasis added).

### G. Tobacco Taint

The purpose of the spin-off was to "enhance shareholder value," which included increasing the value of Nabisco by minimizing its exposure to and association with tobacco litigation. At the time of the spin-off, RJRT and RJRTH were defendants in numerous tobacco-related lawsuits and there had been a "noteworthy increase in the number of cases pending" leading up to the spin-off. DX-13 at RJR001593. Risks associated with these lawsuits were disclosed in RJRTH's filings with the Securities Exchange Commission (SEC). RJRTH's May 19, 1999 public information statement warned that "[e]xposure to tobacco related litigation could negatively affect RJR's prospects" and reported that:

> There has been a noteworthy increase in the number of these cases pending. *As of May 14, 1999, 653 active cases were pending against RJR, Reynolds Tobacco and/or its affiliates or indemnitees in the United States.* Plaintiffs have specifically pleaded punitive damages, often in amounts

---

1999, until the end of June 2001. 1/27/10 Tr. at 32:17-22 (Lapiejko) (Dock. # 385).
    Mr. Robertiello attended the quarterly meetings of the PIC and provided quarterly reports to the PIC regarding the investments held in the RJRT Plan. The reports included an evaluation of returns, and recommended asset allocations suitable for the Plan. DX-105 at RJR000073 (meeting minutes explaining Summit's role); 1/27/10 Tr. at 32:23-33:19 (Lapiejko) (Dock. # 385).

17

ranging into the *hundreds of millions, or even billions of dollars*, in a number of cases, in addition to compensatory and other damages.

DX-13 at RJR001593 (emphasis added).

NGH was a defendant in a number of the cases in which RJRT also was a defendant. Indemnification agreements had been executed as part of the spin-off which made RJRT and RJRTH responsible for paying NGH's legal expenses in those lawsuits in which NGH was a defendant. However, there was increasing concern among RJR executives that tobacco verdicts would be so large that RJR would not be able to satisfy their payment obligations, in which case plaintiffs in those lawsuits may have sought payment from NGH. 1/22/10 Tr. at 205:10-13 (Blixt) (Dock. # 382); 1/21/10 Tr. at 196:12-17 (Angowitz) (Dock. # 381).

NGH's June 3, 1999 8-K filing with the SEC reported this possibility:

In addition to the cases pending against NGH, there are several hundred lawsuits relating to cigarettes in which Reynolds Tobacco, and sometimes RJR, are named defendants. *If Reynolds Tobacco and RJR are unable to satisfy their payment obligations for any adverse judgments against them in some or all of these cases, it is possible that plaintiffs in these cases would seek to recover the unsatisfied obligations from the assets of NGH by bringing lawsuits on various theories.*

Some of the claims against NGH seek recovery of hundreds of millions and possibly billions of dollars. This is also true of the litigation pending against Reynolds Tobacco and RJR. Litigation is subject to many uncertainties. Management is unable to predict the outcome of the litigation against NGH, or to derive a meaningful estimate of the amount or range of any possible loss in any quarterly or annual period or in the aggregate.

DX-88 at RJR018151-52 (emphasis added).

A specific concern in 1999 was the Engle case, an ongoing class action in Florida state court. In July 1999, a jury had found RJRT liable to a class of individual

18

smokers, and it was determined that the class as a whole would be entitled to one lump sum of punitive damages.[8] In the fall of 1999, the second phase of the case, which would establish damages, was scheduled to begin, and concern grew because of the cost of appealing a potentially large damages verdict.[9]

At that time, RJR senior management became concerned that a cash bond in the full amount of any punitive damages award might be required in order to appeal. RJRT's portion of any bond would have been about one-third the total amount of the award. If RJRT could not satisfy the cash bond, there was fear that RJR would go bankrupt and/or plaintiffs would turn to NGH for payment. In its November 1999 10-Q, NGH made disclosures regarding the Engle situation:

> It is not possible to predict the amount of class-wide punitive damages the EAGLE [sic] jury might award, if any, but it could be in the billions of dollars. Although the tobacco company defendants are expected to appeal any award of punitive damages, it is uncertain when the right of such appeal would be available and what, if any, bonding requirements might be imposed on the defendants in connection with such an appeal. If a multibillion dollar punitive damages award were to be granted in the second phase of this case and a bond in the full amount of the award were required to stay execution on the judgment of such an award, it could be difficult or impossible for defendants to post such a bond.

---

[8] Originally, the trial judge had ruled that punitive damages would be determined on an individual-by-individual basis. However, in the summer of 1999, the trial judge reversed himself and stated that the class as a whole would be entitled to one lump sum of punitive damages.

RJRT and the other cigarette companies appealed the judge's ruling on punitive damages. The Florida intermediate appellate court initially ordered the trial judge to begin the second phase as had originally been scheduled. However, a week later, the intermediate appellate court reversed itself *sua sponte* and subsequently upheld the judge's new trial order regarding punitive damages. 1/22/10 Tr. at 199:3-22 (Blixt) (Dock. # 382).

[9] The Engle jury ultimately awarded the class over $140 billion in punitive damages in the summer of 2000.

19

DX-33 at RJR018220-21. When RJR received the adverse ruling on classwide punitive damages on October 20, 1999, stock prices of *both* RJRT and NGH reacted sharply in a negative direction. 2/2/10 Tr. at 124:11-127:1 (Montgomery) (Dock. # 388) (testifying that tobacco stocks and NGH declined due to "heightened concern over the risks for tobacco related companies of tobacco litigation and the sharp decline in late October was in reaction to the Florida Appeals Court decision in the <u>Engle</u> case on October 20"); DX-60, Ex. 16. By October 1, 1999, NGH shares had declined from $21.37 the day after the spin-off to $14.75. DX-157.[10]

### H. October Meetings

Several meetings of committees and executives also took place in October. On October 7, 1999, the PIC met for its quarterly meeting. DX-121. At that time, Dennis Kass, a vice chairman at JP Morgan Investment Company, gave a presentation on fiduciary responsibilities that had previously been scheduled for the PIC's orientation meeting. DX-29 at RJR000108; DX-121 at RJR000080; DX-122 at RJR000085; 1/14/10 Tr. at 119:16-20 (Gordon) (Dock. # 377). Mr. Kass instructed the PIC members on such topics as:

- "Named fiduciary: of a pension plan has specified fiduciary responsibilities, 'fiduciary' is functionally defined";

---

[10] NA, while less impacted by tobacco litigation, also dropped in value after the spin-off. By October 1999, NA shares had declined from $42.00 the day following the spin-off to $34.56—an 18 percent decline. <u>See</u> DX-158. It is more difficult to determine the cause of NA's decline, because during 1999 and early 2000, food sector stocks were generally performing poorly. From December 31, 1998 through January 31, 2000, the overall stock market rose, but the food industry index fell 25 percent and NA's stock price fell 27 percent. 2/2/10 Tr. at 124:11-127:1 (Montgomery) (Dock. # 388); DX-60 Ex. 18.

- "Act for the exclusive benefit of plan participants and beneficiaries and for the purpose of providing plan benefits and paying plan expenses";

- "Act prudently" focusing on "procedural prudence" as a "critical" component;

- "Diversify the plan's investments"; and

- "Act in accordance with the documents governing the plan, except to the extent inconsistent with ERISA."

DX-122 at RJR0000089. The training lasted approximately 30 to 40 minutes, and the majority of the time was spent on topics related to the above bullet points. 1/14/10 Tr. at 125:3-8 (Gordon) (Dock. # 377).

PIC members were also told at that meeting that the NGH fund had declined 5.2% and the NA fund had declined 5.3%. DX-122 at RJR000087; 1/20/10 Tr. at 138:24-139:6 (Beasley) (Dock. # 380).

The very next day, on October 8, 1999, HR managers, corporate executives and in-house legal staff met to discuss the logistics of eliminating the Nabisco Funds. RJR held a meeting of various employees in which the decision to eliminate the Nabisco Funds was reconsidered. 1/19/10 Tr. at 36:2-9, 46:6-16, 51:2-6 (Cissna) (Dock. # 379); 1/20/10 Tr. at 70:12-74:5 (Beasley) (Dock. # 380).[11] During the meeting, Mr. Gordon raised the issue of the elimination itself. CEO Andrew Schindler had reported that an RJR employee had questioned the plan to eliminate the Nabisco Funds based on their

---

[11] Participants in the October 8, 1999 meeting included human resources managers, corporate executives, and in-house legal staff. Beasley, Trial Tr. Vol. VII at 70:12-19 (Jan. 20, 2010). The HR managers included Kathy Cissna, Robert Gordon, Ann Johnston, Susan Newsome, and Carol Christian. Id. Corporate executives included McDara Folan and Jennie Beasley.

21

declining value. 1/20/10 at 177:23-178:13 (Schindler) (Dock. # 380); 1/19/10 Tr. at 37:11-20 (Cissna) (Dock. # 378); 1/20/10 Tr. at 72:10-15 (Beasley) (Dock. # 380); 1/25/10 Tr. at 110:2-6 (Johnston) (Dock. # 383).

The group ultimately decided not to change anything about the planned divestment of the funds. This decision was partially based on the concern that many participants had already transferred all of their holdings out of the Nabisco Funds in reliance on communications from the Plan. DX-37. The group believed that it would be unfair to the participants who had transferred out of the Nabisco Funds at a loss if the Plan acted in a manner inconsistent with the previous communications informing them of the divestment timeline. 1/19/10 Tr. at 167:13-169:6 (Cissna) (Dock. # 379); 1/20/10 Tr. at 143:16-146:15 (Beasley) (Dock. # 380); 1/25/10 Tr. at 70:5-24, 110:19-111:4 (Johnston) (Dock. # 383); DX-36.

There was also concern that unfreezing the funds, and allowing participants an opportunity to reinvest if they chose, would be seen by some participants as a recommendation that they reinvest in the Nabisco Funds. In the view of the group members, the appearance of a stamp of approval could lead many participants either to continue holding the Nabisco Funds or to increase their contributions in those funds. 1/20/10 Tr. at 143:16-144:25 (Beasley) (Dock. #380); 1/25/10 Tr. at 70:16-24, 110:25-111:4 (Johnston) (Dock. # 383). Then, if the stock prices continued their downward slide, the fear was that those participants who reinvested would blame RJR for any losses. 1/25/10 Tr. at 14:17-15:21 (Blixt) (Dock. # 383). Because of these considerations, there was a belief the company would face a lawsuit if it reversed the spring decision and decided not to eliminate Nabisco stocks from the Plan. 1/14/10 Tr.

22

at 49:24-50:13 (Gordon) (Dock. # 377); 1/22/10 Tr. at 180:23-183:8 (Blixt) (Dock. # 382).

In addition, the NGH and NA stock prices had continued to fall, and the group was concerned that they would continue to fall and never rebound. 1/20/10 Tr. at 99:3-15, 142:13-17 (Beasley) (Dock. # 380); 1/25/10 Tr. At 110:10-18 (Johnston) (Dock. # 383).

Finally, the group discussed that if the Nabisco Funds were retained in the Plan, the fiduciaries would be required to monitor and investigate them on a continuing basis and at significant expense paid from the Plan's trust. If the fiduciaries had decided to hire a financial consultant, outside counsel, and/or independent fiduciary to assist them in deciding whether and when to eliminate the Nabisco Funds, it was believed that the costs for these professionals would have been paid by the trust fund, and thus, ultimately by the participants. 1/19/10 Tr. at 139:21-24 (Cissna) (Dock. # 379). The issue of monitoring the funds and how independent consultants were paid was not discussed at length or investigated.

These discussions led the group to agree that there was no reason to change course in October, and that decision was reported back to Mr. Schindler.

Following the October 8 meeting, Susan Newsome contacted Kwasha to confirm that a number of participants had already exited the Nabisco Funds. 1/19/10 Tr. at 41:18-24, 170:16-23 (Cissna) (Dock. # 379). Her research corroborated the group's beliefs that participants had begun to sell their NGH and NA funds after the announcement of the planned divestment of the NGH and NA funds. DX-37 at RJR014243; 1/19/10 Tr. at 170:24-171:20 (Cissna) (Dock. # 379). From June of 1999

23

(following the spin-off) to September 30, 1999, the number of participants in the RJR Nabisco Holdings/NGH fund had dropped from 3,252 to 2,775 (approximately 15% decrease). In the same time period, the number of participants in the NA fund dropped from 659 to 552 (approximately 16% decrease).

### I. October 14 Meeting

On October 14, 1999, Kathy Cissna, Ann Johnston, Susan Newsome, Carol Christian, and Jennie Beasley, all members of the RJRT employee benefits department, met with the Plan's record-keeper to discuss administrative issues regarding the Plan. DX-125; 1/19/10 Tr. at 173:20-174:4, 175:24-176:3 (Cissna) (Dock. # 379).

The closest month-end after the six-month freeze period announced on June 14, 1999, would have been December 31, 1999, but Kwasha representatives were concerned about potentially widespread computer problems ("Y2K") that could interfere with the liquidation of the single stock funds in the days following December 31, 1999. The group members determined that the potential Y2K problems merited extending the freeze period to January 31, 2000, and eliminating the Nabisco Funds on that date. 1/19/10 Tr. at 178:11-180:1 (Cissna) (Dock. # 379); 1/20/10 Tr. at 78:20-79:22 (Beasley) (Dock. # 380).

### J. Analyst Reports

By October, the stock prices for NGH and NA had continued to steadily decline, but analyst reports available throughout 1999 were generally positive, overwhelmingly recommending "hold" or "buy", particularly after the spin-off. During 1999 and 2000,

however, "optimism bias" was affecting all analyst reports. During those years, only two percent of all stocks were rated "sell," and it was "commonly accepted knowledge" during the 1999-2000 time period that "sell" ratings were extremely rare. 1/27/10 Tr. at 139:8-140:23 (McEnally) (Dock. # 385); 1/15/10 Tr. at 126:25-127:13 (Biller) (Dock. # 378).

Despite being generally positive, however, not all analyst statements regarding NGH and NA were positive, and some analysts believed any positive aspects of the company were already reflected in the stock price. For example, a July 22, 1999, Paine Webber report had maintained a "neutral" rating on the NA stock and stated that:

> While NA should continue its positive trends, we believe these initiatives [ramping up marketing spending . . . to restore volume growth and generate market share gains] *already have been priced into the stock*, which had moved from trading at a discount to the food group to a slight premium. We believe the long-term fundamentals are solid and would be more interested in the stock below $40.

DX-286 at MONTGOMERY015722 (emphasis added). A report on NA issued by Credit Suisse First Boston on July 23, 1999, stated that "[o]verall, given the challenges Nabisco faces in sustaining its momentum and transitioning to more cost-effective means of growth, we consider the company to be fully valued and maintain our Hold rating." DX-287 at MONTGOMERY015726. An analyst report on NA by John Renwick of Morgan Stanley Dean Witter, issued on July 27, 1999, maintained a "neutral" rating on the stock "despite the company's turnaround in volume growth and potential operating profit" because Morgan Stanley Dean Witter "believe[d] that the turnaround is already reflected in the stock's valuation." DX-288 at MONTGOMERY015730.

The tobacco risk was acknowledged as well, even in positive reports. In August

1999, Solomon Smith Barney included a section in its report entitled "Primary Reasons for the Existence of the Discount" and stated "[t]he most substantial reason for the existence of the discount is an investor fear that if the RJR tobacco company is unable to service litigation awards against it, the assets of NGH may be threatened." PX-226. The report goes on to downplay the risk, but acknowledges its impact on investor mentality and price. On October 6, 1999, another Solomon Smith Barney report commented on the continual decline of the Nabisco stocks, despite a general rise in the "biscuit" food category. The article blamed NGH's connection to tobacco for NA's problems, despite NA's "strong fundamentals." And although a "buy" rating is "reiterated" in the report, it comments on the depressed stock price:

> NGH: Investors Still Assume Where There's Smoke, There's Fire: Although we believe most investors if asked would tell you that they believe that the odds are most remote that NGH will need to be or could be found liable to support tobacco industry financial settlements, the NGH-NA gap continues to widen. More importantly it appears that NGH and NA are locked in some sort of downward arbitrage death spiral: as the price of NGH goes down, it appears to drag down NA and in turn, as NA goes down, traders knock down the price of NGH to close the gap, and so on. The NGH-NA valuation gap is currently near 40%.

DX-276 at TAT000218.

### K. Further Communications with Plan Participants

In October 1999, Ms. Cissna drafted a letter to Plan participants with their third quarter statements informing them that the frozen Nabisco Funds would be eliminated on January 31, 2000. Mr. Gordon directed that the letter indicate that the law did not allow the Plan to continue to offer the Nabisco Funds. Specifically, the letter told participants: "Because regulations do not allow the Plan to offer ongoing investment in individual stocks other than Company stock, the 'frozen' [Nabisco] stock funds will be

26

eliminated." PX-12 at RJR106; 1/14/10 Tr. at 53:1-54:6 (Gordon) (Dock. # 377); 1/25/10

Tr. at 78:1-79:24 (Johnston) (Dock. # 383); see also PX-13 at RJR1320. Ms. Cissna

drafted the letter at the direction of Mr. Gordon, and, at the time she prepared it, she

knew the statement was incorrect. 1/19/10 Tr. at 64:1-66:9 (Cissna) (Dock. # 379).[12]

The letter was sent out to all participants with their third quarter statements sometime in

October 1999. 1/14/10 Tr. at 53:1-18 (Gordon) (Dock. # 377).

No lawyer reviewed the letter before it was sent to participants. 1/19/10 Tr. at

67:11-15; 69:5-7 (Cissna) (Dock. # 379). The erroneous statement of law included in

the letter was never corrected, even after responsible RJR officials were informed that it

was wrong. 1/22/10 Tr. at 210:23-211:16 (Blixt) (Dock. # 382); 1/14/10 Tr. at 53:19-

55:13 (Gordon) (Dock. # 377); 1/20/10 Tr. at 81:6-82:11 (Beasley) (Dock. # 380);

1/25/10 Tr. at 199:25-202:11 (Folan) (Dock. # 383).

In January 2000, that same incorrect statement of law was included in a second

letter to participants. PX-14 at RJR270; 1/14/10 Tr. at 55:20-55:13 (Gordon) (Dock. #

377). By that time, RJR's managers, including its lawyers, had become aware that the

statement was false, but nevertheless permitted the communication to be sent to

participants. 1/25/10 Tr. at 201:13-202:11 (Folan) (Dock. # 383); 1/22/10 Tr. at 210:23-

211:16 (Blixt) (Dock. # 382). Again, the erroneous statement of law was never

corrected, even though responsible RJR officials knew that it was wrong. 1/20/10 Tr.

at 82:12-25 (Beasley) (Dock. # 380).

---

[12] Ms. Cissna testified that she modified Gordon's proposed language that the
"law" does not allow the Plan to hold non-employer stock to the "regulations" do not
allow the same as a "compromise" to "soften" the language. 1/19/10 Tr. at 64:1-66:9
(Cissna) (Dock. # 379).

## L. Final Meetings and Communications to Participants

In the fall of 1999 and first part of 2000, plans and communications centered around the logistics of eliminating the funds. In November 1999, Mr. Folan (an EBC member and serving as Secretary of the EBC) drafted and signed a document that included language which would have eliminated the Nabisco Funds as required investment options in the Plan on January 31, 2000, but it was not validly executed or voted upon by the EBC. The purported amendment to the Plan was dated as being effective February 1, 2000, and included the following language:

> 4.03 Separate Funds. The Trustee shall maintain the following separate Investment Funds within the Trust Fund: the Interest Income Fund, the RJR Common Stock Fund, the Total Stock Market Fund, the Total International Fund, the Conservative Growth Fund, the Moderate Growth Fund and the Growth Fund.
>
> All Investment Funds under the Plan are active Funds. In addition, the Trustee shall maintain any other Investment Funds as are designated by the RJR Pension Investment Committee.

PX-34 at RJR1261-62 (§ 4.03). Because it was not distributed to other EBC members for signature as a consent in lieu of meeting or voted on by EBC members in a meeting, the amendment was held to be invalid because the amendment procedures outlined in the Plan were not followed. Tatum v. R.J. Reynolds Tobacco Co., et al., 2011 WL 2160893 (M.D.N.C. 2011) (Dock. # 420).

The December quarterly PIC meeting included a review of the performance of the NGH and NA funds with PIC investment advisor, Ed Robertiello. During the third quarter of 1999, the NGH Fund had declined 22.1 percent and the NA Fund had declined 18.8 percent. DX-133 at RJR000082; DX-134 at RJR000238; 1/20/10 Tr. at 153:19-25 (Beasley) (Dock. # 380). At that time, PIC members discussed those figures

28

and were reminded of the January 31 time frame by Mr. Robertiello. 1/20/10 Tr. at 154:1-155:2 (Beasley) (Dock. # 380); 1/27/10 Tr. at 52:17-53:1 (Lapiejko) (Dock. # 385); DX-134 at RJR000238. There was no further inquiry into or discussion about the Nabisco Funds.

Also in December 1999, all participants received a revised SPD which included a reminder about the Nabisco Funds. DX-42 at RJR000037-38. This SPD was in effect from December 1999 until at least January 31, 2000. 1/19/10 Tr. at 189:17-190:9 (Cissna) (Dock. # 379). As noted earlier, the final Plan statements were sent to participants in January 2000, with a reminder letter that again contained the erroneous statement that eliminating the funds was required by regulation. That final statement showed that the Nabisco Common Stock Fund was down an additional 7.7 percent in the fourth quarter, and the Nabisco Group Holdings Common Stock Fund was down a further 27.3 percent in the fourth quarter. From January 1, 1999 through December 31, 1999, the Nabisco Common Stock Fund had declined by 21.7 percent.[13] DX-292; 1/19/10 Tr. at 185:25-187:3 (Cissna) (Dock. # 379).

### M. Sale of Nabisco Stocks

On January 31, 2000, the units of the Nabisco Funds held by participants who had not sold prior to that date were eliminated at prices set by the public stock market– $8.62 per share for NGH and $30.18 per share for NA. PX-302 at 5; PX-303 at 5.

When the Nabisco Funds were terminated, participants' accounts were credited with the closing price of NGH and/or NA stock as of the end of trading on January 31,

---

[13] Comparable figures were unavailable for the NGH Fund, which did not come into existence until June 14, 1999. DX-292 at RJR000262.

29

2000. The last shares were sold on February 4, 2000.[14]

The proceeds of the sale were invested in the Plan's Interest Income Fund, and participants could immediately move those proceeds to any existing fund option. 1/19/10 Tr. at 195:20-22 (Cissna) (Dock. # 379). By contrast, the following RJR officers held their personal Nabisco stock and/or options until December 11, 2000:

- Andrew Schindler - Chairman, President and CEO for RJRT (held stock and stock options). 1/20/10 Tr. at 185:13-18 (Schindler) (Dock. # 380).

- Ken Lapiejko - Executive Vice President and Chief Financial Officer for RJRT (held restricted stock and stock options). 1/26/10 Tr. at 214:14-215:217-218) (Lapiejko) (Dock. # 384).

- Francis Suozzi - Treasurer and Senior Vice President of Corporate Development for RJR Nabisco and NA (held stock and stock options). 1/13/10 Tr. at 193:4-195:2 (Suozzi) (Dock. # 372).

- Bob Gordon - Executive Vice President of Human Resources for RJRT (held stock). 1/15/10 Tr. at 14:8-14; 156:3-58:4 (Gordon) (Dock. # 378).

- Charles Blixt - Executive Vice President and General Counsel for RJRT (held NGH stock) 1/22/10 Tr. at 187:20-189:20 (Blixt) (Dock. # 382).

Between June 15, 1999 and January 31, 2000, the market price of NGH had fallen 60 percent and NA had fallen 28 percent. DX-157 at RJR00437-42; DX-158 at RJR001448-53.

### N. Rise of Nabisco Stock Values

Nabisco stocks began to rise in the early spring of 2000, two months after the sale of the NGH and NA stocks out of the Tobacco Plan. On March 30, Carl Icahn

---

[14] The amounts credited to each participant's account did not change based on any fluctuation in the price of NGH and/or NA stock between the end of trading on January 31, 2000 and the date on which the shares held by the Plan were actually sold on the market. 1/14/10 Tr. at 152:15-153:12 (Gordon) (Dock. # 377).

made a renewed attempt to take over Nabisco in the form of an unsolicited tender offer

to purchase NGH for $13 per share. Because the Icahn offer was unsolicited, under

the tax laws, NGH could pursue corporate restructuring without endangering the tax-

free nature of the spin-off. 1/13/10 Tr. at 171:21-172:10 (Angowitz Dep.) (Dock. # 372);

1/22/10 Tr. at 211:22-212:13 (Blixt) (Dock. # 382); 1/25/10 Tr. at 19:23-20:2 (Blixt)

(Dock. # 383).

On April 4, 2000, NGH's Board of Directors rejected Icahn's original bid, but

announced that it would explore all alternatives to maximize shareholder value,

effectively putting NGH on the auction block. 1/25/10 Tr. at 20:3-10 (Blixt) (Dock. #

383). After several months of competitive bidding, on June 25, 2000, it was announced

that definitive agreements were signed for the sales of NGH and NA. Under the

agreements, NA would be sold for $55 per share to Philip Morris, which would infuse

NGH (the sole asset of which was NA) with $11 billion in cash. RJR would then

purchase NGH for $30 per share, or $9.5 billion.

The transactions closed on December 11, 2000. On that day, NGH was priced at

$29.9375 per share and NA was priced at $55 per share. PX-302 at 9; PX-303 at 9.

The closing prices represented an increase of 247 percent for NGH and 82 percent for

NA from the January 31, 2000 share prices. DX-157 at RJR001432-37; DX-158 at

RJR001443-48.

Before his unsolicited offer, Icahn had made three previous attempts to take over

Nabisco, between November 1996 and the spring of 1999, and was well known to have

an interest in the company. PX-271 at TAT3326; PX-275 at TAT3447; PX-276 at

TAT3467-68; PX-277 at TAT3473; PX-278 at 2-4; PX-304 at 4, 6; see also PX-228 at

31

TAT193; PX-248 at TAT281; PX-221 at TAT117; PX-304 at 4.

Prior to the spin-off, Icahn had attempted a takeover in March 1999 and was vocal about his belief that RJR and Nabisco should part ways. After that attempt, he continued to hold a significant number of shares through at least June 1999. PX-221 at TAT117; PX-275 at TAT3447; PX-276 at TAT3467-68; PX-277 at TAT3473; PX-278 at 2-4; PX-304 at 4,6.

On November 26, 1999, a *Wall Street Journal* article reported that Icahn had purchased six million shares of NGH stock, and speculated that "Mr. Icahn might just be bottom fishing." PX-346. While the *Wall Street Journal* speculated about the significance of the purchase, there was no price reaction to this report. 2/2/10 Tr. at 127:23-129:1 (Montgomery) (Dock. # 388). No analyst reports or news articles between the spin-off and February 1, 2000, mentioned the possibility of Icahn making an offer for NGH. 2/2/10 Tr. at 127:23-129:1 (Montgomery) (Dock. # 388).

As late as March 27, 2000, *after* divestment and three days before the unsolicited tender offer by Mr. Icahn, Salomon Smith Barney noted that "derivative tobacco fears continue to compress NA valuation despite strong fundamentals" and warned that "with storm clouds gathering on the tobacco litigation front in the near-term, NA may remain volatile, but we see this as a strong long term idea in food stocks." DX-279. The report went on to say:

> We have had a Buy rating on NA shares for more than a year; however that recommendation has been disappointing since the middle of 1999. After peaking at $43 in July 1999, NA shares are down 37% since then. In addition to the underperformance of the food group, we believe the weakness in NA shares relates in large part to the formation of NGH as well as the increasing uncertainty in the tobacco industry. Although we believe that Nabisco is ultimately insulated from tobacco financial liability, the shares continue to be

32

impacted by investor concerns.

DX-279, TAT000106. There was no mention of Carl Icahn in the report.

### O. Communications with Mr. Tatum

On January 27, 2000, shortly before the scheduled liquidation, Mr. Tatum sent an email to Ann Johnston and Bob Gordon requesting that the forced sale not go through, because it would result in a 60 percent loss in his 401(k) account. Tatum indicated that he was waiting to sell his stock until the Nabisco stock prices rebounded, and observed that company communications had been "optimistic" that the stock would perform better after the spin-off. PX-41 at RJR122; 1/13/10 Tr. at 26:22-29:6 (Tatum) (Dock. # 372). He also stated his understanding that former RJR employees of Winston-Salem Health Care and Winston-Salem Dental Care still had frozen Nabisco and RJR funds in their plans.[15]

Upon their receipt of Mr. Tatum's email, Ms. Johnston and Kathy Cissna met with Mr. Tatum to discuss his request that the Plan not divest the Nabisco stocks. During the discussion, Ms. Johnston told Mr. Tatum that others had complained and nothing could be done to reverse the decision. Mr. Tatum reiterated his understanding that Novant had retained the RJR and Nabisco stocks as a frozen investment option in the

---

[15] In 1996, Novant Health acquired Winston-Salem Healthcare and Winston-Salem Dental Care from RJR. Sams, Trial Tr. Vol IX at 50:2-4, 52:8-11 (Jan. 22, 2010). The former employees of Winston-Salem Healthcare had participated in a 401(k) plan while that company was owned by RJR. Some of these participants' accounts had been invested in the RJR Nabisco common stock fund and the Nabisco common stock fund before the purchase of Winston-Salem Healthcare by Novant. Those funds were maintained in Novant's plan after Novant's purchase of Winston-Salem Healthcare, despite the fact that Winston-Salem Healthcare was no longer related to RJR Nabisco. 1/22/10 Tr. at 52-53, 59:19-60:10 (Sams) (Dock. # 382).

33

Winston-Salem Health Care and Winston-Salem Dental Care Plan. 1/13/10 Tr. at 29:19-31:8 (Tatum) (Dock. # 372). Ms. Johnston responded that there was nothing that could be done to stop the divestment, and Tatum did not have further conversations with any company officials about the divestment until after January 31, 2000. Id.

In mid-November of 2000, Mr. Tatum requested a meeting with Mr. Gordon to discuss losses to the Plan as a result of selling the Nabisco stocks at close to their lowest point. At the meeting, Tatum expressed his concern over the marked increase in value of the Nabisco Funds since the divestment of them from the Plan. 1/13/10 Tr. at 33:3-34:1 (Tatum) (Dock. # 372).

On March 22, 2001, Mr. Tatum wrote a letter to the RJR Employee Benefits committee stating his concern that the Nabisco Funds "could have been maintained as 'frozen funds' with no further contributions or transfers into them allowed," and asking for copies of Plan documents and other information. PX-46.

On April 5, 2001, Mr. Folan, writing on behalf of the EBC, responded to Mr. Tatum's March 22, 2001 letter. In his response, Mr. Folan wrote, in part, that "[w]e disagree with your contention; we believe that the fiduciaries of the CIP did act prudently and in the interests of Plan participants and beneficiaries when the frozen NGH and NA stock funds were eliminated from the CIP on January 31, 2000." PX-47. On May 1, 2001, Mr. Tatum responded to Mr. Folan's letter making the following claim, "As a participant in the RJR CIP Plan I should receive a total of $30 per share instead of between $8 and $9 dollars per share for all NGH shares I held in the plan on January 31, 2000." PX-48.

On July 20, 2001, Mr. Gordon, as chair of the Benefits Administration Committee

34

("BAC"), responded to and denied Mr. Tatum's claim. PX-43. In its Basis for Denial, the BAC cited to the regulations under ERISA 404(c) for self-directed accounts, 29 C.F.R. §§ 2550.404c-1, *et seq.*, and stated that "[a]s a participant in the RJR CIP, you had and continue to have the ability to direct the investment of all assets in your account" and cited to the 1998 and 1999 SPDs, stating that "the 1998 and 1999 SPD each clearly explains that the Plan Fiduciary will provide a range of investment choices for RJR CIP participants to invest in, but [] each participant is responsible for directing the investment of assets in his/her own account."

The letter also emphasized that Tatum received notice of the intent to eliminate the Nabisco Funds in the 1999 SPD, as well as in communications sent to Plan participants in April 1999, June 1999, October 1999, and December 1999, and that Tatum could have redirected his investment at any time but that Tatum "chose to wait, presumably in the hope that the price of the NGH shares would increase." PX-43. In denying the claim, Gordon wrote that Tatum's claim had no merit "[b]ecause of your decision not to redirect your investment in the frozen NGH Fund before it was liquidated." PX-43, RJR000292.

Tatum appealed the BAC's decision to the EBC on August 7, 2001, and received a written response from Mr. Gordon, as Chairman of the EBC, on September 27, 2001. PX-56. In the denial of Mr. Tatum's claim, Mr. Gordon writes as an "undisputed fact" that "Plan Section 4.03 vests the *RJR Pension Investment Committee* with the absolute right to change or eliminate investment options." Id. (emphasis added). Again, the major basis for denying Mr. Tatum's claim is that ERISA § 404(c) "permits a participant to exercise control over assets in his account" and that in such cases, "no person who

35

is otherwise a fiduciary shall be liable under this part of any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control." PX-56, RJR00150. Part C of the letter is entitled "The Fiduciary Right to Change or Eliminate Investment Options Offered Under the Plan" and states, in part:

> *Under Plan Section 4.03, the RJR Pension Investment Committee has been delegated the unambiguous right to change or eliminate investment alternatives.* Once a decision is reached to change or eliminate an investment alternative, the [EBC] has a duty to inform participants of the changes in the investment alternatives. Consistent with that duty, as evidenced by the undisputed facts, the [EBC] gave you and the other Plan participants considerable, advance notice of the changes in investment alternatives with respect to the NGH stock, including the elimination of that investment option from the Plan.

PX-56, RJR000151 (emphasis added). In addition to the above statement, the letter contained sections entitled "The Fiduciary Obligation to Give Notice to Participants of the Change or Elimination of Investment Options Offered Under the Plan," "Participant Control and Self-direction of Investments," and "the Measure of a Fiduciary's Duty is not based on Hindsight." The acts discussed throughout the letter are discussed in terms of fiduciary acts and fiduciary duties.

## II. PROCEDURAL HISTORY

Tatum filed the original complaint in this case in May 2002, naming RJR as defendant as well as the EBC and the PIC. Tatum alleged that RJR breached its fiduciary duties by eliminating the Nabisco stock from the Plan without the thorough investigation or analysis required by ERISA, thereby causing losses to the Plan.

In July 2002, RJR filed a motion to dismiss. The motion was granted based on a determination that Tatum's allegations involved "settlor" rather than "fiduciary" actions

36

and thus Tatum had not stated a claim of breach of fiduciary duty. Tatum v. R.J. Reynolds Tobacco Co., 294 F.Supp.2d 776, 784 (M.D.N.C. 2003), rev'd, 392 F.2d 636 (4th Cir. 2004). On appeal, the Fourth Circuit reversed, holding that Plan amendments created in the relevant time period (the June and November amendments), which this Court found had mandated removal of the Nabisco stock, did not mandate removal and thus did not preclude Tatum from stating a claim that divesting the Nabisco stock from the Plan was a discretionary, fiduciary act. Tatum v. R.J. Reynolds Tobacco Co., 392 F.3d 636, 640 (4th Cir. 2004) .

In January 2005, RJR filed a second motion to dismiss [Dock. # 43, 44] on several grounds. After limited discovery was allowed, Tatum filed a second amended complaint, adding new facts to the allegation that RJR was a "functional fiduciary" and thus also subject to the duty of prudence. Dock. # 49-4 (Second Amended Complaint).[16]

In April 2007, RJR filed a third motion to dismiss, which sought, among other things, to dismiss the EBC and the PIC as defendants in this case. This Court granted RJR's motion as to the two plan committees but allowed the case to proceed against RJR. Dock. # 90.

The class was certified in September 2008. Dock. # 209. The class is described as:

> All participants in the R.J. Reynolds Tobacco Company Capital Investment Plan ("Plan") for whose individual accounts the Plan held shares of Nabisco Group Holdings (NGH) Common Stock and/or Nabisco (NA) Common Stock

---

[16]Although it was the second amended complaint, the pleading is titled the "Third Amended Complaint." See Dock. # 49-4.

at any time from June 14, 1999 and including January 31, 2000. The following individuals are excluded from the Class:

> Officers and directors of R.J. Reynolds Tobacco Holdings, Inc., R.J. Reynolds Tobacco Company, RJR Industries, Inc., R.J. Reynolds Tobacco International, Inc. and RJR Tobacco Consolidated IHC, Inc., members of their immediate families; and the heirs, successors or assigns of any of the foregoing.

Dock. # 209, at 5.

In May 2008, RJR filed a Motion for Judgment on the Pleadings With Respect to "Voluntary Seller" class members [Dock. # 169], claiming that Tatum had not adequately pled causation with respect to a Plan participants (referred to as "Early Sellers") who directed sales of their Nabisco stocks before the final divestiture date of the Plan's Nabisco stocks. [Dock. # 277]. Because Tatum's claim was brought under ERISA § 502(a)(2), it was determined that he sufficiently pled causation as to all Plan participants, including the Early Sellers, by alleging in the complaint that the Plan had suffered losses as a result of RJR's breach of fiduciary duty. Id. at 3-4.

On January 9, 2009, RJR filed a Motion to Decertify the Class [Dock. # 263], which was denied. [Dock. # 359]. The parties' cross motions for summary judgment were denied in December 2009, and a bench trial on Tatum's breach of fiduciary duty claim was held from January 13, 2010 to February 9, 2010.

Pre-trial motions were heard on January 11 and 12, 2010, but the Court reserved judgment on a number of motions until after the close of evidence.

A number of issues raised before the start of trial need not be decided in light of the Court's finding that the investment decision was objectively prudent. Those that remain relevant will be discussed within this Opinion at the appropriate time.

38

## A. Pre-trial Issue: The Scope of the Evidence

At trial, evidence was accepted regarding events that occurred from early spring (March) of 1999 through and beyond the January 31, 2000 date of divestment. RJR contends that Tatum did not put sufficient allegations in the Second Amended Complaint to put RJR on notice that the spring 1999 decision to divest the Plan of the Nabisco stock was a breach of the duty of prudence.

There are two problems with RJR's objection. First, the Court views the breach of fiduciary duty as one act: the removal of the funds from the Plan. The discussion of spring and fall events constitute the facts surrounding that alleged breach, and thus, all facts related to the removal of the funds are relevant and should be considered.

Second, even if Tatum alleged only that actions taken or not taken in the fall were a breach of fiduciary duty, the acts of the previous working group in the spring of 1999 would be relevant facts to consider because the group of employees in the fall who revisited the decision to eliminate the Nabisco Funds relied on the rationales from the spring decision to support its continued belief that the funds should be removed. Furthermore, at this time it is not reasonable to include only the events related to the November time frame because the November Amendment has been determined to be invalid.

Third, and most importantly, the Second Amended Complaint provides ample notice of Tatum's claim that the initial decision constituted a breach of fiduciary duty. Paragraphs 21-23 allege:

> 21. In or about *March 1999*, officers, employees, and/or agents of RJRT and RJRTH, acting as functional fiduciaries of the Plan, *determined that* after the spinoff

and the split of the RJR Nabisco Plan into two plans for the respective companies, (1) the investment options for participants in the RJR Plan would remain the same, except that the Nabisco stock funds (NH and NGH) would be frozen from any active investment; (2) the Nabisco stock funds would remain frozen for approximately six months; (3) at a time approximately six months in the future, the Plan would divest itself of the Nabisco stock funds and limit its single stock fund investment options to RJR and/or RJRTH company stock, and 4) during that period in which the Nabisco stock funds were frozen, participants would be informed that they could sell their Nabisco stock.

22. On or about *March 31, 1999*, officers, employees, and/or agents of defendants RJRT and RJRTH, acting as functional fiduciaries of the Plan, notified participants in the Plan *of the decision* to freeze the Nabisco stock funds in the RJR Plan at the time of spinoff.

23. In or about May or June, 1999, officers, employees, and/or agents of RJRT and RJRTH, acting as functional fiduciaries of the Plan, notified participants in the Plan of the decision that as of the spin-off date, Nabisco stock funds in the RJR Plan would be frozen, and would be divested in approximately six months thereafter.

Paragraph 50 alleges:

50. Defendant's *selection*, monitoring, and continuation of investment alternatives under the Plan were and are subject to the above-described fiduciary duties. By their acts and omissions *in eliminating the Nabisco stock as investment alternatives under the Plan, requiring complete divestiture of all Plan assets from all Nabisco stock on or before January 31, 2000, and failing to exercise their discretion to include these funds as continuing investment options under the Plan*, defendants breached each of the fiduciary duties described above.

Finally, Paragaph 56 alleges:

56. As a direct and proximate consequence of defendant's breaches of fiduciary duty, the Plan suffered losses *from the divestiture of shares of NA and NGH stock* up to and including January 31, 2000.

Dock. # 49-4 (Second Amended Complaint) (emphasis added); see also id. ¶¶ 17-25

(specifying spring events).

These allegations were sufficient to place RJR on notice that Tatum was alleging

that RJR's actions in the spring of 1999 were subject to ERISA's fiduciary duties and

that the ultimate elimination of the stock was preceded by a series of events which began with the decision and notice to Plan participants in March of 1999 and culminated in the removal of the stock from the plan on January 31, 1999.

Thus, RJR has been on notice that the spring decision was at issue in this action at least since the Second Amended Complaint was filed. There was no conceivable surprise or prejudice to RJR in permitting Tatum to present his claim concerning the spring decision to eliminate the Nabisco funds.

### B. Post-trial Issue: Amendment to Conform to Proof

As discussed in more detail in this Court's Memorandum Opinion dated June 1, 2011, during trial of this action, evidence was presented by both parties that raised an issue as to whether the EBC had validly adopted "Amendment no. 1. to the Plan," dated Nov. 18, 1999 ("November Amendment"), which was to intended to remove, effective February 1, 2000, the Nabisco stocks from the section of the Plan listing specific required investment options. 1/14/10 Tr. at 184:17-186:1 (Gordon) (Dock. # 377); 1/25/10 Tr. at 210:5-212:10 (Folan) (Dock. #383). In that June 1, 2011 Memorandum Opinion, this Court allowed Tatum to amend the complaint to conform to evidence supporting such a finding. Plaintiff was permitted to add alternative Paragraph 30A, which challenged the validity of the November Amendment. In the same Memorandum Opinion, the November Amendment was determined to be invalid based upon the evidence presented at trial. Dock. # 420.

41

## III. CONCLUSIONS OF LAW

The central questions in this case are 1) whether the fiduciaries of the Tobacco Plan undertook the appropriate investigation into the prudence of removing the Nabisco Funds from the Tobacco Plan, and 2) if not, whether, after considering all the available information and informed opinion necessary to make a reasonable decision, prudence would have compelled a fiduciary to maintain the Nabisco Funds as frozen funds in the Plan.

### A. The Duty of Prudence Under ERISA

Under ERISA, fiduciaries are required to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[17]  ERISA § 404(a), 29 U.S.C. § 1104(a)(1)(B).  Tatum claims RJR breached this duty of prudence when it removed the Nabisco Funds from the Plan at a loss to participants.

The duty of prudence applies only if an act is fiduciary in nature–i.e., if the action at issue involved the use of discretion. DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 417 (4th Cir. 2007) ("ERISA fiduciaries owe [the duties of prudence and loyalty] only when they are acting in their capacity as a fiduciary."). In this case, the issue of discretion was initially resolved by the Fourth Circuit in Tatum, 392 F.3d at 640, when the Court

---

[17] ERISA "governs employee benefit plans, including retirement plans." DiFelice, 497 F.3d at 417 (citing Mertins v. Hewitt Assocs., 508 U.S. 248, 251 (1993)). There is no dispute that the Plan at issue in this case is an "employee pension benefit plan" and an "employee benefit plan" within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

42

held that the two Plan amendments issued during the class period, the "June

Amendment" and the "November Amendment," did not prevent Tatum from bringing a

breach of fiduciary duty claim because the amendments "did not strip" the fiduciaries of

discretion to re-designate the Nabisco Funds as investment options effective February

1, 2000.  Since then, this Court has determined the November Amendment was invalid.

See Tatum v. R.J. Reynolds Tobacco Co., et al., 2011 WL 2160893 (M.D.N.C. 2011).

Nevertheless, it is determined for the following reasons that the decision to remove the

Nabisco Funds from the Plan was a fiduciary act.[18]

### 1. Removal of the Nabisco stocks was a discretionary act subject to the duty of prudence

Contrary to RJR's argument that fund selection was a settlor act and not

discretionary, documents from the 1999-2000 time period support the finding that the

_____

[18] A separate question at trial was whether RJR was a "functional fiduciary."
ERISA defines a fiduciary beyond the named fiduciaries in the plan documents and
emphasizes control over plan management:

> [A] person is a fiduciary with respect to a plan to the extent (i) he
> exercises any discretionary authority or discretionary control respecting
> management of such plan or exercises any authority or control respecting
> management or disposition of its assets; (ii) he renders investment advice
> for a fee or other compensation, direct or indirect, with respect to any
> moneys or other properties of such plan, or has any authority or
> responsibility to do so, or (iii) he has any discretionary authority or
> discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21(A)).  The evidence strongly favors Tatum's argument that RJR
was in control of the decision to remove the Nabisco Funds.  The evidence at trial
showed that RJR employees made and implemented the elimination decision before
any official committee action was ever attempted and failed to use the committees
designated in the Plan (the PIC and EBC) for any of the discretionary decisions.
However, lengthy discussion and decision on this issue is not required because RJR
prevails on the issue of substantive prudence.

selection of funds for the Plan was to be made by the PIC, was fiduciary in nature, and was thus subject to the duty of prudence.

Several documents reference the fiduciary obligations of the PIC. The outline provided at the July 29, 1999 orientation meeting for the new Tobacco Plan PIC included, as one of the PIC's functions, to "[a]pprove the selection and elimination of each investment option within the CIP." DX-29, RJR000110. Likewise, the topics listed for Mr. Kass's presentation to the PIC on fiduciary duties in October 1999 included topics such as prudence requirements, procedural prudence, and diversification of the Plan's assets, all of which suggest that Mr. Kass had been given information that the PIC had duties of prudence related to fund selection. DX-122.

The letters from the EBC and BAC in response to Mr. Tatum's claim and appeal for benefits contain repeated language regarding the PIC's fiduciary duties and right to select investment funds for the Plan. The EBC's first response to Mr. Tatum's request for information did not inform Mr. Tatum that the fiduciaries lacked discretion to maintain or remove the funds, as RJR later claimed. Rather, it stated that "we (the EBC) believe that *the fiduciaries* of the CIP did act prudently and in the interests of Plan participants and beneficiaries when the frozen NGH and NA stock funds were eliminated from the CIP on January 31, 2000." PX-47 (emphasis added). When the BAC responded to Tatum's official claim for benefits in July 2001, it stated that "the *Plan Fiduciary* will provide a range of investment choices for RJR CIP participants to invest in." PX-43 (emphasis added). The EBC's September 27, 2001 response to Mr. Tatum's appeal for benefits specifically stated–under the heading "The *Fiduciary* Right to change or Eliminate Investment Options Under the Plan"–that the PIC had "been

44

delegated the *unambiguous right to change or eliminate an investment alternative*"
under "Plan Section 4.03." PX- 56 at RJR151 (emphasis added). The letter's reference
is presumably to the last line of Section 4.03 of the Plan as it existed on January 31,
2000, which at that time stated: "In addition, the Trustee shall maintain any other
Investment Funds as are designated by the RJR Pension Investment Committee." The
last line of Section 4.03 was also present in the June Amendment.

The contemporaneous documents referencing the PIC's fiduciary role are far
more persuasive than the testimony of EBC members presented by RJR to support its
contention that fund selection was not discretionary. Furthermore, many of the
contemporaneous documents represent communications to Mr. Tatum regarding his
claims for benefits, and those communications were written with the intent that Mr.
Tatum would rely on them. Thus, the Court finds based on the evidence presented at
trial that the act of eliminating the Nabisco Funds was a fiduciary act, subject to the
fiduciary duty of prudence–in addition to finding that the parties have stipulated to a
prudence standard for purposes of this opinion.[19]

---

[19] The same findings regarding discretion may be applied to RJR's scrivener's
error argument. RJR has always claimed that the removal of the Nabisco Funds was
dictated by Plan amendment, thus leaving no discretion to the Plan fiduciaries as to the
fate of those funds. At trial, RJR argued that the language in the November Amendment
giving the PIC discretion to re-designate the Nabisco Funds was a scrivener's error,
asserting there was no intention by the EBC to give the PIC discretion to designate any
funds outside of the Plan amendment.
    The issue need not be decided because the amendment has been determined to
be invalid; however, it is noted that the Fourth Circuit has not changed its position that
ERISA plans generally should not be re-written by the court. While Blackshear v.
Reliance Standard Life Ins. Co., 509 F.3d 634 (4th Cir. 2007), *abrogated on other
grounds as stated in* Williams v. Metro. Life Ins. Co., 609 F.3d 622, 630 (4th Cir. 2010),
suggests that reformation may be possible with respect to ERISA plans in the case of
mutual mistake or fraud, the overriding message in Blackshear is that the goals of

## B. Procedural Prudence

ERISA's prudence standard requires that a plan investment decision, including the decision to keep or eliminate a plan investment option, be made only after a thorough and impartial investigation and analysis. DiFelice, 497 F.3d at 420; Bunch v. W.R. Grace & Co., 555 F.3d 1, 6 (1st Cir. 1999). In determining whether an ERISA fiduciary has breached the duty of prudence, courts "'inquire whether the individual

---

ERISA, i.e. "ensur[ing] that an employee's rights and obligations can be readily ascertained from Plan documents," must not be compromised absent clear and convincing evidence of mutual mistake or a scrivener's error. Id. at 642. While RJR contended at trial that the last sentence of the November Amendment is a "scrivener's error," RJR failed to provide clear and convincing evidence that the PIC did not have discretion to designate additional funds outside those written in the Plan. At best, the sentence is a unilateral mistake made by the drafter that is not apparent on its face. Folan, who signed the November Amendment, testified that Jennie Beasley drafted the amendment and that she should have struck the last sentence "because people could have interpreted it [to say that the PIC had discretion to add funds]." Folan testimony, Jan. 25, 2010, Vol. X, p. 204 line 12-205 line 3. Blackshear states that equitable reformation is available only to "correct a mutual mistake of fact or a scrivener's error that fails to capture the true intent of the contracting *parties.*" Id. (emphasis added). Blackshear clearly defines a scrivener's error as an error which, "like a mutual mistake, occurs when the intention of the *parties* is identical at the time of the transaction but the written agreement does not express that intention because of error. . . ." (emphasis added, citation omitted). The court in Blackshear declined to reform the plan at issue, noting that there was "utterly no indication of an error or mistake . . . unlike . . . where a clerical or scrivener's error would be apparent." Id.

Here, the November Amendment gives no indication of error or mistake on the part of the drafters of the Plan. Reforming the November Amendment in accordance with the wishes of RJR would undermine ERISA's goal that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." Id.; see also Cross v. Bragg, 329 Fed. Appx. 443, 455 (4th Cir. 2009) (finding no mutual mistake where there was no evidence of the plaintiff's intent and disregarding scrivenor's error evidence from IRS proceeding because there was no evidence of plaintiff's intent presented at that proceeding).

Furthermore, the documents discussed above regarding the PIC's role during 1999-2000 also refutes RJR's claim that the language found in the invalid November Amendment–leaving discretion with the PIC–was a scrivenor's error. Thus, although the scrivenor's error argument is moot, it would not have succeeded on the merits under these facts.

46

trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" DiFelice, 497 F.3d at 420 (quoting Flanigan v. Gen. Elec. Co., 242 F.3d 78, 86 (2d Cir. 2001)). The fiduciary must "engage[] in a reasoned decision-making process, consistent with that of a 'prudent man acting in like capacity.'" Id. (quoting 29 U.S.C. § 1104(a)(1)(B)). "The evaluation is not a general one, but rather must 'depend[] on the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time.'" Id.

While cases discussing the retention or removal of *company* stocks are distinguishable because of the type of investment decision, they do provide some guidance for determining the types of actions fiduciaries have taken in conducting an investigation and are helpful in evaluating the strength and credibility of the expert opinions on this issue. The most helpful Fourth Circuit case on the issue of procedural prudence, DiFelice, involved allegations that U.S. Airways, as fiduciary of its own plan, should have removed its own stock from the company 401(k) plan because the company was in great peril and facing potential bankruptcy. DiFelice ultimately held the fiduciaries acted prudently with regard to the challenged retention of company stock as an investment option, concluding that the fiduciaries had formed a reasonable, "well-founded belief" after an appropriate and "thorough" investigation. In DiFelice, the fiduciaries met multiple times (formally and informally) to consider the issue, sought outside legal advice, appointed an independent fiduciary, monitored the performance of

47

the company stock fund, and evaluated its continued suitability.[20]  The court found the

actions of the fiduciaries to be prudent as well as the ultimate investment decision itself.

Bunch v. W.R. Grace & Co., 555 F.3d 1, 4-9 (1st Cir. 2009) involved the possible

sale of company stock due to impending bankruptcy.  In Bunch, the court found the

fiduciary's actions were prudent when it named an independent fiduciary to render an

expert opinion and retained an outside financial firm which gave a detailed 88-page

financial and valuation analysis; retained an outside law firm; closely monitored the

price of the company stock; compiled and studied the financial performance and

outlook of the company; analyzed the impact of the pending bankruptcy and

reorganization; deliberated at various meetings and conferences; and unanimously

approved the recommendation to sell the company stock at a formal meeting.  The

fiduciary in Bunch continued to monitor the divestment decision by receiving regular

updates from financial advisors, consulting outside legal advisors, and holding

additional meetings when there were new developments. As a result, the court found

that the fiduciary had made an "appropriate and thorough investigation." Id. at 9,10.

In Noa v. Keyser, 519 F.Supp.2d 481, 491 (D.N.J. 2007), the District of New

Jersey found that the fiduciaries did not breach their duty in selling company stock in a

401(k) plan where they conducted formal meetings after significant corporate events,

(such as the de-listing of the company from the New York Stock Exchange and a

proposed restructuring of the company), regularly consulted independent legal counsel

---

[20] The Fourth Circuit emphasized the fact that outside advisors were consulted,
though this was more important in DiFelice, where the company itself was the named
fiduciary and the determination was about the company's own stock.

48

retained to advise them as to fiduciary duties, regularly consulted both future and present Plan trustees, and exchanged extensive e-mails and memoranda regarding the prudence issue. The court also noted that "this process was approached by defendants with the primary goal of 'acting solely in the interest of the [plan] participants and beneficiaries as required by section 404 of ERISA.'" Id.; see also Riley v. Murdock, 890 F.Supp. 444, 458-59 (E.D.N.C. 1995) (finding on summary judgment that the fiduciaries fulfilled their duities of prudence where a committee of internal experts was formed to investigate an investment decision).

The above cases are beneficial in evaluating the expert opinions in this case. Not surprisingly, the parties' experts disagreed over the amount and type of investigation required under the circumstances of this case. RJR's main expert on the topic of procedural prudence, Howard Crane,[21] testified that little investigation is required by a fiduciary when the fund at issue is a single stock, non-employer fund. 1/28/10 Tr. at 119:10-20 (Crane) (Dock. # 386). He focused on the inherent high risk of a single stock fund and thus opined that the decision-making processes undertaken by the March 1999 committee and the October 1999 group were adequate under these circumstances. Id. at 120 (finding adequate process because "[w]e are dealing with a non-employer, single stock fund, which essentially arose at the time of the spin-out. There was planning for the spin-out event that took place over the spring, during which discussions were had, including appropriate internal staff, internal ERISA counsel and

---

[21] Mr. Crane is an independent financial consultant and was qualified as an expert in "the field of fiduciary responsibilities and decision-making and decision-making process of prudent ERISA plan fiduciaries and portfolio and plan construction and investment decision-making." 1/28/10 Tr. at 119:10-20 (Crane) (Dock. # 386).

external counsel, and the . . . fund's investment advisor."). According to Mr. Crane, having a single stock fund in a retirement plan creates so much risk that very little discussion or analysis is required of fiduciaries when determining whether to keep such a fund in a plan. Id. at 123 ("[The fall decision] was procedurally prudent . . . [T]hese were nonemployer single stock funds. A single stock is approximately four times as risky as a diversified portfolio of mutual funds." ); 151:10-12 ("My advice to clients has consistently been, if possible, avoid single stock funds. I have never encountered a situation where a client said, would it be a good idea to start a new investment fund based on a non-employer single stock, but my advice would have been the same.").

Jim Raborn, a partner at Baker Botts in the area of employee benefits, was tendered by RJR and accepted by the Court in a very limited capacity as an expert in the field of fiduciary responsibilities and the decision-making process of ERISA plan fiduciaries.[22] Like Mr. Crane, Raborn testified that the process a prudent fiduciary should follow in making a decision regarding whether to add, maintain, or eliminate a non-employer single stock fund in a 401(k) plan would not require much investigation by fiduciaries. Raborn did say a prudent fiduciary should consider available investment alternatives, including whether those alternatives provide a range of investments that would be considered diversified, with differing risk reward profiles, and whether there was any particular reason to prefer the single stock investment over the other investments in the Plan. Raborn also testified, however, that outside counsel is not

---

[22] A majority of the testimony and report provided by Raborn was stricken during the trial, but he was permitted to testify as to what a fiduciary should review when making investment decisions. 1/28/10 Tr. at 96-99 (Raborn) (Dock. # 386).

required when considering a non-employer stock fund, that there is no need for an independent fiduciary when considering a non-employer stock fund absent concern about a fiduciary's loyalty, and that outside investment advice might be appropriate in some circumstances but that it depended on the nature of the fund. 1/28/10 Tr. at 96-99 (Raborn) (Dock. # 386). He also said that a prudent fiduciary needn't analyze the company's business prospects or financial reports, nor analyze the SEC filings, and need not research industry prospects or review analyst reports when considering removing a non-employer stock fund from a plan. Id.

Crane expressed at trial that he was satisfied with the discussion and investigation performed by the RJR decision-makers because of the type of investment (single, non-employer stock) involved. Raborn was not permitted to make such a conclusion, but his opinion regarding fiduciary duties nonetheless lacked a meaningful requirement for fiduciaries to conduct research about the investment decision. Crane's conclusion (and Raborn's opinion) disregards the requirement of the case law, regulations, and the statute itself to conduct a thorough evaluation, investigation, and analysis prior to an investment (or divestment) decision. See DiFelice, 497 F.3d at 421; Bunch, 555 F.3d at 6; Noa, 519 F.Supp.2d at 490-93; 29 CFR § 2550.404a-1 (2009) (requiring that a fiduciary give "appropriate consideration" "to those facts and circumstances that . . . the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio" and including a determination "that the particular investment or investment course of action is reasonably designed, as part of the portfolio . . . to further the purposes of the plan,

51

taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action").

Mr. Tatum's expert, Dr. Alan Biller–also an independent advisor to multi-employer plans–focused more on the risk of divesting a fund already in the Plan.  He opined that more significant investigation into a company's prospects is required in order to minimize potential immediate losses to participants that would come from forcing a sale within an arbitrary time frame.  Dr. Biller testified that, once an investment option is part of a plan's investment portfolio, the fiduciaries must evaluate whether an investment option remains prudent, and must conduct an investigation of the option before deciding to dispose of it. 1/15/10 Tr. at 38:16-23; 57:3-7 (Biller) (Dock. # 378).  In performing such an investigation, fiduciaries should "take account of information which is available about that option," which would include, in this case, "reports from professional analysts who follow the particular company, company filings required by the SEC, news reports, and general commentary on the state of the company and the industry."  He also testified that most plans he is familiar with "use the services of investment professionals, consultants to help make decisions." Id. at 38:24-40:1; 57 ("Based on the evidence that I read, there was no evaluation done of the prospects of the company, prospects of the industry. For that matter, the length of time that they might take for the tobacco taint to dissipate.").[23]

_____

[23] Plaintiff's expert Professor Thomas Lys, the Eric L. Kohler Chair in Accounting and Professor of Accounting and Information Management at the Kellogg School of Management, Northwestern University, also testified regarding prudence, but in the context of what a prudent *investor* would determine.  Tatum argues that the prudent investor standard would be a lower standard than the fiduciary standard, and thus, Professor Lys's opinion should be considered as a threshold for the investigation

52

Dr. Biller's opinion and conclusions regarding a fiduciary's considerations are persuasive in light of what courts have considered in other cases and what the ERISA statute and regulations require. For that reason, Dr. Biller's opinions are adopted. Fed. R. Evid. 702.

The above cases and opinion of Dr. Biller provide a background, not a checklist, for a review of the decision-makers' actions in this case. The process used by the decision-makers in this case fell far below what ERISA would require of a fiduciary. The Court therefore finds that, under the ERISA prudence standard, RJR breached the duty to investigate the investment decision to eliminate the Nabisco Funds from the Plan.

### 1. RJR failed to adequately investigate the decision to eliminate the Nabisco stock from the Tobacco Plan

#### a. Pre-spinoff, Spring 1999

The decision at issue in the spring of 1999 was whether the Nabisco Funds, which would become non-company stock funds immediately upon the spin-off, should be removed from the Plan. As indicated in the Court's Findings of Fact, the working group's decision in March 1999 was made with virtually no discussion or analysis and was almost entirely based upon the assumptions of those present and not on research

---

required under the circumstances.

The Court finds Professor Lys's testimony to be unhelpful to a finding of what is required of a prudent fiduciary. Professor Lys testified that he did not know the ERISA standard for fiduciaries. Furthermore, what is required for a prudent investor may be completely irrelevant to the analysis for fiduciaries, who are necessarily making decisions on behalf of others and have duties to others that may be vastly different than a standard they may hold for themselves. Since Professor Lys is not qualified to give an opinion as to a fiduciary's duties, the Court will not consider his analysis as relevant to the procedural prudence analysis.

or investigation. The total discussion of eliminating the Nabisco stocks took place in approximately one hour, no opposing viewpoints were expressed, no one followed up with further research on the assumptions made by the group, and the decision was almost immediately put into a letter that went out to Plan participants with the March 1999 statements.

Those present at the meeting were focused on removing the funds and did not raise basic questions about the impact of corporate reorganizations on former company stock in an ERISA plan or about the impact on participants of removing a fund already in the Plan. The general risk of a single stock fund was the driving consideration, as well as emphasis on the unconfirmed assumption that RJR would no longer be exempt from the ERISA diversification requirement because the funds would no longer be employer stocks. The group did not discuss all of the consequences of removing the funds or any possible reasons to keep them in the Plan. They did not discuss the purpose of the Plan, which was for long term retirement savings, or the purpose of the spin-off, which was, in large part, to allow the Nabisco stock a chance to recover from the tobacco taint and hopefully rise in value. The possibility of allowing the Nabisco stock to remain frozen indefinitely, in order to allow employees to move money from those funds at will, was not discussed. The idea that, perhaps, it would take a while for the tobacco taint to dissipate was not discussed, nor was the fact that determining for employees exactly when the stocks would be removed could result in large and unnecessary losses to the Plan through the individual accounts of employees. In addition, the six month timeline for the divestment was chosen arbitrarily and with no research other than asking those at the meeting their own experience with single stock

54

funds.

There is no evidence—in the form of documentation or testimony—of any process by which fiduciaries investigated, analyzed, or considered the circumstances regarding the Nabisco stocks and whether it was appropriate to divest. The only documents from spring of 1999 reflecting the divestment decision are meeting agendas and a few handwritten notes addressing various administrative and human resources logistical issues associated with the split. See DX-7 at RJR14724; DX-80 at RJR219; PX-49; PX-99 at RJR14276-77.

While internal counsel for RJR Nabisco Holdings at the time, Leon Lichter and Andy Nebens [24] were present at the March working group meetings, those meetings covered numerous topics related to the spin-off, and there was very limited testimony regarding the participation of the attorneys. There is no written evidence of any legal opinions or advice provided, and no testimonial evidence regarding advice provided by any attorneys about the Nabisco stocks. See 1/20/10 Tr. at 198:1-6 (Lichter (video)) (stating that he had a "fuzzy recollection of those events from that time); 199:17-19 (stating as his recollection of why the stock was eliminated only his understanding that

_____

[24] Colin McBride, who was Assistant General Counsel and Corporate Secretary at RJR Nabisco Holdings, was a member of the pre-spin EBC and PIC and his office was in New York. The record is not clear whether Mr. McBride actually attended the March 24-25 meeting, but Gerald Angowitz, Senior Vice President of Human Resources and Administration for RJR Nabisco Holdings at that time and who was present at the March meeting, stated that he would have discussed the decision made at the March meeting with Mr. McBride (who was on the pre-spin EBC) *after* the March meeting took place. 1/21/10 Tr. at 217 (Angowitz) (Dock. # 381). McBride did not recall being asked for or giving his opinion regarding benefits issues during that time period. 1/26/10 Tr. at 184:3-10 (McBride (video)) (Dock. # 384) (not remembering being asked for, or giving his opinion); 187:18-24 (describing that he was "mainly focused on the corporation as opposed to the benefits aspect of the spin-off").

55

"it just doesn't make sense to have a single stock fund of an unrelated entity perpetually in a 401(k) plan," but not any legal grounds for the elimination) (Dock. #380); 1/14/10 Tr. at 7:15-23 (Gordon) (Dock. # 377) (recalling that Nebens was present for the meeting); 1/19/10 Tr. at 127:2-21(Cissna) (Dock. # 379) (unable to recall what Nebens or Lichter said, if anything, regarding benefits); 1/25/10 Tr. at 98-102 (Johnston) (Dock. # 383); 1/21/10 Tr. at 213 (Angowitz) (Dock. # 381).

Allen Erreich, an attorney from Roberts & Holland LLP, was on the agenda for the March 24, 1999 meeting, and Kathy Cissna testified at trial that Mr. Erreich was present at the meeting as outside counsel. However, there is no evidence in the record indicating Mr. Erreich's advice or recommendation, if any, to the group. See PX-98 at RJR14274.[25]

The Plan's internal advisor, Ed Robertiello, was also present at the March meeting; however, the testimony of RJR's former managers was uniform that no one remembered Robertiello providing any specific advice regarding the Nabisco Funds in the Plan. See 1/22/10 Tr. at 119:1-17 (Robertiello) (Dock. # 382) (not recalling any discussions about what to do with company stock funds in the Plan at any time and not recalling whether or not the subject was discussed); 1/26/10 Tr. at 184:19-23 (McBride)

---

[25]During the trial, the parties disagreed over the extent to which testimony regarding Mr. Erreich's advice could be considered due to a previous disagreement over attorney-client privilege and RJR's reluctance to waive any privilege. It appears from the parties' submissions after trial that RJR abandoned any argument that testimony regarding Mr. Erreich's advice should be admitted. As a result, the only evidence regarding Mr. Erreich is that he was present at the March meeting, which does not aid RJR on the issue of procedural prudence, particularly in light of the fact that numerous topics were covered on that day other than the Nabisco Funds.

56

(Dock. # 384); 1/14/10 Tr. at 171:1-25 (Gordon) (Dock. # 377).

The main rationale articulated at the March meeting for removing the Nabisco stocks was the belief that the Plan would lose its exemption from the ERISA diversification requirement for employer stocks, see 29 U.S.C. §1104(a)(2), making the fund per se imprudent because Nabisco would no longer be an employer stock. However, no one researched the accuracy of that assumption, and it was later determined that nothing in the law or regulations required that the Nabisco Funds be removed from the Plan.

The meeting participants briefly focused on the risk of a single stock fund in the Plan and quickly moved on to determine a time for divestment. There is no evidence that the meeting participants ever considered an alternative, such as maintaining the stock in a frozen fund indefinitely, making the timeline for divestment longer, or any other strategy to minimize a potential immediate loss to participants or any potential opportunity for gain. Given that the strategy behind the spin-off was largely to rid Nabisco stock prices of the "tobacco taint," the failure to consider these issues is notable.

The only other rationale for eliminating the Nabisco Funds that was discussed at the March meeting was a concern that there would be additional burdens with respect to monitoring and administering a single stock fund that was not a company stock fund. While these concerns were expressed, they were not researched or discussed at length.

While additional discussions did take place after the March meeting–in the form of informal meetings or hallway conversations–there is no evidence in the record that

57

those conversations between March 1999 and October 8, 1999 contemplated any formal action other than what had already been decided at the March meeting. See, e.g. 1/21/10 Tr. at 217 (Angowitz) (Dock. # 381). Thus, the additional discussions and meetings are not evidence of any additional procedures or processes used by RJR to determine whether to eliminate the Nabisco Funds.

### b. Post-spinoff, Fall 1999

Although DiFelice explained that a fiduciary must "continue to monitor, the prudence of *each* investment option available to plan participants," DiFelice, 497 F.3d at 421, 423, RJR's fiduciaries did not. Although a decision had been made to divest the Nabisco Funds, that decision was not to be implemented until January 31, 2000, and thus RJR was obligated to continue to evaluate the reasonableness of the decision from the perspective of plan participants. The fact that RJR had already informed participants did not relieve it of this duty. The focus in the late summer and early fall of 1999 was on setting a specific date for divestment and on providing notice to participants regarding the planned removal of the funds, not on seeking information or monitoring the elimination decision.

Indicative of the pervading mindset against reexamining the original decision were the communications known to be false when sent to participants in October 1999 with the third quarter statements and the December/fourth quarter statements, erroneously stating that "regulations [did] not allow" RJR to keep the funds as investment options in the new Tobacco Plan. PX-12, PX-14. RJR admits that there are no regulations prohibiting single stock funds of any kind in an ERISA plan. This

58

misstatement of law in the Plan communications is further evidence of the fiduciaries' failure to investigate the decision before they made it, as no one consulted an appropriate legal expert before drafting this communication or asked an attorney to review it before it was sent out. 1/19/10 Tr. at 69:507 (Cissna) (Dock. # 379). Even when other persons became aware that the communication was incorrect, they did not change or correct it in subsequent communications to plan participants with the fourth quarter statements, sent in January 2000. PX-14; 1/14/10 Tr. at 53:1-55:13 (Dock. # 377); 1/25/10 Tr. at 200:2-202:1 (Folan) (Dock. # 383); 1/25/10 Tr. at 81:8-83:18 (Johnston) (Dock. # 383); 1/19/10 Tr. at 71:3-14 (Cissna) (Dock. # 379); see also 1/20/10 Tr. at 73:1-23 (Beasley) (Dock. # 380).

The one time after the spin-off that any one group at RJR actually discussed the merits of the spring decision was at the October 8, 1999 meeting, which was intended to be a logistical meeting among a group of human resources employees about divesting the funds.[26] It was at that meeting that Mr. Gordon raised the concern from Andy Schindler, CEO of RJRT, that participants were questioning the timing of the elimination given the Nabisco stocks' continued decline in value. As a result of that reported concern, the October 8 group did engage in another discussion about the prudence of eliminating the funds on the six-month time schedule originally discussed, but again the individuals involved in the discussion did not undertake any investigation

---

[26] As noted in the Findings of Fact, participants in the October 8, 1999 meeting included human resources managers, corporate executives, and in-house legal staff. Beasley, Trial Tr. Vol. VII at 70:12-19 (Jan. 20, 2010). The HR managers included Kathy Cissna, Robert Gordon, Ann Johnston, Susan Newsome, and Carol Christian. Id. Corporate executives included McDara Folan and Jennie Beasley.

into the decision to stay the course to eliminate the Nabisco Funds from the Plan.

Concerns expressed by meeting participants at the October 8 meeting included their view that the "[employees] who cashed out [their Nabisco stock] at a loss" were a "[p]roblem." PX-62 at RJR 1338; 1/20/10 Tr. at 74:6-17 (Beasley) (Dock. # 380). Those employees, the "early sellers," had already directed sales of their Nabisco stocks in reliance on Plan communications. Mr. Blixt and Gordon testified that a concern associated with this was fear that the early sellers might sue RJR. See 1/14/10 Tr. at 49:24-50:13 (Gordon) (Dock. # 377) ("That was certainly a possibility that we talked about."); 1/25/10 Tr. at 14:17-15:21 (Blixt) (Dock. # 383) (stating concern he had at the time that people would sue). It was inappropriate for those considering the issue to consider their own potential liability as part of the reason for not changing course on their decision to divest the Plan of Nabisco stocks. Fiduciaries are to act "*solely* in the interest of participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A). Despite their fear of liability, RJR still did not engage an independent analyst or outside counsel to analyze the problem.

Plan fiduciaries also failed to consider that they could have offered the early sellers the opportunity to repurchase the stock by seeking an amendment to the Plan (which at that time prohibited the purchase of the Nabisco Funds) and failed to seek other alternatives for remedying the problem. See 1/19/10 Tr. at 168:13-169:6 (Cissna) (Dock. # 379); 1/20/10 Tr. at 74:6-75:6, 76:5-11 (Beasley) (Dock. # 380). Furthermore, there was no discussion in the fall about the fact that, since the stock had steadily declined, it was actually worth *less* than when the early sellers eliminated it, and thus they could have bought more shares with the same amount of money at a later time.

60

Instead, the discussion focused around the liability of *RJR*, rather than what might be in the best interest of the participants.

Those present at the October 8 meeting also discussed their concern that the Nabisco stock might not recover during the period of any possible deadline extension. To the extent that this might have been relevant, this should have been a basis for further investigation and analysis, but there was none. See, e.g., 1/15/10 Tr. at 64:19-22 (Biller) (Dock. # 378); 1/19/10 Tr. at 43:1-10 (Cissna) (Dock. # 379).

There was also concern expressed in the fall that extending the deadline could be construed by participants as investment advice. The concern was that if the decision were reversed after it had already been announced, participants would take the change as a sign that they should maintain their investment in the Nabisco Funds. Despite that concern, this assumption was not investigated for its accuracy but was an assumption based upon the experience of various individuals who had worked with plans and plan participants over the years.

After October 1999, the PIC monitored the stock prices of NGH and NA along with the performance of other funds in the Plan, but no committee members or responsible RJR employees gave further thought or consideration to the prudence or imprudence of eliminating them.

The lack of effort on the part of those considering the removal of the Nabisco Funds–from March of 1999 until the stock was removed from the plan on January 31, 2000–compels a finding that the RJR decision-makers in this case failed to exercise prudence in coming to their decision to eliminate the Nabisco Funds from the Plan.

61

## C. Causation or "Substantive Prudence"

A finding that RJR breached the duty of procedural prudence by failing to engage in a proper investigation does not end the inquiry into whether Mr. Tatum and the class he represents should ultimately prevail on their claim. Since the trial of this matter, the Fourth Circuit has affirmatively found that, "while certain conduct may be a breach of an ERISA fiduciary's duties under §1104, that fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan." Plasterers' Local Union No. 96 Pension Plan, et al. v. Pepper, 663 F.3d 210, 217 (4th Cir. 2011) (citations omitted). Quoting Judge (now Justice) Scalia's dissent in Fink v. National Savings & Trust Co., 772 F.2d 951, 962 (D.C. Cir. 1985), the court further noted "'[i]t is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit; breach of the latter duty is merely evidence bearing upon breach of the former, tending to show that the trustee *should have known* more than he knew.'" Plasterer's, 663 F.3d at 218.

The Fourth Circuit also adopted language used by other courts in stating that "'[e]ven if a trustee failed to conduct an investigation before making a decision, he is insulated from liability [under §1109(a)] if "a hypothetical prudent fiduciary *would* have made the same decision anyway." Plasterer's, 663 F.3d at 218 (citing Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994) (emphasis added). During the trial there was much discussion regarding this phrase and how it should be applied. Tatum reads this to mean "that RJR would have the burden to show what a prudent fiduciary would have done if the fiduciary had carried out a prudent investigation and

62

analysis, not what decision it *might reasonably have made.*" Dock. # 415 (Proposed Findings of Fact/Conclusions of Law by Richard G. Tatum) at 134, ¶ 387. Tatum is concerned that "[i]f the ERISA standard were a range of reasonableness or what a hypothetical fiduciary 'could' have done, Plaintiffs would rarely, if ever, succeed despite demonstrating a breach of procedural prudence and loss, because a defendant could argue that nearly any decision could possibly have been made under some rationale under the circumstances." Id. at 136, ¶ 390. This is a strained reading of the standard. It is certainly possible, depending upon specific circumstances, that there might be more than one reasonable decision available to a fiduciary.[27] So long as the decision is one that is reasonable under the circumstances, it is objectively prudent.

### 1. Burden of Proof as to Causation

The Fourth Circuit addressed the issue of who has the burden of proof in Plasterer's, but made no decision, stating instead that while the plaintiff "bears the burden of at least making a prima facie showing that there was a breach of fiduciary duty and that there was some sort of loss to the plan," the issue of which party must demonstrate that the loss resulted from the breach is left to "to the district court . . . to determine the method most consistent with the relevant statutory provisions." Id. at 220. The issue is significant: the burden of proof dictates who prevails when the

---

[27] Plaintiff's experts agreed with this. Dr. Biller conceded that "prudent investors are not unanimous on most any issue" and agreed with the statement that "in certain circumstances, a prudent investor might think its prudent to buy and one right next to him might think it is prudent to sell." 1/15/10 Tr. at 172:20-175:25 (Biller) (Dock. # 378). Similarly, Plaintiff's expert Professor Lys agreed with the statement that "two hypothetical prudent investors could review all the same material and reach opposite results and both could be rational." 1/21/10 Tr. at 109:11-17 (Lys) (Dock. # 378).

63

evidence is evenly balanced. See Schaffer v. Weast, 546 U.S. 49, 58, 126 S.Ct. 528, 533-43 (2005).

It is determined that, once Tatum made a showing that there was a breach of fiduciary duty and some sort of loss to the plan, RJR assumed the burden (that is, the burden of production and persuasion) to show that the decision to remove the Nabisco stock from the plan was objectively prudent. See, e.g., McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir. 1995) (finding burden shifts to defendant fiduciary to prove that the loss was not caused by the breach); Martin v. Feilen, 965 F.2d 660, 671 (8th Cir. 1992) (finding that once plaintiff has proved breach of fiduciary duty and a prima facie case of loss to the plan, the burden of persuasion shifts to the fiduciary to show loss was not caused by the breach); Chao v. Trust Fund Advisors, 2004 WL 44029 (D.D.C. Jan. 2004) (applying trust law which requires the fiduciary to "bear the risk of uncertainty as a consequence of his breach of fiduciary duty" and therefore requiring defendants to prove the loss was *not* caused by their breach); cf. Brink v. DaLesio, 667 F.2d 420, 426 (4th Cir. 1982) (finding in non-ERISA context that burden is on defendant fiduciary to prove the extent of loss, and stating that [i]t is generally recognized that one who acts in violation of this fiduciary duty bears the burden of showing that he acted fairly and reasonably"). This approach is the most fair considering that a causation analysis would only follow a finding of breach. It is, therefore, incumbent upon RJR to establish that its conduct in removing the Nabisco stock was objectively prudent. Thus, if RJR is unable to show by a preponderance of the evidence that removing the Nabisco Funds from the plan at the time they were removed–January 31, 2001–was objectively prudent, then Tatum prevails as to that

64

issue.

### 2. RJR has met its burden to show that removing the Nabisco stock funds from the Plan effective January 31, 2000 was an objectively prudent decision

Analyzing substantive prudence, it is appropriate in this case to begin the analysis with a recognition of the risk to participants when one of the fund choices is a single stock fund. With the exception of employer stock, most funds in a plan–whether considered more aggressive or more conservative–are diversified in holdings so that the poor performance of one or two stocks or mutual funds does not substantially affect the fund itself. In this case, while the original purpose of separating Nabisco from RJR was to free the Nabisco stock from the tobacco taint, Nabisco stock steadily declined in value from the date of the spin-off until the date of divestiture. Some analysts saw the stock as undervalued and thus one to acquire; others felt it was fully valued and high risk. While Nabisco was a leader in its segment of the food industry, the food industry itself was being overshadowed by the technology boom and was becoming stagnant. And, despite having indemnity agreements from RJR, tobacco cases–especially the Engle case in Florida–were casting shadows of unknowable dimension. There had been a report of Carl Icahn's renewal of interest in Nabisco but that had not fueled a consensus among analysts that Nabisco was undervalued. And certainly, not even the most optimistic of those analysts foresaw what was going to occur in the spring and fall of 2000.

Nevertheless, for whatever their individual investment reasons might have been, the Plan decision-makers retained their own individual positions in Nabisco as they

65

determined that it should be removed as a fund from the Tobacco Plan. It is, however, consequential that individual investment decisions affect only that individual, while investment decisions made for plan participants must be made solely for the benefit of those participants–among whom a majority is recognized to suffer from inertia when it comes to keeping up with or acting upon current investment information. Taken together, these factors establish that it was not imprudent for RJR to eliminate the Nabisco stocks from the Plan once they were no longer employer funds. And while Tatum has presented evidence that it might also have been prudent to maintain Nabisco as a frozen fund in the Plan, having a prudent alternative does not, under the circumstances, make RJR's decision imprudent.

### a. Single stock funds, even employer funds, are risky funds to include in a retirement plan

A single stock fund carries significantly more risk than a diversified fund, as noted in Howard Crane's testimony, which strongly emphasized the general risks of single stock funds. 1/28/10 Tr. at 123:12-16 (Crane) (Dock. # 386) ("A single stock is approximately four times as risky as a diversified portfolio of mutual funds. That's been researched, conclusion [sic] and documented in the financial literature for more than 35 years."). ERISA's diversification requirement and cases such as DiFelice recognize that single stock funds carry significant risk. 29 U.S.C. § 1104(a)(1)(c) (requiring fiduciaries to "diversify the investments of the plan so as to minimize the risk of large losses"); DiFelice, 497 F.3d at 424 ("[P]lacing retirement funds in *any* single stock fund carries significant risk, and so would seem generally *imprudent* for ERISA purposes . . . .").

Added to that general risk of a single stock fund was the specific risk of the

66

Nabisco Funds. NGH and NA were still tied to the ongoing tobacco litigation and the corresponding potential bankruptcy of RJR, and there really was nothing to do but wait and see if the spin-off "worked" in removing the tobacco taint. During 1999, a fiduciary monitoring the Nabisco Funds would have seen that the price of Nabisco stock was losing value nearly every day and that RJR was continuing to experience adverse rulings and verdicts related to the tobacco litigation. Thus, at the time, there was no information or market activity with respect to Nabisco that would have led a fiduciary to believe that the tobacco taint was going away any time soon. There was simply no way to know.

The litigation risk for NGH was particularly notable because it was considered a "non-systematic risk." Non-systematic, or idiosyncratic risks, attach to "specific companies or securities independent of the general market . . . litigation risk and bankruptcy risk are examples of that." 1/27/10 Tr. at 172:22-173:17 (McEnally) (Dock. # 385). RJR's expert Professor McEnally testified that in a single security portfolio, non-systematic risks "don't go away" and concluded that "holding a large pot of money in a single security with this level of risk . . . would be scarry [sic] troublesome." Id.; see also DX-277, 1/28/10 Tr. at 122:25-124:7 (Crane) (Dock. # 386) ("the evidence of the tobacco taint suggests that it's not unreasonable to see that that risk of a single stock fund indeed might be higher than the average single stock"). The fact that NGH had indemnification agreements with RJR was not mitigating the situation either, particularly in light of the Engle litigation and the potential for large tobacco verdicts that could jeopardize RJR's ability to post an appeal bond, pay a large verdict, or protect NGH.

Considering that, at the time, it appeared NGH stock prices were reacting to

67

news about tobacco litigation, and considering that NGH might have to carry some burden of the tobacco litigation, it would have been logical for a fiduciary monitoring the Nabisco Funds in 1999 to conclude that NGH was a higher risk stock than many other undiversified funds and certainly more risk than an alternate diversified fund.

### b. The high risk of the Nabisco Funds added to the risk levels of the Plan

Compounding the issue of risk was the fact that NA, NGH and RJRT were all in the Plan as high-risk options, because they were the most volatile funds in the Plan. Having all three funds in the Plan, instead of the one employer-related RJRT stock fund, increased risk for participants because a higher number of risky funds were part of the same plan. Furthermore, the Nabisco funds (particularly NGH) were highly correlated with the returns on the RJRTH stock and the common factor of the tobacco taint, which was becoming more dominant after the ruling in the Engle case (as shown in the stock price drop after that ruling). As Mr. Crane pointed out, "[a] reasonable investor could infer that [tobacco] risk was increasing, rather than decreasing, due to doubling down on that common factor, if you will." 1/29/10 Tr. at 5:6-6:2 (Crane) (Dock. # 387).

### c. Even if public information favored the Nabisco Funds, considering and trading on that information would not have created above-market returns

The analyst reports during 1999-2000 did not compel a decision to maintain the Nabisco Funds in the Plan. As noted in the Findings of Fact, throughout 1999 and 2000, analyst reports were generally favorable, during a time when nearly all analyst reports were favorable. Furthermore, although they were favorable, they were not

68

unanimous in their recommendations, or in their focus on the risk of tobacco litigation, or in the time frame for dissipation of the tobacco taint. The fact that there was no consensus among analysts during 1999 is a further indication that the analyst reports did not require a specific response from fiduciaries. In <u>Kuper v. Quantum Chems. Corp.</u>, 852 F.Supp. 1389, 1395 (S.D. Ohio 1994), *aff'd sub nom.*, <u>Kuper v. Iovenko</u>, 66 F.3d 1447 (6th Cir. 1995), the court noted that the existence of positive analyst reports coupled with "peaks and plateaus" in the stock value were indicators that a prudent fiduciary could use to support a decision to maintain a stock in the plan, even when that stock was losing value. In so noting, the Southern District of Ohio stated that "evidence that independent, professional observers of market trends differed in their projections of future Quantum stock performance merely underscores the fact that circumstances then existing would not have compelled reasonable persons to a singular conclusion about the stock's future prospects." <u>Kuper</u>, 852 F.Supp. at 1395. Here, there had been no substantial peaks or plateaus in stock value between the date of the initial divestment decision and the date of divestment. The decline downward in value was steady and continual in spite of the separation of the Nabisco Funds from the tobacco stock. While many analyst reports stated the fundamentals of Nabisco were strong, those reports often also acknowledged the tobacco taint and noted surprise at the continued slide of Nabisco's stock prices. Thus, the analyst reports themselves, while positive, did not and could not counter the noted litigation risks, the continual decline in stock values, and the reality that no one could predict investor behavior with regard to the "tobacco taint."

Furthermore, even if the public information on NGH and NA had been more

69

favorable than the market as a whole, considering and trading on that information was not likely to create above-market returns, nor would it have been appropriate for a prudent fiduciary to attempt to beat the market with such information. Dr. Montgomery explained that the generally-efficient U.S. stock market kept any extraordinary returns from being likely:

> [T]he market consists of thousands, if not millions of investors each seeking to find some informational edge to exploit–to get the highest possible return they can for the lowest amount of risk, and if there were public information out there in the market that would have led people to expect that either of these stocks would have a better return, a greater return than the market as a whole or other stocks which are represented by the market average, . . . investors who didn't own either of these stocks would be rushing to buy them. That process would be bidding up the price.

> Conversely, investors who already held them, . . . and may have had plans for whatever reason to sell them, would have said, well, wait I [sic] minute, I expect extraordinary returns, I'm not going to sell these stocks now.

> Both of those things together would create a demand for the stocks and they would, quite quickly, and in a matter of hours, if not quicker, would bid up the price of those stocks, and whatever that public information would quickly be reflected in the stock price, such that there would no longer be any predictable extraordinary returns to be had by investing in the stock, and . . . that's–essentially it is common sense, when you think about how the market works and what all the investors in the market are doing as well as all the media covering the market.

2/2/10 Tr. at 50:3-51:7 (Montgomery) (Dock. # 388). Pursuant to the semi-strong form of the efficient market hypothesis, when an analyst report is first issued, "people who have the really, really quick ability to get this information, figure out what it says, exploit it, they're probably going to make a little extra money." However:

> [T]he bloom is going to go off that rose very, very quickly . . . [s]o when we go out here and we see investment ratings and recommendations and for that matter analyst reports, that have been out there over a few days, they really tell us nothing, nothing in an usable, informative money making sense. Money making is what this is all about.

1/27/10 Tr. at 158:5-160:13 (McEnally) (Dock. # 385).

Furthermore, in cases that have involved plaintiffs who allege that fiduciaries or trustees should have taken information outside the market to determine the fate of a company or the value of a stock, some courts have made clear that the market is a better determiner of company value than anything else, and it is not an obligation of the fiduciary to second guess the market. In Summers v. State Street Bank & Trust Co., 453 F.3d 404, 408 (7th Cir. 2006), for example, the Seventh Circuit commented that "[s]ome investors, it is true, consistently beat the market, but few of them are trustees; it would be *hubris* for a trust company like State Street to think it could predict United's future more accurately than the market could, and *preposterous for a committee of union officials (the named fiduciary) to challenge the market's valuation.*" Summers, 453 F.3d at 408 (citations omitted) (emphasis added); see also, Nelson v. IPALCO Enterprises, Inc., 480 F.Supp.2d 1061,1082 (S.D. Ind. 2007) ("AES stock traded in an efficient market subject to extensive public disclosure requirements. The company and its stock were watched closely by many sophisticated investors and analysts. There simply is no reason to believe that the stock price at any given time . . . did not reflect a full and fair market assessment of the company's prospects.").[28]

---

[28] Tatum argues that the issue is not market efficiency, but whether the information in the marketplace showed *any* reason to sell the Nabisco stocks (and he claims it did not). But even if all analysts said there was no good reason to sell the Nabisco stocks, there may have been other factors, such as high risk, plan goals, or other "circumstances prevailing at the time." The point is, the analyst reports are to give information to the fiduciaries regarding how the stock funds are generally regarded, or to give notice of potential problems with certain funds. In this case, the analyst reports showed general optimism about Nabisco as a company. That simply does not translate into a determination that it was imprudent for RJR to eliminate the stock from the Plan

71

Thus, while consulting analyst reports is useful in determining whether a fiduciary should investigate further the reason for consistently favorable ratings, or to support a decision based on additional factors, the reports themselves in this case would not compel a decision by a prudent fiduciary to hold the Nabisco Funds. On the other hand, the positive reports could have lent support for a decision to keep the funds in the Plan. The point is that a prudent fiduciary who conducted an adequate investigation, which included reviewing the analyst reports, would not have been obligated to maintain the Nabisco Funds based upon their ratings alone or on the assumption that such ratings meant that the stock was undervalued and may realize above-market returns.

### d. Carl Icahn's bidding war was neither expected nor foreseeable

The reports of Carl Icahn's renewed interest in Nabisco did not create a consensus among analysts that the Nabisco stocks were undervalued, nor did it create a reaction in the market. Even if it had, no one could have predicted that the offer would result in a bidding war that drove up the price of both NGH and NA so dramatically. Certainly if one could have made such a prediction, the stock prices would have reflected it at a much earlier date. While there arguably was information in the market to support a *theory* that Carl Icahn *might* do *something* with the six million shares he acquired, there was not any information indicating what–or when–that might be, or if he would be successful, and it would not have been appropriate to take action based on speculation.

Significantly, the market did not react to news about Mr. Icahn's acquisition of

---

due to other factors.

72

shares in November of 1999. After the spin-off and prior to the bidding war there was no price reaction in the NGH stock to any news about Mr. Icahn's acquisition of shares. No analyst reports or news articles mentioned the possibility of Mr. Icahn making an offer for NGH, based on the news of his acquisition of more shares or any of his prior conduct. 2/2/10 Tr. at 127:23-129:1 (Montgomery) (Dock. # 388).

With the benefit of hindsight, Plaintiff has been able to put together evidence that Icahn was around and continued to be interested in the Nabisco stocks, but at the time the information did not trigger much speculation. None of the analyst reports in the record for NA and NGH published between January 27, 1999 and March 27, 2000 predicted the initial Icahn bid on March 30 or the subsequent bidding that ultimately drove up the Nabisco stock prices, or foresaw the substantial gains experienced in late 2000. 1/27/10 Tr. at 173:18-174:6 (McEnally) (Dock. # 385); 2/2/10 Tr. at 97:12-23 (Montgomery) (Dock. # 388) (noting that analyst reports "were not forecasting the scope of the returns that NGH and NA had in 2000. After January 31, 2000, none of them were expecting the chain of events starting with the bid by Carl Icahn that led to the large rise in NGH and NA."); see also 2/2/10 Tr. at 123:11-124:2. Nor did news articles published during this time period mention the possibility that Carl Icahn, or anyone else, might make an offer for NGH or NA in 2000. Id. at 123:23-124:2, 127:12-18. Tatum's experts were unaware of any predictions prior to January 31, 2000 that Carl Icahn would make a bid to purchase NGH and NA. 1/15/10 Tr. at 176:1-8 (Biller) (Dock. # 378).

Furthermore, the tax-free nature of the spin-off made it very unlikely that any corporate restructuring would be initiated for two years. This lessened the overall

likelihood of any type of transaction occurring because Nabisco was not going to initiate a transaction for fear of jeopardizing the tax-free status of the spin-off.

The significant appreciation in NGH and NA stock price that began in March 2000 was simply not predictable before January 31, 2000, based on factors in the marketplace. 2/2/10 Tr. at 118:17-23, 123:11-124:2 (Montgomery) (Dock. # 388). Thus, while a hypothetical prudent fiduciary would have been aware of Mr. Icahn's history with RJR Nabisco (and in fact several defense witnesses said they were), that simply does not translate to a conclusion that he or she would have maintained the Nabisco Funds after January 31, 2000, expecting considerable appreciation. Holding on to a stock on the basis that a takeover *might* be coming, in some unknown form, regardless of what evidence might exist, is speculative. 1/28/10 Tr. at 40:19-41:6 (McEnally) (Dock. # 386).

### e. Tatum's evidence of other plans where non-employer funds were maintained is not probative on the issue of prudence

The prudence determination is a fact-based inquiry, dependent upon "the character and aim of the particular plan and decision at issue and circumstances prevailing at the time." DiFelice, 497 F.3d at 420 (quoting 29 U.S.C. § 1104(a)(1)(B)). Thus, the probity of what other plans were doing, even if such evidence were more robust than Tatum's, is highly questionable. The circumstances of each decision may be different, and the fact that another plan made one decision under unknown circumstances would not inform anyone as to the imprudence of a different action.[29]

---

[29] Even if the issue were probative, Tatum's evidence of seven other companies who opted to freeze non-employer stocks in their own retirement plans was not sufficient. Tatum's evidence was in the form of securities filings, with accompanying

Therefore, the evidence introduced by Tatum—that seven other companies out of a universe of nearly ten thousand plans—retained frozen stock funds in their plans, is not probative on the issue of prudence.

### f. A hypothetical prudent fiduciary could have decided not to add or maintain the Nabisco Funds as either frozen or active funds on January 31, 2000

Based on the information available at the time, "there was no reason in 1999 or 2000 to expect returns from NGH and NA . . . in excess of what could be achieved from diversified investment funds." 2/2/10 Tr. at 49:11-50:2 (Montgomery) (Dock. # 388).

---

witness testimony in only one instance. The parties stipulated that they had "no knowledge" regarding whether or not the stock in those funds was retained by either a fiduciary or settlor action. See 1/12/10 Tr. at 24:11-25:12 (Dock. # 371) (reflecting stipulation); 1/26/10 Tr. at 150:7-160:6 (Altman) (Dock. # 384) (acknowledging for each of the plans presented in evidence that he was not aware whether the funds were maintained as a result of fiduciary, rather than settlor, actions); PX-270.

Tatum presented evidence through a live witness for the Novant Health plan. In 1996, Novant Health acquired Winston-Salem Healthcare and Winston-Salem Dental Care from RJR. 1/22/10 Tr. at 50:2-4, 52:8-11 (Sams) (Dock. # 382). The former employees of Winston-Salem Healthcare had participated in a 401(k) plan while that company was owned by RJR. Some of these participants' accounts had been invested in the RJR Nabisco common stock fund and the Nabisco common stock fund before the purchase of Winston-Salem Healthcare by Novant. Those funds were maintained in Novant's plan after Novant's purchase of Winston-Salem Healthcare, despite the fact that Winston-Salem Healthcare was no longer related to RJR Nabisco. Id. at 52-53, 59:19-60:10.

Plaintiff's evidence regarding Novant's plan suffers from the same defect as his submission of securities filings. Tatum's witness for Novant Health, Mr. Barry Sams, testified that the decision made to freeze the Nabisco Funds in that case was made by plan amendment. Because the issue here is whether a hypothetical prudent *fiduciary* could have decided to eliminate the non-employer, single stock Nabisco Funds from the Plan on January 31, 2000, the examples are not probative of the issue here without evidence that they were maintained by fiduciary acts. In fact, even if Tatum had established that the Novant decision—or any of the other decisions in the other plans presented by Tatum—was a fiduciary decision, no additional information regarding the varying circumstances of each decision was presented in order to assess whether those decisions were reasonable under the circumstances; therefore, the fact that those plans were in existence is not instructive here.

75

While there may have been countervailing reasons to consider maintaining the frozen funds in the Plan, the removal of NGH and NA was not imprudent. Plaintiffs' experts acknowledged that there may be more than one prudent decision with respect to investments. As Professor Lys acknowledged, two hypothetical prudent investors can review the same materials and reach opposite, rational results. 1/21/10 Tr. at 109:11-17 (Lys) (Dock. # 381). Similarly, as Dr. Biller conceded, in certain circumstances, one investor might believe it is prudent to buy a stock and another investor might believe it is prudent to sell the stock, and both investors might be prudent. 1/15/10 Tr. at 172:20-175:25 (Biller) (Dock. # 378). The same concepts are true for hypothetical prudent fiduciaries.[30] Considering all of the evidence, including (1) the inherent risk of holding a single stock fund in a 401(k) plan; (2) the particularly high risk associated with having the Nabisco stock in the Plan; and (3) the fact that there was no reason to expect extraordinary returns from either of the Nabisco Funds after the liquidation on January 31, 2000, a hypothetical prudent fiduciary could have decided not to add or maintain the Nabisco Funds as either frozen or active funds in the Plan on January 31, 2000. Accordingly, RJR has satisfied its burden of establishing at trial that its actions were not imprudent and a hypothetical prudent fiduciary could have decided to eliminate the

---

[30] Plaintiff's arguments were largely centered around the theory that there were good reasons to retain the Nabisco Funds. Some of his evidence on that issue was persuasive. A prudent fiduciary might have decided to do as several other plans did and keep the funds frozen indefinitely. A prudent fiduciary looking at Nabisco's prospects and positive analyst reports might have decided the tobacco litigation risk was minimal enough to allow plan participants to remain in the plan indefinitely. But RJR's position in removing the funds was supported by the facts discussed above. It is not imprudent to reduce risk for plan participants, particularly when the opportunity for gain was merely speculative.

76

Nabisco Funds on January 31, 2000. The Court therefore concludes that the fiduciaries' failure to properly investigate their decision to eliminate the Nabisco Funds was not the cause of any of Tatum's or the class's alleged injuries. Tatum and the class are therefore not entitled to recover from RJR based on their breach of fiduciary duty claim.

## IV. REMAINING DEFENSES AND MOTIONS

The Court's findings above make RJR's remaining defenses and motions either moot or irrelevant. RJR filed Second and Third Motions to Decertify the Class (Dock. # 416, 424) in this case. RJR's motions to decertify the class are dismissed as moot in light of the fact that RJR prevails in this case. Likewise, Tatum's Motion to Strike the Third Motion to Decertify the Class is also moot.

## V. CONCLUSION

For the foregoing reasons, the Court finds in favor of RJR. A final judgment order will issue in favor of RJR and against the Plaintiff and the class. In addition, RJR's Second and Third Motions to Decertify the Class (Dock. # 416, 424) and Plaintiff's Motion to Strike (Dock. # 426) are DISMISSED AS MOOT.

This the 25th day of February, 2013.

Senior United States District Judge

77