# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RICHARD G. TATUM, individually )
and on behalf of a class of all other )
persons similarly situated, )
                     )
         Plaintiff, )      1:02CV00373
                     )
      v. )
                     )
R.J. REYNOLDS TOBACCO )
COMPANY, et al. )
                     )
         Defendant. )

## MEMORANDUM OPINION

Plaintiff Richard G. Tatum, individually and on behalf of all other persons similarly situated, brought this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. alleging that Defendants R.J. Reynolds Tobacco Company and R.J. Reynolds Tobacco Holdings, Inc. (collectively "RJR") breached their fiduciary duties in managing the R.J. Reynolds Tobacco Capital Investment Plan (the "Plan" or "Tobacco Plan"). The matter is currently before the Court on remand from the Fourth Circuit, 761 F.3d 346 (2014), cert. denied, 135 S. Ct. 2887 (2015), affirming in part, vacating in part, and reversing in part this Court's opinion after a bench trial on the issues, 926 F. Supp. 2d 648 (M.D.N.C. 2013).

In March 1999, RJR Nabisco, Inc. decided to separate the company's food business, Nabisco, and tobacco business, R.J. Reynolds Tobacco Company,

through a spin-off of the tobacco business. <u>Tatum</u>, 926 F. Supp. 2d at 651. As a result of the spin-off, the R.J. Reynolds Tobacco Company retained the existing Capital Investment Plan, a 401(k) retirement plan for employees of the post-split R.J. Reynolds Tobacco Company, and renamed it the R.J. Reynolds Tobacco Capital Investment Plan. A new plan was created for Nabisco employees. 1/19/10 Tr. at 132:6-14 (Cissna) (Doc. # 379); <u>Tatum</u>, 926 F. Supp. at 653.

The pre-spin RJR Nabisco Capital Investment Plan included, among several investment options, two company-related funds: the RJR Nabisco Common Stock Fund and the Nabisco Common Stock Fund. <u>See</u> DX—24. As a result of the spin-off, for every three shares of RJR Nabisco common stock, participants in the Tobacco Plan received three shares of Nabisco Group Holdings ("NGH") common stock and one share of R.J. Reynolds Tobacco Holdings common stock. <u>Id.</u> Shares in both the new NGH Common Stock Fund and any shares in the Nabisco Common Stock Fund (collectively "Nabisco Funds") were frozen on the date of the spin-off. DX—9 at RJR000258-59. When a fund is frozen, no new investments may be made in the fund. However, participants may maintain their existing investments in the fund, withdraw money from the fund, or transfer money from the fund into another fund. 1/26/10 Tr. at 9:12–18 (Folan) (Doc. # 384); 1/14/10 Tr. at 106:17–22 (Gordon) (Doc. # 377). On January 31, 2000, the units of the Nabisco Funds held by participants who had not sold prior to that date were eliminated from the Plan. <u>Tatum</u>, 926 F. Supp. at 665.

In <u>Tatum</u>, it was determined that, under the ERISA prudence standard, RJR

2

breached its fiduciary duty of procedural prudence to investigate the investment decision to eliminate the Nabisco Funds from the Plan. Id. at 651. Nevertheless, RJR was found to have met its burden to show that removing the Nabisco Funds from the Plan effective January 30, 2000 was an objectively prudent decision. Id. Specifically, it was determined "that the decision to remove the stock, under the circumstances of this case, is one which a reasonable and prudent fiduciary could have made after performing such an investigation." Id.

On appeal, the Fourth Circuit affirmed the holdings that RJR breached its duty of procedural prudence and therefore bore the burden of proof as to causation. Tatum, 761 F.3d at 351. However, the Fourth Circuit found that this Court did not apply the correct legal standard in determining RJR's liability, reversed the judgment, and remanded with instructions "to review the evidence to determine whether RJR has met its burden of proving by a preponderance of the evidence that a prudent fiduciary would have made the same decision." Id. at 351, 368 (citing Plasterers' Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 218 (4th Cir. 2011)). The Fourth Circuit further directed this Court to include in its review of all of the relevant evidence the previously-excluded testimony of Thomas Lys, one of Tatum's experts, and the timing of the divestment "as part of a totality-of-the-circumstances inquiry." Id. at 368, 368 n. 17 (citing Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. ____, ____, 134 S. Ct. 2459, 2471 (2014) & DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 420 (4th Cir. 2007)).

On remand, as instructed, this Court has reviewed all of the relevant

3

evidence as part of its totality-of-the-circumstances inquiry.  After a careful weighing of the evidence and a review of all of the circumstances prevailing at the time, it is determined that RJR has shown by a preponderance of the evidence that a fiduciary acting with prudence would have divested the Nabisco Funds at the time and in the manner that RJR did.

# I. FINDINGS OF FACT[1]

### A.

#### 1. The Spin-Off

In early March 1999, RJR Nabisco, Inc. decided to separate the company's food business, Nabisco, and tobacco business, R.J. Reynolds Tobacco Company, through a spin-off of the tobacco business to shareholders of the holding company, RJR Nabisco Holdings Corp.

At the time, RJR Nabisco Holdings Corp. owned 100% of RJR Nabisco, Inc. which had two operating subsidiaries − R.J. Reynolds Tobacco Company ("Tobacco Company") and Nabisco ("NA").  RJR Nabisco, Inc. owned 100% of R.J. Reynolds Tobacco Company, the second-largest tobacco company in the United States, whose stock was not publicly traded.  RJR Nabisco, Inc. also owned 80.5% of Nabisco, one of the nation's top snack food and bakery products companies.  The remaining 19.5% of NA was owned by public stockholders and traded on the New York Stock Exchange. See DX−208.

---

[1] The Court made Findings of Fact in Tatum.  What follows are the findings of facts relevant to the issue presently before the Court.

4

To accomplish the spin-off, the shares of NA held by RJR Nabisco, Inc. were conveyed to the holding company, RJR Nabisco Holdings Corp., which was renamed Nabisco Group Holdings. 1/14/10 Tr. at 80:24–81:2 (Gordon) (Doc. # 377).  RJR Nabisco, Inc., now holding shares only of R.J. Reynolds Tobacco Company, was renamed R.J. Reynolds Tobacco Holdings, Inc. ("RJRTH"). Id. at 81:2-6; DX—208.  Shareholders received one share of RJRTH common stock for every three shares of NGH common stock. DX—24; DX—13 at RJR001598.  As a result of the spin-off, where an RJR Nabisco Holdings Corp. shareholder previously owned one share of RJR Nabisco Holdings Corp. — which included both the food and tobacco businesses — the shareholder, following the spin-off, owned two stocks — stock of a food business (NGH) and a second stock of the tobacco business (RJRTH). DX—9 at RJR000257; DX—13 at RJR001599.  Ownership of NA stock was not affected.  For Tobacco Plan participants, shares in the new NGH Common Stock Fund and the Nabisco Common Stock Fund were frozen on the date of the spin-off. DX—9 at RJR000258-59.

## 2. Rationale Behind the Spin-off

The May 19, 1999 public information statement filed with the U.S. Securities and Exchange Commission ("SEC") by R.J. Reynolds Tobacco Holdings, Inc. described the "primary purposes of the distribution":

- each of the food and tobacco businesses will be better able to respond to the opportunities and challenges in its industry and thereby achieve its full potential under separate ownership;

- management of each business will be able to focus solely on that

5

business;

- RJR will be able to align management's incentives more closely with stockholder's interests;

- the companies will achieve substantial costs savings; and

- investors and financial markets will be better able to understand and evaluate the food business and the tobacco business.

DX–13 at RJR001588; 1/21/10 Tr. at 190:16–191:19 (Angowitz) (Doc. # 381).

The May 19, 1999 public information statement further explained that, in deciding to move forward with the spin-off, management considered that:

> -[T]he food and tobacco businesses are large, complex businesses with different challenges, strategies and means of doing business and that, under a separate ownership structure, each business will be better able to respond to the opportunities and challenges in its industry and thereby achieve its full potential.
> . . .
> -[T]he separation will result in two distinct publicly traded equity securities that will enable financial markets to better understand and evaluate the food and tobacco businesses.

DX–13 at RJR001599; 1/21/10 Tr. at 191:20–192:10 (Angowitz) (Doc. #381).

While neither party has suggested that the public statements regarding the reason for the spin-off were not accurate, employees from RJR and Nabisco testified at trial that it was widely believed the shareholder value of Nabisco would be enhanced after the split because the value of Nabisco's stocks was being unnecessarily depressed by investors' fears regarding ongoing litigation against tobacco companies. See 1/20/10 Tr. at 173:1–174:6 (Schindler) (Doc. # 380); 1/13/10 Tr. at 187:4–10 (Suozzi (Video)) (Doc. # 372); 1/22/10 Tr. at 27:10–15 (Angowitz) (Doc. # 382); 1/25/10 Tr. at 37:20–38:4 (Johnston) (Doc. # 383).

6

The discount on the Nabisco stocks as a result of the tobacco litigation was known as the "tobacco taint." See, e.g., 1/14/10 Tr. at 22:19–23, 132:11–13 (Gordon) (Doc. # 372); 1/22/10 Tr. at 170:18–21 (Angowitz) (Doc. # 382).

### 3. Tax Consequences of the Spin-off

The spin-off transaction was structured to comply with a section of the tax code that allowed for a tax-free spin-off transaction (with no tax consequences to RJR Nabisco, Inc. or RJR Nabisco Holdings Corp./NGH shareholders resulting from the spin-off of the shares of the domestic tobacco company to the shareholders of RJR Nabisco) provided the spin-off was not part of a larger sales transaction. Tax code regulations allowed a presumption that there was no larger transaction if two years had passed from the time of the spin-off until a further event or sale occurred. 1/21/10 Tr. at 185:21–186:18 (Angowitz) (Doc. # 381); DX—9 at RJR000257; 26 U.S.C. § 355(e); 26 C.F.R. § 1.355–7 (2010). If NGH initiated any corporate restructuring or a sale within two years, the spin-off transaction could lose its tax-free status. Members of senior management at RJR Nabisco Holdings Corp. were aware of the tax consequences of the spin-off and had discussions about those consequences. 1/21/10 Tr. at 186:19–187:3 (Angowitz) (Doc. # 381).

7

### 4. The Tobacco Plan[2]

As a result of the spin-off, the RJR Nabisco Capital Investment Plan was divided into two separate plans, one for Nabisco and one for R.J. Reynolds Tobacco Company. R.J. Reynolds Tobacco Company retained the pre-spin-off Capital Investment Plan, and renamed it the R.J. Reynolds Tobacco Capital Investment Plan, while a new plan was created for employees of Nabisco. 1/19/10 Tr. at 132:6–14 (Cissna) (Doc. # 379). Because the spin-off created two different stocks – NGH and RJRTH – from the former RJR Nabisco Holdings stock, participants in the RJR Nabisco Holdings Fund of the Plan (which was one of several investment options in the pre-spin-off RJR Nabisco Capital Investment Plan) held units of the new NGH and RJRTH Funds in their accounts after the spin-off. 1/19/10 Tr. at 151:10–17 (Cissna) (Doc. # 379).

The Tobacco Plan came into existence on June 14, 1999, at the time of the spin-off. The stated purpose of the Plan was to "help [participants] meet [their]

---

[2] Before the spin-off, employees of R.J. Reynolds Tobacco Company, RJR Nabisco Holdings Corp., and Nabisco were allowed to participate in the RJR Nabisco Capital Investment Plan, a 401(k) retirement plan for employees of RJR Nabisco. PX—79. RJR Nabisco was the plan sponsor of the pre-spin-off RJR Nabisco Capital Investment Plan. DX—1; 1/14/10 Tr. at 62:10–12 (Gordon) (Doc. # 377). Employees of both the food and tobacco businesses participated in the RJR Nabisco Capital Investment Plan, which included several investment options, including investment in company stock. PX—79 at RJR000643–45. For employees of R.J. Reynolds Tobacco Company, following the split, the R.J. Reynolds Tobacco Company Capital Investment Plan succeeded the RJR Nabisco Capital Investment Plan. PX—1 at RJR000729–30.

long-term savings goals." PX—155 at RJR000030. The RJR Employee Benefits Committee ("EBC") administered the Plan on behalf of R.J. Reynolds Tobacco Holdings, Inc. and was designated as "the Plan Administrator for ERISA purposes." Id. at RJR000059. The EBC had the "general authority to interpret and administer" the Plan, including to amend the Plan, and its decisions were to be "final, conclusive and binding." PX—155 at RJR000059; DX—21 at RJR011525. A quorum (a majority of the members of the EBC) was required to transact business. DX—21 at RJR011525. All action taken by the EBC required "the vote of a majority of the members of the Committee present at any meeting or without a meeting by an instrument in writing signed by a majority of the members of the Committee." Id. at RJR011525. On July 2, 1999, Robert Gordon as Chairman, Ann Johnston, McDara Folan, and Kenneth Lapiejko were appointed as the first members of RJR's EBC. DX—27 at RJR014134-35. The Pension Investment Committee ("PIC") oversaw the investment funds held in the Plan. PX—155 at RJR000059. During the relevant time period, all members of the EBC were also members of the PIC, in addition to two other individuals. PX—4; PX—25.

### 5. Early Decisions Regarding the Tobacco Plan

Immediately after the public announcement in March 1999 of the spin-off, company employees—mostly from the human resources departments of RJR Nabisco Holdings, Nabisco, and R.J. Reynolds Tobacco Company—began a series of meetings at the RJR Nabisco Holdings headquarters in New York to address the effect of the spin-off on a wide variety of issues, including the various benefit

9

plans of RJR Nabisco Holdings and its subsidiaries. 1/21/10 Tr. at 211:11−212:6 (Angowitz) (Doc. # 381). These "working groups" met at least three times between March and June 1999, and covered a range of topics. 1/19/10 Tr. at 105:16−22 (Cissna) (Doc. # 379); 1/21/10 Tr. at 212:7−17 (Angowitz) (Doc. # 381); 1/25/10 Tr. at 98:13−14 (Johnston) (Doc. # 383).

The working groups had no authority or responsibility under the then-existing Plan documents to implement any decision regarding the pre-spin-off RJR Nabisco Capital Investment Plan, nor were they later given authority to make or enforce decisions in the Tobacco Plan documents. 1/19/10 Tr. at 131:23−132:4 (Cissna) (Doc. # 379); 1/20/10 Tr. at 33:11−14 (Cissna) (Doc. # 380); 1/21/10 Tr. at 213:23−214:9 (Angowitz) (Doc. # 381); 1/25/10 Tr. at 45:5−15, 100:22−25 (Johnston) (Doc. # 383); 1/14/10 Tr. at 9:23−97:4 (Gordon) (Doc. # 377); PX−92 at 14.

Believing it would be inappropriate to hold stock in what was to become a non-related company, attendees at the March 24-25, 1999 meeting were in agreement that the Nabisco Funds should be frozen at the time of the spin-off and eventually eliminated from the Plan, after giving participants notice and an opportunity to exit the fund at any time. How long the Nabisco Funds would be frozen was discussed. "There was a general discussion, and different ideas were thrown out, would three months be appropriate, would a year be appropriate, and everybody got very comfortable with six months." 1/19/10 Tr. at 140:19−141:4 (Cissna) (Doc. # 379). During this six month time frame, the Nabisco Funds would

be frozen in the Tobacco Plan and not open to new investments. Id. at 141:5–10, 11–25. The group did not determine a specific date for liquidating the Nabisco stocks at that time.

The working group's decisions were taken back by Ann Johnston, Vice President of HR for R.J. Reynolds Tobacco Company, who reported them to Robert Gordon – a member of the EBC before and after the spin-off – during the course of a two to three hour discussion the day she returned from the meeting. 1/25/10 Tr. at 103:6–15 (Johnston) (Doc. # 383). Johnston informed Gordon of the working group's decision that the Nabisco Funds should be frozen in the Tobacco Plan and eliminated in approximately six months. 1/25/10 Tr. at 101:4–14 (Johnston) (Doc. # 383); 1/14/10 Tr. at 89:11–90:15 (Gordon) (Doc. # 377). Gordon agreed with the working group's recommendation to freeze and eliminate the funds. 1/14/10 Tr. at 95:16-96:5 (Gordon) (Doc. #377). Also around this period of time, Gordon spoke with Lapiejko, who would become a member of the post-spin EBC and chairman of the post-spin PIC, who was in favor of having only tobacco stock in the post-spin Tobacco Plan. 1/26/10 Tr. at 196:10-197:7 (Lapiejko) (Doc. # 384) (recalling that the conversation with Gordon took place in April, May, or June 1999). Lapiejko also agreed with the proposed six-month time frame by which to divest the Nabisco Funds. Id. at 201:2-9.

Soon after the working group meeting, R.J. Reynolds Tobacco Company officials began taking immediate steps to implement the decision by disseminating communications to Plan participants and providing directions to the Plan record-

keeper. 1/25/10 Tr. at 39:3–41:10, 56:14–58:3 (Johnston) (Doc. # 383); see also PX—10 at RJR000257–259; PX—135; PX—99 at RJR14276–77; PX—49 at RJR000246–47. Two letters were sent to participants before the spin-off and prior to the formation of the new Tobacco Plan. Participants were told as early as April 1999, in the letter accompanying their March 31, 1999 Plan account statement, that "Nabisco Group Holdings and the Nabisco Common Stock funds will be eventually eliminated from the R.J. Reynolds CIP plan." See 1/25/10 Tr. at 56:14–58:3 (Johnston) (Doc. # 383). On June 2, 1999, participants were notified that the Nabisco Funds would be eliminated within approximately six months after the spin-off. See id. at 58:9–60:9 (discussing PX—135 and saying language was "consistent with what the working group preference was"). Both letters were written before the official amendment to the Plan by the EBC, which froze the Nabisco Funds but did not mention eliminating them from the Plan. See infra § I.A.6.

### 6. The June Amendment to the RJR Nabisco Capital Investment Plan

The spin-off was implemented on June 14, 1999. On the same day, the RJR Nabisco Capital Investment Plan was amended and renamed the R.J. Reynolds Tobacco Company Capital Investment Plan.

Section 4.03 of the Plan was amended to provide language stating the Nabisco Funds were frozen:

> The Trustee shall maintain the following separate investment Funds within the Trust Fund: the Interest Income Fund, the Nabisco Common Stock Fund, the Nabisco Group Holdings Common Stock

12

Fund, the RJR Common Stock Fund, the Total Stock Market Fund, the Total International Fund, the Conservative Growth Fund, the Moderate Growth Fund and the Growth Fund. All Investment Funds under the Plan are active Funds; *provided, however, the Nabisco Common Stock Fund and the Nabisco Group Holdings Common Stock Fund are frozen and, as of the Effective Date, participants are prohibited from investing contributions or reallocating amounts held under the Plan to such Funds.* In addition, the Trustee shall maintain any other Investment Funds as are designated by the RJR Pension Investment Committee.

See PX—1 at RJR000757 (§ 4.03) (emphasis added).

By its terms, the June amendment required that the Nabisco Common Stock Fund and the Nabisco Group Holdings Common Stock Fund held by the Plan be "frozen." There was no language in the amendment eliminating the Nabisco Funds or limiting the duration in which the Plan would hold the funds.[3]

### 7. Tobacco Taint

The purpose of the spin-off was to "enhance shareholder value," which

---

[3] On June 7, 1999, the EBC, including Gordon, had executed a Consent in Lieu of Meeting which authorized the June Amendment and stated its purpose:

> [D]ue to the spinoff of RJ Reynolds Tobacco Company the Committee desires to amend and restate the RJR Nabisco, Inc. Capital Investment Plan to a) cease all future investing in the new Nabisco Group Holdings Common Stock Fund and in the Nabisco Common Stock Fund on and after the date of the spin-off, b) change the sponsorship of the Plan, Employee Benefits Committee, Pension Investment Committee, Board and Agent for Service of Process to R.J. Reynolds Tobacco Company and c) delete all Nabisco related subsidiaries and RJR Nabisco Inc. from Schedule B, Participating Companies.

DX—20 at RJR000069-72. The Consent did not mention eliminating the frozen funds or limiting their duration.

included increasing the value of Nabisco by minimizing its exposure to and

association with tobacco litigation. At the time of the spin-off, R.J. Reynolds

Tobacco Company and R.J. Reynolds Tobacco Holdings, Inc. were defendants in

numerous tobacco-related lawsuits and there had been a "noteworthy increase in

the number of cases pending" leading up to the spin-off. DX—13 at RJR001593.

Risks associated with these lawsuits were disclosed in R.J. Reynolds Tobacco

Holdings, Inc.'s filings with the SEC. Its May 19, 1999 public information

statement warned that "[e]xposure to tobacco related litigation could negatively

affect RJR's prospects" and reported that:

> There has been a noteworthy increase in the number of these cases
> pending. *As of May 14, 1999, 653 active cases were pending
> against RJR, Reynolds Tobacco and/or its affiliates or indemnitees
> in the United States.* Plaintiffs have specifically pleaded punitive
> damages, often in amounts ranging into the *hundreds of millions, or
> even billions of dollars,* in a number of cases, in addition to
> compensatory and other damages.

DX—13 at RJR001593 (emphasis added).

NGH was a defendant in a number of the cases in which R.J. Reynolds

Tobacco Company also was a defendant. Indemnification agreements had been

executed as part of the spin-off which made R.J. Reynolds Tobacco Company and

R.J. Reynolds Tobacco Holdings, Inc. responsible for paying NGH's legal expenses

in those lawsuits in which NGH was a defendant. However, there was increasing

concern among RJR executives that tobacco verdicts would be so large that RJR

would not be able to satisfy their payment obligations, in which case plaintiffs in

those lawsuits may have sought payment from NGH. 1/22/10 Tr. at 205:10–13

14

(Blixt) (Doc. # 382); 1/21/10 Tr. at 196:12–17 (Angowitz) (Doc. # 381).

NGH's June 3, 1999 8–K filing with the SEC reported this possibility:

In addition to the cases pending against NGH, there are several hundred lawsuits relating to cigarettes in which Reynolds Tobacco, and sometimes RJR, are named defendants. *If Reynolds Tobacco and RJR are unable to satisfy their payment obligations for any adverse judgments against them in some or all of these cases, it is possible that plaintiffs in these cases would seek to recover the unsatisfied obligations from the assets of NGH by bringing lawsuits on various theories.*

Some of the claims against NGH seek recovery of hundreds of millions and possibly billions of dollars. This is also true of the litigation pending against Reynolds Tobacco and RJR. Litigation is subject to many uncertainties. Management is unable to predict the outcome of the litigation against NGH, or to derive a meaningful estimate of the amount or range of any possible loss in any quarterly or annual period or in the aggregate.

DX—88 at RJR018151–52 (emphasis added).

A specific concern in 1999 was the Engle case, an ongoing class action in Florida state court. In July 1999, a jury found R.J. Reynolds Tobacco Company liable to a class of individual smokers, and it was determined that the class as a whole would be entitled to one lump sum of punitive damages.[4]  In the fall of 1999, the damages phase of the case was scheduled to begin, and concern grew

---

[4] Originally, the trial judge ruled that punitive damages would be determined on an individual-by-individual basis.  However, in the summer of 1999, the trial judge reversed himself and stated that the class as a whole would be entitled to one lump sum of punitive damages.  R.J. Reynolds Tobacco Company and the other cigarette companies appealed the judge's ruling on punitive damages.  The Florida intermediate appellate court initially ordered the trial judge to begin the second phase as had originally been scheduled.  However, a week later, the intermediate appellate court reversed itself sua sponte and subsequently upheld the judge's new trial order regarding punitive damages. 1/22/10 Tr. at 199:3–22 (Blixt) (Doc. # 382).

because of the cost of appealing a potentially large damages verdict.[5]

At that time, RJR senior management became concerned that a cash bond in the full amount of any punitive damages award might be required in order to appeal. R.J. Reynolds Tobacco Company's portion of any bond would have been about one-third the total amount of the award. If it could not satisfy the cash bond, there was fear that RJR would go bankrupt and/or plaintiffs would turn to NGH for payment. In its November 1999 10−Q, NGH made disclosures regarding the Engle situation:

> It is not possible to predict the amount of class-wide punitive damages the EAGLE [sic] jury might award, if any, but it could be in the billions of dollars. Although the tobacco company defendants are expected to appeal any award of punitive damages, it is uncertain when the right of such appeal would be available and what, if any, bonding requirements might be imposed on the defendants in connection with such an appeal. If a multibillion dollar punitive damages award were to be granted in the second phase of this case and a bond in the full amount of the award were required to stay execution on the judgment of such an award, it could be difficult or impossible for defendants to post such a bond.

DX—33 at RJR018220−21.

On October 1, 1999, NGH shares had declined from $21.37 the day after the spin-off to $14.75. DX—157.[6] When RJR received the adverse ruling on

---

[5] The Engle jury ultimately awarded the class over $140 billion in punitive damages in the summer of 2000.

[6] NA, while less impacted by tobacco litigation, also dropped in value after the spin-off. By October 1999, NA shares had declined from $42.00 the day following the spin-off to $34.56—an 18% decline. See DX—158. It is more difficult to determine the cause of NA's decline, because during 1999 and early 2000, food sector stocks were generally performing poorly. From December 31, 1998 through

classwide punitive damages on October 20, 1999, stock prices of *both* R.J. Reynolds Tobacco Company and NGH reacted sharply in a negative direction. 2/2/10 Tr. at 124:11–127:1 (Montgomery) (Doc. # 388) (testifying that tobacco stocks and NGH declined due to "heightened concern over the risks for tobacco related companies of tobacco litigation and the sharp decline in late October was in reaction to the Florida Appeals Court decision in the Engle case on October 20"); DX—60, Ex. 16.  NGH shares fell from a close of $14.81 on October 19 to a close of $12.62 on October 20. DX—157.  With the exception of three days thereafter, the price of NGH never rose as high again until April 4, 2000. Id.

### 8. October Meetings

Several meetings of committees and executives also took place in October. On October 7, 1999, the Pension Investment Committee ("PIC") met for its quarterly meeting. DX—121.  At that time, Dennis Kass, a vice chairman at JP Morgan Investment Company, gave a presentation on fiduciary responsibilities that had previously been scheduled for the PIC's orientation meeting. DX—29 at RJR000108; DX—121 at RJR000080; DX—122 at RJR000085; 1/14/10 Tr. at 119:16–20 (Gordon) (Doc. # 377).  Mr. Kass instructed the PIC members on such topics as:

- "Named fiduciary: of a pension plan has specified fiduciary responsibilities,

---

January 31, 2000, the overall stock market rose, but the food industry index fell 25% and NA's stock price fell 27%. 2/2/10 Tr. at 124:11–127:1 (Montgomery) (Doc. # 388); DX—60, Ex. 18.

'fiduciary' is functionally defined";

- "Act for the exclusive benefit of plan participants and beneficiaries and for the purpose of providing plan benefits and paying plan expenses";

- "Act prudently" focusing on "procedural prudence" as a "critical" component;

- "Diversify the plan's investments"; and

- "Act in accordance with the documents governing the plan, except to the extent inconsistent with ERISA."

DX–122 at RJR0000089.

PIC members were also told at that meeting that the NGH fund had declined 5.2% and the NA fund had declined 5.3% in the month of August 1999. DX—122 at RJR000087; 1/20/10 Tr. at 138:24–139:6 (Beasley) (Doc. # 380).

The very next day, on October 8, 1999, HR managers, corporate executives and in-house legal staff met to discuss the logistics of eliminating the Nabisco Funds. RJR held a meeting of various employees, including EBC member Johnston and EBC chairman Gordon, in which the decision to eliminate the Nabisco Funds was reconsidered, at least in part because of an RJR employee's inquiry. 1/19/10 Tr. at 36:2–9, 46:6–16, 51:2–6 (Cissna) (Doc. # 379); 1/20/10 Tr. at 70:12–74:5 (Beasley) (Doc. # 380). Prior to the meeting, an RJR employee had questioned CEO Andrew Schindler about the plan to eliminate the Nabisco Funds because the employee was concerned about the drop in the price of the stock. 1/20/10 at 177:23–178:13 (Schindler) (Doc. # 380). Schindler then asked Gordon if the elimination of the Nabisco Stock was "still on track[.]" 1/14/10 Tr. at 31:11-22 (Gordon) (Doc. #377). At the October 8 meeting, Gordon told the

18

attendees that an employee had asked Schindler about the timing of the elimination of the Nabisco Funds and whether the decision could be reconsidered. 1/25/10 Tr. at 110:2–6 (Johnston) (Doc. # 383); 1/19/10 Tr. at 37:11-20 (Cissna) (Doc. # 379).  The group ultimately decided not to change anything about the planned divestment of the funds.

By this time, the number of participants in each of the Nabisco Funds had dropped.  From June 14, 1999 to September 30, 1999, the number of participants in the pre-spin RJR Nabisco Holdings/post-spin NGH Fund had dropped from 3,252 to 2,775 (approximately a 15% decrease).  In the same time period, the number of participants in the NA Fund had dropped from 659 to 552 (approximately a 16% decrease). DX—37 at RJR014243; 1/19/10 Tr. at 170:24-171:20 (Cissna) (Doc. # 379).

### 9. October 14 Meeting

On October 14, 1999, Kathy Cissna, Ann Johnston, Susan Newsome, Carol Christian, and Jennie Beasley, all members of the R.J. Reynolds Tobacco Company employee benefits department, met with the Plan's record-keeper to discuss administrative issues regarding the Plan. DX—125; 1/19/10 Tr. at 173:20–174:4, 175:24–176:3 (Cissna) (Doc. # 379).

The closest month-end after the six-month freeze period announced on June 14, 1999, would have been December 31, 1999, but representatives from the Plan record-keeper Kwasha were concerned about potentially widespread computer problems ("Y2K") that could interfere with the liquidation of the single stock funds

in the days following December 31, 1999.  This was also something that Gordon and Lapiejko had discussed. 1/26/10 Tr. at 201:22-202:4 (Lapiejko) (Doc. # 384). The group members determined that the potential Y2K problems merited extending the freeze period to January 31, 2000, and eliminating the Nabisco Funds on that date. 1/19/10 Tr. at 178:11–180:1 (Cissna) (Doc. # 379); 1/20/10 Tr. at 78:20–79:22 (Beasley) (Doc. # 380).

### 10. Analyst Reports

Although by October, stock prices for NGH and NA had continued to steadily decline, analyst reports available throughout 1999 were generally positive, overwhelmingly recommending "hold" or "buy," particularly after the spin-off. See infra § I.B.3.b. at 49-51 (explaining analysts' "optimism bias" during 1999 and 2000). Despite being generally positive, however, not all analyst statements regarding NGH and NA were positive, and some analysts believed any positive aspects of the company were already reflected in the stock price.  For example, a July 22, 1999, Paine Webber report had maintained a "neutral" rating on the NA stock and stated that:

> While NA should continue its positive trends, we believe these initiatives [ramping up marketing spending … to restore volume growth and generate market share gains] *already have been priced into the stock,* which had moved from trading at a discount to the food group to a slight premium. We believe the long-term fundamentals are solid and would be more interested in the stock below $40.

DX—286 at MONTGOMERY015722 (emphasis added).  A report on NA issued by Credit Suisse First Boston on July 23, 1999, stated that "[o]verall, given the

20

challenges Nabisco faces in sustaining its momentum and transitioning to more cost-effective means of growth, we consider the company to be fully valued and maintain our Hold rating." DX—287 at MONTGOMERY015726.  An analyst report on NA by John Renwick of Morgan Stanley Dean Witter, issued on July 27, 1999, maintained a "neutral" rating on the stock "despite the company's turnaround in volume growth and potential operating profit" because Morgan Stanley Dean Witter "believe[d] that the turnaround is already reflected in the stock's valuation." DX—288 at MONTGOMERY015730.

The tobacco risk was acknowledged, as well, even in positive reports.  In August 1999, Salomon Smith Barney included a section in its report entitled "Primary Reasons for the Existence of the Discount" and stated "[t]he most substantial reason for the existence of the discount is an investor fear that if the RJR tobacco company is unable to service litigation awards against it, the assets of NGH may be threatened." PX—226.  The report went on to downplay the risk, but acknowledged its impact on investor mentality and price.  On October 6, 1999, another Salomon Smith Barney report commented on the continual decline of the Nabisco stocks, despite a general rise in the "biscuit" food category.  The article blamed NGH's connection to tobacco for NA's problems, despite NA's "strong fundamentals."  And although a "buy" rating was "reiterated" in the report, it commented on the depressed stock price:

> NGH: Investors Still Assume Where There's Smoke, There's Fire: Although we believe most investors if asked would tell you that they believe that the odds are most remote that NGH will need to be or

could be found liable to support tobacco industry financial settlements, the NGH–NA gap continues to widen. More importantly it appears that NGH and NA are locked in some sort of downward arbitrage death spiral: as the price of NGH goes down, it appears to drag down NA and in turn, as NA goes down, traders knock down the price of NGH to close the gap, and so on. The NGH–NA valuation gap is currently near 40%.

DX–276 at TAT000218.

In October 1999, Cissna drafted a letter to Plan participants with their third quarter statements informing them that the frozen Nabisco Funds would be eliminated on January 31, 2000.

### 11. Final Meetings and Communications to Participants

In the fall of 1999 and first part of 2000, plans and communications centered around the logistics of eliminating the funds. For the purpose of amending Section 4.03 to eliminate the Nabisco Funds from the Plan, in November 1999, McDara Folan (an EBC member and serving as Secretary of the EBC) drafted and signed a document entitled "Amendment No. 1 to the R.J. Reynolds Tobacco Company Capital Investment Plan" ("November Amendment") which stated:

4.03 Separate Funds. The Trustee shall maintain the following separate Investment Funds within the Trust Fund: the Interest Income Fund, the RJR Common Stock Fund, the Total Stock Market Fund, the Total International Fund, the Conservative Growth Fund, the Moderate Growth Fund and the Growth Fund.

All Investment Funds under the Plan are active Funds. In addition, the Trustee shall maintain any other Investment Funds as are designated by the RJR Pension Investment Committee.

PX–34 at RJR001260–63.[7]

---

[7] No question was ever raised as to the validity of the November Amendment until

The December quarterly PIC meeting included a review of the performance of the NGH and NA funds with PIC investment advisor, Ed Robertiello. During the third quarter of 1999, the NGH Common Stock Fund had declined 22.1% and the NA Common Stock Fund had declined 18.8%. DX—133 at RJR000082; DX—134 at RJR000238; 1/20/10 Tr. at 153:19—25 (Beasley) (Doc. # 380). At that time, PIC members discussed those figures, and Robertiello reminded them of the January 31 time frame. 1/20/10 Tr. at 154:1—155:2 (Beasley) (Doc. # 380); 1/27/10 Tr. at 52:17—53:1 (Lapiejko) (Doc. # 385); DX—134 at RJR000238. There was no further inquiry into or discussion about the Nabisco Funds.

Also in December 1999, all participants received a revised SPD which included a reminder about the upcoming elimination of the Nabisco Funds. DX—42 at RJR000037—38. This SPD was in effect from December 1999 until at least January 31, 2000. 1/19/10 Tr. at 189:17—190:9 (Cissna) (Doc. # 379). The final Plan statements were sent to participants in January 2000. That final statement showed that the NGH Common Stock Fund was down a further 27.3% in the fourth quarter and that the NA Common Stock Fund was down an additional 7.7% in the fourth quarter. From January 1, 1999 through December 31, 1999, the NA

well into trial as discussed in Section II.A. at 59-61. All parties had viewed the November Amendment as having been validly executed. However, because it was neither distributed to other EBC members for signature as a consent in lieu of meeting nor voted upon by EBC members in a meeting, the purported amendment was found to be invalid. Tatum v. R.J. Reynolds Tobacco Co., et al., 2011 WL 2160893 (M.D.N.C. 2011) (Doc. # 420).

Common Stock Fund had declined by 21.7%.[8] DX—292; 1/19/10 Tr. at 185:25–187:3 (Cissna) (Doc. # 379). During the third and fourth quarters of 1999, the NGH Common Stock Fund had fallen 49.4% and the NA Common Stock Fund had fallen 26.5%. DX—134 at RJR000238; DX—292 at RJR000262.

### 12. Sale of Nabisco Stocks

On January 31, 2000, the units of the Nabisco Funds held by participants who had not sold prior to that date were eliminated at prices set by the public stock market—$8.62 per share for NGH and $30.18 per share for NA. PX—302 at 5; PX—303 at 5.

When the Nabisco Funds were terminated, participants' accounts were credited with the closing price of NGH and/or NA stock as of the end of trading on January 31, 2000. The last shares were sold on February 4, 2000.[9]

The proceeds of the sale were invested in the Plan's Interest Income Fund, and participants could immediately move those proceeds to any existing fund option. 1/19/10 Tr. at 195:20–22 (Cissna) (Doc. # 379). By contrast, the following RJR officers held their personal Nabisco stock and/or options until December 11, 2000:

---

[8] Comparable figures were unavailable for the NGH Fund, which did not come into existence until June 14, 1999. DX—292 at RJR000262.

[9] The amounts credited to each participant's account did not change based on any fluctuation in the price of NGH and/or NA stock between the end of trading on January 31, 2000 and the date on which the shares held by the Plan were actually sold on the market. 1/14/10 Tr. at 152:15–153:12 (Gordon) (Doc. # 377).

24

- Andrew Schindler—Chairman, President and CEO for R.J. Reynolds Tobacco Company (held stock and stock options). 1/20/10 Tr. at 185:13–18 (Schindler) (Doc. # 380).

- Ken Lapiejko—Executive Vice President and Chief Financial Officer for R.J. Reynolds Tobacco Company (held restricted stock and stock options). 1/26/10 Tr. at 214:14–215:217–218) (Lapiejko) (Doc. # 384).

- Francis Suozzi—Treasurer and Senior Vice President of Corporate Development for RJR Nabisco and NA (held stock and stock options). 1/13/10 Tr. at 193:4–195:2 (Suozzi) (Doc. # 372).

- Robert Gordon—Executive Vice President of Human Resources for R.J. Reynolds Tobacco Company (held stock). 1/15/10 Tr. at 14:8–14; 156:3–58:4 (Gordon) (Doc. # 378).

- Charles Blixt—Executive Vice President and General Counsel for R.J. Reynolds Tobacco Company (held NGH stock) 1/22/10 Tr. at 187:20–189:20 (Blixt) (Doc. # 382).

Between June 15, 1999 and January 31, 2000, the market price of NGH had fallen 60% and NA had fallen 28%. DX—157 at RJR00437–42; DX—158 at RJR001448–53.

### 13. Rise of Nabisco Stock Values

Nabisco stocks began to rise in the early spring of 2000, two months after the sale of the NGH and NA stocks out of the Tobacco Plan. On March 30, Carl Icahn made an attempt to take over Nabisco in the form of an unsolicited tender offer to purchase NGH for $13 per share. Because the Icahn offer was unsolicited, under the tax laws, NGH could pursue corporate restructuring without endangering the tax-free nature of the spin-off. 1/13/10 Tr. at 171:21–172:10 (Angowitz Dep.) (Doc. # 372); 1/22/10 Tr. at 211:22–212:13 (Blixt) (Doc. # 382); 1/25/10 Tr. at 19:23–20:2 (Blixt) (Doc. # 383).

On April 4, 2000, NGH's Board of Directors rejected Icahn's original bid, but

announced that it would explore all alternatives to maximize shareholder value, effectively putting NGH on the auction block. 1/25/10 Tr. at 20:3–10 (Blixt) (Doc. # 383). After several months of competitive bidding, on June 25, 2000, it was announced that definitive agreements were signed for the sales of NGH and NA. Under the agreements, NA would be sold for $55 per share to Philip Morris, which would infuse NGH (the sole asset of which was NA) with $11 billion in cash. RJR would then purchase NGH for $30 per share, or $9.5 billion.

The transactions closed on December 11, 2000. On that day, NGH was priced at $29.9375 per share and NA was priced at $55 per share. PX—302 at 9; PX—303 at 9. The closing prices represented an increase of 247% for NGH and 82% for NA from the January 31, 2000 share prices. DX—157 at RJR001432–37; DX—158 at RJR001443–48.

Before his unsolicited offer, Icahn had made three previous attempts to take over Nabisco, between November 1996 and the spring of 1999, and was well known to have an interest in the company. PX—271 at TAT3326; PX—275 at TAT3447; PX—276 at TAT3467–68; PX—277 at TAT3473; PX—278 at 2–4; PX—304 at 4, 6; see also PX—228 at TAT193; PX—248 at TAT281; PX—221 at TAT117; PX—304 at 4.

Prior to the spin-off, Icahn had attempted a takeover in March 1999 and was vocal about his belief that RJR and Nabisco should part ways. After that attempt, he continued to hold a significant number of shares through at least June 1999. PX—221 at TAT117; PX—275 at TAT3447; PX—276 at TAT3467–68;

PX—277 at TAT3473; PX—278 at 2–4; PX—304 at 4, 6.

On November 26, 1999, a <u>Wall Street Journal</u> article reported that Icahn had purchased six million shares of NGH stock, and speculated that "Mr. Icahn might just be bottom fishing." PX—346.  While the <u>Wall Street Journal</u> speculated about the significance of the purchase, there was no stock price reaction to this report. 2/2/10 Tr. at 127:23–129:1 (Montgomery) (Doc. # 388).  No analyst reports or other news articles between the spin-off and February 1, 2000, mentioned the possibility of Icahn making an offer for NGH. <u>Id.</u> at 127:23–129:1.

As late as March 27, 2000, *after* divestment and three days before the unsolicited tender offer by Icahn, Salomon Smith Barney noted that "derivative tobacco fears continue to compress NA valuation despite strong fundamentals" and warned that "with storm clouds gathering on the tobacco litigation front in the near-term, NA may remain volatile, but we see this as a strong long term idea in food stocks." DX—279.  The report went on to say:

> We have had a Buy rating on NA shares for more than a year; however that recommendation has been disappointing since the middle of 1999. After peaking at $43 in July 1999, NA shares are down 37% since then, in addition to the underperformance of the food group, we believe the weakness in NA shares relates in large part to the formation of NGH as well as the increasing uncertainty in the tobacco industry. Although we believe that Nabisco is ultimately insulated from tobacco financial liability, the shares continue to be impacted by investor concerns.

DX—279 at TAT000106.  There was no mention of Carl Icahn in the report.

**B.**

### 1. Prudent Fiduciary's Investigation

Both parties' experts testified about the investigation that a prudent fiduciary would have performed, and, in light of such an investigation, the decision that a prudent fiduciary would have made about the frozen Nabisco Funds. Tatum's witness Alan Biller[10] was qualified as an expert in the fields of fiduciary responsibilities, prudent investments, and the decision-making process for prudent pension plan fiduciaries. He testified that when a prudent fiduciary makes a decision to eliminate an investment option from a plan, it should take into account reports of sell-side and buy-side analysts who follow the company, company filings with the SEC, news reports, and general commentary on the company and its industry. 1/15/10 Tr. at 37:9-15, 38:16-39:3, 39:22-24 (Biller) (Doc. # 378). Most of the plans with which Biller was familiar also used the services of investment professionals. Id. at 39:17-21.

Similarly, Tatum's expert Thomas Lys,[11] qualified in finance, accounting,

---

[10] At the time of trial, Biller had been advising fiduciaries for over thirty years on issues such as pensions, employee benefit plans, asset allocation, risk analysis, and the prudence of offerings available to participants. 1/15/10 Tr. at 28:21-32:19 (Biller) (Doc. # 387). His academic credentials include an undergraduate degree from Yale, a Master of Philosophy in history, philosophy, and religion at the University of London, a Ph.D. from Columbia University, and an MBA from Harvard Business School. Id. at 25:18-26:3.

[11] At the time of trial, Lys had been a professor in the MBA and Ph.D. programs at Kellogg School at Northwestern for approximately twenty-nine years. He has published in the top journals in his field and has published articles on topics such as investing, investment decision-making, analyst reports, and the efficient market hypothesis. 1/21/10 Tr. at 13:6-26:7 (Lys) (Doc. # 381).

economics, investment decision-making, securities analysis, efficient market hypothesis, the reaction of financial markets to information events, and analyst reports and recommendations, provided similar expectations of prudence, although from the perspective of an investor, not a fiduciary.[12] 1/21/10 Tr. at 27:1-7, 27:19-28:12 (Lys) (Doc. #381). Lys testified that when a prudent investor determines whether or not to sell a security he owns, he could or should perform the analysis himself, rely on an advisor, or, at a minimum, consult available information such as analyst reports, newspaper reports, or corporate disclosures. Id. at 35:7-15, 36:16-37:1. When the investor performs the analysis himself, he would conduct a valuation analysis in which he would compare the security's value to the market price. Id. at 35:16-20. If the market price is higher than the valuation, the investor should sell the security and vice versa. Id. at 35:21-25. In addition to the valuation analysis, the investor should perform an analysis of the security's risk. Id. at 36:2-4. Although the valuation analysis includes the risk of the security from the market's perspective, an investor may have his own idiosyncratic motives. Id. at 36:12-15. When the investor assesses the risk of a particular security, he may believe it is undervalued, but decides to sell the security because holding it is not worth the risk it poses. Id. at 36:4-9.

---

[12] As Biller testified, the term prudence does not have the same meaning to a private investor as it does to a fiduciary of a 401(k) plan. 1/15/10 Tr. at 170:17-20 (Biller) Doc. # 378). While a prudent private investor makes decisions in his judgment to further his own economic interest, a prudent fiduciary must make decisions in the interests of the beneficiaries. Id. at 170:20-25.

RJR's expert Howard Crane,[13] qualified as an expert in fiduciary responsibilities, the decision-making process of prudent fiduciaries, portfolio and plan construction and investment decision-making, disagreed with Biller that a prudent fiduciary would use analyst ratings during its decision-making for a participant directed defined contribution plan. 1/28/10 Tr. at 127:4-11 (Crane) (Doc. # 386). Crane considered reliance on those reports speculation, whereas the fiduciary's role is to manage assets carefully and prudently. Id. at 127:13-16. "It does not involve making a short-term forecast about what the future price action of the stock might be and betting on it." Id. 128:2-4; see also id. at 127:16-128:4 (explaining further that "[t]he role of the fiduciary is to carefully and prudently manage assets," by reviewing risk and return of diversified asset representations like mutual funds and different asset classes). However, even in the context of a fiduciary as opposed to an individual investor, he agreed with Lys that "the relevant points of the analysis regard a forecast of risk and a forecast of the shape of the return distribution of the security in the absence of specific point in time valuation relative to a long term equilibrium value for the security." 1/29/10 Tr. at 8:12-16 (Crane) (Doc. # 387) (quoting Crane Dep. 254-55). The Court finds

[13] At the time of trial, Crane was a Chartered Financial Analyst and independent fiduciary with twenty-five years of ERISA experience and thirty-seven years of experience in consulting with retirement plan fiduciaries. He has a Bachelor of Arts degree in economics and a Master of Science in operations research from Union College, a Master of Art in economics from Brown University, and, in 1972, began the Chartered Financial Analyst program. 1/28/10 Tr. at 106:11-117:14 (Crane) (Doc. # 386).

30

Crane's testimony persuasive.

## 2. Risk

### a. Risk of multiple single-stock funds

A single-stock fund "is approximately four times as risky as a diversified portfolio of mutual funds." 1/28/10 Tr. at 123:12-16 (Crane) (Doc. # 386) (noting that this increased risk has been researched and recognized in literature for more than thirty-five years). Notably, here, the Plan included not one single-stock fund, but three single-stock funds, two of which were non-employer single-stock funds. In contrast, of approximately 10,000 participant directed funds, none maintained active non-employer single-stock options. 1/29/10 Tr. at 19:16-20 (Crane) (Doc. #387). The parties identified only twelve circumstances in which 401(k) plans maintained frozen non-employer stock funds, nine[14] of which occurred prior to January 31, 2000. See 1/26/10 Tr. at 145:17-148:12 (Altman) (Doc. # 384); PX—270 at TAT003314.

### b. Idiosyncratic risks

However, holding undiversified, non-employer single-stock funds was not the only heightened risk borne by Plan participants invested in those stocks. Idiosyncratic risk is specific to companies and includes litigation risk and bankruptcy risk, both of which existed here. 1/27/10 Tr. at 172:22-173:10

---

[14] Of the twelve circumstances identified, eleven are presented in a table, and eight of those occurred prior to January 31, 2000. PX—270 at TAT003314. The circumstance not identified in the table – the Cooper transaction in the 1980s – is one about which Ian Altman, an expert for Tatum, testified during his deposition and at trial. 1/26/10 Tr. at 147:1-17 (Altman) (Doc. # 384).

31

(McEnally[15]) (Doc. # 385) (agreeing with Lys that there is systematic risk that all securities share and idiosyncratic risk unique to each company). "[F]rom an investment perspective, holding a large pot of money in a single security with this level of risk, . . . would be scary, troublesome." Id. at 173:14-17. Although the spin-off created separate companies, they were "still highly correlated" because of what finance literature calls a "common factor[]" – tobacco taint. 1/29/10 Tr. at 5:11-16 (Crane) (Doc. # 387). As a result, holding both companies' stocks would not "necessarily achieve any diversification benefit[.]" Id. at 5:16-17; see also id. at 5:18-20 (noting that Lys's exhibit showing "NGH and RJRT moving in the same direction over time lend[s] force" to this conclusion). In addition, because the common factor was becoming stronger as the Engle decision drove stock prices down considerably, a reasonable investor could infer that risk was increasing "due to doubling down on that common factor[.]" Id. at 5:21-6:2.

As Crane explained, "not only is the [non-employer single] stock risky in and of itself, indeed it is both what I believe and what the Plan documents say is a very high risk investment fund, but the evidence of the tobacco taint suggests that it's

---

[15] Richard McEnally, a witness for RJR, was qualified as an expert on the securities market, securities evaluation, market efficiency, and portfolio diversification. 1/27/10 Tr. at 137:10-15 (McEnally) (Doc. # 385). At the time of trial, he was the Meade Willis Emeritus Professor of Investment Banking at the University of North Carolina at Chapel Hill and had taught virtually every class in the areas of finance and financial institutions, including Research and Finance to doctoral candidates. He earned a Bachelor of Science degree in banking with a specialization in accounting from Washington & Lee University, an MBA and a Ph.D. with a concentration in finance, both from the University of North Carolina at Chapel Hill. Id. at 123-135.

not unreasonable to see that that risk of a single-stock fund indeed might be higher than the average single stock." 1/28/10 Tr. at 123:21-124:2 (Crane) (Doc. # 386).

Related to the litigation risk is bankruptcy risk. Tobacco analyst Martin Feldman, referenced in Lys's first report, found NGH's bankruptcy risk "considerably less than one in five." DX—301 at 6. To McEnally, and to the Court, this is "a non-negligible risk of bankruptcy." Tr. 1/27/10 at 172:8-21 (McEnally) (Doc. # 385). McEnally understood the analysts to be reporting a high level of bankruptcy risk and, by implication, a high level of litigation risk. Id. at 173:2-8.

### c. Montgomery and Risk

RJR's witness John Montgomery[16] was qualified as an expert in evaluations of securities, finance, economics, investing, the stock market, portfolio diversification, market efficiency, and computation of damages. He testified that his analysis showed, among Plan options, the RJR Tobacco Common Stock Fund had the highest volatility, NGH had the second highest volatility, and NA had the third highest volatility. 2/2/10 Tr. at 64:23-65:4 (Montgomery) (Doc. # 388); DX—

---

[16] At the time of trial, Montgomery was employed as a Senior Vice President of NERA Economic Consulting, a worldwide firm providing consulting in areas of finance and consulting. He estimated he had worked on between fifteen and twenty projects related to ERISA issues during his time at NERA. Prior to joining NERA in 2002, Montgomery advised institutional investors, hedge funds, and investment advisors and consultants as a senior economist at Morgan Stanley. He graduated from Yale and has a Master of Science from the London School of Economics and a Ph.D. in Economics from Princeton. 2/2/10 Tr. at 8-17 (Montgomery) (Doc. # 388).

33

60, Ex. 19.

In addition, NGH's returns were very highly correlated with the returns on RJR Tobacco Common Stock. Id. at 65:18-20; DX—60, Ex. 20. The returns of NA were less correlated with RJR Tobacco Common Stock. Id. at 65:25-66:2; DX—60, Ex. 20. Investments are correlated if there is a "tendency of two investments to have high returns at the same time, or conversely low returns at the same time." Id. at 65:8-10. The more correlated two investments are, the less benefit is realized from diversification when holding those investments. Id. at 65:7-13. In other words, when trying to diversify, it is better to choose investments that have low correlation to each other. Id. at 65:13-15. The finding that NGH and RJR Tobacco Common Stock returns were very highly correlated did not surprise Montgomery because of both stocks' exposure to tobacco litigation. Id. at 65:20-24.[17]

Montgomery also analyzed participants' voluntary transfers from one investment fund to another. Id. at 70:23-71:14. "[M]ost participants who were forced to liquidate NGH held exactly the same RJR and NGH positions that they received in the spin-off, without having either increased or decreased those investments." Id. at 74:18-22 (quoting DX—60 at 24). Biller's understanding of industry studies supports Montgomery's findings. Industry studies report that, as

---

[17] Fewer participants held NA than NGH because investment in NA required a more active decision, which relatively few participants made. Id. at 66:9-11. NGH was held by many participants, because they had received it during the spin-off and had retained their positions. Id. at 66:2-8.

34

a general matter, the vast majority of participants make few or no changes to their investments within their 401(k) plans. 1/15/10 Tr. at 141:23-142:4, 142:11-144:10 (Biller) (Doc. # 378). Even when a 401(k) educates participants about the plan, the financial market, and basic investment principles, literature suggests that those efforts are ineffective. Id. at 145:10-20. Montgomery's analysis and Biller's understanding of participants' behavior are also reflected in what has become recognized as the "disposition effect." The disposition effect "essentially means that investors are irrationally reluctant to sell investments that have fallen in price." Id. at 145:21-146:2. Among individual investors, there is strong empirical evidence of the disposition effect in the American Stock Market. Id. at 146:3-6.

### d. Biller and Risk

Biller testified that a prudent fiduciary would not have decided to eliminate the Nabisco Stocks in the Plan. 1/15/10 Tr. at 58:6-10 (Biller) (Doc. # 378). According to Biller, when a stock is already in a Plan, it should stay "[o]ther things being equal[.]" Id. at 41:2-7. He considered massive fraud in the company and likelihood of bankruptcy valid reasons to eliminate a single stock as an investment option, neither of which did he believe existed here. Id. at 57:8-16. Instead, according to Biller, Nabisco's business was strong. See, e.g., id. at 186:4-5.

While Biller is very well qualified to offer such opinions, his opinions as to the risk involved here are not as persuasive as the opinions of others. Although he testified that a prudent fiduciary would review analyst reports, company filings with the SEC, news reports, and general commentary on the state of the company

35

and the industry when determining whether or not to eliminate an investment option from a plan, Biller did not follow his own guidance when he reached his opinions.

Biller's misunderstanding of the posture of the Nabisco Funds proved problematic to his underlying opinion that the existence of those funds in the Plan did not increase risk. When asked if he considered the assertion that the Nabisco Fund would be an undiversified option a valid reason to eliminate the Nabisco Stocks, he answered no. Id. 55:8-12. In support of this conclusion, he testified that "Nabisco Stock was already in the Plan" as an "undiversified option" so its "[s]tatus as undiversified didn't change" and "[i]t wouldn't increase risk."[18] Id. at 51:1, 56:1-3. However, NGH only became a part of the Plan at the time of the spin-off. Perhaps Biller's misunderstanding arises from the fact that before submitting his initial report, he did not review the Plan, its amendments, the minutes of the committee meetings, or the notes of the employees. Id. at 97:2-23. Contrary to Biller's conclusion, NGH's inclusion in the Plan as part of the spin-off as a non-employer single-stock investment option increased the level of risk, as explained above.

---

[18] Biller did, however, acknowledge that the equity research analyst report issued by Salomon Smith Barney dated August 13, 1999 rated NGH "1H" which meant that, as of August 1999, it was a high risk stock. Id. at 134:13-135:7 (referring to DX—277). He also agreed that, on January 31, 2000, it would have been impossible to know how long it would take for NGH and NA to lose the tobacco taint. Id. at 147:2-13 (testifying there was no way to know how long it would have taken).

36

In addition, before arriving at his opinions and preparing his expert reports, Biller never reviewed NGH's or NA's financial statements. Id. at 182:5-10. Nor did he review NGH's or NA's SEC filings. Id. at 182:11-15. Specifically, he did not consider the statements in the relevant SEC Form 8-K, id. at 148:6-150:12 (referring to DX—88 at RJR018151), the Form 10-Q filed August 13, 1999 for the period ending June 30, id. at 152:6-153:8 (referring to DX—22 at RJR018182-83), or the Form 10-Q filed November 15, 1999 for the period ending September 30, id. at 153:22-155:16 (referring to DX—33 at RJR018220-21), each of which detailed the number of lawsuits pending against NGH and possible liability of "hundreds of millions and possibly billions of dollars."

He also never comprehensively researched and reviewed news stories about Nabisco. Id. at 182:16-19. Instead, he read the news stories that Tatum provided. Id. at 182:20-22. He was not provided with any information about the Engle lawsuit. Id. at 184:18-21. Although he believed that he was aware of the jury verdict after having heard it on the news, he could not recall whether he "was thinking about it" when he wrote his report. Id. at 185:1-7. Nevertheless, he did not mention the Engle case in either of his reports. Id. at 185:8-12.

Furthermore, Biller did not research the prospects of the food industry as of June 14, 1999 or as of January 31, 2000. Id. at 185:20-186:1. Instead, his opinion that "Nabisco's business was strong" was based on a review of the analyst reports that Tatum provided. Id. at 186:4-12.

Finally, Biller testified about single-stock funds, not about non-employer

37

single stock funds or multiple single-stock funds, as existed here. Furthermore, none of the approximately ten 401(k) plans he advised at the time of trial offered an active non-employer single-stock fund as an investment option. Id. at 106:17-107:11. Biller himself had never recommended to his 401(k) plan clients that the plan should offer a non-employer single-stock fund as an active investment option in the plan. Id. at 107:12-16. Furthermore, Biller did not know of any 401(k) plans that offered non-employer single-stock funds as investment options. Id. at 109:16-110:2.

### 3. Value

Not only was it risky to have the Nabisco Funds, along with RJRTH, as options in the Plan, but holding those funds was not worth the risk because there was no reason in 1999 and 2000 to expect extraordinary returns from NGH and NA. 1/27/10 Tr. at 138:17-139:1 (McEnally) (Doc. # 385); 2/2/10 Tr. at 49:12-17 (Montgomery) (Doc. # 388). In other words, "the markets for NA and NGH were generally efficient . . . in 1999 and 2000, and in an efficient market, there is no ability for investors to predictably make extraordinary returns based on publicly available information." 2/2/10 Tr. at 62:10-14 (Montgomery) (Doc. # 388).

#### a. Market Efficiency

##### i. Efficient Market Hypothesis

"Markets are more or less efficient, but none are perfectly efficient." 1/15/10 Tr. at 69:3-4 (Biller) (Doc. # 378). The market's thousands, if not millions, of investors are looking for information to exploit for the highest possible

38

return for the lowest possible risk. 2/2/10 Tr. at 50:7-10 (Montgomery) (Doc. #

388).  If there were such information available, investors would bid up the price of

the security, increasing demand. Id. at 50:10-23.  Quickly, that information would

be reflected in the stock price, and there would no longer be any predictable

extraordinary returns by investing in that stock. Id. at 50:24-51:5; see also

1/27/10 Tr. at 159:6-160:7 (McEnally) (Doc. # 385).

More specifically, this idea that there are no extraordinary returns available

in the market is known as the efficient market hypothesis. 2/2/10 Tr. at 51:14-20

(Montgomery) (Doc. # 388); 1/27/10 Tr. at 159:8-20 (McEnally) (Doc. # 385);

1/15/10 Tr. at 69:7-9 (Biller) (Doc. # 378) (noting that equity investment

managers and stockbrokers accept the efficient market hypothesis "as a

reasonably good approximation [although not a perfect description] for [the] stock

market").  The weak form of the efficient market hypothesis proposes that there is

no reason to expect extraordinary returns based on the past performance of the

stock. 2/2/10 Tr. at 51:21-23 (Montgomery) (Doc. # 388).  The "very robust

phenomenon" that is the semi-strong form of the efficient market hypothesis

proposes that there is no reason to expect extraordinary returns based on any

publicly available information. Id. at 51:24-52:1; 1/27/10 Tr. at 159:25-160:2

(McEnally) (Doc. # 385).  Even the Barber Study, infra § I.B.3.b. at 48-49,

acknowledged that "none of [the authors' investment] strategies generate[d] an

abnormal net return that [was] reliably greater than zero.  This strongly suggests

that, although market inefficiencies exist, they are not easily exploitable by traders,

39

thereby allowing these inefficiencies to persist." 1/27/10 Tr. at 167:2-24

(McEnally) (Doc. # 385) (quoting DX—213 at 562); see also DX—213 at 562 n.

28 ("Others might state [the authors'] conclusion somewhat differently – that the

market is efficient, given that traders cannot profit from the publicly available

consensus recommendation.").

Within the context of the efficient market hypothesis, Montgomery tested

the efficiency of the markets for NGH and NA specifically and found them to be

generally efficient. See 2/2/10 Tr. at 52:13-53:10 (Montgomery) (Doc. # 388)

(referring to DX—60 and DX—240).  Montgomery ran six tests: (1) average

weekly trading volume for the stocks, (2) number of securities analysts covering

the stock, (3) eligibility to file S-3 Registration Statement with the SEC, (4) price

response to unexpected news, (5) overall market capitalization, and (6) size of the

bid-ask spread. Id. at 54:3-4, 54:22-23, 55:13-15, 55:20-21, 57:2-3, 57:24-25;

see also, e.g., DX—60, Exs. 6, 7. See, e.g., Unger v. Amedisys Inc., 401 F.3d

316, 323 (5th Cir. 2005) (citing Cammer v. Bloom, 711 F. Supp. 1264, 1285-87

(D.N.J. 1989) for first four tests and also including the company's market

capitalization and the bid-ask spread for the stock sales); Gariety v. Grant

Thornton, LLP, 368 F.3d 356, 368 (4th Cir. 2004) (citing Cammer and noting that,

when a court is determining whether a security trades on an efficient market, the

court should consider, among other things, whether the security is actively traded,

the volume of trades, and the extent to which market professionals follow it).

The more that a stock is traded on a weekly basis over a period of time, the

more investors are active in the market. 2/2/10 Tr. at 54:3-7 (Montgomery) (Doc. # 388).  Those traders will use publicly available information to make their decisions, and the prices will more quickly reflect any public information. Id. at 54:8-13.  The average weekly trading volume for NGH was about 2.1% of the outstanding shares and for NA was 3.24% of the outstanding shares. Id. at 54:14-16.  Both NGH's and NA's trading volume of 2% or more of the outstanding shares "justif[ies] a strong presumption that the market for the securit[ies] is an efficient one[.]" Cammer, 711 F. Supp. at 1286 (citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)); see also 2/2/10 Tr. at 54:16-21 (Montgomery) (Doc. # 388) (referring to the 2% level cited in Cammer).

The number of analysts covering a stock can also support a finding of an efficient market.  Eleven analysts were covering NGH and nineteen were covering NA, all of which were sell-side analysts working for brokerage firms and banks. 2/2/10 Tr. at 54:22-55:4 (Montgomery) (Doc. # 388) (determining the number of analysts by studying the I/B/E/S database analysts who were providing earnings statements and forecasts for NGH and NA); see also DX—60, Exs. 6, 7. Montgomery considered these numbers to reflect "a substantial amount of analysts" providing additional evidence of an efficient market for NGH and NA. 2/2/10 Tr. at 55:5-7 (Montgomery) (Doc. # 388).

Also relevant to an efficient market evaluation is a company's eligibility to file an S-3 Registration Statement with the SEC, which is an abbreviated statement permitted for more established companies. Id. at 55:13-17.  Both NGH and NA

were eligible to file S-3 Registration Statements, further supporting an efficient market. Id. at 55:17-19; see also DX—60, Ex. 6 (noting for NGH's analysis that RJR Nabisco filed form S-3 on June 30, 1995), Ex. 7 (noting for NA's analysis that Nabisco Holdings Corp. filed form S-3 on October 23, 1998).

Most directly relevant to an efficient market is a stock price's response to unexpected news. 2/2/10 Tr. at 55:20-22 (Montgomery) (Doc. # 388). Three "fairly standard" sources of information potentially relevant to investors include earnings announcements, dividend announcements, and acquisition announcements. Id. at 56:5-8; see also DX—60, Exs. 8, 9. Montgomery studied whether the abnormal returns of NGH and NA on days when there was such an announcement tended to be larger than abnormal returns on days without such an announcement. 2/2/10 Tr. at 56:8-12 (Montgomery) (Doc. # 388). He found that there were more days proportionately that showed large returns when there was such an announcement than on days when there was no such information released. Id. at 56:12-15; see also DX—60, Exs. 8, 9. This tendency of news to move the stock more than simply regular buying and selling was further support for the conclusion that both stocks had a fast response to unexpected news and traded in an efficient market. 2/2/10 Tr. at 56:15-21 (Montgomery) (Doc. # 388).

Large capitalization stocks can also evidence an efficient market. Market capitalization is the total value of outstanding shares of stock for a company. Id. at 57:7-8. NGH's market capitalization ranged from 2.7 to 7 billion shares from June 15, 1999 through January 31, 2000. 2/2/10 Tr. at 57:16-18 (Montgomery) (Doc.

42

# 388); see also DX—60, Ex. 6.  NA's market capitalization, looking only at 20%

of the stock that was traded in the market, was 1.5 to 2.3 billion shares. 2/2/10

Tr. at 57:20-22 (Montgomery) (Doc. # 388); see also DX—60, Ex. 7.  Both NGH

and NA were large capitalization stocks, and these results reflect an efficient

market. Id. at 57:15, 18-19, 22-23; see also 1/15/10 Tr. at 137:13-20 (Biller)

(Doc. # 378) (agreeing that the market for large capitalization stocks in the United

States is very efficient).

The bid-ask spread of NGH and NA, though, provided mixed results as to the

efficiency of the markets for those stocks. 2/2/10 Tr. at 57:24-25 (Montgomery)

(Doc. # 388); see also DX—60, Exs. 6, 7.  The size of the bid-ask spread is the

difference between the highest quote to buy the stock and the lowest quote to sell

the stock. 2/2/10 Tr. at 57:25-58:4 (Montgomery) (Doc. # 388).  The spread for

NGH and NA was "somewhat wider than the average or typical stock." Id. at 58:4-

5; see also DX—60, Ex. 6 (noting that the median for NGH was 31.25 cents and

1.69% of closing price compared to the 1996 NYSE median of 15.8 cents and the

2001 NASDAQ median of 0.83% of stock price), Ex. 7 (noting that the median for

NA was 37.5 cents and 0.91% of closing price compared to the 1996 NYSE

median of 15.8 cents and the 2001 NASDAQ median of 0.83% of stock price).

Nevertheless, while this test's results were mixed, both stocks traded on the New

York Stock Exchange, a very well established and generally efficient market

43

according to Montgomery.[19] 2/2/10 Tr. at 58:6-8 (Montgomery) (Doc. # 388); 1/15/10 Tr. at 137:8-9 (Biller) (Doc. # 378) (describing the New York Stock Exchange as very efficient).

As a result of Montgomery's six tests on market efficiency, he concluded, as does this Court, that the market for NGH and NA was "generally efficient." 2/2/10 Tr. at 80:7-8 (Montgomery) (Doc. # 388). Lys, however, believed that research documents inconsistencies with the semi-strong form of the efficient market hypothesis because there are "systematic pockets where the market seems to systematically misprice publicly available information." 1/21/10 Tr. at 81:13-15, 82:19-23 (Lys) (Doc. # 381). First, he described the post-earnings announcement drift whereby the effects of an earnings announcement continue to occur for the three quarters following the announcement. Id. at 82:25-83:21. Next, Lys described the accrual anomaly. Id. at 84:16. The stock prices of companies that announce larger than expected accruals[20] subsequently drift down, and the stock

---

[19] Courts have found the New York Stock Exchange is likely an efficient market. See, e.g., Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp., 762 F.3d 1248, 1258 (11th Cir. 2014) (noting that "millions of shares of . . . stock are traded on the New York Stock Exchange daily, a high trading volume that strongly suggests an efficient market"); In re: PHP Healthcare Corp., 128 F. App'x 839, 848 (3d Cir. Mar. 3, 2005) (describing the New York Stock Exchange as "one of the most efficient capital markets in the world"). But cf. In re Enron Corp. Sec., 529 F. Supp. 2d 644 (S.D. Tex. 2006) (noting that "the location of where a stock trades might be relevant, [but] it is not dispositive of whether the current price reflects all available information, . . . the hallmark of an efficient capital market").
[20] Lys explained that a company's earnings are composed of cash and accruals, such as receivables. Id. at 84:19-20.

prices of companies that announce smaller than expected accruals subsequently drift up. Id. at 84:24-85:4. Lys considered the stock prices' move in a predictable direction like this "inconsistent with" the semi-strong form of the efficient market hypothesis. Id. at 85:5-6. Finally, Lys also testified that analyst trade recommendations are not priced efficiently. Id. at 85:12-14. Although stock prices rise when an analyst rates a company higher, the stock prices continue to rise. Id. at 85:15-17. Likewise, when an analyst downgrades a stock, the prices fall initially, but they continue to fall. Id. at 85:17-19. According to Lys, this is "the problem." Id. at 85:19-20. But see § I.B.3.b. (discussing the Barber Study).

However, while Montgomery acknowledged that there is extensive literature on post-earnings announcement drift, he noted post-earnings announcement drift was not at issue in this case, where the focus is the removal of NA and NGH. 2/2/10 Tr. at 80:10-81:4 (Montgomery) (Doc. # 388). Montgomery also testified that the accrual anomaly was not relevant, as there was no assertion related to the level of accruals in NGH's or NA's financial statements. Id. at 81:4-8. It is determined that neither post-earnings announcement drift nor accrual anomaly were relevant to the question facing a prudent fiduciary here.

### ii. Econometric Tests of Behavior

In addition to studying the Cammer and Unger factors, Montgomery performed three econometric tests of the behavior of NGH's and NA's stock prices, the results of which also supported an efficient market. Id. at 59:4-8; see also DX—60, Ex. 10. First, Montgomery performed a serial correlation test that

45

examined the extent to which a stock's return on a particular day is a statistically significant predictor of the next day's return. 2/2/10 Tr. at 60:1-6 (Montgomery) (Doc. # 388); see also DX—60, Ex. 10 n. 1. A positive serial correlation would suggest that a positive abnormal or excess return would be followed by another positive abnormal or excess return. 2/2/10 Tr. at 60:7-9 (Montgomery) (Doc. # 388). On the other hand, a negative serial correlation would suggest that a positive return would be followed by a negative return, reflecting that the market is not efficient. Id. at 60:10-14. The results of the serial correlation test for NGH and NA "fail to reject the hypothesis that there is no serial correlation," supporting the efficiency of NGH and NA. Id. at 60:15-19; see also DX—60, Ex. 10.

Next, Montgomery tested the tendency of NGH and NA to overreact to news, based on a selection of days in which either NGH or NA had a statistically significant return.[21] 2/2/10 Tr. at 60:20-25 (Montgomery) (Doc. # 388). He studied whether days with a statistically significant return are generally followed by other statistically significant returns more than would be expected by looking at a random selection of days. Id. at 60:25-61:7; DX—60, Ex. 10 n. 2. There was no tendency of NGH or NA stocks to overreact or underreact to news, which supports the conclusion that their markets are efficient. 2/2/10 Tr. at 61:7-10 (Montgomery) (Doc. # 388.)

Finally, Montgomery used the Lo-MacKinlay test to examine whether stock

---

[21] Montgomery testified that "the 5% level . . . is a standard measure of statistical significance." Id. at 60:23-25.

prices follow the random-walk hypothesis. DX—60, Ex. 10 n. 3. The random-walk hypothesis proposes that a stock's returns should follow a random pattern whereby the stock price change on Day 1 should not help investors determine the direction of stock price movement on Day 2. DX—60; see also 2/2/10 Tr. at 61:11-13 (Montgomery) (Doc. # 388). If the market follows a "random walk" whereby stock returns are unpredictable day-to-day, then the market is efficient. 2/2/10 Tr. at 61:13-20 (Montgomery) (Doc. # 388). The variability of a stock's return is supposed to be exactly proportional to the length of time over which the return is calculated such that a two-day return would have twice the variability of a one day return and so on. Id. at 61:20-25. The results of this test also support "a finding of efficiency for NGH and NA." Id. at 62:2-3; see also DX—60, Ex. 10.

Together, the results of Montgomery's efficient market hypothesis tests and econometric tests of behavior support his conclusion that the markets for NGH and NA were "generally efficient" in 1999 and 2000. 2/2/10 Tr. at 62:9-11 (Montgomery) (Doc. # 388). As a result, there was "no ability for investors to predictably make extraordinary returns based on publicly available information." Id. at 62:11-14. See also Fifth Third Bancorp, 134 S. Ct. at 2471 ("[W]here a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that a market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances.").

47

### b. Analyst Reports

Although Biller testified that analyst reports are among the informational sources a prudent fiduciary would review, the persuasive evidence does not suggest analyst recommendations provided meaningful investment direction. Several experts discussed a study that examined whether investors could profit from the publicly available recommendations of securities analysts. See DX—213 (Brad Barber, Reuven Lehavy, Maureen McNichols, Brett Trueman, Can Investors Profit from the Prophets?  Security Analyst Recommendations and Stock Returns, 56 J. of Fin. 531, 531-64 (2001) ("Barber Study")).  The Barber Study notes that, for its sample period of 1985 to 1996, buying the stocks with the most favorable consensus recommendations earned an annualized geometric mean return of 18.8% compared to a 5.78% return when buying the least favorable consensus recommendations. Id. at 533.  After controlling for certain variables, the Barber Study found that "a portfolio comprised of the most highly recommended stocks provides an average annual abnormal gross return of 4.13%" compared to an abnormal gross return of -4.91% for "a portfolio of the least favorably recommended" stocks. Id.

However, even the Barber Study itself put into question its applicability to NGH and NA when it noted that its results were "most pronounced for small firms; among the few hundred larger firms we find no reliable differences between the returns of those most highly rated and those least favorably recommended." Id. at 534; see also 2/2/10 Tr. at 82:7-14 (Montgomery) (Doc. # 388).  NGH and NA are

48

among the top several hundred companies in market capitalization, and, therefore, the study's applicability to NGH and NA is questionable. 2/2/10 Tr. at 82:15-18 (Montgomery) (Doc. # 388). Also, the category of stocks with the highest analyst ratings had "substantially better" average ratings than NGH and NA during 1999 and 2000. Id. at 82:19-23.

Specific to NGH and NA, McEnally testified that analyst ratings and change in analyst ratings for NGH and NA did not provide any meaningful basis for investment decisions from June 1999 to January 31, 2000. 1/27/10 Tr. at 138:4-16 (McEnally) (Doc. # 385). He found that analyst ratings for NGH and NA "were not materially different" than those for other typical stocks trading at the time. Id. at 138:10-13. Had the ratings for NGH and NA been materially different, "it would have been essentially irrelevant to a reasonable investment decision." Id. at 138:14-16.

During the period in question, approximately 68% to 70% of the stocks trading at the time had buy recommendations, 30% had hold recommendations, and only approximately 2% had sell recommendations. Id. at 139:12-140:23; see also id. at 151:6-18. According to survey data from buy-side investment professionals during the time in question, 79% of them said they considered a hold recommendation as a sell recommendation. Id. at 140:24-141:4.

Lys studied the analysts' recommendations for NA from January 1999 to January 2000. See, e.g., DX—339 (using data from Thompson First Call). In January 1999, a little less than 10% of analysts recommended selling the stock,

49

approximately 40% recommended buying the stock, and approximately 50% recommended holding the stock. 1/21/10 Tr. at 51:14-20 (Lys) (Doc. # 381). After June 1999, the sell recommendations disappeared, hold recommendations fell, and buy recommendations increased. Id. at 51:21-24. By January 2000, approximately 80% of the analysts rated it a buy or strong buy, and approximately 22% recommended holding it. Id. at 51:24-52:3.

Lys performed the same study for NGH, as of June 1999 at which time it was created. See DX—340 (using data from Thompson First Call). As of June 1999, approximately 10% of analysts recommended selling NGH, approximately 30% recommended holding it, and approximately 60% recommended buying it. 1/21/10 Tr. at 52:24-53:6 (Lys) (Doc. # 381). By the end of July or August, no analysts recommended selling NGH, approximately 22% of analysts recommended holding, and an increasing number of analysts recommended buying it. Id. at 53:7-12.

As for NGH and NA, the number of buy recommendations was not statistically different than the proportion of buy recommendations for the typical stock. 1/27/10 Tr. at 154:9-13 (McEnally) (Doc. # 385). Even the change in the buy recommendations for NGH and NA during the period of time in question was not statistically meaningful. Id. at 155:20-158:4 (finding buy recommendations for NGH and NA increased from 71.4% to 82.4%, but noting that Fisher's Exact Test says that 11% change is not statistically meaningful). Even Lys acknowledged analyst bias, stating that "it is just a fact" that "the average company would have

50

a large number of buys[.]" 1/21/10 Tr. at 72:16-23 (Doc. # 381). However, Lys believed that research takes analyst bias into account, and he considered himself to have accounted for analyst bias when he analyzed the trend in analyst recommendations for NGH and NA. Id. at 72:24-73:15. Nevertheless, he described following analyst reports as "the fall-back position" if a prudent investor did not conduct his own analysis and did not seek the analysis of an investment advisor. Id. at 74:4-16 (noting that if an investor did his own analysis or had the analysis of an investment advisor, the investor "might want to not follow analysts").

Furthermore, in a 2003 study, Boni and Womack analyzed the value to retail investors of consensus level analyst recommendations and the value to institutional investors of the changes in direction of analyst recommendations. Leslie Boni & Kent L. Womack, Wall Street Research: Will New Rules Change Its Usefulness?, 59 Fin. Analysts J. 25, 26 (2003) (PX—366) cited in DX—57; see also Tr. 1/28/10 at 6:11-7:16, 13:1-6 (McEnally) (Doc. # 386). The study found that if retail investors had followed a strategy of buying an equally weighted portfolio of all stocks with a consensus level of buy or better, they would have had a higher annualized return than investing in an S&P 500 Index fund from the second quarter of 2000 to the second quarter of 2001. PX—366 at 27; Tr. 1/28/10 at 13:8-16, 14:9-13 (McEnally) (Doc. # 386). But, the study found that the consensus level strategy underperformed the Index from 1996 through the first quarter of 2000, which includes the period of time at issue here. PX—366 at 27; Tr. 1/28/10 at

51

14:9-11 (McEnally) (Doc. # 386).

Boni and Womack next analyzed the value of analyst recommendations to institutional investors by calculating "the one month holding period returns from a self-financing strategy of buying all 'net upgraded stocks' and selling short all 'net downgraded stocks' (a 'net-net strategy')." PX—366 at 27; Tr. 1/28/10 at 14:16-22 (McEnally) (Doc. # 386). A net-upgraded stock was one that received more upgrades than downgrades, and a net-downgraded stock was one that received more downgrades than upgrades, from all analysts in the previous calendar month. PX—366 at 27; Tr. 1/28/10 at 14:22-25 (McEnally) (Doc. # 386). Although this net-net strategy outperformed the S&P 500 Index fund for the period after the market highs, it did worse than the consensus level strategy from 1996 to the first quarter of 2000. PX—366 at 27; Tr. 1/28/10 at 15:3-23 (McEnally) (Doc. # 386). As noted above, the consensus level strategy, in turn, did worse than the S&P 500 Index fund during the same time period. In other words, research at the time in question would have shown that following analysts' ratings from 1996 through the fourth quarter of 1999 would not have led to greater returns than following the S&P 500 Index during the same time period.

Even if analyst ratings or recommendations were meaningful, they would have been essentially irrelevant to a reasonable investment decision because of the efficient market hypothesis. 1/27/10 Tr. at 138:14-16 (McEnally) (Doc. # 385). While under ideal conditions analyst recommendations have "value relevance," in a "real world investment environment," they are not useful to the retail investor. Id.

52

at 168:8-21.

### c. Unforeseeable Appreciation

Furthermore, the appreciation of the stock prices of NGH and NA after March 2000 was not foreseeable. 2/2/10 Tr. at 123:11-15 (Montgomery) (Doc. # 388). Nabisco could not approach a buyer for two years after the spin-off because of the tax consequences for doing so. Neither analyst reports nor newspapers indicated that Icahn's bid for NGH was anticipated. Id. at 123:20-124:2; 1/27/10 Tr. at 173:22-174:6 (McEnally) (Doc. # 385). Even after the Wall Street Journal reported that Icahn had purchased six million shares of NGH, there was no price reaction in NGH stock and there was no mention in analyst reports or news articles prior to March 30, 2000 of a possible offer for NGH by Icahn. 2/2/10 Tr. at 127:24-129:1 (Montgomery) (Doc. # 388); 1/27/10 Tr. at 174:7-13 (McEnally) (Doc. # 385) (explaining that Icahn's takeover bid was "something of a surprise" because "had it been obvious that this was going to happen" or even "high[ly] probab[le]," there "should have [been] movement upward in the price of the stock, either on the basis of the general speculation or that Wall Street Journal article, and we did not see it").

In addition, although using information a prudent fiduciary would not have had at the time, Montgomery found no tendency of the NGH and NA stock prices to rebound like they did. 2/2/10 Tr. at 114:3-14 (Montgomery) (Doc. # 388) (referring to DX—60, Ex. 14 & DX—243). To determine the tendency, if any, of stocks that have fallen by a significant amount to recover, Montgomery studied the

53

stocks of the members of the S&P 500 Index from 1999 to 2004, looked at the stock price returns, identified each time a stock declined by either 60% or 29% (NGH's and NA's stock price decline, respectively, see infra), and determined the returns for the subsequent year (250 trading days after that decline). Id. at 115:8-117:25; DX—243.

NGH's stock price fell 60% from June 14, 1999 to January 31, 2000. 2/2/10 Tr. at 115:15-17 (Montgomery) (Doc. # 388). To recover fully from a 60% drop in stock price, a stock must subsequently increase 150%. Id. at 116:19-21. NGH's stock price rose 247% from January 31, 2000 to December 11, 2000. Id. at 116:24-117:2. NA's stock price fell 29% from June 14, 1999 to January 31, 2000. Id. at 117:10-11. To recover fully from a 29% drop in stock price, a stock must subsequently increase by 41%. Id. at 117:19-21. NA's stock price increased 82% from January 31, 2000 to December 11, 2000. Id. at 117:24-25.

There were 326 total episodes where a stock price dropped by at least 60%, as did NGH during the period noted. Id. at 115:22-116:4. Of those 326 episodes, 306 of them were not followed by an increase of 150% or more in order to recover fully from the loss. Id. at 116:21-22; DX—243. Only fourteen were followed by an increase of between 150% and 247%, and only six were followed by an increase of at least 247%. 2/2/10 Tr. at 116:23-117:5 (Montgomery) (Doc. # 388); see also 116:3-22 (describing in more detail the break-down of stock recovery in the year subsequent to sustaining at least a 60% stock price decline) & DX—243.

54

There were 1,693 total episodes of a stock price falling 29% or more, as did NA during the period noted. Id. at 117:9-13. Of the 1,693 episodes, 1,335 of those were not followed by an increase of at least 41% in order to recover fully. Id. at 117:21-23; DX—243. Only 248 of those were followed by an increase of 41% up to 82%, meaning that out of 1,693 episodes, 1,583 were followed by a return less than NA's. 2/2/10 Tr. at 117:23-118:4 (Montgomery) (Doc. # 388); DX—243. Only 110 were followed by an increase of at least 82%. 2/2/10 Tr. at 117:21-24 (Montgomery) (Doc. # 388); see also 117:14-21 (describing in more detail the break-down of stock recovery in the year subsequent to sustaining at least a 29% stock price decline) & DX—243.

As a result of his study, Montgomery opined that "there is no reason" based on the fact that a stock's price declines significantly "to expect that its return would be anything out of the ordinary in a subsequent period." 2/2/10 Tr. at 118:5-16 (Montgomery) (Doc. # 388).

### d. Biller and Value

As explained supra § I.B.2.d. at 36, Biller testified that a prudent fiduciary would not have decided to eliminate the Nabisco Stocks in the Plan. 1/15/10 Tr. at 58:6-10 (Biller) (Doc. # 378). He believed that publicly available information from June 1999 to January 2000 indicated that NGH and NA "presented an opportunity for gain at above market levels[.]" Id. at 71:22-72:1.

However, as before, although Biller is qualified to offer his opinion on this topic, his opinions as to the opportunity for exceptional returns for NGH and NA

55

stocks are not as persuasive as the opinions of others. He never analyzed whether the analyst ratings for NGH and NA were "more or less positive than the average rating of all stocks available on the New York Stock Exchange[.]" Id. at 128:16-25; see also id. at 127:16-130:1, 134:4-12. He did acknowledge that he believed sell recommendations in analyst reports in 1999 and early 2000 were extremely rare and that the "general agreement" during that time was that "anything less than a buy was certainly not a stark endorsement of the stock." Id. at 126:25-127:15.

Biller never analyzed whether the markets for NGH and NA were efficient. Id. at 138:5-13. He did not conduct a study to determine and, therefore, could not say whether it would have been possible to achieve "admirable returns on a risk-adjusted basis by investing in NGH or NA between June 14, 1999 and January 31, 2000[.]" Id. at 138:14-25. He acknowledged that, while not impossible, it would be difficult for investors to earn abnormal returns on a risk-adjusted basis using publicly available information or exceed the performance of the stock market as a whole over the long term. Id. at 139:16-25; see also id. at 140:1-8 (testifying that between 50-75% of active mutual fund managers fail to beat the market indexes over a ten-year period).

### 4. Timing

A prudent fiduciary in the fall of 1999, according to Crane, would have reaffirmed the divestment decision. At that time, risk had increased because of the Engle decision and "there was no clear indication that there was a change and expected return[,]" suggesting to the fiduciary that his "original basis was sound."

56

1/29/10 at 15:21-18:4 (Crane) (Doc. # 387).  Although Lys disagreed and believed

that "the reason to sell the Nabisco stocks became less and less and less,"

1/21/10 Tr. at 49:21-22 (Lys) (Doc. # 381), as is evident from the discussion

above about risk and value, Crane's opinion is more persuasive.

Experts for both sides, Biller and Crane, agreed that once the decision to

divest was made, "a period long enough to give notice to all plan participants, long

enough to coordinate all the activity of the service providers to accomplish an

orderly fashion, and then to do things with a competent plan as of a date certain

. . . would be less than a year." 1/28/10 Tr. at 128:5-17 (Crane) (Doc. # 386); see

also 1/15/10 Tr. at 40:10-41:1 (Biller) (Doc. # 387) (explaining that, once a

decision is made to eliminate an investment option in the future, a minimum of six

months is needed to allow participants the opportunity to reallocate their

investments).

## II. CONCLUSIONS OF LAW

Affirming this Court's finding that, because of the lack of procedural

prudence, RJR bore the burden of proof as to causation, but disagreeing with the

legal standard applied by this Court,[22] the Fourth Circuit observed, "To carry its

burden [of substantive prudence], RJR had to prove that despite its imprudent

---

[22] This Court found that RJR satisfied its burden of establishing that "a
hypothetical prudent fiduciary could have decided to eliminate the Nabisco Funds
on January 31, 2000." Tatum, 926 F. Supp. 2d at 690; see also id. at 683, 683
n. 27 (noting that "depending on the specific circumstances, . . . there might be
more than one reasonable decision available to a fiduciary[]" and citing the
testimony of Plaintiff's experts Biller and Lys).

decision-making process, its ultimate investment decision was 'objectively prudent.'" Tatum, 761 F.3d at 363. "[A] decision is 'objectively prudent' if 'a hypothetical prudent fiduciary would have made the same decision anyway.'" Id. (quoting Plasterers', 663 F.3d at 218).

> Under this standard, a plaintiff who has proved the defendant-fiduciary's procedural imprudence and a prima facie loss prevails unless the defendant-fiduciary can show, by a preponderance of the evidence, that a prudent fiduciary would have made the same decision. Put another way, a plan fiduciary carries its burden by demonstrating that it would have reached the same decision had it undertaken a proper investigation.

Id. at 364.

As explained below, it is more likely true than not that had a prudent fiduciary reviewed the information available to it at the time, including Plan documents, public disclosures, analysts' reports and associated research as to their significance, and newspaper articles, it would have decided to divest the Nabisco Funds at the time and in the manner as did RJR.

### A. Requirements of Plan Documents

In its opinion, the Fourth Circuit observed that "the governing Plan document required the Nabisco Funds to remain as frozen funds in the Plan." Tatum, 761 F.3d at 367. Because "ERISA mandates that fiduciaries act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]'," the Fourth Circuit found that it was error for this Court not to "factor into its causation analysis RJR's lack of compliance with the governing Plan document." Id. at 367-68 (quoting 29 U.S.C.

58

§ 1104(a)(1)(D)); see id. at 367 (noting that "courts have found a breaching fiduciary's failure to follow plan documents to be highly relevant in assessing loss causation" and citing Allison v. Bank One-Denver, 289 F.3d 1223, 1239 (10th Cir. 2002) & Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1241 (2d Cir. 1989)). In other words, the "plan terms, and the fiduciary's lack of compliance with those terms, inform a court's inquiry as to how a prudent fiduciary would act under the circumstances." Id. at 367 n.16.

During trial, counsel and the Court became aware simultaneously the record contained no minutes of a meeting nor a consent in lieu of meeting to effect the November Amendment. Until that point, each party and the Court had proceeded without questioning the validity of the November Amendment. Plan participants had been given notice in four mailings of the elimination of the frozen funds and of that timing. PX—10 at RJR000257-59; PX—135; PX—12; PX—14. The frozen funds were eliminated according to the notice. There is no issue of Plan participants being unaware of the action anticipated nor of committee members intentionally trying to act in disregard of the Plan documents.

Nor is there an issue whether any of the committee members would have hesitated to sign the consent had it been properly circulated. Robert Gordon, who was a member of the EBC and PIC post-spin off, signed the June Amendment Consent in Lieu of Meeting in which the Nabisco Funds were frozen. PX—17 at RJR000072. In July 1999, Gordon as Chairman, Johnston, Folan (the author of the November Amendment), and Lapiejko were appointed as the members of the

59

RJR EBC, the committee with the authority to amend the Plan. DX—27 at RJR014134-35. They remained the only members of the EBC throughout the period in question. See, e.g., PX—16 (reflecting appointment of new member to EBC in April 2002, but no other new members were appointed between July 1999 and April 2002); PX—57 (meeting minutes from September 2001 EBC meeting noting Gordon, Johnston, Folan, and Lapiejko as members). They were four of the six members of the PIC throughout the operative period. See PX—4 (board resolution of July 1999); PX—25 (meeting minutes July 1999); PX-29 (meeting minutes October 1999); PX—37 (meeting minutes December 1999).

As discussed earlier, Gordon and Johnston had been in accord from the earliest pre-spin discussions about freezing then, after a reasonable time, divesting the Nabisco stocks. Both were also present during the October 8, 1999 meeting when the question of divestiture was revisited. 1/20/10 Tr. at 70:12-23 (Beasley) (Doc. # 380). Lapiejko testified he had believed from the first discussion that Nabisco stocks should be removed from the post-spin Plan. 1/26/10 Tr. at 196:10-197:7 (Lapiejko) (Doc. # 384). And, Folan was the one who drafted the "November Amendment." PX–34 at RJR001260–63.

Once the November Amendment document had been placed in the record, it is unlikely that a fiduciary would later find the need to look for minutes of a meeting or a consent in lieu of meeting formally adopting it. In this case, two parties, a number of lawyers, and two courts had focused on the Plan and its terms and provisions for years without ever perceiving the need to do so until well

60

into a multi-week trial.

Failure to obtain consent in lieu of meeting does not affect determination of the substantive issues addressed by a prudent fiduciary: whether, after properly considering (1) information relating to the risk of holding the Nabisco stocks measured against the likelihood of abnormal returns, (2) purposes of the Plan, and (3) any other factors bearing upon benefit or detriment to Plan participants, the Nabisco Funds should be retained or divested.

### B. Risk Unmatched by Return

The Fourth Circuit explained that, while "risk is a relevant consideration in evaluating a divestment decision," objective prudence cannot rest on risk alone. Tatum, 761 F.2d at 366. Quoting the Department of Labor's Rules and Regulations for Fiduciary Responsibility, the Fourth Circuit stated that

> an investment reasonably designed – as part of a portfolio – to further the purposes of the plan, and that is made upon appropriate consideration of the surrounding facts and circumstances, should not be deemed to be imprudent merely because the investment, standing alone, would have, for example, a relatively high degree of risk.

Id. at 367 (quoting 44 Fed. Reg. 37,221, 37,224).

A prudent fiduciary should balance the risk with the "return characteristics of the investment option and how they fit within the context of the plan as it was envisioned by the plan designer." 1/29/10 Tr. at 7:19-8:9 (Crane) (Doc. # 387). Here, the context includes, among other things, the Plan's purpose to help participants meet long-term savings goals (PX—155 at RJR000030), as well as consideration of the disposition effect according to which "investors are irrationally

61

reluctant to sell investments that have fallen in price" and for which "there is strong evidence" among individual investors in the American Stock Market (1/15/10 Tr. at 145:21-146:6 (Biller) (Doc. # 378)), and the findings that, as a general matter, the vast majority of 401(k) participants make few or no changes to their investments (id. at 141:23-144:10).

The spin-off created two different stocks – NGH and RJRTH – from the former RJR Nabisco Holdings stock. An RJR employee participating in the Plan who had previously been employed by RJR Nabisco, Inc. could have investments in two or three single-stock funds: RJRTH, along with non-employer NGH or NA or both. ERISA requires that a fiduciary act solely in the interest of the Plan participants and beneficiaries "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). Here, a prudent fiduciary at the time would have known that the Plan included three single-stock funds, each of which is approximately four times as risky as a diversified portfolio of mutual funds, two of which were non-employer single-stock funds. See supra at 3. In addition to those risks, a prudent fiduciary would have taken into account the litigation risk that was considerable and the consequent bankruptcy risk that was noteworthy. See supra at 31-33. A prudent fiduciary would also have known that NGH's returns were very highly correlated with the RJR Tobacco Common Stock returns. See supra 34. During 1999, a fiduciary monitoring the Nabisco Funds would have seen that Nabisco stock was losing value and that RJR was continuing

62

to experience adverse rulings and verdicts related to the tobacco litigation. The fact that NGH had indemnification agreements with RJR was not mitigating the situation either, particularly in light of the Engle litigation and the potential for large tobacco verdicts that could jeopardize RJR's ability to post an appeal bond, pay a large verdict, or protect NGH.

Because NGH and NA traded on the New York Stock Exchange, a generally efficient market, see supra at 38-47, research at the time would have revealed that there was no reason to expect extraordinary returns based upon analyst recommendations. Optimism bias of the period was reflected in 68-70% of all analyst recommendations being a "buy" on whatever stock was being discussed. The questionable value of recommendations to highly capitalized stocks like NGH and NA trading on a generally efficient market also undermined the value of such recommendations. See supra 48-51. In addition, according to the study by Boni and Womack, an institutional investor using a net-net strategy based upon analyst recommendations would not have beaten the S&P 500 Index during the period of time in question here. See supra at 51-52.

C. Timing

Closely related to risk and value is the timing of the divestment. The prudence of the timing of the divestment decision involves analysis of (1) whether a fiduciary who properly investigated the prudence of divesting the Nabisco Funds would have made the decision that the Nabisco Funds be removed from the Plan approximately six months after the spin-off and (2) whether a fiduciary, having

63

chosen to divest the Nabisco Funds in six months, under the duty to continually monitor the prudence of the divestment decision, would have decided to go forward with the divestment as planned in light of any changes to be considered. In Tatum, the timeline for divestment was described as "arbitrary" because it was "chosen arbitrarily and with no research other than asking those at the meeting their own experience with single stock funds." 926 F. Supp. 2d at 679. Nevertheless, once the decision was made to divest the stock, six months was a period long enough to give notice to all plan participants and coordinate the process of divestment. See supra at 56-57.

Moreover, while "six months" was referenced by the committees, participants were first notified in April 1999 and divestment occurred in January 2000, approximately nine months later. Thus, RJR's six month time frame and the rationale for it – to give employees notice and allow them to reallocate their funds, while arrived at without investigation or research, was indeed within a reasonable time frame. By the fall of 1999, the risk of holding those Funds had increased because of the Engle decision. See supra 15-17, 32. The NGH and NA Common Stock Funds had declined by 49.4% and 26.5%, respectively, in the third and fourth quarters of 1999. See supra 24.

In sum, Defendants have proven by a preponderance of the evidence that a prudent fiduciary would have decided to divest the Nabisco Funds and held to the determination that divestiture was a benefit to Plan participants and retained the same time line for divestment.

Judgment shall be entered accordingly.

This the 18th day of February, 2016.


                                          /s/ N. Carlton Tilley, Jr.
                                     Senior United States District Judge